# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THERESA VICTORY** | **: CIVIL ACTION** |
| | : |
| **v.** | **: NO. 18-5170** |
| | : |
| **BERKS COUNTY, et al.** | : |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**KEARNEY, J.**                                                                             **January 15, 2019**

Berks County thoughtfully classifies newly admitted inmates in its jail system after careful study from a variety of experts using complicated analysis tools in reviewing each newly admitted inmate consistent with the sentencing state court judge's recommendations. It does not distinguish between male and female inmates in carefully setting custody classifications from highest to lowest risk. It focuses on risk posed by the newly admitted inmate and the inmate's need for rehabilitation. Just as it classifies certain newly admitted inmates as high or medium risk, Berks County properly finds a limited number of male and female inmates can be classified in the "Trusty" class—the lowest level of security risk. Trusty inmates typically spend approximately fifty-seven days in custody and may leave the jail system if their sentencing judge finds work release for the Trusty inmate fulfills the Commonwealth's sentencing goals. Male and female Trusty inmates are examined and classified in the same manner.

But, after carefully setting this custody classification for all newly admitted inmates, Berks County then houses the Trusty inmates in substantially different facilities depending on their gender: all male Trusty inmates live in a separate "Community Reentry Center" with, among other benefits, dorm-style unlocked cells attached to community day rooms, thirteen hours of daily recreation time, unlimited access to toilets/showers, meals served in a community

day room, less risk of lockdown, and several programs designed to enhance their re-entry into the community as Berks County proudly touts on its website. Sounds like Berks County pursues an innovative and thoughtful approach to re-entry. Unless you are a female Trusty inmate.

By comparison, Theresa Victory, a female Trusty inmate since January 2018, is housed in the F Block of the neighboring but much larger Berks County Jail with locked cells, no more than six hours of daily recreation, limited access to toilets/showers, meals served in her cell, more lockdowns, and fewer programs fostering re-entry into the community. Her sentencing judge found she warranted work release and she has been a diligent worker at a local diner. But other than being transported to the diner and back, Berks County does not allow her out of locked cell for more than six hours a day—assuming no lockdowns on a certain day attendant to a much larger jail. Substantially different treatment.

Asked to explain its reasons for this substantially different treatment when sued by Ms. Victory for depriving her of equal protection under the Law, Berks County speculates it cannot allocate two its thirty-one female correctional officers to supervise Ms. Victory at the Community Reentry Center and the unknown speculative costs of modifications to either the jail or Community Reentry Center outweigh her rights. Relying on these staffing and costs concerns, it speculates as to a safety alarm. We find Berks County does not adequately justify its reasons for this substantially different treatment of lowest risk Trusty inmates working in our community on work release based on their chromosomes. After too long, Berks County must act now to mitigate further harm to Ms. Victory and ensure her equal protection under the Law, without retaliating against her (or other male and female inmates) because Berks County now needs to treat men and women Trusty inmates in the same manner.

2

Following briefing, oral argument and evaluating the credibility of several witnesses and dozens of admitted exhibits at our January 10, 2019 evidentiary hearing, we find facts and enter conclusions of law supporting our accompanying Order granting Ms. Victory's Motion for a preliminary injunction:

## I. Findings of Fact

1.      For at least two years before January 2018, forty-eight-year-old Theresa Victory worked as a waitress and hostess at the Route 61 Diner in Berks County while residing with a significant other in a local apartment.      She admittedly struggled with attention deficits compounded with alcohol dependency resulting in, among other things, two arrests for driving under the influence.

2.      On an unknown date, the Commonwealth arrested Ms. Victory for her third driving under the influence offense.

3.      On January 24, 2018, following a negotiated plea agreement, a Berks County judge sentenced Theresa Victory to a sentence of not less than one year nor more than five years to be served in the Berks County Jail arising from her third driving under the influence conviction within ten years, beginning January 28, 2018.[1]

4.      The judge required Ms. Victory participate in drug and alcohol and mental health programs and found Ms. Victory immediately eligible for Work Release.[2]  The judge did not allow furloughs. Ms. Victory never asked the judge to modify the sentence to allow furloughs.

5.      Upon entry into a sentence, Ms. Victory learned the Berks County Jail System defines five levels of custody depending on the security risk posed by the newly admitted inmate: Administrative segregation, Maximum, Medium, Minimum, and Trusty.

3

6. Berks County Warden Janine L. Quigley, as appointed by and responsible to the Berks County Prison Board and the Berks County Commissioners, is responsible for this custody classification system. She delegates this classification system to the Institutional Classification Committee consisting of five persons experienced in evaluating the treatment and clinical needs of the newly admitted inmate, including a logistical person familiar with the number of available beds and programs at the neighboring Community Reentry Center ("CRC").

7. Within three days of beginning her sentence, the Institutional Classification Committee approved Ms. Victory for "Trusty" classification—the lowest level of security for inmates.[3] The Committee found Ms. Victory had a low risk of recidivism.

