## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| THERESA VICTORY | : CIVIL ACTION |
| | : |
| v. | : NO. 18-5170 |
| | : |
| BERKS COUNTY, *et al.* | : |

## MEMORANDUM

**KEARNEY, J.**                                                                      **April 5, 2019**

Berks County admittedly provides much different housing for inmates it carefully identifies as warranting the lowest security "Trusty" custody status in its jail system based on their sex. Male Trusty inmates live in a "community reentry center" with unlocked cells, unlimited liberty in a defined common area, and several programming alternatives designed to reintegrate them into the community. Women Trusty inmates live in locked cells on the F Block of the county jail with a defined number of hours outside of the cell and with less programming compared to the male Trusty inmates. After Trusty inmate Theresa Victory complained about this differing treatment to no avail and arguable retaliation, she filed this lawsuit seeking damages and injunctive relief. She testified during our extensive preliminary injunction hearing. After evaluating testimony of several witnesses, we enjoined Berks County's disparate treatment of Theresa Victory. Two other Trusty women inmates then joined her Amended Complaint challenging the disparate treatment in the F Block. But they had not earlier filed grievances. Ms. Victory also alleges Berks County prison officers retaliated against her for exercising her First Amendment rights by complaining about prison conditions and officers' conduct towards her. She grieved some of these complaints but not others because she feared further retaliation.

Berks County, its Commissioners and prison officials now move to dismiss the Amended Complaint. In the accompanying Order, we grant the motion in part and deny it in part. The parties will now proceed into discovery on Ms. Victory's claims seeking injunctive relief to stop the disparate treatment of female Trusty inmates, and for damages for the disparate treatment against Defendants who do not enjoy qualified immunity. The parties will also proceed into discovery on Ms. Victory's claims of First Amendment retaliation against Sergeant Spotts, and Correctional Officers Reichart, Zerr, and Brown. We dismiss the remaining claims.

## I. Facts alleged in the Amended Complaint.

Theresa Victory, Samantha Huntington, and Amara Sanders sue all Defendants for depriving them of equal protection. Berks County fails to offer them, as female inmates with the "Trusty" custody-level classification housed in the F Block of the Jail, the level of services and housing offered to male inmates with the Trusty custody-level classification who are housed in a separate Community Reentry Center down the hill from the Jail.[1] Ms. Victory also sues individually for First Amendment retaliation and conspiracy to interfere with her civil rights against individual officers of the Jail system.

### *The Defendants manage and administer the Berks County Jail System.*

The Berks County Prison Board, led by its President Kevin S. Burnhardt, governs the Berks County Jail System.[2] Under Pennsylvania law, the Board must "provide for the safekeeping, discipline and employment of inmates and the government and management" of the Berks County Jail System.[3] The Board also approves all spending for the Jail System by majority vote and approves policies concerning inmate housing.[4] Along with President Burnhardt, Christian Leinbach and Mark Scott sit on the Prison Board.[5] Messrs. Burnhardt, Leinbach, and Scott (the

2

County Commissioner Defendants) also serve on the Berks County Board of Commissioners.[6] The Board of Commissioners serves as the chief governing body of Berks County.[7]

The County Commissioner Defendants do not manage the day to day operations of the Jail System. They hired Janine Quigley as the Warden and Chief Executive Officer of the Berks County Jail System.[8] She approves all policies for the Jail System, including inmate custody level classification and housing assignments.[9] She supervises Deputy Warden Stephanie Smith and several junior officers including those sued here.

Captain Castro is a correctional captain and serves as the grievance coordinator for the Berks County Jail.[10] Lieutenant Weber and Sergeant Spotts are correctional lieutenants at the Jail.[11] Lieutenant Weber also responds to inmate grievances.[12] Joanna Brown is the work release coordinator for the Berks County Jail System responsible for monitoring inmates with Work Release status.[13]

Officers Drosdak, Reichart, Zerr, Brown, and Bauer are correctional officers in the Berks County Jail.[14] The officers enforce the Jail's policies and release inmates for work each day. Berks County also employs an unnamed Sergeant "John Doe" at the Jail.[15]

### *The differing treatment of male and females in the Jail System.*

The Jail System consists of the Berks County Jail and the Berks County Community Reentry Center.[16] The Jail houses prisoners of both sexes and all custody levels.[17] The Jail System has five custody levels for prisoners: Administrative Segregation, Maximum, Medium, Minimum, and Trusty.[18] Trusty is the least-restrictive level.[19] The Jail has three housing categories: Quarantine, General Population, and Restricted Housing (administrative and disciplinary segregation).[20] The Reentry Center has one housing category—Reentry—which includes Trusty or Work Release prisoners.[21]

3

The Jail System offers a Work Release program to "provide[] an opportunity for [prisoners] to become employed in the community."[22] A prisoner must qualify for Trusty custody level and attend all necessary programming to be eligible for Work Release.[23]

Berks County opened the Reentry Center, a building separate from the Jail, in May 2010.[24] Berks County represents the Reentry Center "strive[s] to provide the guidance and resources necessary to enable reintegration back into the community."[25] It houses one hundred men and no women but can potentially house 152 people.[26] It admittedly offers the guidance and resources necessary to enable reintegration at the Reentry Center to men only.

The Reentry Center "affords inmates more freedom and subjects them to less direct supervision than in the Jail."[27] For example, the F Block in the Jail contains locked cells, with two inmates and one toilet per cell.[28] The cells remain locked and prisoners on the F Block eat all their meals in their cell.[29] F Block prisoners have six hours of recreation a day but often forfeit recreation time because of lockdowns.[30] They can only use showers, phones, and microwaves during recreation time.[31]

In contrast, the male prisoners in the Reentry Center live in unlocked cells with access to a day room and other cells for nineteen-and-a-half hours a day.[32] They can shower any time and may eat their meals in a day room.[33] Berks Connection, a non-profit organization, provides Reentry Center prisoners with programs for returning to society and finding employment after their release.[34] Prisoners in the jail cannot access these programs.[35]

Mses. Victory, Huntingdon and Sanders allege Berks County has a policy and custom of housing (1) male prisoners with Trusty custody level and Work Release status in the Reentry Center and (2) female prisoners with the same status and custody level in the Jail.[36] Berks County also houses some male prisoners with Minimum or Medium custody level in the Reentry Center.[37]

4

Commissioners Barnhardt, Leinbach and Scott, Warden Quigley, and Deputy Warden Smith "approved and ratified" the policy barring Trusty and Work Release female prisoners from the Reentry Center.[38]

### *Ms. Victory's year-long incarceration in the Berks County Jail.*

On January 24, 2018, Ms. Victory plead guilty in the Berks County Court of Common Pleas and the judge sentenced her to a one-year prison term guaranteeing Work Release status.[39] On January 27, 2018, she reported to Berks County Jail.[40] On January 31, 2018, Berks County approved her for Trusty custody level with Work Release status.[41] Berks County assigned her to the Jail and placed her in the "overflow" unit with forty-five female prisoners in "dormitory" housing.[42]

Shortly after arriving at the Jail, Ms. Victory and other Trusty or Work Release female prisoners (1) filed grievances complaining about Berks County's failure to house them in the Reentry Center and (2) "requested the same services and privileges that male prisoners with Trusty custody level received."[43] Warden Quigley and Deputy Warden Smith authorized Officer Bauer to move Ms. Victory and other Trusty and Work Release female prisoners from the overflow housing to F Block, where they lived in locked cells.[44] Officer Bauer told Ms. Victory she moved them because they were "too demanding."[45]

### *Ms. Victory exhausts her grievances relating to differing treatment.*

On May 31, 2018, Ms. Victory filed a grievance complaining about her housing in the Jail instead of the Reentry Center, and the differing treatment of male Trusty and Work Release prisoners and female prisoners with the same status.[46]

On July 14, 2018, Officers Drosdak and Bauer refused to release Ms. Victory for work, causing her late arrival to work.[47] When she told them she had work, Officers Drosdak and Bauer

5

"responded derisively" and Sergeant Spotts told her, "You will go to work when I tell you to. If you keep it up, you will not go at all."[48]

On July 24, 2018, Ms. Victory requested a furlough.[49] The same day, she appealed the unanswered May 31, 2018 grievance.[50] On August 14, 2018, Ms. Victory asked her counselor about the grievance and her counselor provided for the first time a July 26, 2018 response to her appeal from Captain Castro.[51] In the response, Captain Castro stated he did not receive the initial grievance, he treated the appeal as a grievance, and he denied the grievance.[52] Captain Castro stated:

> Due to the small size of the female prisoner population, in comparison to the male population, the physical design of the jail prohibits dedicating a housing unit for trusty status females. Even our smallest housing unit would maintain nearly 90% unoccupied beds if we were to attempt to create a female trusty unit. This would be a tremendous waste of valuable bedspace and resources. The [Reentry Center] is not a co-ed building.[53]

On August 14, 2018, Ms. Victory appealed Captain Castro's denial of her grievance.[54] On August 17, 2018, Deputy Warden Smith denied her appeal, stating Berks County could not house her in the Reentry Center.[55]

### *Interfering with Mr. Victory's work release.*

On August 17, 2018, Deputy Warden Smith denied Ms. Victory's July 24, 2018 request for a furlough.[56] On August 18, 2018, she filed a grievance complaining about the denial of her furlough request, explaining Berks County routinely granted male Trusty or Work Release prisoners' furlough requests.[57] On August 30, 2018, Lieutenant Webster denied the grievance, responding "[y]ou have already filed an appeal to your grievance. This exhausts the steps of the grievance process. Future communication on this topic will be considered harassment and discipline will follow."[58]

6

On September 4, 2018, Officers Zerr and Brown refused to let Ms. Victory leave for work.[59] When she told Officer Zerr she could lose her job, Officer Zerr responded she would send Ms. Victory to "the hole" (disciplinary segregation) if she continued asking.[60] When she told Officer Brown she needed to leave, Officer Brown responded, "If you ask me one more time, I'm going to put you in the hole today."[61] Ms. Victory's fiancé and boss called Berks County Jail's Work Release Coordinator Joanna Brown multiple times but she did not answer.[62] Ms. Victory missed the entire day of work.[63]

On September 12, 2018, when Ms. Victory asked to go to work, Officer Reichart responded, "Knock on your door one more time, and you'll lose your job."[64] On September 13, 2018, after being released late to go to work, Officer Reichart told Ms. Victory, "It's jail. We cannot help it if you are late for work."[65]

On September 26, 2018, Officer Drosdak prevented Ms. Victory from leaving for work on time, telling her, "It's not a priority. . . . I don't care. I will get to it when I get around to it."[66] Officer Drosdak also required Ms. Victory's fiancé to check in before releasing Ms. Victory, something other officers did not require.[67]

On October 18, 2018, Officers Zerr and Reichart failed to release her from her cell in time for work, resulting in her late arrival to work.[68]

### *Defendants' conduct unrelated to work release.*

On November 19, 2018, Officer Brown accused Ms. Victory of having an extra towel, bed sheet, and prohibited correspondence from another inmate.[69] Her former cellmate wrote a poem— the alleged correspondence—and left it in the cell.[70] Given the choice between ten days locked in her cell and a "formal" punishment possibly resulting in termination of her Work Release status

7

and time in the "hole," she chose the first option.[71] Sergeant "John Doe" approved the punishment.[72]

### *Ms. Victory files this case and claimed retaliation.*

Ms. Victory filed this case on November 30, 2018.[73]

