## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

THERESA VICTORY,                          :
ALICE VELAZQUEZ-DIAZ,                      :
ANABELL DEALBA,                           :
and all others similarly situated,         :
                                          :
     Plaintiffs,                        :
                                          :
     v.                                 :
                                          :      CIVIL ACTION NO. 18-05170
BERKS COUNTY, BERKS COUNTY                 :
COMMISSIONERS KEVIN S.                     :
BARNHARDT, CHRISTIAN Y.                    :      Judge Mark A. Kearney
LEINBACH AND MARK C. SCOTT, ESQ.,          :
WARDEN JANINE L. QUIGLEY,                  :
DEPUTY WARDEN STEPHANIE SMITH,             :      CLASS ACTION COMPLAINT
SERGEANT SPOTTS, C.O. REICHART,            :
C.O. ZERR, C.O. BROWN,                     :
                                          :
     Defendants.                        :      JURY DEMANDED
_____       :


## SECOND AMENDED COMPLAINT

## I.    STATEMENT OF THE CASE

1.     This is a civil rights action brought under 42 U.S.C. § 1983, the United States

Constitution, and the Pennsylvania Constitution concerning Defendants' refusal to provide

Plaintiffs Theresa Victory, Alice Velazquez-Diaz, Anabell Dealba, and other female prisoners

with "Trusty" custody-level classifications and/or Work Release status the same housing and

services as similarly situated male prisoners, solely on the basis of sex, and Defendants'

subsequent retaliation against Ms. Victory for complaining to staff and filing grievances about

this issue. By denying otherwise eligible female prisoners access to housing and services

provided to male prisoners in the Berks County Jail System's Community Reentry Center

("CRC"), Defendants discriminate on the basis of sex in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and the Pennsylvania Equal Rights Amendment, Art. I, § 28 of the Pennsylvania Constitution. By retaliating against Ms. Victory for filing grievances and complaining orally and threatening punishment if she files additional grievances, Defendants violated the First Amendment to the U.S. Constitution.

## II.   JURISDICTION

2.      Jurisdiction is conferred on this Court by 28 U.S.C. § 1331. Jurisdiction for declaratory and other relief is invoked pursuant to 28 U.S.C. §§ 2201(a) and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

3.      This court has supplemental jurisdiction over the state Equal Rights Amendment claim pursuant to 28 U.S.C. § 1367.

4.      Venue is proper pursuant to 28 U.S.C. § 1391(a) as all of the claims arise in and the Defendants are located in the Eastern District of Pennsylvania.

## III.   PARTIES

5.      Plaintiff Theresa Victory resides in Lenhartsville, Pennsylvania and was incarcerated in the Berks County Jail in Leesport, Pennsylvania from January 27, 2018 through January 28, 2019.

6.      Plaintiff Alice Velazquez-Diaz resides in Pennsylvania and is incarcerated in the Berks County Jail in Leesport, Pennsylvania.

7.      Plaintiff Anabell Dealba resides in Pennsylvania and is incarcerated in the Berks County Jail in Leesport, Pennsylvania.

8.      Defendant Berks County is a county of the third class in Pennsylvania, operates the Berks County Jail System, and has offices at 633 Court Street, Reading, PA 19601.

9.     Defendant Kevin S. Barnhardt is a commissioner on the Berks County Board of Commissioners, which constitutes the chief governing body of Berks County and has offices at 633 Court Street, 13th Floor, Reading, PA 19601. He serves on and is the president of the Berks County Prison Board. He is sued in his official capacity.

10.     Defendant Christian Y. Leinbach is a commissioner on the Berks County Board of Commissioners, which constitutes the chief governing body of Berks County and has offices at 633 Court Street, 13th Floor, Reading, PA 19601. He serves on and is the vice president of the Berks County Prison Board. He is sued in his official capacity.

11.     Defendant Mark C. Scott, Esq. is a commissioner on the Berks County Board of Commissioners, which constitutes the chief governing body of Berks County and has offices at 633 Court Street, 13th Floor, Reading, PA 19601. He serves on the Berks County Prison Board. He is sued in his official capacity.

12.     Defendant Janine Quigley is and was employed as the warden of the Berks County Jail System at all times relevant to this complaint. She is sued in her official capacity.

13.     Defendant Stephanie Smith is and was employed as the deputy warden for treatment in the Berks County Jail System at all times relevant to this complaint. She is sued in her official capacity.

14.     Defendant Sergeant Spotts is and was employed as a correctional lieutenant in the Berks County Jail System at all times relevant to this complaint. He is sued in his individual capacity.

15.     Defendant Corrections Officer Reichart is and was employed by the Berks County Jail System at all times relevant to this complaint. She is sued in her individual capacity.

16.     Defendant Corrections Officer Zerr is and was employed by the Berks County Jail System at all times relevant to this complaint. She is sued in her individual capacity.

17.     Defendant Corrections Officer Brown is and was employed by the Berks County Jail System at all times relevant to this complaint. She is sued in her individual capacity.

## IV.     CLASS ACTION ALLEGATIONS

18.     Plaintiffs Victory, Velazquez-Diaz, and Dealba bring this action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) on behalf of themselves and the following class:

> All current and future female inmates committed to the Berks County Jail System who have the Trusty custody-level classification and/or Work Release status but have been denied assignment to the Community Reentry Center ("CRC") and denied access to the privileges, services, and programs available to men assigned to the CRC.