8. The average incarceration of an inmate with Trusty classification—regardless of woman or man—is approximately fifty-six or fifty-seven days.

9. An inmate with a Trusty classification is eligible for Work Release, consistent with the state judge's sentence.[4]

10. Berks County provides four general categories of inmate housing: classification/quarantine; general population; restricted housing (administrative or disciplinary segregation); or reentry (including Trusty or work release).[5]

11. Berks County describes the reentry housing as "assigned to those who meet a number of criteria [where] you may be housed outside the secure perimeter of the jail [and] afforded, to a degree, more freedom and less direct supervision by staff."[6] Berks County represents to Ms. Victory and others in reentry housing: "[y]ou will be accountable for your behavior and responsible to prepare yourself to return to the community."[7]

4

12. Berks County sets different dress codes for each housing, with a greater number of clothes issued to Trusty classification inmates who are not housed in general population but instead housed in the neighboring CRC.[8]

13. Upon her arrival and after a short quarantine period, Berks County housed Ms. Victory in an overflow unit of the Jail housing over forty female prisoners in dormitory housing with several women in bunk beds and no cell walls or bars.

14. On February 14, 2018, in stated reliance upon Warden Quigley's and Deputy Warden Stephanie E. Smith's recommendation, a Berks County judge permitted Ms. Victory to leave the Jail to return to work again until discharged from her sentence or re-classified to a non-Trusty status.[9]

15. Ms. Victory returned to work as a waitress/hostess including at the Route 61 Diner working an eight-hour shift, five days a week, often returning later in the evening. She continues to work there.

16. In April 2018, Ms. Victory complained about her safety in the Jail when she returned from Work Release at approximately 10:25 P.M. when unsupervised male inmates were waiting in the lobby with her to enter the Jail. Berks County officers responded she faced no safety risk as cameras are monitoring the Jail lobby.[10]

17. After Berks County denied her requests for furlough not permitted by the judge's sentence, Ms. Victory inquired in July 2018 as to programs available to other inmates classified as "Trusty" and housed in a nearby facility known as the "CRC." Ms. Victory sought to participate in job reentry and training programs which she understood were available to those with Trusty classification at CRC but not available to her in the Jail.[11]

5

18.     After she filed grievances, Berks County moved Ms. Victory and other female prisoners with Trusty classification and/or work release status from the dormitory-style overflow housing unit to F Block in General Population in the Jail.

19.     By mid-summer 2018, Berks County housed Ms. Victory in the general population F Block unit of its Jail, reserved exclusively for women inmates regardless of their classification.

20.     Apparently unknown to her upon entering the Jail, Berks County also maintains housing for inmates with the Trusty classification in a neighboring CRC, just down the hill from the Jail where, as Berks County promises, the inmates may be "afforded, to a degree, more freedom and less direct supervision by staff."[12]

21.     Berks County agrees every male inmate with a Trusty classification is housed on the CRC and afforded, to a degree, more freedom.

22.     Berks County did not place Ms. Victory in the CRC.    But upon her arrival in January 2018, the Committee found Ms. Victory's "placement in the CRC is contingent upon [her] participation in recommended programming" including drug and alcohol group.[13]    The Committee further represented after her placement in the CRC, the CRC staff may require her to participate in additional programming.[14]

23.     Ms. Victory filed several grievances on a variety of concerns, including denial of services offered at the CRC and her mistaken belief she could obtain a furlough absent a court order, while being housed in the F unit from July through November 2018.[15]

24.     Ms. Victory never specifically asked for a program before this lawsuit.

6

25.     Berks County denied her grievances and appeals and once cited her for misconduct for having poems and clothing which Berks County characterized as contraband in the F Unit.[16]

26.     Ms. Victory completed the Outpatient Drug and Alcohol Treatment Program required by the sentencing judge by October 29, 2018.[17]

27.     At an unknown time possibly as early as May or June 2018, Berks County correctional officers told her only male inmates could be housed at CRC.

28.     Ms. Victory filed this case on her behalf, and other similarly situated female inmates with the Trusty classification, on November 30, 2018.[18] She seeks, among other things, injunctive relief compelling the Warden and Deputy Warden to move her to the CRC or an alternative with the exact same privileges, programs and services as provided at the CRC.

29.     Approximately a week later following newspaper coverage of her filing this case, Berks County ceased her work release privileges on December 7, 2018.[19] She missed work one day before Berks County ended this conduct based on a perceived disciplinary claim.

### *Berks County's Jail compared to its Community Reentry Center.*

30.     Berks County maintains a jail with several units exclusively for men, one unit (F or "foxtrot" Block) exclusively for women, and other units for medical care and discipline. The Jail includes persons with each level of custody classification.

31.     The inmates in the Jail are confined to locked cells of approximately seventy-five square feet in size, except for a period of either four or six hours of recreation time when they can access phones, showers and a microwave. There are two persons to each locked cell in the Jail who share a toilet in the cell. The inmates eat their meals in the cell.