On December 7, 2018, Officer Drosdak reported Ms. Victory saved oatmeal from breakfast in violation of Jail policies.[74] Ms. Victory did not know of the report until she received a copy several days later.[75] The same day, Work Release Coordinator Brown told Ms. Victory's boss she had been removed from Work Release status.[76] Ms. Victory learned of the termination of her status when she arrived at work.[77]

On December 10, 2018, Ms. Victory's counsel served Defendants with this lawsuit.[78] A local newspaper published a story about her lawsuit on December 11, 2018.[79] The same day, Work Release Coordinator Brown reinstated her Work Release status.[80] Ms. Victory moved for injunctive relief on December 11, 2018 and we set a preliminary injunction hearing for January 10, 2019 to allow expedited discovery.[81]

On January 10, 2019, Ms. Victory, Warden Quigley, Deputy Warden Smith, and Captain Castro testified during our preliminary injunction hearing.[82] Ms. Victory alleges all Berks County Jail System employees knew of Ms. Victory's lawsuit.[83]

On January 15, 2019, Ms. Victory passed a newspaper article under the cell door of female inmate Cassie Heilman.[84] The same day, Officer Brown reported Ms. Victory for harassment for passing the article.[85] Ms. Victory denied the allegations because she did not intend to harass Ms. Heilman.[86] Nonparty Lieutenant Baurle reported Ms. Victory for three misconducts ("Harassment, Misrepresentation, and Transfer of Property") and placed her on disciplinary segregation in the

8

Restricted Housing Unit.[87] After a disciplinary hearing, Ms. Victory received a fifteen-day sentence in the Restricted Housing Unit and termination of her Work Release status.[88]

Ms. Victory alleges Warden Quigley and Deputy Warden Smith "did not want to transfer Ms. Victory to the [Reentry Center] or treat her the same as male Trusty/Work Release inmates, even if the Court ordered them to do so."[89] If she received a formal misconduct citation, "they could argue she was no longer similarly situated to male Trusty inmates and would not be entitled" to any relief we ordered.[90] Warden Quigley and Deputy Warden Smith knew of and "directed" the January 15, 2019 misconduct reports.[91] Warden Quigley, Deputy Warden Smith, and Lieutenant Weber knew of "the pattern of retaliation against [her] by the Jail staff they supervised, did nothing to stop it, and, in some cases, even encouraged it or directed it."[92]

### *Mses. Huntington and Sanders join in Amended Complaint.*

Ms. Victory filed an Amended Complaint on January 17, 2019, joined by Mses. Huntingdon and Sanders.[93] Mses. Victory, Huntington, and Sanders sue Berks County, the County Commissioner Defendants, Warden Quigley, and Deputy Warden Smith for sex discrimination under the Equal Protection Clause of the Fourteenth Amendment and the Equal Rights Amendment of the Pennsylvania Constitution for differing treatment of male prisoners with Trusty or Work Release status and female prisoners with the same status.

Ms. Victory also sues for (1) First Amendment retaliation against Warden Quigley, Deputy Warden Smith, Captain Castro, Lieutenant Weber, Sergeant Spotts, Officers Drosdak, Reichart, Zerr, Brown, and Bauer, Sergeant "John Doe," and Work Release Coordinator Joanna Brown; and, (2) conspiracy to interfere with civil rights under § 1985 against Warden Quigley, Deputy Warden Smith, Lieutenant Weber, and Officers Brown and Drosdak.[94]

Defendants move to dismiss the entire Amended Complaint.

9

## *We held a hearing on excusing the Plaintiffs' exhaustion obligation.*

Defendants move to dismiss two claims for failure to exhaust administrative remedies: (1) Ms. Victory's First Amendment retaliation claim and (2) Mses. Huntington's and Sanders' sex discrimination claim under the Fourteenth Amendment and the Pennsylvania Constitution. Mses. Victory, Huntington, and Sanders argue they could not exhaust remedies because they could not avail themselves of the grievance process. Mses. Victory, Huntington, and Sanders requested a fact-finding hearing to determine whether they could avail themselves of the grievance process. Under our court of appeals' guidance in *Rinaldi v. United States*,[95] we held an evidentiary hearing to determine whether Mses. Victory, Huntington, and Sanders could avail themselves of the grievance process to exhaust administrative remedies for their claims.

Ms. Victory testified she could not avail herself of the grievance process for her First Amendment retaliation claims as to certain prison conduct towards her because she feared if she filed a grievance complaining of a particular officer's retaliatory conduct, she would suffer further retaliation or punishment from the officer, including transfer to disciplinary segregation or loss of her Work Release status. She based this fear on statements made by the officer to her. She testified if an officer sent her to disciplinary segregation—"the hole"—she would miss work and lose her job.[96] She paid for her apartment while incarcerated because her disabled fiancé lived there.[97]

After Warden Quigley, Deputy Warden Smith, and Officer Bauer transferred her to F Block housing, Ms. Victory did not grieve the transfer. She testified she "was already being punished by moving to [F Block], so [she] was scared of further punishment and losing [her] job."[98] She testified if prison officials housed her in disciplinary segregation, she would lose her job which she needed to pay for her apartment.

10

Ms. Victory did not file a grievance after Sergeant Spotts and Officers Bauer and Drosdak refused to release her for work on time on July 14, 2018. She feared if she filed a grievance against these officers, "they would take it personally and it would come back to me, and there would be possibly further retaliation and harassment."[99] She admitted officers were responding to a suicide attempt when she had to leave for work on July 14, 2018.[100]

She testified she did not file a grievance after Officer Drosdak made her go to work without underwear on July 15, 2018 because she feared further harassment from Officer Drosdak. She did not file grievances when the Officer Defendants failed to release her for work on time in September and October 2018 because she feared if she directed a grievance at an officer's conduct, those officers would further retaliate against her or she would lose her job.[101]

On October 10, 2018, Work Release Coordinator Joanna Brown told Ms. Victory correctional officers complained about Ms. Victory knocking on her door to go to work. Coordinator Brown told her "Work release is a privilege and don't you ever forget that it can be taken away from you at any time for any reason."[102]

Ms. Victory acknowledged she filed other grievances during the period she alleges retaliatory conduct. But she grieved unrelated issues concerning the prison's administrative policies. For example, she filed a grievance in November 2018 because the Jail administration left the air conditioning unit on.[103] She felt comfortable filing a grievance about the air conditioning because she directed the grievance to the maintenance department and no maintenance employee ever threatened her.[104] She also filed a grievance in November 2018 concerning her recreation time. She filed the grievance because she did not direct the grievance at a correctional officer but at the administration. She "wanted to clarify the rules" on recreation time for inmates.[105] In those

11

cases, she testified she did not fear retaliation because she did not direct her grievances at a particular officer but rather she sought clarity about a prison policy.

She also filed a grievance in November 2018 after Officer Brown reported Ms. Victory for keeping an extra towel, an extra bedsheet, and restricted correspondence in her cell. Ms. Victory filed grievances to clarify the rules concerning towels and restricted correspondence.[106] She testified she did not direct the grievances toward Officer Brown's conduct.

She filed a grievance on December 7, 2018 after Officer Drosdak threw out her oatmeal. She filed the grievance "requesting a refund" for her oatmeal rather than complaining about Officer Drosdak's conduct.[107] The same day, Coordinator Brown terminated her Work Release status.

On December 11, 2018, a local newspaper published an article about Ms. Victory's lawsuit. Coordinator Brown reinstated Ms. Victory's Work Release status the same day.

She also filed a grievance on January 16, 2019, complaining about her mattress restriction.[108] By this point, Ms. Victory resided in disciplinary segregation without Work Release status following her January 15, 2019 misconduct report. Ms. Victory testified she filed the grievance because she lost her job and no longer feared further retaliation.[109]

Mses. Huntington and Sanders did not adduce evidence at our March 22, 2019 hearing showing they could not avail themselves of the grievance process for their sex discrimination claims.

**II.   Analysis.**

Defendants move to dismiss the Amended Complaint.[110]   While the parties cite to evidence from the preliminary injunction hearing, for purposes of deciding Defendants' motion to dismiss, we are limited to the well-plead allegations in the Amended Complaint.[111]  Under *Rinaldi*, we will

12

also consider the adduced evidence relating to whether we can excuse the failure to grieve all of Ms. Victory's retaliation claims and Mses. Huntingdon's and Sanders' sex discrimination claim.

## A. Mses. Victory, Huntington, and Sanders state a claim for sex discrimination under the Fourteenth Amendment.[112]

Mses. Victory, Huntington, and Sanders sue Berks County, the County Commissioner Defendants, Warden Quigley, and Deputy Warden Smith for sex discrimination under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Under the Fourteenth Amendment, no state shall "deny to any person within its jurisdiction the equal protection of the laws."[113] To state a claim under the Equal Protection clause, Mses. Victory, Huntington, and Sanders must allege "the existence of purposeful discrimination," specifically they "received different treatment from that received by other individuals similarly situated."[114]

### 1. Mses. Victory, Huntington, and Sanders state a sex discrimination claim against Berks County.

Berks County argues Mses. Victory, Huntington, and Sanders fail to state a claim for sex discrimination because they fail to allege Berks County's policy of treating male and female prisoners with Trusty or Work Release status differently "does not pursue an important government objective."[115] But at this stage, they need not allege this proof.[116] To survive a motion to dismiss, they need only allege Defendants treated her differently from other similarly-situated individuals.

Plaintiffs allege Berks County has a "policy and custom of housing male prisoners with a Trusty custody-level classification and/or Work Release status in the [Reentry Center]."[117] They also allege Berks County has a policy of housing "all women committed to [the Berks County Jail

13

System]—regardless of their assigned custody level—in the Jail, including those with the Trusty classification and those on Work Release."[118]

Plaintiffs allege Berks County treated male prisoners on Trusty or Work Release status in the Reentry Center more favorably than it treated female prisoners with the same classifications in the Jail. For example, Berks County houses female prisoners with Trusty or Work Release status in the Jail in "locked cells, approximately 75 square feet[.]"[119] But Berks County houses male Reentry Center prisoners with the same status in unlocked cells where the prisoners can move freely between cells.[120] While female prisoners can only shower during their six hours of recreation time, male prisoners in the Reentry Center can shower at any time during the nineteen-and-a-half hours during the day they can leave their cells.[121] Ms. Victory alleges Berks County classified her as a "Trusty" with approval for "Work Release" but housed her in the Jail throughout her confinement.[122] Defendants do not dispute Ms. Victory is similarly situated to the Trusty and Work Release men in the Community Reentry Center.

Berks County cites *Klinger v. Department of Corrections*[123] where female state prisoners in Nebraska alleged the Nebraska Department of Corrections violated their equal protection rights by treating male prisoners more favorably for prison programs and services.[124] The Court of Appeals for the Eighth Circuit found no Equal Protection violation. But the court in *Klinger* made its determination after developing an extensive factual record showing "the number of inmates housed in each facility, their average length of stay, their security levels, and the statistical incidence of violence and victimhood."[125] At this stage, looking only at Plaintiffs' well-plead allegations, they sufficiently allege Berks County treated similarly situated individuals differently based on sex.

14

Mses. Victory, Huntington, and Sanders state a claim for sex discrimination against Berks County.

> ### 2. Mses. Victory, Huntington, and Sanders state a claim for sex discrimination against the County Commissioner Defendants, Warden Quigley, and Deputy Warden Smith.

County Commissioner Defendants, Warden Quigley, and Deputy Warden Smith argue Mses. Victory, Huntington, and Sanders fail to state a claim against them under the Equal Protection clause of the Fourteenth Amendment because they fail to allege personal involvement.