19.     All class members are aggrieved persons under federal and state civil rights law as a result of Defendants' actions, policies, customs, and practices.

20.     On information and belief, there are currently approximately 11 women committed to the Berks County Jail System who satisfy the criteria for class membership.

21.     On information and belief, numerous other women enter the facility throughout the year who satisfy the criteria for class membership.

22.     This matter is properly maintainable as a class action pursuant to Fed. R. Civ. P. 23(a)(1) in that joinder of all members of the proposed class is not only impracticable, but also impossible, because the class includes a shifting prison population whose identities are incapable of being known at the present time.

23. The proposed class meets the requirements of Fed. R. Civ. P. 23(a)(2) because there are questions of law and fact common to the class members, including, but not limited to, the following:

(1) Whether Defendants' disparate treatment of men and women with Trusty custody-level classification and/or Work Release status is a sex-based classification;

(2) Whether the Defendants violate the Fourteenth Amendment Equal Protection rights of the Proposed Class members by housing them in the Jail rather than in the CRC;

(3) Whether the Defendants violate the Fourteenth Amendment Equal Protection rights of the Proposed Class members by denying them the privileges, services, and programs provided to male prisoners housed in the CRC;

(4) Whether the Defendants have a genuine and exceedingly persuasive justification for their failure to treat the Proposed Class members and similarly situated men equally;

(5) Whether the Defendants' failure to treat the Proposed Class members and similarly situated men equally serves important governmental objectives;

(6) Whether the Defendants' denial of CRC housing and its concomitant privileges, services, and programs to the Proposed Class members is substantially related to the achievement of important governmental objectives;

(7) Whether the Defendants violate the rights of the Proposed Class members under the Pennsylvania Equal Rights Amendment, Art. I, § 28 of the Pennsylvania Constitution.

24.     The proposed class representatives satisfy Fed. R. Civ. P. 23(a)(3) because their claims are typical of those of the proposed class in that the representatives are or, at the time this action was initiated, were being denied access to the same reentry housing and the benefits accompanying the reentry housing based solely on sex.

25.     The proposed class representatives will fairly and adequately protect the interests of the class pursuant to Fed. R. Civ. P. 23(a)(4) because they will prosecute this action vigorously in order to obtain remedies for the all members of the class, whose interests they share.

## V.     FACTUAL ALLEGATIONS

**<u>Berks County Jail System</u>**

26.     At all times relevant to this Complaint, individual Defendants were acting under color of state law, within the scope and course of their employment, and under the direct control and supervision of Berks County.

27.     The Berks County Jail System ("BCJS") is governed and controlled by a board of inspectors, also known as the Berks County Prison Board ("Prison Board"), which is mandated by law to "provide for the safekeeping, discipline and employment of inmates and the government and management of [BCJS]" and to appoint a warden. *See* 61 Pa. C.S. §§ 1731(3), 1733.

28.     All expenditures connected with the operation of BCJS must be approved by a majority of the members of the Prison Board and, in addition, specifically by Defendant Barnhardt, in his role as Prison Board president. *See* 61 Pa. C.S. § 1735.

29.     Defendant Warden Quigley is the chief executive officer of BCJS and approves all of BCJS's policies, including those that govern the classification of inmates into different custody levels and inmates' housing assignments.

30.     BCJS includes two facilities, located in close proximity to each other: the Berks County Jail ("Jail") and the Berks County Community Reentry Center ("CRC").

31.     The Jail is a secure custodial facility with prisoners of both sexes and all security levels, located at 1287 County Welfare Road, Leesport, PA 19533.

32.     The CRC is a separate facility located close to the Jail at 1261 County Welfare Road, Leesport, PA 19533, that houses men only.

33.     According to Berks County, the CRC is "dedicated to improving the quality of our community by delivering effective and innovative inmate services that instill pro-social behavior, healthy life choices, and personal accountability, thereby reducing recidivism and its financial burden on the county." *Welcome to Berks County Community Reentry Center*, COUNTY OF BERKS PENNSYLVANIA, http://www.co.berks.pa.us/Dept/Jail/CRC/Pages/default.aspx (last visited Nov. 26, 2018).

34.     The CRC "opened its doors in May of 2010 with the goal of reducing recidivism and assisting residents in re-establishing themselves as productive members of our community. Through a collaborative effort with other local government agencies, non-profit agencies, community-based agencies and faith-based organizations, [the CRC] strive[s] to provide the guidance and resources necessary to enable reintegration back into the community. These agencies deliver services both pre- and post-release and provide a continuum of care for up to three years after release. The partnership among these aforementioned agencies seeks to enhance public safety by utilizing evidence based practices which support positive choices, constructive

7

behavior and accountability, thereby reducing criminal actions and financial burden upon the county." *About the Community Reentry Center*, COUNTY OF BERKS PENNSYLVANIA,

http://www.co.berks.pa.us/Dept/Jail/CRC/Pages/About-the-CRC.aspx (last visited Nov. 26, 2018).