7

32. The Jail provides a variety of programs for the inmates in the Jail, including drug and alcohol treatment.

33. The Warden and her staff strive, consistent with her understanding of Pennsylvania Law, to always assign at least one of their thirty-one women correctional officers on the F (or otherwise characterized as the "foxtrot") Block in the Jail for each of three daily shifts.

34. Given the physical size of the Jail and number of inmates, the Jail has frequent lockdowns requiring the inmates remain in their cell, often forfeiting recreation time.

35. In 2010, Berks County converted a juvenile detention center down the hill from the Jail into a Community Reentry Center for the admitted "goal of reducing recidivism and assisting residents in re-establishing themselves as productive members of our community."[20]

36. Berks County while touting the value of its CRC does not represent the CRC is available only to men to assist in re-establishing themselves as productive members of the community.

37. The CRC has four units: Q, R, S and T. Q and R units are across from each other on the same level separated by a roll-up steel door and possibly having ceiling holes which would allow comments to pass between the units. S and T units are next to each other on another level which have large glass windows looking into their community or day room from the guard stations.

38. Each of the four CRC units has a large community or day room with microwave, at least three showers/sinks shared by up to twenty-two inmates who may share cells opening into the day room with two or four beds and private closets. The cells within the four CRC units are never locked so as to allow the male inmates free access to the bathrooms and showers all

8

day. The male inmates may come and go throughout their assigned unit, play backgammon and privately use the bathrooms and showers. They eat their meals in the group community or day room.

39.     The CRC has 152 beds spread among the cells in the four units.    As of our January 10, 2019 Hearing, approximately 100 beds are now being used by male inmates.

40.     These inmates include all male inmates with Trusty classification as well as male inmates with greater risk, including medium security.

41.     The Deputy Warden credibly testified she could assign each of the present 100 male inmates at CRC into three of the four units at the CRC and leave another unit for women.

42.     The Warden has only assigned one female correctional officer to the CRC.    The Warden would like to hire more female correctional officers.    The correctional officers belong to a union and some of these assignments are considered "bid" positions.

43.     Ms. Victory is eligible for parole as of January 28, 2019 but we have no assurance of her release on any date.[21]

### *Berks County's failed reasons for the different treatment of Trusty inmates based on gender.*

44.     Berks County maintains an official policy of excluding female inmates from housing in the CRC.    Berks County admittedly justifies its policy to house only male inmates in the CRC through a confluence of staffing, security, and cost concerns.

45.     Berks County must staff the Jail and CRC twenty-four hours each day, 365 days per year.    To ensure around-the-clock staffing, Berks County estimates it must employ six correctional staff members to fill one duty post each day.

46.     Berks County officials testified male and female correctional staff must be assigned in a manner consistent with Pennsylvania law requiring at least one male and one

9

female corrections staff member be on duty at all times in the prison and also in units where male and female inmates are housed together (e.g., the Jail's medical care unit with both males and females).[22]

47.     Berks County currently employs approximately thirty-one female correctional officers.     Berks County prefers one female correctional officer available to the necessary strip search of female inmates new to the jail system or returning each day from Work Release.

48.     Three female correctional staff members are currently on inactive status for various reasons.   Six female correctional staff members are in bid positions, meaning Berks County cannot freely reallocate these personnel throughout the jail.   As a result, Berks County may assign approximately twenty-two female correctional staff members to posts throughout the Jail and CRC.

49.     Assigning Ms. Victory to the CRC will require Berks County to assign at least six female corrections officers to the facility (2 officers for each of three daily shifts), reducing the number of female correctional staff Berks County can assign to the F Block and medical units in the Jail. Berks County did not credibly explain why six female corrections officers are necessary except it prefers one female officer available for the strip search protocol and one female officer available generally on a unit with a female inmate.   But Berks County concedes it often has one female officer available on a unit with a female inmate.

50.     Berks County officials testified inmates must be housed in compliance with Pennsylvania law requiring the separation of male and female inmates.[23]

51.     Housing Ms. Victory or any other female inmates in the CRC may require Berks County to modify certain physical aspects of the CRC to provide female inmates necessary safety, privacy, and security.   If it were to elect to treat Ms. Victory in the same manner it treats

10

male Trusty inmates at the CRC, Berks County may need minimally necessary modifications to either level of the CRC.

52.     Minimally necessary modifications to allow male and female inmates to reside safely in the CRC may include, by way of example: (1) reinforcing or replacing a rolling door between units Q and R which could secure a possible to-be designated female unit in the CRC; (2) installing a shade or other type of vision-blocking shield on an unused guard station currently allowing inmates to see into the day room of the to-be designated female unit S or T in the CRC; and (3) blocking or sealing open spaces in the ceiling of the Q and R units in the CRC which now potentially allows inmates to communicate with or harass one another.

53.     Berks County has not introduced evidence of the cost or time required to implement modifications. It produced no evidence of ever considering these steps.