"A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing[.]"[126] Plaintiffs can show personal involvement "through allegations of personal direction or of actual knowledge and acquiescence."[127]

Mses. Victory, Huntington, and Sanders allege personal involvement of the Commissioner Defendants, Warden Quigley, and Deputy Warden Smith. They allege Warden Quigley "is the chief executive officer of [the Berks County Jail System] and approves all of [the Jail System]'s policies, including those that govern the classification of inmates into different custody levels and inmates' housing assignments."[128]

Plaintiffs allege the County Commissioner Defendants sit on the Berks County Prison Board, which controls the Jail System.[129] The Board "provide[s] for the safekeeping, discipline and employment of inmates and the government and management of [the Jail System]" and appoints a warden.[130] Plaintiffs also allege the County Commissioner Defendants and Warden Quigley "approved and ratified [the Jail System]'s policy and custom of barring Trusty and Work Release women from the [Reentry Center], on the basis of their sex and gender."[131]

Deputy Warden Smith argues Plaintiffs fail to allege her personal involvement because a denial of a grievance is not a constitutional violation. While denial of a grievance is not a *per se*

15

violation, a denial is actionable if it furthers a deprivation of constitutional rights. In *Sutton v. Rasheed*, the plaintiff alleged a prison cleric denied an appeal of his grievance seeking access to religious texts.[132] The plaintiff sued the cleric under § 1983 for denial of free exercise of religion under the First Amendment. Our Court of Appeals reversed a grant of summary judgment for the cleric. The court explained the plaintiff showed the cleric's personal involvement when he denied the appeal of his grievance complaining of a deprivation of constitutional rights.[133]

Plaintiffs allege Deputy Warden Smith's personal involvement. They allege on August 17, 2018, Deputy Warden Smith "denied Ms. Victory's appeal of her [Reentry Center] grievance, claiming that, Trusty Status, [Reentry Center], and Work Release were unrelated and that Ms. Victory was not entitled to [Reentry Center] housing and benefits based on her Work Release and Trusty status."[134] Plaintiffs essentially allege Deputy Warden Smith upheld the allegedly discriminatory policy. Like *Sutton*, Plaintiffs allege Deputy Warden Smith denied an appeal of Ms. Victory's grievance complaining of a deprivation of her constitutional rights.[135]

Plaintiffs state a sex discrimination claim against the County Commissioner Defendants, Warden Quigley, and Deputy Warden Smith.

### 3. Mses. Victory, Huntington, and Sanders state a *Monell* claim against Berks County.

Mses. Victory, Huntington, and Sanders sue Berks County alleging it instituted a policy causing a deprivation of equal protection. Berks County argues Mses. Victory, Huntington, and Sanders fail to state a claim under *Monell v. Department of Social Services*[136] because they fail to allege deliberate indifference. Berks County also argues it cannot be liable unless its employees are primarily liable.

To state a *Monell* claim against a local government like Berks County, Mses. Victory, Huntington, and Sanders must allege "(1) [Plaintiffs] possessed a constitutional right of which

16

[they were] deprived; (2) the municipality had a policy; (3) the policy 'amount[ed] to deliberate indifference' to [their] constitutional right[s]; and (4) the policy was the 'moving force behind the constitutional violation.'"[137]

The Fourteenth Amendment provides no state shall "deny to any person within its jurisdiction the equal protection of the laws."[138] Mses. Victory, Huntington, and Sanders argue they have a constitutional right to be treated similarly to male prisoners with the same custody-level classification. They allege "Berks County and [the Jail System] have a policy and custom of housing male prisoners with a Trusty custody-level classification and/or Work Release status in the [Reentry Center]."[139] They allege a policy and custom "of housing all women committed to [the Jail System]—regardless of their assigned custody-level—in the Jail, including those with the Trusty classification and those on Work Release."[140] They allege a number of facts showing Berks County treats male prisoners with Trusty or Work Release status more favorably than female prisoners with the same status.[141]

Berks County argues Mses. Victory, Huntington, and Sanders fail to state a claim because they do not allege deliberate indifference. But Plaintiffs allege intentional discrimination. "[P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably."[142] Mses. Victory, Huntington, and Sanders allege more than deliberate indifference. They allege Berks County intentionally deprived them of equal protection. Berks County's argument fails.

Berks County also argues Mses. Victory, Huntington, and Sanders cannot state a *Monell* claim without establishing one of its employees violated a constitutional right. It cites *City of Los Angeles v. Heller* in support of its argument.[143] In *Heller*, the plaintiff sued a police officer and the

city under § 1983 claiming the officer used excessive force when he arrested the plaintiff. The plaintiff sued the city alleging its police department regulations caused the constitutional violation. The jury found the plaintiff did not suffer a constitutional violation, thus, the municipality could not be held liable without a violation.[144] The Supreme Court agreed explaining its decision in *Monell* does not authorize "the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."[145]

Mses. Victory, Huntington, and Sanders allege a constitutional violation subject to proof: Berks County houses male Trusty and Work Release prisoners in the Reentry Center, and female prisoners with the same status like themselves in the Jail. Berks County Jail officials implemented this policy. Berks County's argument fails.

Mses. Victory, Huntington, and Sanders state a *Monell* claim for sex discrimination against Berks County.

**4. Qualified immunity bars sex discrimination claims for damages against County Commissioner Defendants, Warden Quigley, and Deputy Warden Smith.**

Defendants argue qualified immunity shields the individual Defendants from liability for damages because they relied on the Pennsylvania Code requiring separation of male and female inmates.[146] We agree.

The Pennsylvania Code provides, "[f]emale inmates shall be completely separated from male inmates."[147] Mses. Victory, Huntington, and Sanders respond the remaining portion of this Code section provides "[t]his does not preclude rehabilitative projects and food service assignments where male and female inmates could participate together with proper supervision."[148]

18

Plaintiffs argue Pennsylvania "obviously contemplates men and women being incarcerated in the same facility—just as they are currently in the Jail."[149]

To determine whether qualified immunity shields the individual Defendants, we ask: "(1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was 'clearly established' at the time of the official's conduct."[150] We frame constitutional right "in light of the specific context of the case, not as a broad general proposition."[151]

To determine whether the right is "clearly established," we ask whether at the time of the challenged conduct, "'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" We look first to Supreme Court precedent and, if none exists, we ask whether "a robust consensus of cases of persuasive authority" in the courts of appeals clearly establishes the right.[152]

While Mses. Victory, Huntington, and Sanders cite a number of cases standing for the general proposition "government policies and practices that classify people based on sex or gender and then subject men and women to different treatment violate the Equal Protection Clause," they cite no Supreme Court or court of appeals cases applicable to the particular right in this case: the right of female prisoners with a certain custody-level status to be treated to the same services in like housing as male prisoners with the same custody-level status. Only Defendants cite a factually similar case to show the right is not clearly established. In *Klinger*, the court of appeals for the Eighth Circuit found no Equal Protection violation after years of discovery and trial where female prisoners alleged the Nebraska Department of Corrections treated male prisoners in a separate facility more favorably with respect to prison services and programs.[153]

While *Klinger* militates in favor of no clearly established right to be treated equally in prisons, there is contrary appellate guidance after *Klinger*. In *Yates v. Stalder*, male prisoners in a

19

Louisiana state prison sued the Secretary for the state department of corrections under the Equal Protection clause, arguing living conditions for male prisoners were significantly harsher than those for female prisoners.[154] The district court found the Secretary entitled to qualified immunity finding he did not violate a clearly established constitutional or statutory right. The court of appeals reversed, explaining "[i]t is clearly established that a state violates the equal protection clause when it treats one set of persons differently from others who are similarly situated."[155] While the Secretary cited *Klinger*, the court in *Yates* explained the court of appeals in *Klinger* found no Equal Protection violation based on an "extensive factual development," consisting of three years of discovery and a four-week trial. The court in *Yates* explained *Klinger* supported reversal and remand for further development of the facts regarding the difference between the male prisoners' and female prisoners' living conditions.[156]

Plaintiffs are correct the right of similarly situated persons of different genders to be treated equally is clearly established. But we focus our scrutiny on the fact raised by the prisoners' claim: do female prisoners have a clearly established right to be housed and afforded equal services as similarly situated male prisoners? The Pennsylvania Code requires separate treatment based on sex to some extent. The correctional officers are caught between a Pennsylvania Code provision and an interpretation on one court of appeals decision from nineteen years ago contrary to another court of appeals decision from twenty-five years ago. We cannot find the clearly established right in *Yates* considers the "specific context of the case" as we must do in a qualified immunity analysis.[157] Nor does *Yates* constitute a "robust consensus" of persuasive authority.

A reasonable official could rely on the Pennsylvania Code in making the Reentry Center a male-only facility. Such official could determine, as permitted under the Pennsylvania Code, male and female inmates could not participate together in the rehabilitative programs or proper

supervision did not exist. We cannot say this section of the Pennsylvania Code "clearly establishes" the constitutional right Mses. Victory, Huntington, and Sanders seek to enforce.

Qualified immunity bars the sex discrimination claims against the County Commissioner Defendants, Warden Quigley, and Deputy Warden Smith. But qualified immunity only bars recovery of damages from these individual defendants.[158] Mses. Victory, Huntington, and Sanders may still seek injunctive relief against these individual Defendants.

### 5. Mses. Huntington and Sanders failed to exhaust administrative remedies for their equal protection claims.

Defendants argue Mses. Huntington and Sanders failed to exhaust administrative remedies for their sex discrimination claims under the Fourteenth Amendment and the Pennsylvania Constitution. Mses. Huntington and Sanders did not adduce evidence at our March 22, 2019 hearing showing unavailability of administrative remedies.

Under the Prison Litigation Reform Act, prisoners must exhaust available administrative remedies before suing officials for deficient prison conditions.[159] Defendants carry the burden to "plead and prove failure to exhaust as an affirmative defense."[160] If Defendants prove failure to exhaust administrative remedies, Mses. Huntington and Sanders must prove they could not avail themselves of administrative remedies.[161]

Defendants argue Mses. Huntington and Sanders failed to exhaust administrative remedies for their sex discrimination claims under the Fourteenth Amendment and the Pennsylvania Constitution. Mses. Huntington and Sanders concede they failed to exhaust administrative remedies but argue unavailability of remedies.

Under our Court of Appeals' guidance in *Rinaldi v. United States*,[162] we held a fact-finding hearing on March 22, 2019 to determine whether Mses. Huntington and Sanders could avail themselves of the grievance process in the Berks County Jail to exhaust remedies for their sex

21

discrimination claims under the Fourteenth Amendment and Pennsylvania Constitution. They failed to appear at the hearing; they did not adduce evidence showing they could not avail themselves of the grievance process.

Instead of offering evidence to prove unavailability, counsel for Mses. Huntington and Sanders repeat arguments we rejected during the preliminary injunction stage of this case.[163] They first argue they could not grieve sex discrimination since Ms. Victory placed the issue "in the process of litigation" when she sued Berks County for sex discrimination on November 30, 2018. In its Inmate Handbook, Berks County prohibits inmates from filing grievances on matters "in the process of litigation."[164] Berks County considers a matter in the litigation process "when someone communicates intent/threat to a member of our staff or upon receipt of a 'notice' from the court."[165] But we explained, and see no reason to change our mind today, a reasonable inmate could read the provision as preventing only the inmate litigating, or threatening to litigate, the issue from filing further grievances. Such interpretation makes sense since the prison could not reasonably punish an inmate for grieving an issue the inmate does not know is being litigated. Our Supreme Court explained "[w]hen an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion."[166] Since the provision is susceptible to multiple interpretations, Mses. Huntington and Sanders should have grieved sex discrimination. But they did not.