35.     On information and belief, there are currently approximately 100 men—and no women—housed in the CRC.

36.     The CRC has enough space and beds to house up to 152 people.

37.     BCJS has a classification system that assigns prisoners to one of five custody levels: Administrative Segregation, Maximum, Medium, Minimum, and Trusty.  Trusty is the least restrictive custody level. BERKS COUNTY JAIL SYSTEM INMATE HANDBOOK (Eff. Apr. 1, 2016) 31, available at

http://www.co.berks.pa.us/Dept/Jail/Documents/INMATE%20HANDBOOK%202016%20-%20PDF%20version%2004-01-16.pdf.

38.     Classification is determined based on:

- Reports from law enforcement agencies

- Medical or psychiatric condition and history

- Jail records of conduct and adjustment

- Records of prior incarceration

- Length of time in present classification status

- Criminal charges

- Existence of detainers

- Adjudication status

- Program participation

*Id*.

39.     BCJS has four categories of housing. Three are located in the Jail: Quarantine, General Population, and Restricted Housing (administrative or disciplinary segregation). *Id*.

40.     The fourth housing category is Reentry, which "includes Trusty or work release." Reentry housing, also known as the CRC, is outside the secure perimeter of the jail and affords inmates more freedom and subjects them to less direct supervision than in the Jail.  *Id*.

41.     According to the Inmate Handbook, "[a prisoner's] housing assignment [is] based upon the results of the classification process." *Id*.

42.     The Inmate Handbook says that "[r]eentry housing is assigned to those who meet a number of criteria" but does not state what those criteria are. *Id*. at 33.

43.     Prisoners are not eligible for reentry housing if they:

- Are in an administrative segregation status

- Are in quarantine status

- Ever escaped or attempted to escape from custody in the last eight (8) years

- Have a detainer from another jurisdiction lodged against the prisoner

- Have a custody level assignment of minimum, medium, or maximum until reviewed and approved by the ICC

- Have a risk assessment level of medium high, or high

- Refuse to participate in specific treatment programs or fail to demonstrate improvement

- Have a prior work release failure in the last three years

- Have received a formal misconduct in the past sixty (60) days

*Id*. at 34.

9

44.     The Work Release Program "provides an opportunity for [prisoners] to become employed in the community." *Id.* at 29.

45.     To be eligible for Work Release, a prisoner must meet the criteria for Trusty custody level classification and attend or be involved in all recommended programming. *Id.* at 30.

**Discrimination against Women in the Berks County Jail System**

46.     Berks County and BCJS have a policy and custom of housing male prisoners with a Trusty custody-level classification and/or Work Release status in the CRC.

47.     Berks County and BCJS have a policy and custom of housing all women committed to BCJS—regardless of their assigned custody level—in the Jail, including those with the Trusty classification and those on Work Release.

48.     On information and belief, Defendants Barnhardt, Leinbach, Scott, Quigley, and Smith approved and ratified BCJS's policy and custom of barring Trusty and Work Release women from the CRC, on the basis of their sex and gender.

49.     In addition to housing Trusty and Work Release men, the CRC also houses some men with custody-level classifications of Minimum or Medium.

50.     Men incarcerated in BCJS, whether in the Jail or the CRC, live on housing units or cell blocks only with other men of the same custody level.

51.     Women incarcerated in BCJS, unless they are in a medical or other special unit, are all housed on F Block in the Jail, where women with custody levels ranging from Trusty to Maximum are all housed together and sometimes share cells; for example, an inmate classified as Trusty sometimes shares a cell with an inmate classified as Maximum.

52.     Women housed on F Block are confined in locked cells, approximately 75 square feet in area.

53.     Each cell on F Block houses two inmates and contains a toilet with no lid or cover.

54.     Women on F Block eat all their meals in their cells.

55.     The toilets in the cells on F Block automatically "lock"—i.e., they cannot be flushed—for one hour if they are flushed twiced within five minutes.

56.     There is sometimes fecal matter and/or urine in the uncovered toilets while women on F Block are eating in their cells.

57.     Excluding time that women who have jobs spend at work, women on F Block are limited to a maximum of 6 hours out of their cells daily, during three different two-hour recreation periods.

58.     Women on F Block are often forced to forfeit their recreation time—and, thus, often get less than six hours out of their cells each day—because of frequent "lockdowns" and "lock-ins," during which prisoners are confined in their locked cells for hours, and sometimes days, on end.

59.     Women on F Block are only permitted to use the phones, microwaves, and showers during their recreation periods.

60.     Consequently, women on F Block sometimes go for days without access to showers.

61.     When female Trusty and/or Work Release prisoners in the Jail receive visitors, they must sit in a room with other prisoners and are separated from their visitors by a glass or

11

plexiglass barrier, through which they must talk without the benefit of a phone or other means of amplification.

62.     The CRC consists of four housing units, each of which contains cells, a "day room," and a communal bathroom, which contains at least three showers and toilets.

63.     Inmates in the CRC live in cells, the doors of which remain unlocked at all times.

64.     The CRC cells contain either 2 or 4 beds and a private closet for each inmate's possessions.

65.     Inmates in the CRC have unfettered access to the day room from 4:00 A.M. through 11:30 P.M. every day, and can move freely between their cells and the day room, socialize, and play games.

66.     Inmates in the CRC have unfettered access to showers during the 19 ½ hours they are permitted out of their cells each day, and can shower as often as they want.

67.     The day rooms in the CRC contain phones and microwaves, which the inmates are free to use during the 19 ½ hours they are permitted out of their cells each day.

68.     Inmates in the CRC eat their meals in the day room.

69.     Inmates in the CRC are able to have visitors on days when they are not working and are able to sit at a table with their visitors, without any physical barrier between them.