## II.     Conclusions of Law

54.     "A preliminary injunction is an extraordinary remedy that should be granted only if a party shows: (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."[24] Ms. Victory must first carry her burden of proving each of the "first two 'most critical' factors."[25] Only "[i]f these gateway factors are met [do we] then consider[] the remaining two factors and determine[] in [our] sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."[26]

### *Ms. Victory has preliminarily shown a substantial likelihood of success on the merits.*

55.     Ms. Victory must first prove she is likely to obtain success on the merits of her equal protection and sex discrimination claim.[27] "To establish a likelihood of success on the

11

merits, a movant must produce sufficient evidence to satisfy the essential elements of the underlying cause of action."[28] "[T]he movant need only prove a 'prima facie case,' not a 'certainty' she'll win."[29]

56. "A showing that is 'significantly better than negligible but not necessarily more likely than not' is sufficient to obtain preliminary injunctive relief."[30] In other words, "[w]e do not require that the right to a final decision after trial be 'wholly without doubt'; the movant need only show a 'reasonable probability' of success."[31] To assess whether Ms. Victory demonstrates a substantial likelihood of success on the merits, "[w]e must examine the legal principles controlling the claim and the potential defenses available to the opposing party."[32]

57. "A successful claim that a government practice or policy violates the Equal Protection Clause requires proof that the plaintiff 'has been treated differently from persons who are similarly situated.'"[33] Even if we find differential treatment between similarly situated persons or groups, however, we will only find such treatment runs afoul of the Equal Protection Clause if the state fails to "show that the classification 'serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'"[34]

58. Ms. Victory must first show she is similar situated to the Trusty class of male inmates she contends receives favorable treatment. We consider a variety of factors when considering whether inmates are similarly situated. The United States Court of Appeals for the Eighth Circuit's decision in *Klinger v. Department of Corrections*,[35] is instructive. In *Klinger*, the plaintiffs, a class of female inmates housed at the Nebraska Center for Women, the only state correctional facility exclusively housing women, sued various state officials alleging their receipt of inferior programs and services compared to inmates at the all-male Nebraska State

Penitentiary violated their Fourteenth Amendment right to equal protection.[36] Following a four-week trial, the district court found the current and former directors of the Nebraska Department of Correctional Services liable "for violating the plaintiffs' equal protection rights in over a dozen different ways relating to the programs in the challenged areas."[37] On interlocutory appeal, the court of appeals reversed the district court's order finding the defendants liable and dismissed the plaintiff's equal protection claim.[38] The court of appeals held, as a matter of law, the inmates at all-female facility and the male inmates at the Nebraska State Penitentiary "are not similarly situated for purposes of prison programs and services."[39]

The court of appeals emphasized "how different" the two facilities are.[40] The Nebraska Center for Women, the court described, "houses the fewest inmates" among Nebraska's five single-sex prisons, while the male-only Nebraska State Penitentiary "houses about six times as many inmates."[41] The court emphasized disparities in the average length of inmate stay and the security levels of the institutions,[42] and also found relevant plaintiffs' witnesses testified "female inmates as a class have special characteristics distinguishing them from male inmates, ranging from the fact that they are more likely to be single parents with primary responsibility for child rearing to the fact that they are more likely to be sexual or physical abuse victims," and male inmates "are more likely to be violent and predatory than female inmates."[43] The court of appeals held the programs at the two institutions "reflect separate sets of decisions based on entirely different circumstances."[44] And the court of appeals cautioned against relying solely on differences in programming between institutions, which "improperly assumes that the Constitution requires all prisons to have similar program priorities and to allocate resources similarly."[45]

13

59.     In *Yates v. Stalder*, the United States Court of Appeals for the Fifth Circuit emphasized the similarly situated analysis is a fact-intensive inquiry.[46]  In *Yates*, the district court dismissed male inmates' equal protection claim alleging female inmates at the Louisiana Correctional Institute for Women received favorable treatment in living conditions and work requirements as compared to male inmates at the state penitentiary.[47]  The court of appeals reversed the dismissal of the plaintiffs' equal protection claims and remanded.[48]  The court of appeals explained "*Klinger*'s holding is based on a fact intensive examination of, *inter alia,* the number of inmates housed in each facility, their average length of stay, their security levels, and the statistical incidence of violence and victimhood."[49]  Finding the record below insufficient, the court of appeals instructed "[t]he record developed in the present case is, as illuminated by a comparison to *Klinger,* wholly inadequate to allow us to determine whether Plaintiffs are similarly situated to the female inmates in [Louisiana Correctional Institute for Women]."[50]

60.     We enjoy the benefit of a fully developed evidentiary record with several witnesses, dozens of admitted exhibits and extensive briefing.    After scrutinizing dozens of admitted exhibits and testimony, most of the facts are not disputed.    Ms. Victory is similarly situated to Trusty male inmates.  From the perspective of security risk, Berks County applies a nationally-recognized risk management equation to ensure no difference between Ms. Victory and Trusty male inmates as to custody classification.  Berks County officials testified inmates, regardless of gender, are designated as Trusty only after the Institutional Classification Committee determines after a careful review the inmate presents the lowest security risk.  Berks County introduced no testimony or evidence indicating Trusty males are more dangerous than Ms. Victory who serves as a waitress/hostess at a local diner most nights.  Ms. Victory is also

14

similarly situated to Trusty male inmates in terms of length of incarceration. The average length of incarceration of Trusty male and Trusty female inmates differs by one day.