The same reasoning applies to their second argument. They argue they could not grieve sex discrimination since Berks County would consider the grievance an "abuse of the process." Berks County also provides in its handbook an "[a]buse of the grievance process may include . . . [submitting grievances] that have previously been addressed and answered by staff."[167] Abuse of the process "may result in discipline."[168] Mses. Huntington and Sanders argue because Ms. Victory

22

already grieved sex discrimination, they feared Berks County would consider their sex discrimination grievances abuse. But we explained a reasonable inmate could read this provision as preventing only the *same* inmate from filing duplicative grievances. Again, Mses. Huntington and Sanders must err on the side of exhaustion when a provision is susceptible to multiple interpretations. But they failed to exhaust.

Mses. Huntington and Sanders now argue considering the ambiguity in the handbook provisions, they could not avail themselves of the grievance process since these provisions are "so opaque that [they] become[], practically speaking, incapable of use."[169] Our Supreme Court explained a remedy is unavailable when "no ordinary prisoner can make sense of what it demands."[170]

We do not believe these provisions are so confusing as to be unusable. As we explained, the alternative interpretations make practical sense since the prison cannot expect an inmate's awareness of other inmates' grievances and lawsuits. But we will not determine this question now since Mses. Huntington and Sanders failed to adduce evidence when we held our hearing on March 22, 2019 to determine unavailability of remedies.

We dismiss Mses. Huntington's and Sanders's sex discrimination claims under the Fourteenth Amendment and Pennsylvania Constitution for failure to exhaust administrative remedies. As a result, we dismiss Mses. Huntingdon and Sanders as parties.

## B. Ms. Victory states a sex discrimination claim against Berks County, the County Commissioner Defendants, Warden Quigley, and Deputy Warden Smith under the Pennsylvania Constitution.[171]

Ms. Victory sues Berks County, the Commissioner Defendants, Warden Quigley, and Deputy Warden Smith on behalf of herself and the class for sex discrimination under the Pennsylvania Constitution. Defendants argue (1) Pennsylvania does not provide a private cause of

23

action under Article One, Section Twenty-Eight and (2) the Pennsylvania's Political Subdivision Tort Claims Act bars the claim. Ms. Victory argues Pennsylvania allows constitutional claims for injunctive relief.

Article One, Section Twenty-Eight of the Pennsylvania Constitution provides "[e]quality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual."[172] Our Court of Appeals held "[a]lthough monetary relief is barred for claims under the Pennsylvania Constitution, equitable remedies are available."[173] The Pennsylvania General Assembly similarly provides in the Tort Claims Act "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."[174]

Ms. Victory seeks only injunctive relief for her claim under the Pennsylvania Constitution. We deny Defendants' motion to dismiss this claim.

## C.     We grant in part and deny in part the motion to dismiss Ms. Victory's First Amendment retaliation claim for failure to exhaust administrative remedies.

Ms. Victory alone sues Warden Quigley, Deputy Warden Smith, Captain Castro, Lieutenant Weber, Sergeant Spotts, Officers Drosdak, Reichart, Zerr, Brown, Bauer, Sergeant "John Doe" (the Correctional Officer defendants), and Work Release Coordinator Joanna Brown for First Amendment retaliation. Defendants argue she fails to state a claim. Defendants also argue Ms. Victory failed to exhaust administrative remedies for her claims.

To state a claim for First Amendment retaliation, Ms. Victory must allege "(1) [s]he engaged in constitutionally protected conduct; (2) [s]he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising [her] constitutional rights; and (3) the constitutionally protected conduct was 'a substantial or motivating factor' for the adverse action."[175] Ms. Victory can show causal connection with "(1) an unusually suggestive temporal

24

proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."[176]

To sue for First Amendment retaliation in court, Ms. Victory must first exhaust "available" administrative remedies. Under the Prison Litigation Reform Act, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."[177]

While Ms. Victory must exhaust available remedies, administrative remedies are unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."[178] Our Court of Appeals explained the relative burdens for proving exhaustion: "The burden to plead and prove failure to exhaust as an affirmative defense rests on the defendant. But once the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him."[179]

Our Court of Appeals' decision in *Rinaldi v. United States* provides guidance on unavailability of remedies.[180] In *Rinaldi*, a prisoner filed several grievances regarding retaliation and assault. His counselor warned him unless he stopped filing grievances, she "would have him moved to a different unit and placed in a cell with an inmate who was known for assaulting his cellmates[.]"[181] A prison correctional officer eventually transferred the plaintiff into a cell with the inmate, who had told the officer and counselor "if [the plaintiff] were placed in the cell he would kill [him]."[182] The plaintiff suffered injuries from his cellmate but did not grieve the transfer. The plaintiff sued the counselor and officer for housing him with a violent inmate, but the defendants responded the plaintiff failed to exhaust his administrative remedies because he did not grieve the

transfer. The plaintiff argued he could not avail himself of administrative remedies because he was "deterred from pursuing an administrative grievance by a prison official's serious threats of substantial retaliation."[183]

Our Court of Appeals held while a prisoner must exhaust "available" administrative remedies to sue in court, administrative remedies are "unavailable" when prison officials "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."[184] To show a prison official's threats thwarted inmates from the grievance process, the plaintiff must show "(1) that the [prison official's] threat was sufficiently serious that it would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance and (2) that the threat actually did deter this particular inmate."[185] The court explained the purpose of the objective element: "The objective component is of chief importance because it maintains the exhaustion requirement for the vast majority of claims and allows otherwise unexhausted claims to proceed only in the exceptional circumstance where the facts alleged would reasonably give rise to a substantial fear of serious harm."[186]

While conceding the prison officials' threats and decision to house the prisoner with a violent inmate would objectively deter prisoners from filing grievances, the defendants argued this conduct did not subjectively deter the plaintiff because he continued filing grievances on other matters like availability of cleaning supplies. The court explained the plaintiff's willingness to file grievances on other matters like cleaning supplies did not negate the second element. Our Court of Appeals quoted the Court of Appeals for the Seventh Circuit regarding the availability of remedies: "[The] ability to take advantage of administrative grievances is not an 'either-or' proposition. Sometimes grievances are clearly available; sometimes they are not; and sometimes

there is a middle ground where, for example, a prisoner may only be able to file grievances on certain topics."[187]

The court explained while the plaintiff filed grievances on certain matters, it "'was unrealistic to expect [the plaintiff] to file a grievance against the very people who were threatening retaliation and preventing him from obtaining the proper forms,' and the fact that an inmate files unrelated claims 'does not prove that remedies were available within the system' for purposes of exhaustion."[188] Thus, a prisoner could still succeed in arguing unavailability of administrative remedies despite filing grievances for other matters unrelated to retaliation.

Ms. Victory alleges three categories of protected conduct: filing grievances, filing a lawsuit and providing testimony in the lawsuit, and informally complaining about prison conditions. For each Defendant, Ms. Victory alleges protected conduct, the Defendant's retaliatory response, and a causal link suggesting her protected conduct motivated the retaliation. In each case, Ms. Victory argues unavailability of remedies because she feared if she filed a grievance against a particular Defendant, she would suffer further retaliation or punishment.

We now turn to her First Amendment retaliation claims. For each Defendant, we ask (1) whether Ms. Victory stated a First Amendment retaliation claim against this Defendant and (2) if so, whether she could avail herself of the grievance process to determine unavailability of administrative remedies. Where Ms. Victory states a claim against a Defendant, we allow her claim to proceed when the Defendant affirmatively threatened her with retaliation. In such an instance, the affirmative threat including loss of the job and income necessary to support her family would deter an objective inmate from filing a grievance against the Defendant for retaliatory conduct. We dismiss (1) claims where a Defendant did not affirmatively threat Ms. Victory with retaliation, (2) claims where Ms. Victory filed a grievance for the exact same issue she filed a grievance leading

27

to Defendant's retaliatory transfer, and (3) claims where Ms. Victory no longer feared retaliation since she lost her job and resided in disciplinary segregation.

### 1. We dismiss Ms. Victory's First Amendment retaliation claim against Warden Quigley.

Ms. Victory alleges two claims against Warden Quigley: (1) authorizing her transfer to more restrictive housing after she grieved sex discrimination "shortly after" arriving at the Jail; and, (2) directing a January 15, 2019 misconduct report after Ms. Victory testified at our preliminary injunction hearing. Neither claim may proceed.

#### a. We dismiss Ms. Victory's First Amendment retaliation claim against Warden Quigley for transferring Ms. Victory after she grieved sex discrimination.

##### i. Ms. Victory states a First Amendment retaliation claim against Warden Quigley for transferring her after she grieved sex discrimination.

Ms. Victory alleges constitutionally protected conduct when, shortly after arriving at Berks County Jail on January 27, 2018, she filed a grievance "complain[ing] about not being housed in the [Reentry Center] and request[ing] the same services and privileges that male prisoners with Trusty custody level received."[189] She alleges retaliatory conduct when "shortly after" the grievance, Warden Quigley authorized Officer Bauer to transfer Ms. Victory "from the dormitory-style overflow housing unit to F Block," where Berks County housed her in a locked cell.[190] She alleges a causal link since (1) the transfer occurred "shortly after" filing the grievance and (2) when she transferred Ms. Victory, Officer Bauer told her she was "too demanding."[191] Ms. Victory states a claim for First Amendment retaliation.

28

### ii. Ms. Victory fails to show unavailability of administrative remedies for Warden Quigley's retaliatory conduct.

While she did not grieve Warden Quigley's retaliatory conduct, Ms. Victory argues unavailability of exhaustion due to the possibility of another transfer. She testified at our hearing she feared since her first grievance led to a transfer, another grievance could lead to another transfer.[192] She also testified further punishment could include housing in "the hole" (i.e. disciplinary segregation) or losing her Work Release status and thus, her job, which she needed to pay for her apartment.[193] Her fiancé lived in the apartment and could not work.[194]

Our Court of Appeals explained we may still find Ms. Victory could not avail herself of the grievance process even when she grieves unrelated issues. She alleges she grieved the Jail's discriminatory treatment "shortly after" arriving at prison in January 2018.[195] Ms. Victory testified after she grieved sex discrimination, she feared another grievance would lead to another transfer.[196] But Ms. Victory grieved *the exact same issue* in May 2018.[197] We cannot credit her testimony she feared to file another grievance because she filed another grievance concerning the issue leading to her transfer. Ms. Victory also fails to allege Warden Quigley affirmatively threatened her. Unlike *Rinaldi* where the defendants told the plaintiff they would house him with a dangerous inmate, Warden Quigley made no oral threat to Ms. Victory. We cannot find an objective inmate would refrain from an issue as serious as a retaliatory transfer without an affirmative threat of serious punishment or retaliation. Ms. Victory could avail herself of the grievance process and thus failed to exhaust administrative remedies for her First Amendment retaliation claim against Warden Smith. We grant Warden Quigley's motion to dismiss her claim for Warden Quigley's transfer to F Block.

29

**b.** **We dismiss Ms. Victory's First Amendment retaliation claim against Warden Quigley for directing Officer Brown's January 15, 2019 misconduct report.**

**i.** **Ms. Victory states a First Amendment retaliation claim against Warden Quigley for directing a January 15, 2019 misconduct report.**

Ms. Victory alleges protected conduct when she testified at the preliminary injunction hearing in this lawsuit on January 10, 2019.[198] She alleges retaliatory conduct when Warden Quigley directed Officer Brown report Ms. Victory for harassment on January 15, 2019.[199] She received a punishment of fifteen days in disciplinary segregation and termination of her Work Release status.[200] Ms. Victory alleges a causal link as the misconduct report occurred several days after she testified at the preliminary injunction hearing. Ms. Victory states a claim for First Amendment retaliation against Warden Quigley.