70.     Although inmates in the CRC are occasionally affected by lockdowns, they spend much less time on lockdown than inmates in the Jail.

71.     On information and belief, men with the Trusty custody level—who are housed in the CRC—have access to job fairs and other programs and services that help them to acquire jobs and get approved for Work Release.

72.     On information and belief, women with the Trusty custody level—who are housed in the Jail—do not have comparable access to job fairs or other programs and services that would enable them to acquire jobs and get approved for Work Release.

73.     Berks Connections is a nonprofit organization that provides programming in the CRC to prepare inmates to return to free society and increase their chances of acquiring employment, including:

        a.   Introduction to Reentry;

        b.   Ready to Re-Enter, a three-session program that assists inmates with reentry planning;

        c.   Resume writing seminar; and

        d.   Ready to Succeed, a four-week program that assists inmates with job-seeking skills, interviewing skills, and other skills needed to acquire jobs.

74.     Each of the programs listed in the previous paragraph is offered in the CRC but not the Jail and, thus, available to men but not women.

75.     Male and female prisoners on Work Release—including Ms. Victory when she was incarcerated—are charged $50 per week for room and board, but male prisoners on Work Release receive all the benefits and privileges associated with being housed in the CRC, while female prisoners on Work Release—including Ms. Victory when she was incarcerated—do not.

**Discrimination and Retaliation Against Theresa Victory**

76.     On January 24, 2018, Theresa Victory entered a guilty plea in the Court of Common Pleas of Berks County pursuant to a negotiated plea agreement, the terms of which guaranteed that she would be immediately eligible for Work Release.

77.     This guarantee of immediate eligibility for Work Release was a major factor in Ms. Victory's decision to accept the plea agreement and plead guilty, as it would enable her to continue to work, pay her bills, and keep her apartment.

78.     As part of those negotiations, Ms. Victory understood that her participation in Work Release would be accompanied by housing separate from the main jail.

79.     On January 24, 2018, Ms. Victory was sentenced to 1 to 5 years confinement.

80.     If she is released before her maximum sentence, she will serve the remainder of her sentence on parole.

81.     Ms. Victory reported to Berks County Jail on January 27, 2018.

82.     On January 31, 2018, Berks County issued a document reflecting Ms. Victory's approval for Trusty custody level and specifically stated that her placement in the CRC was contingent on her participation in a drug and alcohol group.

83.     Ms. Victory was put on Work Release and worked as a server at Route 61 Diner while she was incarcerated. She worked eight-hour shifts, five days a week, and was paid $7.85 per hour.

84.     For the first two weeks she was on Work Release, BCJS deducted $75 per week from Ms. Victory's wages for room and board; and every week for the remainder of her incarceration, BCJS ~~has~~ deducted $50 per week from her wages for room and board.

85.     Ms. Victory participated in and completed the drug and alcohol group, and she ~~has~~ complied with all requirements of the program throughout her time at the Berks County Jail.

86.     Throughout her confinement, Ms. Victory was classified as a Trusty and approved for Work Release.

14

87.     At no point during her confinement, prior to her testifying in this case, was Ms. Victory in any of the disqualifying categories for reentry housing (i.e., housing in the CRC). *See supra*, ¶ 43.

88.     Despite this, Ms. Victory was assigned to General Population in the Jail instead of the CRC.

89.     When Ms. Victory first arrived at the Jail, she was placed in an "overflow" unit of the Jail that houses 45 female prisoners in "dormitory" housing rather than in locked cells.

90.     While housed in the overflow unit, Ms. Victory and, upon information and belief, other female prisoners with Trusty custody level and/or Work Release status, filed grievances in which they complained about not being housed in the CRC and requested the same services and privileges that male prisoners with Trusty custody level received.

91.     Shortly after filing these grievances, Ms. Victory and other female prisoners with Trusty classification and/or Work Release status were moved from the dormitory-style overflow housing unit to F Block in General Population in the Jail, where they were housed in locked cells.

92.     C.O. Bauer said she moved Ms. Victory and the other female Trusty prisoners out of the overflow housing and on to F Block because, in her words, they were "too demanding."

93.     Upon information and belief, C.O. Bauer received authority to move Ms. Victory and the other female Trusty-classified prisoners from Defendants Warden Quigley and Deputy Warden Smith.

94.     Ms. Victory has been subjected to lockdowns in the Jail—periods when she was not permitted to leave her cell for long periods of time—on more than 45 occasions, including multiple times for 19 hours straight.

95.     Laundry services are unreliable and erratic in the Jail, causing Ms. Victory to have to wear the same dirty clothing to work day after day.

96.     On or around July 15, 2018, Ms. Victory asked C.O. Drosdak to do her laundry and told her that she had no clean underwear.

97.     When it was time for Ms. Victory to leave for work on July 15, 2018 and C.O. Drosdak still had failed to do Ms. Victory's laundry, C.O. Drosdak told Ms. Victory to go to work with no underwear on.

98.     On May 31, 2018, Ms. Victory filed a grievance complaining about the failure of the Jail System to assign her to housing and services in the CRC and complaining about the disparities in treatment and privileges between her and other women with Trusty classification and/or Work Release status (all of whom are housed in the Jail) and men with Trusty classification and/or Work Release status (all of whom are housed in the CRC) ("CRC grievance").