61.     Ms. Victory is similarly situated to Trusty male inmates.

62.     We next consider whether Ms. Victory receives "substantially equivalent" treatment.[51]     We are mindful of the United States Court of Appeals for the Eighth Circuit's instruction "[d]ifferences between challenged programs at . . . two prisons are virtually irrelevant because so many variables affect the mix of programming that an institution has."[52]  But even avoiding a side-by-side comparison of programming compels us to find Ms. Victory does not receive "substantially equivalent" treatment to similarly situated Trusty male inmates with respect to freedom of movement and access to essential facilities.[53]

63.     Trusty male inmates sleep in rooms with unlocked doors.  Trusty male inmates may come and go throughout the CRC units, privately access the bathroom and showers, and eat their meals communally in the community or day room.  Trusty male inmates can move about the unit up to thirteen hours each day.  Ms. Victory, as a Trusty female inmate in the Jail, by contrast, is restricted to a maximum of six hours each day of recreational time, divided into three, two-hour blocks—even when lockdowns do not occur.  Ms. Victory, as a Trusty female inmate housed in the F Block in the Jail does not enjoy the same freedom to use a more private bathroom.

64.     Our finding of differential treatment does not end our inquiry.  Berks County may still prevail if it justifies its differential treatment as substantially related to an important governmental objective.[54]     Berks County argues its policy substantially relates to its governmental interest in ensuring the safety of its inmates while also reintegrating offenders into the community and minimizing overcrowding.  Though these interests are important [55] and we

15

recognize Berks County's forward-thinking on rehabilitation for low-risk inmates, these interests are important to both men and women. Berks County's policy of categorically excluding female Trusty inmates from the CRC is not substantially related to achieving these objectives.

65.     Berks County has not demonstrated its policy is substantially related to its interests in maintaining prison security, rehabilitating inmates, or reducing overcrowding, or that the policy or practice "is supported by sound gender-neutral reasoning."[56] In this analysis, we must "consider the directness of the relation between the classification and the government interest."[57]

66.     Keeping Ms. Victory as a female Trusty and Work Release inmate in the Jail, while permitting similarly designated male inmates to enjoy the CRC accommodations is not substantially related to the goal of rehabilitation. Berks County argues the goal of rehabilitation will be undermined by transferring women to the CRC because Berks County will then have to offer each program twice: once for men and once for women. Such double scheduling at the CRC, Berks County argues, would reduce the number of available programs for all members of the inmate community. Such an argument rests on an unduly narrow reading of the Pennsylvania requirement "[f]emale inmates . . . be completely separated from male inmates" in housing.[58] The next sentence of the same provision directs "[t]his does not preclude rehabilitative projects and food service assignments where male and female inmates could participate together with proper supervision."[59]     This reasoning lacks merit.     All inmates earning the Trusty custody classification can attend rehabilitation programs together without the need for doubling the amount of requested programs.

67.     Nor are we persuaded banning Ms. Victory from the CRC furthers the goal of inmate security given Berks County did not adduce evidence as to cost or time needed to

16

implement minimally necessary modifications to accommodate her in the CRC. Berks County cites Ms. Victory's April 2018 concerns with her safety while in a lobby with male inmates upon returning home from Work Release. But Berks County assured her of safety including through camera surveillance. Those same cameras could be installed in the CRC lobby or outside the CRC unit housing Ms. Victory. Berks County has not argued otherwise.

68.     Berks County speculated as to other safety harm if Ms. Victory—like all male Trusty inmates—is housed at the CRC. Despite these concerns, Berks County witnesses admitted male inmates of *three* security levels reside in the CRC (Trusty, Minimum, and Medium). Berks County's witnesses did not testify about incidents occurring in the CRC between or among inmates of these classifications.

69.     Even if, however, legitimate concerns for Ms. Victory's safety justify limiting the CRC to male Trusty inmates only, Berks County failed to show why it could not house Ms. Victory in an area of the Jail permitting the same or similar freedom of movement as Berks County affords Trusty male inmates residing at the CRC and provide her transport to/from the CRC for joint rehabilitation programs.

70.     We carefully considered Berks County's reasons. They are not sufficient. They are based on staffing speculation such as not enough female corrections officers to staff CRC if Ms. Victory is treated the same as male Trusty inmates. This lacks a basis. We cannot allow Berks County to deprive Ms. Victory of equal protection because of speculation of a lack of female corrections officers who would decline CRC assignment to a low-security unit.