**ii.** **Ms. Victory fails to show unavailability of administrative remedies for Warden Quigley's retaliatory conduct.**

Warden Quigley argues Ms. Victory did not exhaust administrative remedies for her claim, but Ms. Victory argues unavailability of remedies. Warden Quigley argues her conduct did not subjectively deter Ms. Victory as she filed other grievances. Ms. Victory testified she did not direct these grievances against a particular prison official. She filed a grievance on June 23, 2018 after a nondefendant officer sent her art project home. She testified she did not direct the grievance at the officer but rather sought clarity concerning the policy for art projects.[201]

She testified while she later filed grievances in November 2018 complaining about the air conditioner and her recreation time, she did not direct those grievances at a particular officer. She merely addressed a maintenance department issue and sought clarification of a handbook policy. Ms. Victory also filed grievances in November 2018 after Officer Brown disciplined her for having

30

an extra towel and a poem. She testified she did not direct those grievances at a particular officer but rather sought clarity on inmate handbook rules regarding towels and restricted correspondence. She feared an officer would likely retaliate if she filed a grievance about a particular officer's conduct. In considering unavailability of remedies, our Court of Appeals explained it is "unrealistic to expect [a plaintiff] to file a grievance against the very people who were threatening retaliation" and the filing of unrelated grievances "does not prove that remedies were available within the system."[202]

Ms. Victory filed a grievance on January 16, 2019 for denial of her mattress while she resided in disciplinary segregation.[203] She testified at this point, she no longer held her job because Berks County removed her Work Release status. She felt comfortable filing a grievance since she no longer feared a prison official would retaliate by terminating her Work Release status.[204] Because Ms. Victory felt comfortable filing grievances at this point, we cannot find Warden Quigley's conduct deterred Ms. Victory from filing a grievance against Warden Quigley. We cannot find an objective inmate in Ms. Victory's shoes would not grieve Warden Quigley's conduct when she had nothing left to lose. Ms. Victory could have availed herself of the grievance process to exhaust remedies for her claim against Warden Quigley but failed to do so. We dismiss Ms. Victory's First Amendment retaliation claim against Warden Quigley.

### 2. We dismiss Ms. Victory's First Amendment retaliation claim against Deputy Warden Smith.

Ms. Victory alleges the same facts for her First Amendment retaliation claim against Deputy Warden Smith as her claim against Warden Quigley. As we dismissed her claim against Warden Quigley, we also dismiss her First Amendment claim against Deputy Warden Smith.

31

### 3. We dismiss Ms. Victory's First Amendment retaliation claim against Captain Castro for failure to state a claim.

Ms. Victory only alleges Captain Castro denied her grievance on July 26, 2018.[205] Captain Castro argues, and Ms. Victory concedes, denial of a grievance does not constitute retaliatory conduct.[206] Ms. Victory alleges no other conduct by Captain Castro evidencing his denial of her grievance is in retaliation for anything. We dismiss Ms. Victory's First Amendment retaliation claim against Captain Castro.

### 4. We dismiss Ms. Victory's First Amendment retaliation claim against Lieutenant Weber.

#### a. Ms. Victory states a First Amendment retaliation claim against Lieutenant Weber.

Ms. Victory alleges protected conduct when she filed a grievance on August 18, 2018 complaining about a denial of her furlough request.[207] She alleges retaliatory conduct when Lieutenant Weber threatened her with discipline in his August 30, 2018 response to her grievance: "You have already filed an appeal to your grievance. This exhausts the steps of the grievance process. Future communication on this topic will be considered harassment and discipline will follow."[208] Ms. Victory alleges a causal link as his response came less than two weeks after her grievance and referenced her grievance. Ms. Victory states a First Amendment retaliation claim against Lieutenant Weber.

#### b. Ms. Victory fails to prove unavailability of administrative remedies for Lieutenant Weber's retaliatory conduct.

Lieutenant Weber argues Ms. Victory did not exhaust her remedies for this claim. Ms. Victory argues unavailability of exhaustion. She testified she feared if she grieved Lieutenant Weber's threat as retaliatory conduct, she would receive further punishment and possibly lose her Work Release status. Ms. Victory testified Lieutenant Weber's threat deterred her from filing a

32

grievance. But Lieutenant Weber's threat of discipline for further grievance on *denial of a furlough request* would not deter a reasonable inmate of ordinary firmness and fortitude from lodging a separate, unrelated grievance for Lieutenant Weber's retaliatory threat. Lieutenant Weber's alleged threat came from the inmate handbook, which states "Abuse of the grievance process may include . . . submitting repetitive grievance on the same issue. . . . If it is determined you have abused the grievance process, your grievance will be returned to you without a response, but a notation of the abuse which may result in a discipline."[209] Lieutenant Weber essentially repeated the inmate handbook's policy as applying to any further communication on the furlough request denial, for which Ms. Victory had exhausted remedies. Ms. Victory testified she signed a form stating she understood the policies in the handbook.[210] We cannot find Lieutenant Weber's threat would deter an objective inmate of ordinary firmness from filing a grievance for Lieutenant Weber's alleged retaliatory conduct. Ms. Victory could have availed herself of the grievance process for Lieutenant Weber's threat and failed to exhaust administrative remedies for her claim against Lieutenant Weber. We dismiss her First Amendment retaliation claim against Lieutenant Weber.

### 5. We deny Sergeant Spotts' motion to dismiss Mr. Victory's First Amendment retaliation claim.

#### a. Ms. Victory states a First Amendment retaliation claim against Sergeant Spotts.

Ms. Victory alleges protected conduct on July 14, 2018 when she complained Officers Drosdak and Bauer refused to release her on time for work.[211] She alleges retaliatory conduct when after she complained to the officers, Sergeant Spotts threatened her: "You will go to work when I tell you to. If you keep it up, you will not go at all."[212] Ms. Victory alleges a causal link since it

appears from her Amended Complaint Sergeant Spotts threatened her shortly after she complained. Ms. Victory states a First Amendment retaliation claim against Sergeant Spotts.

### b. Ms. Victory proves unavailability of administrative remedies for Sergeant Spotts' retaliatory conduct.

Sergeant Spotts argues Ms. Victory failed to exhaust administrative remedies for the claim. Ms. Victory argues unavailability. Ms. Victory testified she did not grieve Sergeant Spotts' threat because she feared if she filed a grievance against Sergeant Spotts, she would lose her job or suffer some further punishment.[213] Ms. Victory testified Sergeant Spotts' threat she will lose her job subjectively deterred her from filing a grievance against him.

The state court judge directed work release. We have no evidence Ms. Victory's work effort required she stop working. She testified she needed to work to pay for an apartment for her disabled fiancé until she returned. When she asked to leave for a scheduled work day, Sergeant Spotts affirmatively threatened her, responding, "You will go to work when I tell you to. If you keep it up, you will not go at all."[214] While this threat does not rise to the level of physical violence in *Rinaldi*, this threat of losing her job would deter an objective inmate in her shoes as well. Ms. Victory could not avail herself of the grievance process to exhaust her remedies for Sergeant Spotts' retaliatory conduct. We deny Sergeant Spotts' motion to dismiss her First Amendment retaliation claim.

### 6. We dismiss Ms. Victory's First Amendment retaliation claim against Officer Drosdak.

#### a. Ms. Victory states a First Amendment retaliation claim against Officer Drosdak.

Ms. Victory alleges protected conduct when she grieved sex discrimination shortly after her arrival and her subsequent grievances. She alleges retaliatory conduct when Officer Drosdak (1) refused to let Ms. Victory leave in time for work on July 14, 2018;[215] (2) failed to do Ms.

34

Victory's laundry on July 15, 2018, resulting in Ms. Victory going to work without underwear;[216] (3) refused to let Ms. Victory leave for work on time on September 26, 2018;[217] (4) required her fiancé to check in the Jail before permitting Ms. Victory to leave for work several days in September;[218] and reported her for misconduct on December 7, 2018 for saving oatmeal from breakfast in violation of Jail policy.[219] She claims a causal link alleging Officer Drosdak knew of her various grievances, including her May 31, 2018 and August 18, 2018 grievances.[220] She argues after her August 18, 2018 grievance and Lieutenant Weber's response, Officer Drosdak's adverse conduct "ramped up," establishing an inference of retaliatory motive.[221]

### b. Ms. Victory fails to prove unavailability of administrative remedies for her First Amendment retaliation claim.

Officer Drosdak argues Ms. Victory failed to exhaust remedies for the claim. Ms. Victory argues unavailability. Ms. Victory testified she feared punishment if she grieved Officer Drosdak's conduct including loss of her job. But Officer Drosdak did not threaten Ms. Victory with further punishment. She does not allege Officer Drosdak made threatening statements to her on July 14 and 15 when Officer Drosdak engaged in retaliatory conduct. When she asked Officer Drosdak to release her for work on September 26, 2018, Officer Drosdak responded, "It's not a priority. . . . I don't care. I will get to it when I get around to it."[222] Unlike Sergeant Spotts' threat, we detect no similar affirmative threat from Officer Drosdak Ms. Victory would lose her job or suffer serious punishment. Our court of appeals explained it is "unrealistic to expect [a plaintiff] to file a grievance against the very people who were threatening retaliation."[223] But Officer Drosdak did not threaten Ms. Victory with further retaliation. She merely testified she feared further punishment if she grieved Officer Drosdak's conduct.

While Ms. Victory may have subjectively feared further retaliation, we cannot say an inmate of ordinary firmness and fortitude would not file a grievance against Officer Drosdak on a

35

matter of this importance. Our Court of Appeals in *Rinaldi* explained the importance of the objective element of the test for unavailability: "The objective component is of chief importance because it maintains the exhaustion requirement for the vast majority of claims and allows otherwise unexhausted claims to proceed only in the exceptional circumstance where the facts alleged would reasonably give rise to a substantial fear of serious harm."[224] We understand Ms. Victory feared she would lose her job by being placed in the "hole" if she filed a grievance attacking an officer's personal conduct.

But the circumstances alleged do not show exceptional circumstances evincing Ms. Victory could not file a grievance against Officer Drosdak. Ms. Victory could avail herself of the grievance process to exhaust remedies for her claim against Officer Drosdak. She failed to do so. We dismiss her First Amendment retaliation claim against Officer Drosdak.

### 7. We deny Officer Reichart's motion to dismiss Ms. Victory's First Amendment retaliation claim.

#### a. Ms. Victory states a First Amendment retaliation claim against Officer Reichart.

Ms. Victory alleges protected conduct when she filed a grievance on August 18, 2018.[225] She alleges retaliatory conduct when Officer Reichart (1) prevented her from getting to work on time on September 12, 2018, threatening her, "Knock on your door one more time, and you'll lose your job;"[226] (2) failed to release her on time for work on October 18, 2018.[227] Ms. Victory alleges a causal link, claiming Officer Reichart knew of her August 18, 2018 grievance and Lieutenant Weber's response.[228] Ms. Victory states a claim for First Amendment retaliation.