99.     On or about July 24, 2018, Ms. Victory filed an appeal of the unanswered CRC grievance.

100.    On or about August 14, 2018, Ms. Victory asked her counselor about the status of her CRC grievance and appeal, and her counselor found a response to the appeal, dated July 26, 2018, in Ms. Victory's file. Ms. Victory had not previously received a copy of this response.

101.    In the response, Defendant Captain Castro claimed not to have received the initial grievance, treated the appeal as a grievance, and denied the grievance.

102.    In her denial of Ms. Victory's CRC grievance, Captain Castro stated: "Due to the small size of the female prisoner population, in comparison to the male population, the physical design of the jail prohibits dedicating a housing unit for trusty status females. Even our smallest

housing unit would maintain nearly 90% unoccupied beds if we were to attempt to create a female trusty unit. This would be a tremendous waste of valuable bedspace and resources. The CRC is not a co-ed building."

103.    On or about August 14, 2018, Ms. Victory filed an appeal of the denial of her CRC grievance.

104.    On August 17, 2018, Defendant Deputy Warden Stephanie Smith denied Ms. Victory's appeal of her CRC grievance, claiming that, Trusty Status, CRC, and Work Release were unrelated and that Ms. Victory was not entitled to CRC housing and benefits based on her Work Release and Trusty status.

105.    On July 24, 2018, Ms. Victory submitted a furlough request.

106.    On or about August 17, 2018, Defendant Deputy Warden Smith denied Ms. Victory's request for a furlough.

107.    On or about August 18, 2018, Ms. Victory filed a grievance complaining about the denial of her request for a furlough ("furlough grievance"), explaining that she felt it was unfair that men with Trusty classification and/or Work Release status were routinely granted furloughs but women with the same status were not.

108.    On or about August 30, 2018, Lieutenant Weber denied Ms. Victory's furlough grievance and wrote in his response, "You have already filed an appeal to your grievance. This exhausts the steps of the grievance process.  Future communication on this topic will be considered harassment and discipline will follow."

109.    Since filing her grievances and appeals, Ms. Victory has been repeatedly subjected to interference with her Work Release employment and threats to terminate her Trusty

custody level and her Work Release status, in retaliation for her grievances and other communications with BCJS staff.

110.     On information and belief, Defendants Sergeant Spotts, C.O. Reichart, C.O. Zerr, and C.O. Brown, all knew about or were aware of Ms. Victory's grievances, and/or Lieutenant Weber's and Deputy Warden Smith's responses.

111.     On or around July 14, 2018, C.O. Drosdak and C.O. Bauer refused to release Ms. Victory when she was scheduled to leave for work, causing her to arrive at work late.

112.     When she explained that she was scheduled to leave for work, C.O. Drosdak and C.O. Bauer responded derisively, and Defendant Sergeant Spotts said, "You will go to work when I tell you to. If you keep it up, you will not go at all."

113.     On or around September 4, 2018, Ms. Victory was scheduled to go to work, but Defendants C.O. Zerr and C.O. Brown refused to let her leave because they said she was not listed as being scheduled to work that day.

114.     When Ms. Victory explained that she could lose her job if she was absent and asked C.O. Zerr to check with Work Release Coordinator Joanna Brown, C.O. Zerr told her that if she continued to ask about it, she would send her to "the hole" (i.e., Restrictive Housing).

115.     When Ms. Victory told C.O. Brown she needed to go to work and asked C.O. Brown to call Work Release Coordinator Joanna Brown, C.O. Brown replied, "If you ask me one more time, I'm going to put you in the hole today."

116.     Ms. Victory's fiancé and her boss both called Joanna Brown multiple times that day but got no response, and Ms. Victory ended up missing the entire day of work.

117.     On or around September 12, 2018 at approximately 1:10 p.m., Ms. Victory knocked on her cell door because it was time for her to be released to go to work.

18

118.    Defendant C.O. Reichart then told Ms. Victory, "Knock on your door one more time, and you'll lose your job."

119.    On or around September 13, 2018, Ms. Victory was released late from her unit to go to work.

120.    Defendant C.O. Reichart said to Ms. Victory, "It's jail. We cannot help it if you are late for work."

121.    On or around September 26, 2018, Ms. Victory was released late from her unit to go to work because C.O. Drosdak refused to allow her to leave at the proper time.

122.    C.O. Drosdak told Ms. Victory, referring to getting released to go to work, "It's not a priority. . . . I don't care. I will get to it when I get around to it."

123.    On or around September 26, 2018, as well as on multiple other days, C.O. Drosdak interfered with Ms. Victory's ability to get to work on time by requiring her fiancé, who drove her to work, to check in inside the Jail before C.O. Drosdak would permit Ms. Victory to leave; when other C.O.'s were on duty, Ms. Victory's fiancé was not required to do this.

124.    On or around October 18, 2018, Ms. Victory was late to work because Defendants C.O. Zerr and C.O. Reichart failed to let her out of her cell on time.

125.    On or around November 19, 2018, Defendant C.O. Brown searched Ms. Victory's cell and accused her of having an extra towel, an extra bed sheet, and prohibited correspondence from another inmate.

126.    The allegedly prohibited correspondence from another inmate was actually a poem that Ms. Victory's former cellmate, who had been released from the Jail, had written and left in the cell.