### *Irreparable harm*

71.     Ms. Victory must also show irreparable harm to obtain preliminary injunctive relief. Our Court of Appeals instructs the mere "risk of irreparable harm" is insufficient.[60]

17

Rather, "[a] plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'"[61] Further, "[t]he 'requisite feared injury or harm must be irreparable—not merely serious or substantial,' and it 'must be of a peculiar nature, so that compensation in money cannot atone for it.'"[62]

72. Ms. Victory argues she will be irreparably harmed because she "ha[s] a relatively brief opportunity to participate in beneficial prison programming" which would be available to her if she were a man, and once she is released, she "will have forever missed out on the term-term benefits of such programs."[63] Ms. Victory testified the conditions of the Jail significantly impede her access to laundry facilities, and her limited movement in the jail caused and/or contributes to health issues including back pain and anxiety.

73. Ms. Victory shows she is presently suffering, and will continue to suffer, daily irreparable harm from Berks County's differential treatment of her as a female Trusty inmate.

74. Ms. Victory is suffering an injury which money damages alone cannot redress.

75. In *Favia v. Indiana University of Pennsylvania*, Judge Cohill found female athletes suffered irreparable harm when a university cut the women's gymnastics and field hockey teams in response to a budget crisis.[64] The female athletes, Judge Cohill found, were being deprived of the opportunity to develop skills, self-confidence, learn team cohesion and a sense of accomplishment, practice physical and mental well-being, and develop a lifelong healthy attitude.[65] Judge Cohill emphasized "[t]he opportunity to compete in undergraduate interscholastic athletics vanishes quickly, but the benefits do not."[66]

76. While few would compare the privileges of collegiate athletics to the conditions of confinement imposed by a judge, the testimony of various Berks County officials

18

demonstrates the CRC strives to provide its residents many of the same noble benefits Judge Cohill described in *Favia.* Such a deprivation constitutes irreparable injury.

### *Harm to the defendants in treating Ms. Victory the same as male Trusty inmates.*

77. We also consider whether granting preliminary relief will "result in even greater harm to the nonmoving party."[67] Defendants argue awarding Ms. Victory the injunctive relief she seeks will inflict "substantial" harm upon the institution, as they must navigate the confluence of the CRC's design limitations, staffing and logistical constraints, and Pennsylvania law governing the housing of female inmates and allocation of female corrections officers.[68]

78. As a starting point, Defendants argue they must comply with Pennsylvania law mandating "[f]emale inmates . . . be completely separated from male inmates"[69] and "at least one male corrections staff member and one female corrections staff member . . . be on duty at all times" in a prison housing male and female inmates.[70] "To correct the Plaintiff's alleged harms" and maintain compliance with Pennsylvania law, Defendants argue the "Berk[s] County Jail would need to either renovate the CRC (or build an entirely new facility) for a single inmate who is to be released from custody on January 28, 2019."[71] Such renovation, Defendants argue, would also "require the jail to redistribute female correctional officers to the CRC."[72] Defendants did not testify or introduce evidence as to the cost or time needed to complete minimally necessary renovations to accommodate Ms. Victory. Berks County, in fact, could name only a few alterations it would need to make. These include the installation of a screen-type device to block male inmates from seeing into the S or T units in the CRC to block viewing of the female day room and adjoining bathroom, reinforcing or replacing a roll-down security door between the Q and R units to separate a female unit from the rest of the CRC population, and blocking or sealing large holes in the ceilings of various rooms in the Q and R units. Berks

19

County offered no evidence of an extraordinary cost in these minimal modifications to ensure Ms. Victory with equal protection under the Law.

79. Defendants also testified they have a limited number of female corrections officers and encounter challenges hiring more. They also state the obvious fact the County cannot compel females to choose this line of work; they must recruit applicants and then train them for the position, a process that requires time and resources.

80. After hearing the testimony of various Berks County officials, we are not aware of a reason the County cannot minimize cost harm through the strategic allocation of staffing and resources to the CRC.

81. But even if such alterations would not feasible in the next month, Berks County has not demonstrated it could not provide Ms. Victory similar freedom of movement and access to programming in a separate unit of the jail itself; such a solution would minimize the need to allocate additional female correctional staff to two buildings.

### *Public interest favors this narrow injunctive relief.*

82. We next assess "whether the public interest favors the entry of the preliminary injunction."[73] Our Court of Appeals "has recognized that '[a]s a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff.'"[74] Our Court of Appeals also instructs "[i]n the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights,"[75] a principle federal courts across our circuit have repeatedly emphasized.[76]

83. Ms. Victory argues the public interest favors the protection of her constitutional right to be free from unequal treatment solely on the basis of her gender.[77] Ms. Victory emphasizes

20

the public interest is particularly concrete in this case, as the "rehabilitation programs, job fairs, and other services available in the CRC improve prisoners' chances of successfully reentering society and reduce the risk of recidivism."[78]

84. Defendants argue the public interest favors safe prisons.[79] We agree. But they fail to show how treating Ms. Victory to the same liberty as the male Trusty inmates somehow makes either the Jail or CRC somehow unsafe.