#### b. Ms. Victory proves unavailability of administrative remedies for her claim against Officer Reichart.

Officer Reichart argues Ms. Victory failed to exhaust her administrative remedies. Ms. Victory argues unavailability of remedies. She testified she feared punishment or losing her job if

36

she grieved Officer Reichart's conduct. Ms. Victory testified Officer Reichart's threat "you'll lose your job" subjectively deterred her from filing a grievance for Officer Reichart's retaliatory conduct. Unlike Officer Drosdak, Officer Reichart affirmatively threatened Ms. Victory stating, "Knock on your door one more time, and you'll lose your job."[229] Ms. Victory testified another officer told her to knock on her door when she had to leave for work.[230] Ms. Victory still maintained her Work Release status and her employment in September and October 2018 when Officer Reichart threatened her. She needed her job to pay for an apartment for her disabled fiancé. Officer Reichart's affirmative threat she will lose her job would deter an objective inmate in her shoes as well. Ms. Victory could not avail herself of the grievance process to exhaust administrative remedies for her claim against Officer Reichart. We deny Officer Reichart's motion to dismiss Ms. Victory's First Amendment retaliation claim.

## 8. We deny Officer Zerr's motion to dismiss Ms. Victory's First Amendment retaliation claim.

### a. Ms. Victory states a claim for First Amendment retaliation against Officer Zerr.

Ms. Victory alleges protected conduct when she filed a grievance on August 18, 2018. She alleges Officer Zerr retaliated when she refused to let Ms. Victory go to work on September 4, 2018.[231] When Ms. Victory explained she could lose her job, Officer Zerr threatened to send her to "the hole" (i.e., disciplinary segregation) if she continued to ask about work.[232] Ms. Victory alleges a causal link claiming Officer Zerr knew of her grievances, including the August 18, 2018 grievance and Lieutenant Weber's response.[233] Ms. Victory states a First Amendment retaliation claim against Officer Zerr.

37

### b. Ms. Victory shows unavailability of administrative remedies for her claim against Officer Zerr.

Officer Zerr argues Ms. Victory failed to exhaust remedies for the claim. Ms. Victory argues unavailability of remedies. She testified she feared punishment if she grieved the personal conduct of an officer. She testified she worried she would lose her Work Release status if she grieved Officer Zerr's retaliatory conduct. Ms. Victory testified Officer Zerr's threat actually deterred her. Ms. Victory maintained her Work Release status and employment in September when Officer Zerr threatened her. Unlike Officer Drosdak, Officer Zerr affirmatively threatened her with disciplinary segregation when she asked for release on a scheduled work day. Ms. Victory testified she would lose her job if Officer Zerr sent her to "the hole." She needed her job to pay for an apartment for her disabled fiancé. Officer Zerr's threat rises to the level of Officer Reichart's threat. While not as serious as the threat of physical violence in *Rinaldi*, an affirmative threat of disciplinary segregation would deter an objective inmate in Ms. Victory's shoes.   Ms. Victory could not avail herself of the grievance process to exhaust administrative remedies for her claim against Officer Zerr. We deny Officer Zerr's motion to dismiss Ms. Victory's First Amendment retaliation claim.

### 9. We deny Officer Brown's motion to dismiss Ms. Victory's First Amendment retaliation claim against Officer Brown.

#### a. Ms. Victory states a First Amendment retaliation claim against Officer Brown.

Ms. Victory alleges protected conduct when she filed a grievance on August 18, 2018. She alleges retaliatory conduct on September 4, 2018 when Officer Brown refused to let her go to work.[234] When she asked Officer Brown to call the work release coordinator, Officer Brown threatened "If you ask me one more time, I'm going to put you in the hole today."[235] Ms. Victory also alleges on November 19, 2018, Officer Brown punished Ms. Victory for possessing an extra

towel, extra bed sheet, and prohibited correspondence in her cell.[236] Ms. Victory alleges a causal link claiming Officer Brown knew of her grievances, including her August 18, 2018 grievance and Lieutenant Weber's response.[237] Ms. Victory states a First Amendment retaliation claim against Officer Brown.

### b. Ms. Victory proves unavailability of administrative remedies for her claim against Officer Brown.

Officer Brown argues Ms. Victory failed to exhaust remedies for her claim. Ms. Victory argues unavailability of remedies. She testified she feared if she grieved Officer Brown's conduct, Officer Brown would punish her by putting her in "the hole." She testified she would lose her job if Officer Brown placed her in "the hole" and she needed her job to pay for her apartment. Ms. Victory testified Officer Brown's threat to put her in "the hole" actually deterred her from filing a grievance against Officer Brown for retaliatory conduct.

Officer Brown's threat would deter an inmate of ordinary firmness and fortitude as well. Like Officers Zerr and Reichart, Officer Brown affirmatively threatened Ms. Victory with discipline. Ms. Victory asked to be released on a scheduled work day and Officer Brown threatened to send her to "the hole." Ms. Victory still maintained her Work Release status and employment in September when Officer Brown threatened her. If Officer Brown placed her in disciplinary segregation, she would lose her job. The threat of disciplinary segregation does not rise to the threat of physical violence in *Rinaldi*. But the threat would still deter an objective inmate in Ms. Victory's situation. Ms. Victory could not avail herself of the grievance process to exhaust administrative remedies for her claim against Officer Brown. We deny Officer Brown's motion to dismiss her First Amendment retaliation claim.

39

### 10. We dismiss Ms. Victory's First Amendment retaliation claim against Officer Bauer.

#### a. Ms. Victory states a First Amendment retaliation claim against Officer Bauer.

Ms. Victory alleges protected conduct when she grieved sex discrimination "shortly after" arriving at the Berks County Jail.[238] She alleges retaliatory conduct when Officer Bauer moved her to F Block housing following her grievance.[239] Officer moved Ms. Victory because she was "too demanding,"[240] allowing an inference of a causal link between the grievance and the retaliatory conduct. Ms. Victory states a claim for First Amendment retaliation against Officer Bauer.

#### b. Ms. Victory failed to prove unavailability of administrative remedies for her claim against Officer Bauer.

Officer Bauer argues Ms. Victory failed to exhaust administrative remedies for her retaliation claim. Ms. Victory argues unavailability. She testified she did not grieve retaliation because she feared another grievance would lead to another transfer or the loss of her job. Ms. Victory makes the same argument as her claims against Warden Quigley and Deputy Warden Smith. As explained, while she grieved sex discrimination "shortly after" arriving at the Jail leading to her transfer, she grieved the exact same issue in May 2018. We cannot credit Ms. Victory's testimony she feared another grievance would lead to another transfer since she filed a grievance on the exact same matter. Ms. Victory also fails to allege Officer Bauer affirmatively threatened her with further punishment or retaliation. Unlike Sergeant Spotts and Officers Reichart, Zerr, and Brown, Officer Bauer never threatened to send Ms. Victory to "the hole" or threatened her employment. We cannot find an objective inmate would refrain from grieving a retaliatory transfer without a serious affirmative threat. Ms. Victory could have availed herself of the grievance process for her claim against Officer Bauer and failed to exhaust her remedies for the claim. We grant Officer Bauer's motion to dismiss her First Amendment retaliation claim.

### 11. We dismiss Ms. Victory's First Amendment retaliation claim against Work Release Coordinator Joanna Brown.

#### a. Ms. Victory states a First Amendment retaliation claim against Work Release Coordinator Brown.

Ms. Victory alleges protected conduct when she filed a grievance on August 18, 2018 about the denial of her furlough request.[241] Coordinator Brown failed to answer the phone on September 4, 2018 when Ms. Victory's fiancé and boss called about Ms. Victory missing work.[242] Ms. Victory alleges a causal link claiming Coordinator Brown knew of her August 18, 2018 grievance and Lieutenant Weber's response.[243] Ms. Victory states a claim for First Amendment retaliation.

#### b. Ms. Victory fails to prove unavailability of administrative remedies for her claim against Work Release Coordinator Brown.

Coordinator Brown argues Ms. Victory failed to exhaust administrative remedies. Ms. Victory argues unavailability of remedies. She testified she feared punishment if she grieved retaliation against a prison official. Our court of appeals explained it is "unrealistic to expect [a plaintiff] to file a grievance against the very people who were threatening retaliation."[244]

But we see no threat of further retaliation from Coordinator Brown showing unavailability of remedies. Unlike Sergeant Spotts and Officers Zerr, Reichart, and Brown, Coordinator Brown never affirmatively threatened Ms. Victory with serious punishment or loss of employment. While Ms. Victory testified she felt threatened by a conversation with Coordinator Brown on October 10, 2018,[245] the alleged retaliatory conduct occurred September 4, 2018. The conversation occurred over a month later. Ms. Victory could have availed herself of the grievance process to exhaust her remedies for her claim against Coordinator Brown but failed to do so. We dismiss Ms. Victory's First Amendment retaliation claim against Coordinator Brown.

41

### 12. We dismiss Ms. Victory's First Amendment retaliation claim against Sergeant John Doe.

#### a. Ms. Victory states a First Amendment retaliation claim against Sergeant Doe.

Ms. Victory alleges protected conduct when she filed a grievance on August 18, 2018.[246] She alleges retaliatory conduct when an unidentified person Sergeant Doe "approved Ms. Victory's punishment of 10 days locked in her cell."[247] Ms. Victory alleges a causal link claiming Sergeant Doe knew of her August 18, 2018 grievance and Lieutenant Weber's response.[248] Ms. Victory states a First Amendment retaliation claim against Sergeant Doe. We would allow her leave to identify him after discovery if she shows unavailability of an administrative remedy.

#### b. Ms. Victory fails to prove unavailability of administrative remedies for her claim against Sergeant Doe.

Defendants argue Ms. Victory failed to exhaust remedies for her claim against a Sargeant Doe. Ms. Victory argues unavailability of remedies. She testified she feared further punishment if she filed a grievance against an officer. Unlike Sergeant Spotts and Officers Zerr, Reichart, and Brown, we have no record Sergeant Doe made threats against Ms. Victory showing unavailability of remedies. Her only allegation against Sergeant Doe is approval of her punishment. We see no evidence from the record Sergeant Doe threatened Ms. Victory or took any action against her deterring her from filing a grievance against Sergeant Doe for the allegedly retaliatory conduct. She cannot identify this person. We have no basis to find his steps deterred her to the level necessary under *Rinaldi*.

Ms. Victory failed to exhaust available remedies for her claim against Sergeant John Doe. We dismiss her First Amendment retaliation claim against Sergeant John Doe.[249]

**D.    Ms. Victory fails to state a claim for conspiracy to interfere with civil rights under § 1985(2) and 1985(3) against Warden Quigley, Deputy Warden Smith, Lieutenant Weber, Officer Brown, and Officer Drosdak.**

Ms. Victory alleges Warden Quigley, Deputy Warden Smith, Lieutenant Weber, and Officers Brown and Drosdak conspired to interfere with her civil rights violating §§ 1985(2) and 1985(3). Defendants argue Ms. Victory fails to state a claim under either section.

To state a claim under § 1985(2), Ms. Victory must allege "(1) a conspiracy between two or more persons (2) to deter a witness by force, intimidation or threat from attending court or testifying freely in any pending matter, which (3) results in injury to the plaintiff."[250] Ms. Victory must allege facts showing an agreement amongst the defendants.[251] To state a claim under § 1985(3), Ms. Victory must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States."[252]

Ms. Victory cites *Deangelo v. Brady* to support her claim.[253] In *Deangelo*, the plaintiff alleged an attorney general, deputy, and trial judge conspired to convict him of a weapons offense. Our Court of Appeals held the plaintiff failed to allege a conspiracy since the plaintiff failed to allege "supporting allegations of an agreement among defense counsel, the judge, and the Attorney General and his Deputies, as well as the basis for alleging participation with regard to each individual."[254]

Ms. Victory fails to allege facts showing an agreement among Warden Quigley, Deputy Warden Smith, Lieutenant Weber, and Officers Brown and Drosdak. She argues instead these individuals possessed the requisite intent to deprive her of her constitutional right, from which "it

43

is reasonable to infer Defendants agreed to cite and punish Ms. Victory."[255] But without supporting allegations showing an agreement, Ms. Victory fails to state a claim for conspiracy under either subsection in § 1985. We dismiss Ms. Victory's claims under § 1985.