19

127.     C.O. Brown told Ms. Victory she could either accept an "informal" punishment of 10 days locked in her cell or go through the formal discipline process, which would mean time in "the hole" and the possible loss of her Work Release status; Ms. Victory chose the former option.

128.     On December 7, 2018, C.O. Drosdak wrote a misconduct citation in which she alleged that Ms. Victory had saved oatmeal from breakfast, in violation of Jail policies.

129.     Ms. Victory did not receive a copy of C.O. Drosdak's citation and did not know that she had been cited until a few days later.

130.     On December 7, 2018, Joanna Brown, the Work Release Coordinator, wrote in an email to Ms. Victory's boss at the diner that Ms. Victory had been removed from the Work Release Program.

131.     Ms. Victory first learned of this email and its contents when she got to work on December 7, which caused her great embarrassment.

132.     On December 10, 2018, Defendants were served summonses and copies of the original complaint Ms. Victory filed in this lawsuit.

133.     On the morning of December 11, 2018, an article appeared in the *Reading Eagle* about Ms. Victory's lawsuit.

134.     Later that same day, Joanna Brown visited Ms. Victory on F-Block and told her that the December 7th misconduct citation "did not stand," and that her Work Release status was being reinstated.

135.     On Thursday, January 10, 2019, this Court conducted an evidentiary hearing on Ms. Victory's motion for a preliminary injunction.

136.   At the preliminary injunction hearing, Ms. Victory testified about the discrimination to which she has been subjected, Defendants' responses to her grievances, and Defendants' retaliation against her.

137.   Warden Quigley, Deputy Warden Smith, and Captain Castro all testified at the preliminary injunction hearing and were subjected to cross examination by Ms. Victory's counsel.

138.   On information and belief, all of the Defendants employed by BCJS as well as all other BCJS correctional staff knew that that, as a result of Ms. Victory's lawsuit, Warden Quigley, Deputy Warden Smith, and Captain Castro had to testify in court.

139.   On Sunday, January 13, 2019, Ms. Victory passed a newspaper article about homelessness, with certain passages underlined or circled in red pencil, under the cell door of another female inmate on F Block, Cassie Heilman.

140.   Ms. Victory and Ms. Heilman had previously had a conversation about homelessness, so Ms. Victory gave Ms. Heilman the article because she thought she might find it interesting.

141.   Ms. Victory was going to work that day so would not be able to give it to Ms. Heilman directly and, therefore, decided to put it under her cell door.

142.   Ms. Heilman had previously been classified as a Trusty but had recently lost her Trusty classification.

143.   Ms. Heilman and Ms. Victory had previously been cellmates and did not get along well when they were cellmates.

144.    Later in the day on January 13, 2019, Defendant C.O. Brown wrote a report in which she alleged that Ms. Heilman believed Ms. Victory was harassing her by passing the article under her cell door.

145.    Ms. Victory denied the allegations because her intent was not to harass Ms. Heilman and because—in light of Defendants' pattern of retaliation against her and the recent court proceeding—she was fearful of what C.O. Brown and other staff would do to her if she admitted to having passed the newspaper article under Ms. Heilman's door.

146.    After reading C.O. Brown's report and speaking to Ms. Victory, Lieutenant Baurle cited her for three misconducts—Harassment, Misrepresentation, and Transfer of Property—and placed Ms. Victory in the Restricted Housing Unit ("RHU").

147.    A disciplinary hearing was held and Ms. Victory was sentenced to 15 days in the RHU.

148.    As a result of this infraction, Ms. Victory's Work Release status was terminated.

149.    Defendants Quigley and Smith did not want to transfer Ms. Victory to the CRC or treat her the same as male Trusty/Work Release inmates, even if the Court ordered them to do so.

150.    Defendants Quigley and Smith knew that if Ms. Victory got a formal misconduct citation, they could argue she was no longer similarly situated to male Trusty inmates and would not be entitled to any relief this Court might order.

151.    On information and belief, Defendants Quigley and Smith were aware of or directed C.O. Brown's report and Lieutenant Bauerle's misconduct citations against Ms. Victory.

152.    Warden Quigley, Deputy Warden Smith, and Lieutenant Weber were aware of the ongoing pattern of retaliation against Ms. Victory by the Jail staff they supervised, did nothing to stop it, and, in some cases, even encouraged it or directed it.

153.     The intimidation, threats, and retaliation by Defendants ~~have~~ caused Ms. Victory severe depression and anxiety about getting to work late, losing her Trusty custody level, and losing her Work Release employment.

154.     Ms. Victory suffered from frequent nightmares as a result of her anxiety.

155.     Ms. Victory experienced nausea and vomiting several mornings each week as a result of her anxiety, ever since the intimidation and threats by correctional officers began.

156.     In September 2018, medical staff prescribed Ms. Victory medication for her depression and prescribed an increased dosage of medication for her anxiety.

157.     On or around October 3, 2018, Ms. Victory was diagnosed with a muscle spasm in her back, a condition that was caused and/or exacerbated by her having to sleep on a hard metal bedframe, a lack of exercise, and insufficient time out of her cell.

158.     On multiple occasions, as a result of lockdowns or lock-ins, Ms. Victory was forced to go several days without a shower and ~~has~~ had to go to her waitressing job without having showered.