85. Defendants also argue transferring Ms. Victory to the CRC would undermine the goals of reducing recidivism and promoting community reintegration. Defendants argue renovation of the CRC to house female inmates would require each program be offered at separate times, "[o]nce for female inmates and once for male inmates."[80] Given the "finite rooms to hold the programs, it would reduce the variety of programs the CRC is able to offer," and, in turn, actually "reduce the number of programs offered, decreasing the benefit of successful reentry and increasing the risk of recidivism."[81] Berks County can mitigate this alarm by simply affording Ms. Victory the same liberties in the Jail and transporting her to the CRC for its touted rehabilitation programs.

86. The public interest favors granting Ms. Victory injunctive relief. The public interest favors the protection of the constitutional right to be free from discrimination on the basis of gender. And for the reasons already discussed, Berks County could minimize safety concerns through either minimally invasive modifications to the CRC or designating a space in the Berks County Jail in which Ms. Victory could reside with the freedom of movement afforded to similarly situated Trusty male inmates.

21

## III. Appropriate limited remedies on a preliminary basis.

Having found injunctive relief is appropriate, we must next consider the appropriate scope of injunctive relief. We are mindful preliminary injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm."[82] Berks County officials testified as to security concerns surrounding the potential transfer of Ms. Victory from the Jail to the CRC. The officials candidly swore modifications to certain aspects of the CRC would minimize the risk of an attack or other incident should Ms. Victory be transferred there. Berks County did not introduce specific estimates as to the amount of time necessary to make such modifications or the cost of doing so. We have no basis to conclude such modifications would be prohibitively costly or take unduly long.

We must also be mindful, however, Berks County officials—not courts—are responsible for the day-to-day administration of the prison.[83] These officials carry out such a duty with knowledge and experience of the realities of the conditions on the ground, and we therefore factor such realities into our decision-making.

In the accompanying Order, upon Ms. Victory's posting of the required appropriate bond,[84] we direct Berks County, through its agents including Warden Quigley, to implement, on or before January 18, 2019, a schedule at either the Berks County Jail or CRC allowing Ms. Victory to have the same liberty and freedom of movement provided to male Trusty inmates housed at the CRC as of January 10, 2019. Such freedom of movement shall include thirteen hours of each day—not including work release—outside of her cell, no lock on her cell in the evening hours, and direct access to programs she wishes to attend in the CRC. This remedy allows Berks County, consistent with its thoughtful analysis on custody classifications with new

22

inmates, to make an informed decision to comply with today's Order based on which placement best accounts for their expressed security concerns, while ensuring Ms. Victory receives substantially similar treatment to male Trusty inmates now housed in the CRC.

---

[1] Pl.'s Ex. No. 6.

[2] *Id.*

[3] Pl.'s Ex. No. 8.

[4] *See Inmate Handbook*, Pl.'s Ex. No. 1 at 29–30.

[5] *Id.* at 31.

[6] *Id.* at 33.

[7] *Id.*

[8] *Compare id.* at 35; *with id.* at 37.

[9] Pl.'s Ex. No. 7.

[10] Defs.' Ex. No. 35.

[11] Pl.'s Ex. Nos. 14–16.

[12] *Inmate Handbook*, Pl.'s Ex. No. 1 at 33.

[13] Pl.'s Ex. No. 8.

[14] *Id.*

[15] *See* Pl.'s Ex. Nos. 12–23.

[16] Pl.'s Ex. No. 25.

[17] Pl.'s Ex. No. 24.

[18] *See* ECF Doc. No. 1.

[19] Pl.'s Ex. No. 31.

[20] Pl.'s Ex. No. 2 at 2.

23

[21] *See* Defs.' Ex. No. 20.

[22] *See* 37 Pa. Code § 95.241(1)(iii) ("When both male and female inmates are housed in the prison, at least one male corrections staff member and one female corrections staff member shall be on duty at all times.").

[23] *See* 37 Pa. Code § 95.226(3) ("Female inmates shall be completely separated from male inmates. This does not preclude rehabilitative projects and food service assignments where male and female inmates could participate together with proper supervision.").

[24] *Youtie v. Macy's Retail Holding, Inc.*, 653 F. Supp. 2d 612, 627 (E.D. Pa. 2009); *see A.N. By & Through Niziolek v. Upper Perkiomen Sch. Dist.*, 228 F. Supp. 3d 391, 396 (E.D. Pa. 2017).

[25] *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017).

[26] *Id.*

[27] *See Youtie*, 653 F. Supp. 2d at 627.

[28] *Borough v. Middletown Water Joint Venture LLC*, No. 18-861, 2018 WL 3473972, at *5 (M.D. Pa. July 19, 2018).

[29] *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (quoting *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001)).

[30] *Middletown Water Joint Venture LLC*, 2018 WL 3473972, at *5 (quoting *Reilly*, 858 F.3d at 179).

[31] *Issa*, 847 F.3d at 131 (quoting *Punnett v. Carter*, 621 F.2d 578, 583 (3d Cir. 1980)).

[32] *Middletown Water Joint Venture LLC*, 2018 WL 3473972, at *5.