## E. Mses. Victory, Huntington, and Sanders properly served Defendants.

The individual Defendants argue Mses. Victory, Huntington, and Sanders failed to properly serve them.

We may dismiss a complaint for "insufficient service of process."[256] Mses. Victory, Huntington, and Sanders bear the burden of proving sufficient service by a preponderance of the evidence.[257]

Mses. Victory, Huntington, and Sanders may serve process by: (1) following the law for service in Pennsylvania courts of general jurisdiction; (2) delivering a copy to the individual personally; (3) leaving a copy at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or (4) delivering a copy to an agent authorized by appointment or by law to receive service of process for the individual.[258]

Under Pennsylvania law, Mses. Victory, Huntington, and Sanders may serve process by: (1) by handing a copy to the individual; or (2) by handing a copy (i) at the individual's residence to an adult member of the family or an adult person in charge; or (ii) at the individual's residence to the clerk or manager of the hotel, inn, apartment house, boarding house or other place of lodging at which he resides; or (iii) at any office or usual place of business of the individual to his agent or to the person for the time being in charge thereof.[259]

Mses. Victory, Huntington, and Sanders offer process server Karl Perkins' affidavit.[260] He swears:

On December 10th, 2018 at approximately 10:30 am I went to the Berks County Jail to serve legal papers at the request of Angus Love Esq. of the Pa. Institutional

44

Law Project who accompanied me as he was visiting his client in the case of Victory v. Berks County et al Civil Action No. 18-05170. I entered the vestibule through the front door and approached the correctional officer in a glass enclosed booth. I told him I had legal papers. He called someone and then said he couldn't accept them and that I should mail them. I informed him that I could not mail them and they needed to be dropped off at the jail. He got on the phone again and again refused to accept the papers. Angus then went into the jail to visit his client. He went through the metal detector and I followed him. Once past the detector, I placed 11 separate envelopes that contained a summons, a copy of the complaint and cover letter for each defendant in each envelope in the Victory v. Berks case, on a table behind the glass enclosure and went back to the vestibule. I filled out 11 Affidavits of service and signed one for each defendant. Angus later informed me that he would file the affidavits of service with the court.[261]

The parties dispute whether the correctional officer at the Berks County Jail was "the person for the time being in charge thereof" under Pennsylvania law.

Defendants cite *Bush v. Department of Human Services*.[262] In *Bush*, the process server served the defendant by delivering a copy of the complaint to a security guard at the front desk of the defendant's office building.[263] The court found service did not satisfy any option under federal or Pennsylvania law.[264] Mses. Victory, Huntington, and Sanders argue we can distinguish *Bush* because the defendant neither employed, nor shared the same employer as, the security guard. We agree with Mses. Victory, Huntington, and Sanders.

Our Court of Appeals explained under Pennsylvania law, the "person for the time being in charge thereof" must have "some direct connection to the party to be served."[265] In *Grand Entertainment Group, Ltd. v. Star Media Sales, Inc.*, the court found the plaintiff failed to properly serve the defendant when the process server served the receptionist for the defendant's building.[266] The court found no direct connection to the defendant because the receptionist did not work for the defendant nor represent she did.[267]

The correctional officer here was "the person for the time being in charge thereof." The correctional officer suggested Mr. Perkins mail process to the Jail. In other words, the correctional

45

officer did not deny he could accept service but instead suggested a different method for service. The correctional officer served not as a receptionist for the building, but rather served as a representative of the individual Defendants' employer. Mr. Perkins could reasonably believe the correctional officer at Berks County Jail had a direct connection to the individual Defendants. We deny the individual Defendants' motion to dismiss for insufficient service.

## III.    Conclusion

In an accompanying Order, we grant in part and deny in part the Defendants' motion to dismiss the Amended Class Action Complaint.

For claims under the Fourteenth Amendment, we deny Berks County's motion to dismiss Ms. Victory's class action claims for sex discrimination. We grant the motion to dismiss her sex discrimination claims for damages against the County Commissioner Defendants, Warden Quigley, and Deputy Warden Smith since qualified immunity bars these claims. We deny the motion to dismiss claims for injunctive relief against the County Commissioner Defendants, Warden Quigley, and Deputy Warden Smith.

For claims under the Pennsylvania Constitution, we deny the motion to dismiss sex discrimination claims against Berks County, the County Commissioner Defendants, Warden Quigley, and Deputy Warden Smith seeking injunctive relief.

We grant Defendants' motion to dismiss Mses. Huntington's and Sanders' sex discrimination claims under the Fourteenth Amendment and the Pennsylvania Constitution for failure to exhaust administrative remedies.

We grant Defendants' motion to dismiss Ms. Victory's conspiracy claims under § 1985 for failure to state a claim.

We grant in part and deny in part Defendants' motion to dismiss Ms. Victory's First Amendment retaliation claim for failure to exhaust. We deny the motions of Sergeant Spotts and Officers Reichart, Zerr, and Brown to dismiss Ms. Victory's First Amendment retaliation claims. We grant the motions of Warden Quigley, Deputy Warden Smith, Captain Castro, Lieutenant Weber, Officers Drosdak and Bauer, Work Release Coordinator Brown, and Sergeant Doe to dismiss Ms. Victory's First Amendment retaliation claims.

We deny the individual Defendants' motion to dismiss for insufficient service.

---

[1] Amended Complaint (ECF Doc. No. 47) ¶ 24.

[2] *Id.* at ¶¶ 33-34.

[3] *Id.* at ¶ 33.

[4] *Id.* at ¶¶ 34, 54.

[5] *Id.* at ¶¶ 10-11.

[6] *Id.* at ¶¶ 9-11.

[7] *Id.* at ¶ 10.

[8] *Id.* at ¶ 35.

[9] *Id.*

[10] *Id.* at ¶ 14; N.T. M. Castro, Mar. 22, 2019, at p. 62.

[11] ECF Doc. No. 47 ¶¶ 15-16.

[12] *Id.* at ¶ 112.

[13] *Id.* at ¶ 22.

[14] *Id.* at ¶¶ 17-21.

[15] *Id.* at ¶ 23.

[16] *Id.* at ¶ 36.

[17] *Id.* at ¶ 37.

[18] *Id.* at ¶ 43.

[19] *Id.*

[20] *Id.* at ¶ 45.

[21] *Id.* at ¶ 46.

[22] *Id.* at ¶ 50.

[23] *Id.* at ¶ 51.

[24] *Id.* at ¶ 40.

[25] *Id.*

[26] *Id.* at ¶¶ 41, 42.

[27] *Id.* at ¶ 46.

[28] *Id.* at ¶¶ 58-59.

[29] *Id.* at ¶¶ 58, 60.

[30] *Id.* at ¶ 62.

[31] *Id.* at ¶ 63.

[32] *Id.* at ¶ 69.

[33] *Id.* at ¶¶ 70, 72.

[34] *Id.* at ¶ 77.

[35] *Id.* at ¶ 78.

[36] *Id.* at ¶¶ 52-53.

[37] *Id.* at ¶ 55.

[38] *Id.* at ¶ 54.

[39] *Id.* at ¶¶ 80-81.

[40] *Id.* at ¶ 85.

[41] *Id.* at ¶¶ 86-87.

[42] *Id.* at ¶¶ 92-93.

[43] *Id.* at ¶ 94.

[44] *Id.* at ¶¶ 95-97.

[45] *Id.* at ¶ 96.

[46] *Id.* at ¶ 102.

[47] *Id.* at ¶ 115.

[48] *Id.* at ¶ 116.

[49] *Id.* at ¶ 109.

[50] *Id.* at ¶ 103.

[51] *Id.* at ¶ 104.

[52] *Id.* at ¶ 105.

[53] *Id.* at ¶ 106.

[54] *Id.* at ¶ 107.

[55] *Id.* at ¶ 108.   Defendants do not contest Ms. Victory exhausted her appeals on her equal protection challenge to the differing treatment of her.

[56] *Id.* at ¶¶ 109-10.

[57] *Id.* at ¶ 111.

[58] *Id.* at ¶ 112.

[59] *Id.* at ¶ 117.

[60] *Id.* at ¶ 118.

[61] *Id.* at ¶ 119.

[62] *Id.* at ¶ 120.

[63] *Id.*

[64] *Id.* at ¶¶ 121-22.

[65] *Id.* at ¶ 124.

[66] *Id.* at ¶¶ 125-26.

[67] *Id.* at ¶ 127.

[68] *Id.* at ¶ 128.

[69] *Id.* at ¶ 129.

[70] *Id.* at ¶ 130.

[71] *Id.* at ¶ 131.

[72] *Id.* at ¶ 132.

[73] ECF Doc. No. 1.

[74] ECF Doc. No. 47 ¶ 133.

[75] *Id.* at ¶ 134.

[76] *Id.* at ¶ 135.

[77] *Id.* at ¶ 136.

[78] *Id.* at ¶ 137.

[79] *Id.* at ¶ 138.

[80] *Id.* at ¶ 139.

[81] ECF Doc. Nos. 9, 16.

[82] ECF Doc. No. 47 ¶ 140.

[83] *Id.* at ¶ 143.

[84] *Id.* at ¶ 144.

[85] *Id.* at ¶ 149.

[86] *Id.* at ¶ 150.

[87] *Id.* at ¶ 151.

[88] *Id.* at ¶ 152-53.

[89] *Id.* at ¶ 154.

[90] *Id.* at ¶ 155.

[91] *Id.* at ¶ 156.

[92] *Id.* at ¶ 157.

[93] ECF Doc. No. 47.

[94] ECF Doc. No. 47, at pp. 26-28.

[95] *Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018) (citing *Small v. Camden Cty.*, 728 F.3d 265, 271 (3d Cir. 2013)) ("[F]actual disputes relevant to exhaustion may be resolved by a district judge without the participation of a jury.").

[96] N.T. T. Victory, Mar. 22, 2019, at p. 14.

[97] *Id.*

[98] *Id.* at p. 8.

[99] *Id.* at p. 10.

[100] *Id.* at pp. 52-53.

[101] *Id.* at p. 19.

[102] *Id.* at p. 24.

[103] *Id.* at p. 20.

[104] *Id.* at p. 21.

[105] *Id.* at p. 23.

[106] *Id.* at p. 30.

[107] *Id.* at p. 31.

[108] *Id.* at p. 51.

[109] *Id.* at p. 57.

[110] When considering a motion to dismiss "[w]e accept as true all allegations in the plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and we construe them in a light most favorable to the non-movant." *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010)). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679).

[111] *Cephas v. Int'l Longshoremen's Ass'n*, No. 16-316, 2017 WL 2782201, at *1 (D. Del. Mar. 1, 2017) ("[A] court that examines a transcript of a prior proceeding to find facts converts a motion to dismiss into a motion for summary judgment.").

[112] Ms. Victory argues we should deny the motion to dismiss because we found a "substantial likelihood of success" on the merits during the preliminary injunction proceedings. In *McTernan v. City of York*, the court explained "a district court's findings and conclusions on a preliminary injunction motion could 'have preclusive effect if the circumstances make it likely that the findings are "sufficiently firm" to persuade the court that there is no compelling reason for permitting them to be litigated again.'" 577 F.3d 521, 530 (3d Cir. 2009) (quoting *Hawksbill Sea Turtle v. Fed. Emergency Mgmt. Agency*, 126 F.3d 461, 474 (3d Cir. 1997). We based our preliminary injunction findings on extensive testimony at the hearing. Here, we are limited to the allegations in the complaint and to the limited testimony on excused exhaustion of administrative remedies under *Rinaldi*.