159.     One such example was in January 2019, when she went from January 6 - January 11 without showering.

160.     Ms. Victory was released on parole from Berks County Jail on January 28, 2019.

**Discrimination Against Alice Velazquez-Diaz**

161.     Alice Velazquez-Diaz is an inmate at Berks County Jail.

162.     Ms. Velazquez-Diaz was sentenced by the Court of Common Pleas of Berks County on October 24, 2018 to 11 ½ to 23 months confinement.

163.     If she is released before her maximum sentence, she will serve the remainder of her sentence on parole.

23

164.    Ms. Velazquez-Diaz was classified as a Trusty on or around January 30, 2019 and has remained a Trusty since then.

165.    She is incarcerated on F Block in the Jail and subject to all of the same restrictions as other F Block inmates.

166.    She does not fit into any of the categories that would disqualify an inmate from being housed in the CRC. *See supra*, ¶ 43.

167.    But for her being a woman, she would be housed in the CRC.

168.    On February 8, 2019, Ms. Velazquez-Diaz filed a grievance in which she complained about the differences in treatment between male and female Trusty inmates, including asking why women were excluded from the CRC.

169.    In response to her grievance, Ms. Velazquez-Diaz was sent to see a Special Operating Group ("S.O.G.") officer.

170.    S.O.G. officers, known by inmates as "turtles," wear body armor and carry large weapons.

171.    Ms. Velazquez-Diaz felt that her being sent to see a S.O.G. officer was intended to intimidate her.

172.    On February 19, 2019, Deputy Warden Smith responded to the grievance and wrote that the CRC was for men only.

173.    On March 5, 2019, Ms. Velazquez-Diaz filed an appeal of Deputy Warden Smith's response to her grievance.

174.    On March 12, 2019, Captain Castro responded and said it was unclear whether Ms. Velazquez-Diaz was attempting to file an appeal or a new grievance, and he instructed her to re-submit it.

24

175.    On March 15, 2019, Ms. Velazquez-Diaz filed a new appeal of the response to her initial grievance.

176.    On March 28, 2019, Warden Quigley responded to the appeal, upheld Deputy Warden Smith's response, and stated that the CRC was for men only.

177.    Ms. Velazquez-Diaz exhausted the steps of the BCJS grievance procedure.

**Discrimination Against Anabell Dealba**

178.    Anabell Dealba is an inmate at Berks County Jail.

179.    Ms. Dealba was sentenced by the Court of Common Pleas of Berks County on February 13, 2019 to 9 to 23 months confinement.

180.    If she is released before her maximum sentence, she will serve the remainder of her sentence on parole.

181.    On or around March 12, 2019, she was classified as a Trusty and has remained a Trusty ever since.

182.    She is incarcerated on F Block in the Jail and subject to all of the same restrictions as other F Block inmates.

183.    She does not fit into any of the categories that would disqualify an inmate from being housed in the CRC. *See supra*, ¶ 43.

184.    But for her being a woman, Ms. Dealba would be housed in the CRC.

185.    On March 15, 2019, Ms. Dealba filed a grievance in which she complained about the differences in treatment between male and female Trusty inmates.

186.    On March 20, 2019, Deputy Warden Smith responded to Ms. Dealba's grievance and wrote that the CRC was for men only and that "[a]ll inmates are treated equally within the parameters of institutional security and operational limitations."

25

187.    On March 22, 2019, Ms. Dealba filed an appeal of Deputy Warden Smith's response to her grievance.

188.    On April 5, 2019, a BCJS staff member responded to Ms. Dealba's grievance appeal, stating that the "time limit [was] extended for further investigation."

189.    On April 9, 2019, Warden Quigley responded to Ms. Dealba's grievance appeal, upholding Deputy Warden Smith's response, stating that "programs and housing are impacted by the confines of operational limitations and institutional safety and security."

190.    Ms. Dealba exhausted the steps of the BCJS grievance procedure.

## VI.    LEGAL CLAIMS

### Count I – Sex Discrimination in Violation of the Fourteenth Amendment to the US Constitution – Injunctive Relief
### Plaintiffs Victory, Velazquez-Diaz, Dealba, and Class against Berks County, County Commissioner Defendants, Warden Quigley, and Deputy Warden Smith

191.    Plaintiffs repeat and re-allege all of the paragraphs of this Complaint as if fully set forth herein.

192.    Defendants' policy, custom, and practice of refusing to assign female prisoners who are on Work Release and/or have Trusty custody-level classifications to the CRC and denying to them the benefits of such assignment discriminates against Plaintiffs and the class they represent on the basis of sex, in violation of their right to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

193.    The sex-based classification used by Defendants in making housing assignments for prisoners with Trusty custody-level classification or Work Release status is not substantially related to the achievement of any important governmental objectives.

**Count II – Sex Discrimination in Violation of the Fourteenth Amendment to
the US Constitution – Damages
Plaintiffs Victory, Velazquez-Diaz, and Dealba against Berks County**

194.     Plaintiffs repeat and re-allege all of the paragraphs of this Complaint as if fully set

forth herein.

195.     Defendants' policy, custom, and practice of refusing to assign female prisoners

who are on Work Release and/or have Trusty custody-level classifications to the CRC and

denying to them the benefits of such assignment discriminates against Plaintiffs and the class

they represent on the basis of sex, in violation of their right to equal protection of the laws

guaranteed by the Fourteenth Amendment to the United States Constitution.