[33] *Dinote v. Danberg*, 601 F. App'x 127, 130 (3d Cir. 2015) (quoting *Williams v. Morton,* 343 F.3d 212, 221 (3d Cir. 2003)).

[34] *Id.* (quoting *United States v. Virginia,* 518 U.S. 515, 533 (1996)).

[35] *Klinger v. Dep't of Corr.*, 31 F.3d 727 (8th Cir. 1994).

[36] *Id.* at 729.

[37] *Id.* at 730.

[38] *Id.* at 734.

[39] *Id.* at 731.

[40] *Id.*

[41] *Id.*

[42] *Id.* ("Moreover, the average length of inmate stay at NSP is two to three times as long as it is at NCW. On Nebraska's security scale of one to four, with level four being the least secure, NCW is classifed as a level four institution, while NSP is classified as a level two institution.").

[43] *Id.* at 731–32.

[44] *Id.* at 732.

[45] *Id.*

[46] *Yates v. Stalder*, 217 F.3d 332, 334–35 (5th Cir. 2000).

[47] *Id.* at 333.

[48] *Id.* at 335.

[49] *Id.* at 335.

[50] *Id.* at 334–35.

[51] *Glover v. Johnson*, 478 F. Supp. 1075, 1079 (E.D. Mich. 1979).

[52] *Klinger*, 31 F.3d at 733.

[53] *Glover*, 478 F. Supp. at 1079.

[54] *Dinote*, 601 F. App'x at 130.

[55] *See, e.g.*, *Pitts v. Thornburgh*, 866 F.2d 1450, 1456 (D.C. Cir. 1989) ("[S]eeking to reduce prison overcrowding is surely an important government interest.").

[56] *Dinote*, 601 F. App'x at 130.

[57] *Pitts*, 866 F.2d at 1458.

[58] 37 Pa. Code § 95.226(3).

[59] *Id.*

[60] *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3d Cir.1980).

[61] *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (quoting *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3d Cir.1980)).

[62] *Id.* (quoting *Glasco v. Hills,* 558 F.2d 179, 181 (3d Cir.1977)).

[63] ECF Doc. No. 13 at 18.

[64] *Favia v. Indiana Univ. of Pennsylvania*, 812 F. Supp. 578, 583 (W.D. Pa.), *aff'd*, 7 F.3d 332 (3d Cir. 1993).

[65] *Id.*

[66] *Id.*

[67] *Youtie*, 653 F. Supp. 2d at 627.

[68] ECF Doc. No. 21 at 15.

[69] 37 Pa. Code § 95.226(3).

[70] 37 Pa. Code § 95.241(1)(iii).

[71] ECF Doc. No. 21 at 15.

[72] *Id.* at 18.

[73] *Favia*, 812 F. Supp. at 583.

[74] *Chamber of Commerce for Greater Philadelphia v. City of Philadelphia*, 319 F. Supp. 3d 773, 807 (E.D. Pa. 2018) (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)).

[75] *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883–84 (3d Cir. 1997).

[76] *See, e.g.*, *Reach Acad. for Boys & Girls, Inc. v. Delaware Dep't of Educ.*, 8 F. Supp. 3d 574, 582 (D. Del. 2014) ("The public interest favors enforcement of the Individual Plaintiffs' constitutional rights."); *Miller v. Skumanick*, 605 F. Supp. 2d 634, 647 (M.D. Pa. 2009) (issuing temporary restraining order emphasizing "the public interest is on the side of protecting constitutional rights."), *aff'd sub nom. Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010) ("We agree with the District Court's analysis of . . . the public interest."); *Favia*, 812 F. Supp. at 585 ("The public has a strong interest in the prevention of any violation of constitutional rights.").

[77] ECF Doc. No. 13 at 19 (arguing "[t]he public has no interest in perpetuating a system by which women are systematically denied privileges and opportunities available to similarly situated men").

[78] *Id.* at 20.

[79] ECF Doc. No. 21 at 16 ("Providing appropriate and safe living conditions for incarcerated individuals reinforces the moral character of our society. Prisons are entrusted with protecting an inmate while he or she serves their sentence for a wrong they committed. Placing inmates at risk of harm leaves not only the prison open to ridicule but the entire justice system.").

[80] *Id.*

[81] *Id.*

[82] 18 U.S.C. § 3626(a)(2).

[83] *Turner v. Safley*, 482 U.S. 78, 89 (1987) ("Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand.").

[84] We "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Berks County did not request a bond in this case, and Ms. Victory did not request we waive this requirement. Our Court of Appeals "hold[s] that a district court lacks discretion under Rule 65(c) to waive a bond requirement except in the exceptionally narrow circumstance where the nature of the action necessarily precludes any monetary harm to the defendant, and that such bond shall be issued irrespective of any request by the parties." *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010). The parties did not adduce evidence of the potential monetary harm to Defendants. We do not, however, conclude Defendants would incur no harm. We therefore condition this preliminary injunction upon Ms. Victory posting a $100.00 bond with the Clerk of this Court.