[113] U.S. Const. amend. XIV, § 1.

[114] *Reisinger v. Luzerne Cty.*, 712 F. Supp. 2d 332, 355 (M.D. Pa. 2010) (quoting *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005)).

[115] ECF Doc. No. 68-2, at p. 7.

[116] *Morrison v. McDonnell*, No. 18-1125, 2019 WL 355738, at \*4 (M.D. Pa. Jan. 29, 2019) ("To state a denial of equal protection under the traditional theory, the plaintiff must allege that, based on membership in a protected class, he received treatment different from others with whom he is similarly situated and that such difference in treatment was the result of intentional discrimination.").

[117] ECF Doc. No. 47 ¶ 52.

[118] *Id.* at ¶ 53.

[119] *Id.* at ¶ 58.

[120] *Id.* at ¶¶ 67, 69.

[121] *Id.* at ¶¶ 61, 63, 70.

[122] *Id.* at ¶ 90.

[123] *Klinger v. Dep't of Corr.*, 31 F.3d 727, 733 (8th Cir. 1994).

[124] *Id.* at 729.

[125] *Yates v. Stalder*, 217 F.3d 332, 335 (5th Cir. 2000) (explaining the court of appeals in *Klinger* found no Equal Protection violation after a four-week trial on the issue of liability and a subsequent appeal).

[126] *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).

[127] *Id.* (quoting *Rode*, 845 F.2d at 1207).

[128] ECF Doc. No. 47 ¶ 35.

[129] *Id.* at ¶¶ 9-11, 33.

[130] *Id.* at ¶ 33.

[131] *Id.* at ¶ 54.

[132] *Sutton v. Rasheed*, 323 F.3d 236, 250 (3d Cir. 2003).

[133] *Id.*

[134] ECF Doc. No. 47 ¶ 108.

[135] Deputy Warden Smith cites *Gordon v. Vaughn.* No. 99-1511, 1999 WL 305240 (E.D. Pa. May 12, 1999). In *Gordon*, the court explained an inmate does not have a constitutional right to a favorable response to a grievance. Ms. Victory does not complain she has a constitutional right to a favorable response. She argues denial of her appeal furthered the deprivation of her constitutional right to equal protection.

[136] *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

[137] *Vargas v. City of Philadelphia*, 783 F.3d 962, 974 (3d Cir. 2015) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-91 (1989)).

[138] U.S. Const. amend. XIV, § 1.

[139] ECF Doc. No. 47 ¶ 52.

[140] *Id.* at ¶ 53.

[141] *Id.* at ¶¶ 52-79.

[142] *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 405 (1997).

[143] *City of Los Angeles v. Heller*, 475 U.S. 796 (1986).

[144] *Id.* at 799.

[145] *Id.*

[146] ECF Doc. No. 68-2, pp. 19-21.

[147] 37 Pa. Code § 95.226(3).

[148] *Id.*

[149] ECF Doc. No. 89, at p. 23.

[150] *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 241 (3d Cir. 2016) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

[151] *Id.* at 248 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

[152] *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016).

[153] *Klinger*, 31 F.3d at 733.

[154] *Yates*, 217 F.3d at 333.

[155] *Id.*

[156] *Id.* at 334.

[157] *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 719 (3d Cir. 2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)) (explaining the court must consider "the 'particularized' facts of the case" when determining qualified immunity to prevent plaintiffs from converting "the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights").

[158] *See Salerno v. Corzine*, 449 F. App'x 118, 123 (3d Cir. 2011) ("[I]t is well established that qualified immunity does not bar actions for prospective relief, such as an injunction or declaratory judgment.").

[159] 42 U.S.C. § 1997(a).

[160] *Rinaldi*, 904 F.3d at 268 (citing *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002)).

[161] *Id.*

[162] *Id.* at 265 (citing *Small*, 728 F.3d at 271).

[163] ECF Doc. No. 92, at pp. 11-12.

[164] Defs' Ex. No. 1 at p. 51, N.T. Mar. 22, 2019.

[165] *Id.*

[166] *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016).

[167] Defs' Ex. No. 1 at p. 53, N.T. Mar. 22, 2019.

[168] *Id.*

[169] *Ross*, 136 S. Ct. at 1859.

[170] *Id.*

[171] As explained, Mses. Huntington and Sanders failed to exhaust administrative remedies for their Fourteenth Amendment sex discrimination claim. Defendants argue since they failed to grieve sex discrimination, Mses. Huntington and Sanders cannot proceed on their sex discrimination claim under the Pennsylvania Constitution.

[172] Pa. Const. art. I, § 28.

[173] *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 442 F. App'x 681, 688 (3d Cir. 2011).

[174] 42 Pa. C.S. § 8541.

[175] *Pepe v. Lamas*, 679 F. App'x 173, 175 (3d Cir. 2017) (citing *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)).

[176] *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

[177] 42 U.S.C. § 1997e(a).

[178] *Ross*, 136 S. Ct. at 1860.

[179] *Rinaldi*, 904 F.3d at 268 (citing *Kertes*, 285 F.3d at 295) (internal citations omitted).

[180] *Id.*

[181] *Id.* at 262.

[182] *Id.*

[183] *Id.* at 267.

[184] *Id.* at 266-67.

[185] *Id.* at 269.

[186] *Id.* at 268.

[187] *Id.* at 269-70 (quoting *Kaba v. Stepp*, 458 F.3d 678, 685 (7th Cir. 2006)).

[188] *Id.* at 270 (quoting *Kaba*, 458 F.3d at 685-86).

[189] ECF Doc. No. 47 ¶ 94.

[190] *Id.* at ¶ 95.

[191] *Id.* at ¶¶ 95-96.

[192] N.T. T. Victory, Mar. 22, 2019, at p. 8.

[193] *Id.*

[194] *Id.* at p. 14.

[195] ECF Doc. No. 47 ¶ 94.

[196] N.T. T. Victory, Mar. 22, 2019, at p. 8.

[197] ECF Doc. No. 47 ¶ 102.

[198] *Id.* at ¶ 140.

[199] *Id.* at ¶ 149.

[200] *Id.* at ¶¶ 152-53.

[201] N.T. T. Victory, Mar. 22, 2019, at p. 55.

[202] *Rinaldi*, 904 F.3d at 270 (quoting *Kaba*, 458 F.3d 678, 685-86 (7th Cir. 2006)).

[203] N.T. T. Victory, Mar. 22, 2019, at p. 51.

[204] *Id.* at p. 57 ("I filed this because I was not in fear of losing my job, I already lost my job, so what more could they take from me.").

[205] ECF Doc. No. 47 ¶ 104.

[206] ECF Doc. No. 89, at p. 11; *see Alexander v. Forr*, No. 04-0370, 2006 WL 2796412, at *3 (M.D. Pa. Sept. 27, 2006), *aff'd*, 297 F. App'x 102 (3d Cir. 2008) ("It is doubtful that rejection or denial of a grievance constitutes the kind of adverse action that would deter a person of ordinary firmness from exercising constitutional rights.").

[207] ECF Doc. No. 47 ¶ 111.

[208] *Id.* at ¶ 112.

[209] Defs' Ex. No. 1 at p. 53, N.T. Mar. 22, 2019.

[210] N.T. T. Victory, Mar. 22, 2019, at pp. 40-41.

[211] ECF Doc. No. 47 ¶ 115.

[212] *Id.* at ¶ 116.

[213] N.T. T. Victory, Mar. 22, 2019, at p. 10.

[214] ECF Doc. No. 47 ¶ 116.

[215] *Id.* at ¶ 115.

[216] *Id.* at ¶¶ 100-01.

[217] *Id.* at ¶ 125.

[218] *Id.* at ¶ 127.

[219] *Id.* at ¶ 133.

[220] *Id.* at ¶ 114.

[221] ECF Doc. No. 89, pp. 14-15.

[222] ECF Doc. No. 47 ¶ 126.

[223] *Rinaldi*, 904 F.3d at 270 (quoting *Kaba*, 458 F.3d at 685-86).

[224] *Id.* at 268.

[225] ECF Doc. No. 47 ¶ 111.

[226] *Id.* at ¶ 122.

[227] *Id.* at ¶ 128.

[228] *Id.* at ¶ 114.

[229] *Id.* at ¶ 122.

[230] N.T. T. Victory, Mar. 22, 2019, at p. 9.

[231] ECF Doc. No. 47 ¶ 117.

[232] *Id.* at ¶¶ 117-18.

[233] *Id.* at ¶ 114.

[234] *Id.* at ¶ 117.

[235] *Id.* at ¶ 119.

[236] *Id.* at ¶ 129.

[237] *Id.* at ¶ 114.

[238] *Id.* at ¶ 94.

[239] *Id.* at ¶ 96.

[240] *Id.*

[241] *Id.* at ¶ 111.

[242] *Id.* at ¶ 120.

[243] *Id.* at ¶ 114.

[244] *Rinaldi*, 904 F.3d at 270 (quoting *Kaba*, 458 F.3d at 685-86).

[245] N.T. T. Victory, Mar. 22, 2019, at pp. 23-24.

[246] ECF Doc. No. 47 ¶ 111.

[247] *Id.* at ¶ 132.

[248] *Id.* at ¶ 114.

[249] While Defendants also argue the favorable termination doctrine from *Heck v. Humphrey* precludes her retaliation claims based on her misconduct violations, the *Heck* doctrine does not apply because her disciplinary sanctions do not involve a loss of "good-time" credits or affect the fact or duration of her confinement. *Schreane v. Marr*, 722 F. App'x 160, 165 (3d Cir. 2018) (citing *Edwards v. Balisok*, 520 U.S. 641, 646 (1997)) ("The Court has extended the rule in *Heck* to prison disciplinary sanctions, preventing a prisoner from bringing a section 1983 suit where the success of that suit would 'necessarily imply the invalidity of the deprivation of his good-time credits.'").

[250] *White v. Wireman*, No. 16-675, 2017 WL 2215277, at *8 (M.D. Pa. May 19, 2017) (quoting *Rode*, 845 F.2d at 1206).

[251] *Unger v. Sogluizzo*, 673 F. App'x 250, 254 (3d Cir. 2016).

[252] *Guarrasi v. Cty. of Bucks*, No. 10-1879, 2011 WL 1226118, at *7 (E.D. Pa. Mar. 29, 2011) (quoting *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828 (1983)).

[253] *Deangelo v. Brady*, 185 F. App'x 173 (3d Cir. 2006).

[254] *Id.* at 175-76.

[255] ECF Doc. No. 89, at p. 17.

[256] Fed. R. Civ. P. 12(b)(5).

[257] *Kornea v. J.S.D Mgmt., Inc.*, No. 18-2708, 2019 WL 480116, at *2 (E.D. Pa. Feb. 6, 2019).

[258] Fed. R. Civ. P. 4(e).

[259] Pa.R.C.P. No. 402.

[260] ECF Doc. No. 89-3 (Ex. A).

[261] *Id.*

[262] *Bush v. Dep't of Human Servs.*, No. 11-2612, 2013 WL 6164072 (E.D. Pa. Nov. 20, 2013), *aff'd*, 614 F. App'x 616 (3d Cir. 2015).

[263] *Id.* at *3.

[264] *Id.*

[265] *Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 486 (3d Cir. 1993).

[266] *Id.*

[267] *Id.*