The sex-based classification used by Defendants in making housing assignments for prisoners

with Trusty custody-level classification or Work Release status is not substantially related to the

achievement of any important governmental objectives.

**Count III - Retaliation for Asserting First Amendment Rights
Plaintiff Victory against Defendants, Spotts, Reichart, Zerr, and C.O. Brown**

196.     Plaintiff repeats and re-alleges all of the paragraphs of this Complaint as if fully

set forth herein.

197.     Plaintiff Victory engaged in protected First Amendment activity when she filed

grievances and inmate communication forms, made informal complaints to prison staff,

requested to be released from her cell to report to her Work Release job, filed this lawsuit, and

testified at a preliminary injunction hearing.

198.     Defendants took adverse actions against Plaintiff Victory—including transferring

her to different housing, verbally threatening to punish her, and interfering with her

employment—sufficient to deter a prisoner of ordinary firmness from engaging in further protected speech.

199.    Plaintiff Victory's protected First Amendment speech was a motivating factor in Defendants' decisions to threaten and take other adverse actions Plaintiff Victory.

200.    Defendants Quigley and Smith was aware of, acquiesced to, and/or directed the continued retaliation against Ms, Victory.

201.    These actions were undertaken intentionally, with malice, and/or with reckless disregard for Plaintiff Victory's rights.

**Count IV – Sex Discrimination in Violation of the Pennsylvania Equal Rights Amendment, Art. I, § 28 of the Pennsylvania Constitution**
**Plaintiffs Victory, Velazquez-Diaz, Dealba, and Class against Berks County, County Commissioner Defendants, Warden Quigley, and Deputy Warden Smith**

202.    Plaintiffs repeat and re-allege all of the paragraphs of this Complaint as if fully set forth herein.

203.    Defendants' policy, custom, and practice of refusing to assign female prisoners who are on Work Release and/or have Trusty custody-level classifications to the CRC and denying to them the benefits of such assignment discriminates against Plaintiffs and the class they represent on the basis of sex, in violation of their right to equal protection of the laws guaranteed by the Pennsylvania Equal Rights Amendment, Art. I, § 28 of the Pennsylvania Constitution.

**VII.   JURY DEMAND**

Plaintiffs hereby demand that this matter be tried by jury.

## VIII.  RELIEF

**WHEREFORE**, Plaintiffs request that this Court grant:

    A.    A preliminary and permanent injunction:

        (1) Prohibiting Defendants from assigning female prisoners on Work Release and/or with Trusty custody-level classification to any housing other than the CRC or an alternative with the exact same privileges, programs, and services as the CRC;

        (2) Ordering Defendants to immediately move Alice Velazquez-Diaz, Anabell Dealba, and all other members of the Proposed Class currently in the Berks County Jail System to the CRC or an alternative with the exact same privileges, programs, and services as the CRC;

        (3) Prohibiting Defendants from retaliating against Ms. Velazquez-Diaz, Ms. Dealba, and other members of the Proposed Class for complaining about sex discrimination and retaliation.

    B.    A declaratory judgment under 28 U.S.C. § 2201 that the Defendants violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and the Pennsylvania Equal Rights Amendment.

    C.    An award of compensatory damages to Ms. Victory, Ms. Velazquez-Diaz, and Ms. Dealba.

    D.    An award of punitive damages to Ms. Victory, Ms. Velazquez-Diaz, and Ms. Dealba.

    E.    An award of reasonable attorneys' fees and costs.

    F.    Such other and further relief as may appear just and appropriate.

Respectfully submitted,


*/s/ Su Ming Yeh*_____
Su Ming Yeh
PA Attorney No. 95111
*/s/ Angus Love*_____
Angus Love
PA Attorney No. 22392
*/s/ Matthew A. Feldman*_____
Matthew A. Feldman
PA Attorney No. 326273
PENNSYLVANIA INSTITUTIONAL LAW PROJECT
718 Arch St., Suite 304S
Philadelphia, PA 19106
Tel: 215-925-2966
smyeh@pailp.org
alove@pailp.org
mfeldman@pailp.org
*Counsel for Plaintiffs and Proposed Class Members*


Dated:            April 18, 2019

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THERESA VICTORY, | : | |
| ALICE VELAZQUEZ-DIAZ, | : | |
| ANABELL DEALBA, | | : |
| and all others similarly situated, | : | |
| | : | CIVIL ACTION NO. 18 Civ. 5170 |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | Judge Mark A. Kearney |
| BERKS COUNTY, *et al.* | : | |
| | : | |
| Defendants. | : | |
| | : | |

## CERTIFICATE OF SERVICE

I, Matthew A. Feldman, hereby certify that on April 22, 2019, I caused to be served a true and correct copy of Plaintiff's Amended Complaint upon the following by filing it with the Clerk's Office:

> Matthew J. Connell, Esq.
> Samantha Ryan, Esq.
> MacMain Law Group
> 433 W. Market Street
> Suite 200
> West Chester, PA 19382
> mconnell@macmainlaw.com

> /s/ Matthew A. Feldman
> Matthew A. Feldman
> PA Attorney No. 326273
> PENNSYLVANIA INSTITUTIONAL LAW PROJECT
> 718 Arch St., Suite 304S
> Philadelphia, PA 19106
> Tel: 215-925-2966
> mfeldman@pailp.org