## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THERESA VICTORY** | : **CIVIL ACTION** |
| | : |
| **v.** | : **NO. 18-5170** |
| | : |
| **BERKS COUNTY, *et al.*** | : |

## **MEMORANDUM**

**KEARNEY, J.**                                                                 **July 8, 2019**

In 2010, Berks County converted a juvenile detention center down the hill from its Jail to a Community Reentry Center for the admitted goal of assisting residents sentenced to prison in re-establishing themselves as productive members of the community. Its touted goal does not distinguish between male and female residents. Unlike those housed in its Jail, persons living in Berks County's Community Reentry Center reside in unlocked rooms adjacent to an expanded day room with microwaves and private toilets/showers, may come and go throughout their assigned unit, play backgammon, meet visitors without partition, and privately use the bathrooms and showers. They eat their meals in the group community or day room. Residents housed in the Jail live in locked cells for at least eighteen hours a day, eat their meals handed through the door of their locked cell with often-broken toilets, meet visitors through partition, and are subject to many more lockdowns attendant to a larger Jail environment. The same Berks County officials and male and female correctional officers manage both facilities. So how does Berks County choose which of its residents may live at the Community Reentry Center?

It does so by housing only the lowest security risk inmates at the Community Reentry Center. Berks County carefully classifies the security risk level of persons sentenced to its jail system. Berks County characterizes the lowest risk prisoners with the "Trusty" level of custody

classification. It does not distinguish the security risk based on the prisoner's sex. Both male and female prisoners have the same opportunity to obtain Trusty status.

But for evolving reasons initially involving costs, Berks County allows only male Trusty classified inmates to live in the Community Reentry Center. While Berks County carefully uses the identical classification system to determine the security risk of male and female residents in its Jail system, female Trusty inmates live in locked cells in the F Block of the Jail and male Trusty inmates live in the Community Reentry Center. The reason is the sex of the Trusty inmate. There are dozens of available beds in four separate units in Community Reentry Center but Berks County refuses to house female Trusty inmates there; based on the record adduced in discovery, Berks County prefers to leave the female Trusty inmates in the Jail.

Former Trusty inmate Theresa Victory and current Trusty inmate Alice Velazquez-Diaz allege Berks County violates the Equal Protection Clause of the Fourteenth Amendment by treating male Trusty inmates differently than it treats them. Berks County admits this. But it argues male Trusty inmates are not similarly situated with them because the smaller female population size makes it difficult to manage the jail system mindful of security concerns. In other words, they are not entitled to equal protection because not as many Berks County females are sentenced to the Jail. This reason does not warrant summary judgment for Berks County as a matter of law. Unlike cases where prisons persuaded judges in other states as to differences between entire prison systems, Berks County uses the same risk assessment test for both male and female inmates to classify them as "Trusty" residing within a few hundred yards of each other. Berks County admits—in fact, systematically ensures—male and female Trusty inmates present the same level of risk.

We deny Berks County's motion for summary judgment seeking to dismiss Mses. Victory's and Velasquez-Diaz's Equal Protection claim. After careful review of the fulsome record, we grant summary judgment dismissing Mses. Victory's and Velasquez-Diaz's remaining claims under the Pennsylvania Equal Rights Amendment, individual liability for First Amendment retaliation, and for punitive damages.

After rigorous analysis of Mses. Victory's and Velasquez-Diaz's motion to certify a narrow class of present and future female Trusty inmates seeking injunctive relief, we also certify a class of current and future female Trusty inmates.

## I.    Undisputed facts[1]

The Berks County Jail System consists of the Berks County Jail and the Community Reentry Center.[2] Warden Janine Quigley oversees the Jail and Reentry Center.[3] Deputy Warden Stephanie Smith handles documentation related to inmates' treatment.[4] Berks County Commissioners Kevin Barnhardt, Christian Leinbach, and Mark Scott serve on the Berks County Prison Board.[5]

The Reentry Center is located a half mile from the Jail.[6] Berks County houses both male and female inmates in the Jail.[7] The Jail consists of several male-only housing units, one female-only housing unit, and two medical units housing both male and female inmates.[8] Berks County houses only male inmates in the Reentry Center.[9]

Berks County classifies inmates as one of five custody levels: Administrative Segregation, Maximum, Medium, Minimum, and Trusty.[10] Trusty is the least restrictive custody level.[11] Berks County classifies inmates with a custody level after a risk assessment and review by the Institutional Classification Committee.[12]

3

## *Female Trusty inmates in the Jail*

Berks County houses female Trusty inmates on the F Block of the Jail, either in locked cells or in bunk-style housing in the overflow unit.[13] During her incarceration, Ms. Victory lived in both a locked cell and the overflow unit.[14] Ms. Velazquez-Diaz currently lives in a locked cell.[15] The locked cells house two inmates and contain a toilet and a sink.[16] The toilet has no lid and locks after two flushes.[17] Female Trusty inmates eat their meals in their cells.[18] Ms. Velazquez-Diaz testified she ate meals with a locked toilet containing feces.[19] Female Trusty inmates leave their cells to retrieve meals and medicine and attend programming.[20]

Female Trusty inmates in the overflow unit in the Jail live in an open housing area with bunk beds.[21] They use communal bathrooms and showers.[22] Female Trusty inmates in the overflow unit cannot wander freely around the unit except during recreation periods.[23] There are telephones and microwaves in the overflow unit female Trusty inmates can use only during recreation periods.[24]

Female Trusty inmates in the Jail receive six hours of recreation each day but forfeit recreation during lockdowns.[25] Female Trusty inmates can only use the shower, microwave, and telephone during recreation periods but cannot use these amenities during lockdowns.[26] Between February 24, 2018 and April 7, 2019, the Berks County Jail System had seventy-one lockdowns, with six of those only affecting the F Block.[27] Lockdowns can last longer than a day.[28] Captain Miguel Castro admits inmates in the Jail spend more time on lockdown than inmates in the Reentry Center.[29]

Female Trusty inmates may receive visitors in the Jail. A glass partition separates female Trusty inmates in the Jail from their visitors.[30] Ms. Velazquez-Diaz testified she could not hear her

4

family members during visits because she shared the room with other inmates and visitors and people shouted to each other.[31]

### *Male Trusty inmates in the Community Reentry Center*

The Community Reentry Center houses male inmates with Trusty, Minimum, and Medium custody level classifications.[32] It has four units (Q, R, S, and T) and contains 152 beds.[33] Two roll-up doors separate Units Q and R, but there are openings near the ceiling between the two units.[34] Unit T houses Minimum and Medium male inmates.[35] Glass windows separate Units T and S.[36] The Reentry Center also contains a dayroom with telephones and microwaves.[37] The Reentry Center has communal bathrooms and showers.[38]

The Reentry Center contains cells housing two or four inmates.[39] These cells do not contain toilets or sinks, and they do not lock.[40] Inmates in the Reentry Center can access the Center's dayroom and can use the microwaves and showers any time from 5:00 AM to 11:00 PM.[41] They can move freely between their cells and the dayroom during this time.[42] They may eat their meals in the dayroom.[43] Between 11:00 PM and 5:00 AM, they can only leave their cells to use the bathroom.[44] The Reentry Center contains a computer lab.[45]

The Reentry Center also contains four locked cells with toilets for inmates with minor disciplinary infractions.[46]

Inmates in the Reentry Center can only receive visitors on Sundays at specific times.[47] Visitations occur in the Reentry Center's gymnasium.[48] The Inmate Handbook provides visits in the Reentry Center can last up to fifty minutes, while Lieutenant Mugar testified visits in the Reentry Center cannot exceed forty-five minutes.[49] No partition separates Reentry Center inmates from their visitors.[50]

5

### *Berks County's furlough policy*

Berks County officials swore inmates only receive furloughs if the sentencing judge allows for furloughs.[51] The Berks County Jail System's Inmate Handbook describes the furlough policy but does not mention a sentencing judge for eligibility:

> The furlough program provides a means for temporary release from custody for those inmates successfully participating in select treatment programs, or in some specific cases for family emergencies, e.g. to attend funerals of immediate family members. The Warden makes the final determination on whether or not a furlough will be considered. To be eligible for any furlough you must be sentenced on all charges, have no detainers, and have no un-adjudicated parole violations. Requests for any type of furlough are initiated through your counselor.[52]

The policy provides further access to furloughs for Reentry Center inmates only: "Access to other types of program furloughs may be offered and will be considered on an individual basis."[53] Deputy Warden Smith admitted men currently receive furloughs to spend time with family members, but no women do.[54] She testified she could not remember any female inmate ever receiving a furlough to spend time with family members.[55]

### *Berks County's use of the Ohio Risk Assessment System*

Berks County uses an "objective classification system" to determine an inmate's custody level and eligibility for programming.[56] Berks County bases an inmate's custody level on their security risk.[57] Berks County employs the Ohio Risk Assessment System, a nationally recognized risk assessment test, to determine both male and female inmates' risk level in the Jail System.[58] It uses the Ohio Risk Assessment "Prison Screening Tool" to categorize an inmate as low, moderate, or high risk.[59] Prison officials perform the risk assessment analysis for both male and female inmates.[60] Trusty inmates generally receive "low" or "moderate" Ohio Risk Assessment scores.[61] Berks County applies this System to men and women and does not distinguish between men and women in classifying the presented risk.

6

An inmate's risk assessment score determines eligibility for job-related programming. Berks County hired Berks Connection, a non-profit organization, to provide programs at the Jail and the Reentry Center.[62] Berks Connection offers four job-related programs at the Reentry Center: (1) Introduction to Reentry, (2) Ready to Reenter, (3) Resume writing seminar, and (4) Ready to Succeed.[63] Berks Connection offer these four programs to inmates with "moderate" or "high" Ohio Risk Assessment scores.[64]

Berks Connection offers a single job-related program at the Jail called Working Towards Change, a cognitive behavior therapy program focused on problem solving and reducing recidivism.[65] Berks Connection offers Working Towards Change only to "moderate" or "high" risk inmates in the Jail.[66] Deputy Warden Smith testified Berks Connection offers programming to inmates based on their Ohio Risk Assessment scores.[67] She testified Berks Connections only offered job-related programs—in the Jail and the Reentry Center—to inmates with "moderate" or "high" risk scores.[68]

### *Employee staffing in Berks County Jail System*

Correctional staff members in the Jail System belong to the Teamsters Union.[69] The Union's collective bargaining agreement sets wages for correctional staff.[70] Berks County currently employs thirty-three female correctional officers.[71] Only twenty-two female officers are active, due to medical leaves, training, or bid positions.[72] Warden Quigley testified she performed a staffing analysis in 2016 and determined Berks County required six individual correctional staff members to cover shifts for an entire week.[73] Berks County requires at least one female officer present in each facility housing female inmates.[74]

Captain Castro testified Warden Quigley attempted to hire additional female correctional officers, but Berks County cannot force women to apply for these positions.[75]

7

## *Ms. Victory's incarceration*

The Commonwealth incarcerated Theresa Victory in the Berks County Jail from January 28, 2018 to January 28, 2019.[76] During her incarceration, Ms. Victory lived in both a locked cell and the overflow unit on F Block.[77] Berks County scored Ms. Victory as "low" risk under the Ohio Risk Assessment System.[78] On January 31, 2018, Berks County classified Ms. Victory as a Trusty inmate with Work Release status.[79] Deputy Warden Smith testified Ms. Victory could not participate in Berks Connections' job-related programs because of her risk assessment score.[80] Ms. Victory's sentencing judge did not make her eligible for furloughs.[81]

In February 2018, Berks County moved Ms. Victory to the overflow unit on F Block.[82] Ms. Victory requested a furlough on May 12, 2018.[83] Two days later, a nonparty official denied her request.[84] Ms. Victory began hearing of Berks County's treatment of male Trusty inmates in the Reentry Center.[85] In late May 2018, she filed a grievance complaining about not being housed in the Reentry Center.[86] Correctional Officer Bauer transferred her to a locked cell shortly after her grievance.[87]

On August 18, 2018, Ms. Victory filed a grievance complaining about differing treatment of inmates in the Reentry Center.[88] On August 30, 2018, Lieutenant Weber responded "You have already file an appeal to your grievance. . . . Future communications on this topic will be considered harassment and discipline will follow."[89]

On September 4, 2018, Officers Brown and Zerr worked on the F Block.[90] Ms. Victory told these officers she had to go to work.[91] Officers Brown and Zerr did not allow her to go to work.[92] The officers told her if she continued to bang her cell door and harass them, they would send her to the hole.[93] Prison officials did not list Ms. Victory on the Work Release schedule for September 4, 2018.[94]

8

On September 12, 2018, Ms. Victory knocked on her cell door because she had to leave for work.[95] Officer Reichart told her, "Knock on your door one more time and you'll lose your job."[96]

On October 18, 2018, Officer Reichart failed to release Ms. Victory in time for work.[97] Officer Reichart claimed she "forgot" to release Ms. Victory.[98]

On November 19, 2018, Officer Brown conducted a cell search on F Block.[99] Officer Brown searched Ms. Victory's cell.[100] Officer Brown cited Ms. Victory for having an extra towel, bedsheet, and a poem left by a former inmate.[101] Ms. Victory admitted she had two towels in her cell and a former inmate's poem.[102] Officer Brown offered Ms. Victory an "informal adjustment" in lieu of a formal misconduct report.[103] Ms. Victory accepted an informal adjustment and kept her Work Release job.[104]

Ms. Victory sued Berks County Defendants on November 30, 2018 alleging violations of the Equal Protection Clause of the Fourteenth Amendment and Pennsylvania's Equal Rights Amendment for Berks County's differing treatment of male and female Trusty inmates.[105] On December 11, 2018, Ms. Victory moved for preliminary injunctive relief to enjoin Berks County's differing treatment.[106] On January 10, 2019, we heard testimony from Ms. Victory and several Berks County officials concerning Berks County's treatment of male and female Trusty inmates in the Berks County Jail System. On January 15, 2019, we granted Ms. Victory's motion for preliminary injunctive relief and ordered Berks County provide conditions of confinement for Ms. Victory similar to those provided to male Trusty inmates in the Reentry Center.[107]

On January 28, 2019, Berks County released Ms. Victory on parole.[108] On February 15, 2019, we dissolved our January 15, 2019 Order granting Ms. Victory preliminary injunctive relief finding relief moot since Berks County released Ms. Victory.[109]

9

## Ms. Velazquez-Diaz's incarceration

The Commonwealth incarcerated Alice Velazquez-Diaz in the Berks County Jail beginning October 24, 2018.[110] Ms. Velazquez-Diaz scored "low" risk on the Ohio Risk Assessment test.[111] Her sentencing judge did not make her eligible for furloughs.[112]

Berks County initially classified Ms. Velazquez-Diaz as a Trusty inmate.[113] Ms. Velazquez-Diaz lived in both a locked cell and the overflow unit on F Block during her incarceration.[114] On February 8, 2019, Ms. Velazquez-Diaz grieved Berks County's housing male Trusty inmates in the Reentry Center and female Trusty inmates in the Jail.[115] Deputy Warden Smith responded, "[The Reentry Center] is a male housing unit."[116] In April 2019, she requested a furlough but her request was denied.[117]

On April 22, 2019, Ms. Velazquez-Diaz joined Ms. Victory's lawsuit.[118] Two days later, she filed for preliminary injunctive relief seeking to enjoin Berks County's differing treatment.[119] After a hearing, we granted Ms. Velazquez-Diaz's motion for injunctive relief on May 20, 2019.[120] We ordered Berks County provide a plan for providing Ms. Velazquez-Diaz with similar freedom of movement and visitation conditions provided to male Trusty inmates in the Reentry Center.[121] Ms. Velazquez-Diaz remains incarcerated in the Berks County Jail.

## Berks County Jail System population as of May 14, 2019

As of May 14, 2019, Berks County housed 1,006 inmates in the Berks County Jail System, with 873 male inmates and 133 female inmates.[122] Four female inmates held Trusty status, while sixty-eight male inmates held Trusty status.[123] From January 2016 to May 2019, female Trusty inmates accounted for fourteen percent of the total Trusty inmate population.[124] Berks County houses ninety-two male inmates in the Reentry Center.[125]

The average length of stay in the Berks County Jail System for female Trusty inmates from 2014 to 2018 was 126 days, while the average length for male Trusty inmates was 149 days.[126] From January 2016 to May 2019, female Trusty inmates held "Trusty" status for an average forty-nine days during their incarceration, while male Trusty inmates held the status for an average sixty-three days.[127] In 2018, the average length of incarceration was fifty-seven days for female Trusty inmates and fifty-six days for male Trusty inmates.[128]

## II.  We grant Defendants' Motion for summary judgment on all claims other than sex discrimination under the Fourteenth Amendment.[129]

Mses. Victory and Velazquez-Diaz sue Berks County for damages and injunctive relief under the Fourteenth Amendment's Equal Protection Clause and Pennsylvania's Equal Rights Amendment alleging discrimination based on sex.[130] They sue Commissioners Barnhardt, Leinbach, and Scott, Warden Quigley, and Deputy Warden Smith for injunctive relief under the Fourteenth Amendment and the Equal Rights Amendment alleging sex discrimination. Ms. Victory sues Sergeant Spotts and Officers Reichart, Zerr, and Brown, Warden Quigley, and Deputy Warden Smith for First Amendment retaliation. Defendants move for summary judgment on all claims.

Defendants essentially argue the lower number of female Trusty inmates excuses and justifies their unwillingness to provide equal treatment to persons who are found to have identical security risk and managed by the same officials in buildings within walking distance.

Berks County's arguments highlight prisons' challenges in addressing female prisoners. Women constitute a small percentage of the total prison population in the United States: according to statistics from the Department of Justice, women accounted for seven percent of the total prison population at year end 2017.[131] Prisons do not always meet the needs of female inmates due to their small population size. The current criminal justice system was created to deal with men:

11

"correctional officials have focused primarily on male prisoners, developing policies and programs tailored to men's characteristics and needs."[132] But the number of women prisoners increases every year, and there are currently nearly eight times as many women in prison as there were in 1980.[133] The correctional system, with its limited budget and resources, is "often ill equipped to address the challenges women face when they enter the justice system, which can have serious and lasting public safety and community health implications."[134] As a result, "[women] become 'forgotten inmates,' often without equal access to treatment, programs, or services."[135] As we now hear from Berks County, state and local governments often deny female inmates these accommodations due to their small number, as "prison officials balk at the expense of providing the full range of programs available to men to a relatively small number of women."[136]

But Mses. Victory's and Velasquez-Diaz's challenge is different than earlier challenges: the same prison system already classified them as the same as male inmates. They are not seeking recovery programs different from the men. They are seeking only what the male Trusty inmates automatically enjoy: residing at the Community Reentry Center in unlocked cells, freedom of movement, and access to the opportunity of re-establishing themselves as productive members of the community which Berks County touts as offering to male Trusty inmates.

We first analyze Mses. Victory's and Velazquez-Diaz's sex discrimination claims against Berks County, Commissioners Barnhardt, Leinbach, and Scott, Warden Quigley, and Deputy Warden Smith ("Berks County Defendants").

## A. We deny Berks County Defendants summary judgment on Mses. Victory's and Velazquez-Diaz's sex discrimination claims under the Fourteenth Amendment.

Mses. Victory and Velazquez-Diaz allege Berks County Defendants violated the Equal Protection Clause of the Fourteenth Amendment by housing only male Trusty inmates in the

12

Reentry Center and offering them more favorable conditions of confinement. Berks County Defendants argues Mses. Victory and Velazquez-Diaz fail to show they are similarly situated to male Trusty inmates, and they fail to show impermissibly different treatment. They also argue any differing treatment serves important government objectives.

Under the Fourteenth Amendment, Berks County Defendants may not "deny to any person within [their] jurisdiction the equal protection of the law."[137] The Supreme Court held the Equal Protection Clause applies to discrimination on the basis of sex.[138] "A successful claim that a government practice or policy violates the Equal Protection Clause requires proof that the plaintiff 'has been treated differently from persons who are similarly situated.'"[139] "Official action does not violate the Equal Protection Clause solely because it results in a disproportionate impact; proof of discriminatory intent or purpose is required to show a violation."[140]

If Mses. Victory and Velazquez-Diaz show differential treatment of similarly-situated persons, Berks County Defendants can still succeed by showing differing treatment "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."[141]

> **1.    Mses. Victory and Velazquez-Diaz raise a genuine issue of fact as to whether female Trusty inmates are similarly situated to male Trusty inmates in the Berks County Jail System.**

Berks County Defendants argue female and male Trusty inmates in the Berks County Jail System are not similarly situated because (1) the male Trusty inmate population is larger, with a longer average length of incarceration and (2) female Trusty inmates are more likely to be abuse victims and single, sole custody parents. Mses. Victory and Velazquez-Diaz argue male and female Trusty inmates are similarly situated since Berks County Defendants use the same risk assessment test to classify them, and male and female Trusty inmates have similar lengths of incarceration.

13

The Court of Appeals for the Eighth Circuit's decision in *Klinger v. Department of Corrections* offers guidance for determining whether female prisoners are similarly situated to male prisoners under the Equal Protection Clause.[142] In *Klinger*, female inmates in Nebraska's only all-female correctional facility sued the Nebraska Department of Corrections under the Equal Protection Clause alleging male inmates in the Nebraska prison system received favorable treatment with regard to prison programs and services.[143] Female inmates claimed men at an all-male facility received superior "vocational, educational and employment opportunities and programs, rehabilitation programs, exercise and recreational programs and facilities, visiting privileges, legal programs, medical, dental and psychological services, and treatment associated with security classifications."[144] The case did not resolve on summary judgment motions. After a four-week trial, the district court found the Department of Corrections liable violating the female prisoners' right to equal protection of the law.[145]

The Eighth Circuit Court of Appeals reversed the district court, holding the female inmates were not similarly situated to the male inmates without reaching the issue of differing treatment.[146] The court of appeals looked at the differences between the female prison and the male prison, including the size of the two institutions.[147] The all-male prison housed six times as many inmates, the male inmates averaged two to three times greater lengths of incarceration, and the inmates at the all-male prison had a higher security level.[148] The court also explained female inmates were more likely to be single, sole custody parents and were more likely to be victims of sexual or physical abuse.[149] Male inmates were also more violent and predatory than female inmates.

Scholars have criticized the *Klinger* "similarly situated" analysis. The court in *Klinger* found the size difference between the male and female prisons showed female inmates were not similarly situated to male inmates, explaining the all-male prison housed six times as many

inmates. But as Professor Jennifer Lee points out, "[t]he focus on the differences between prison facilities at the 'similarly situated' stage defeats the purpose of the constitutional claim."[150] She argues the court's analysis makes no sense since a challenged condition—e.g., the smaller size of an institution, and as a corollary, its dearth of programming—could prevent a court from even analyzing whether the differing condition violates Equal Protection.

Professor Baker makes a similar argument concerning the court of appeals' use of "special characteristics"—female prisoners were more likely to be single, sole custody parents and abuse victims—to determine male and female inmates are not similarly situated. The court of appeals found because female inmates are "more likely to be single parents with primary responsibility for child rearing [and] more likely to be sexual or physical abuse victims," male and female inmates in the Nebraska correctional system were not similarly situated.[151] Professor Baker argues while this might be true, courts should not allow the state actor to merely point at statistical differences between male and female inmates to avoid an analysis of unequal treatment.[152] Because the court in *Klinger* found male and female inmates not similarly situated, it did not reach the issue of whether offering male inmates in the Nebraska correctional facility more programming violated the Equal Protection Clause. But Professor Baker points out because female inmates are more likely abuse victims and single parents, the prison should arguably allow more programming for these inmates. Focusing on these differences to determine female and male inmates are not similarly situated illogically leads to a court avoiding analysis of an issue which may exacerbate these differences.[153]

Even using the court of appeals' factors in *Klinger*, Mses. Victory and Velazquez-Diaz raise a genuine issue of fact as to whether female Trusty inmates in the Berks County Jail System are similarly situated to male Trusty inmates. Berks County Defendants admittedly use the same

Ohio Risk Assessment System for all inmates, both male and female, to determine risk level and security classification. Berks County Defendants classify inmates—both male and female—as "Trusty" only after inmates receive a risk assessment score and Berks County's Institutional Classification Committee review the inmate's score. Unlike the Nebraska Department of Corrections in *Klinger*, Berks County Defendants adduce no evidence male Trusty inmates are more violent or predatory than female Trusty inmates.

Female and male Trusty inmates also have similar lengths of incarceration. In 2018, the average length of incarceration for female Trusty inmates was fifty-seven days, while the average length for males was fifty-six days.[154] While Berks County Defendants adduce evidence showing male Trusty inmates comprise a larger percentage of the overall inmate population than female Trusty inmates, we cannot find as a matter of law based on one factor from *Klinger* female Trusty inmates are not similarly situated to male Trusty inmates. A jury could find female Trusty inmates are similarly situated to male inmates based on similar classifications, similar risk assessment scores, and similar lengths of incarceration.

Captain Castro testified female Trusty inmates were more likely to be abuse victims and single, sole custody parents. He testified he learned "almost 80 percent of female inmates like nationwide . . . come from some kind of traumatic background, whether it's sexual abuse or domestic violence."[155] But Berks County Defendants provide nationwide statistics; they only speculate female Trusty inmates within the Berks County Jail System possess these characteristics. While Captain Castro testified "a lot of female inmates that come in" to the Berks County Jail System are single parents, Berks County Defendants present no evidence Mses. Victory or Velazquez-Diaz themselves are single, sole custody parents.[156] We also agree with Professor Baker focusing on these characteristics would allow Berks County Defendants to avoid a determination

on unequal treatment, even though these special characteristics may signal the impropriety of unequal treatment. Even assuming these special characteristics exist, considering female and male Trusty inmates' identical classifications, similar length of incarceration, and similar risk assessments, we cannot find as a matter of law female Trusty inmates are not similarly situated to male Trusty inmates.

### 2. Mses. Victory and Velazquez-Diaz raise a genuine issue of fact as to whether Berks County Defendants provided substantially equivalent treatment to female Trusty inmates except as to programming.

Berks County Defendants argue we should grant them summary judgment because housing conditions in the Jail are substantially equivalent to conditions in the Reentry Center. Mses. Victory and Velazquez-Diaz argue they adduce evidence showing differential treatment concerning freedom of movement, access to privileges, visitation conditions, access to programming, and access to furloughs.

Under the Equal Protection Clause, Berks County Defendants are "bound to provide women inmates with treatment and facilities that are substantially equivalent to those provided the men[.]"[157] Courts use a standard of "parity of treatment, as contrasted with identity of treatment, between male and female inmates with respect to the conditions of their confinement and access to rehabilitation opportunities."[158]

For example, in *McCoy v. Nevada Department of Prisons*, female prisoners in Nevada Women's Correctional Center sued the Nevada Correctional Department alleging sex discrimination in Nevada prisons.[159] The female prisoners alleged superior conditions at all-male prisons, and alleged male prisoners received better programs, better visitor privileges, more free time, and more access to telephones than female prisoners. Concerning free time, the plaintiffs alleged "male inmates are permitted greater free time, i.e., more time out of their cells, than female

17

inmates[.]"[160] The court denied the department's motion for summary judgment on the female prisoners' claim male prisoners receive more time out of their cells.[161]

In *Bukhari v. Hutto*, a female prisoner at an all-female prison in Virginia sued the state department of corrections alleging sex discrimination in the state's prison system.[162] She alleged female prisoners experienced "more restricted freedom of movement among and interaction with the general prison population" than male prisoners in the Virginia prison system.[163] The district court refused to dismiss the plaintiff's Equal Protection claim. While acknowledging the female prison population was smaller and providing similar conditions for female prisoners could entail a greater cost, the district court warned the department of corrections may not use cost concerns to "justify official inaction or legislative unwillingness to operate a prison system in a constitutional manner."[164]

In *Mitchell v. Untreiner*, female prisoners in a Florida county jail sued the board of county commissioners alleging sex discrimination.[165] The female prisoners alleged inferior visitation conditions to male inmates, including non-contact visits separated by windows in the presence of other inmates and visitors.[166] The female prisoners alleged the county board allowed male inmates contact visits.[167] The district court entered summary judgment for the female prisoners on their Equal Protection claims and ordered injunctive relief ordering similar visitation conditions for male and female inmates.[168]

Mses. Victory and Velazquez-Diaz adduce evidence Berks County Defendants fail to provide "substantially equivalent" for male and female Trusty inmates. Berks County Defendants offer male Trusty inmates more freedom of movement at the Reentry Center. Male Trusty inmates can move between their cell and a dayroom nineteen hours a day. They can access microwaves, showers, and a television during this time. They may eat their meals in the dayroom. They sleep

in unlocked cells and use communal bathrooms and showers. During visitations, no partition separates visitors from male Trusty inmates.

Berks County Defendants house all female Trusty inmates in the Jail. Ms. Velazquez-Diaz currently resides in a locked cell, and Berks County housed Ms. Victory in a locked cell for most of her incarceration. Female Trusty inmates housed in locked cells eat their meals in their cells. The cells contain locking toilets. Ms. Velazquez-Diaz testified she ate meals next to a locked toilet containing feces.[169] Female Trusty inmates living in locked cells can only leave their cells for six hours a day during recreation periods but forfeit recreation during lockdowns. Captain Castro testified the Jail experiences more lockdowns than the Reentry Center.[170] Female Trusty inmates can only access showers, microwaves, and telephones during recreation periods. As with *Bukhari* and *McCoy*, Mses. Victory and Velazquez-Diaz show differential treatment with evidence of differing amounts of free time and freedom of movement. Like the plaintiff in *Mitchell*, Mses. Victory and Velazquez-Diaz show Berks County Defendants treat male and female Trusty inmates differently with respect to visitation conditions. A glass window separates female Trusty inmates in the Jail from their visitors, while no partition separates male Trusty inmates in the Reentry Center from their visitors.[171]

Mses. Victory and Velazquez-Diaz also argue Berks County Defendants provide male Trusty inmates with more furloughs. Mses. Victory and Velazquez-Diaz both unsuccessfully requested furloughs while incarcerated. They argue while Berks County Defendants provide male inmates with weekly family furloughs, it has not granted a female inmate a family furlough since at least September 2014.[172] Berks County Defendants respond it does not impermissibly discriminate since it only grants inmates—both male and female—furloughs if their sentencing judge allows furloughs.[173]

But Mses. Victory and Velazquez-Diaz raise a genuine issue of fact concerning of differential treatment with access to furloughs. Berks County provides its furlough policy in the Inmate Handbook. It allows furloughs for inmates "successfully participating in select treatment programs, or in some specific cases for family emergencies[.]"[174] Berks County states in the Handbook "[t]o be eligible for any furlough you must be sentenced on all charges, have no detainers, and have no un-adjudicated parole violations."[175] Berks County in its Inmate Handbook does not condition eligibility on a sentencing judge's approval. Nowhere does Berks County mention a sentencing judge in its furlough policy. Berks County further provides in its furlough policy, only inmates in the Reentry Center have "[a]ccess to other types of program furloughs may be offered and will be considered on an individual basis."[176] Based on the additional language in the furlough policy applying only to Reentry Center inmates, Mses. Victory and Velazquez-Diaz argue Berks County treats male Trusty inmates differently than female Trusty inmates concerning access to furloughs. Deputy Warden Smith admitted men currently receive family furloughs, but no women do.[177] Considering the Inmate Handbook's silence concerning a sentencing judge's determination for eligibility and the additional policy for Reentry Center inmates, Mses. Victory and Velazquez-Diaz adduce genuine issues of material fact whether Berks County treats female Trusty inmates differently than male Trusty inmates concerning access to furloughs.

Berks County Defendants also argue they offer job-related programming based on an inmate's risk assessment score, not the inmate's sex. Berks County Defendants admit they offer four job-related programs only at the Reentry Center to inmates with "moderate" or "high" risk scores.[178] They further admit they offer only one job-related program at the Jail to "moderate" or "high" risk inmates.[179] Berks County Defendants argue although they do not offer the four job-related programs at the Reentry Center to female inmates, Mses. Victory and Velazquez-Diaz did

20

not qualify for job-related programming because they scored "low" risk—not "moderate" or "high" risk—on their Ohio Risk Assessment scores.

Mses. Victory and Velazquez-Diaz concede because they scored "low" risk, they fail to qualify for job-related programming based on their risk assessment scores. But they argue the criteria for eligibility disproportionately excludes women. For example, Berks County only offer job-related programming to inmates with risk assessment scores of "high" or "moderate," but Berks County disproportionately score female Trusty inmates as "low" risk. Mses. Victory and Velazquez-Diaz cite a table listing Trusty male and female prisoners, including each prisoner's Ohio Risk Assessment scores.[180] Mses. Victory and Velazquez-Diaz argue the list shows a higher percentage of female Trusty inmates score "low" than male Trusty inmates.[181] For example, for the eleven female Trusty inmates as of December 2018, ten female Trusty inmates scored "low" risk, while only one female Trusty inmate scored "moderate" risk.[182] By comparison, thirty-one out of seventy-four male Trusty inmates scored "low" risk.[183]

But Mses. Victory and Velazquez-Diaz cannot show differential treatment under the Equal Protection Clause by merely showing application of Berks County's criteria had a disproportionate impact on female Trusty inmates.[184] Berks County applies a nationally-recognized risk assessment test for both male and female inmates and Mses. Victory and Velazquez-Diaz fail to show Berks County applies the test differently to female inmates. In fact, Mses. Victory and Velazquez-Diaz rely on inmates' risk assessment scores and corresponding classifications to show male and female Trusty inmates are similarly situated. Mses. Victory and Velazquez-Diaz fail to show Berks County Defendants discriminate against them regarding job-related programming.

Berks County Defendants argue they do not impermissibly treat female Trusty inmates differently because we should not conduct a "side-by-side" comparison of the Reentry Center and

21

the Jail. They argue the Equal Protection Clause only requires "parity" and they provide substantially equivalent housing in the Jail and the Reentry Center. We agree Berks County Defendants need only provide substantially equivalent housing for male and female Trusty inmates. But we cannot say as a matter of law they provide substantially equivalent treatment. Mses. Victory and Velazquez-Diaz adduce evidence Berks County Defendants treat them differently than male Trusty inmates concerning freedom of movement, access to furloughs, and visitation conditions. Courts recognize this differential treatment supports a prisoner's Equal Protection claim. Such evidence is enough to survive summary judgment.

Mses. Victory and Velazquez-Diaz raise a genuine issue of fact regarding differential treatment with respect to freedom of movement, furlough policy, and visitation conditions. They fail to raise a genuine issue of fact concerning access to job-related programming and we dismiss a claim for differential treatment concerning access to job-related programming.

> **3. Mses. Victory and Velazquez-Diaz raise a genuine issue of fact as to whether differential treatment serves important governmental objectives and discrimination is substantially related to those objectives.**

Berks County Defendants argue they may discriminate based on sex if the classification "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."[185] They argue their policy of housing female Trusty inmates in the Jail furthers the interest in minimizing safety risks. After careful review of Berks County's theories, we disagree these theories warrant summary judgment for Berks County Defendants. A jury will need to determine the merits of their argument.

In *Ford v. City of Boston*, Boston city officials housed female arrestees in the county jail and performed strip and body cavity searches on these arrestees during booking.[186] But officials did not search male arrestees, and they housed the men in more comfortable cells in the police

22

station.[187] The female arrestees sued the City of Boston under the Equal Protection Clause alleging impermissibly differential treatment. City officials attempted to justify differential treatment arguing (1) the police station cells "could not hold women, because they were not configured to separate women from men" and (2) the police department "did not have the personnel and resources to administer holding cells for women."[188] The district court rejected these arguments, requiring city officials "to explain *why* it could find no satisfactory space for women in the [police station], and *why* it felt its personnel and resources were better used to meet the needs of male rather than female arrestees."[189]

Berks County Defendants argue the structure of the Reentry Center prohibits housing both male and female Trusty inmates. They argue they cannot safely house female Trusty inmates in the Reentry Center because the units are separated by windows through which inmates can see inmates in other units. They also argue safety concerns prevent female Trusty housing at the Reentry Center because (1) an open area exists near the ceiling between the S and R units, and (2) inmates could slide items under the roll-up doors separating units.

We rejected these arguments during the preliminary injunction phase and Berks County Defendants adduce no new evidence to support their argument. Berks County Defendants only speculate as to safety issues due to the Reentry Center's structure. They also fail to adduce evidence they could not make minor modifications to the Reentry Center to ensure the safety of female Trusty inmates. Berks County Defendants once again adduce no evidence such modification would be cost-prohibitive.

Berks County Defendants also argue moving female Trusty inmates to the Reentry Center requires displacement of male inmates in the Reentry Center. But the Reentry Center contains 152 beds and as of May 14, 2019, Berks County only housed ninety-two inmates in the Reentry

23

Center.[190] As of the same date, only four female Trusty inmates reside in the Jail. Warden Quigley also testified Berks County could house four female Trusty inmates in the Reentry Center's smallest unit and still accommodate the displaced male inmates in the Reentry Center's remaining units.[191] We cannot say as a matter of law Berks County Defendants' failure to house female Trusty inmates in the Reentry Center serves an important governmental interest and is substantially related to the achievement of the objective.

Berks County Defendants also argue they lack enough female correctional staff to house female Trusty inmates in the Reentry Center. They argue they can only freely assign twenty-two of the thirty-three total female correctional staff members and they cannot assign female officers to the Reentry Center without creating security concerns. They argue they need six individual female correctional officers to fill every duty post in the Jail twenty-four hours per day.[192]

We rejected this argument during the preliminary injunction phase and Berks County Defendants adduce no new evidence supporting their argument. We explained Berks County Defendants failed to credibly explain why they need six female correctional officers for each post except they "prefer[] one female correctional officer available to the necessary strip search of female inmates new to the jail system or returning each day from Work Release."[193] But we also found Berks County Defendants admitted they often only have one female officer on a unit with female inmates.[194] Berks County Defendants fail to adduce evidence warranting a different conclusion. Like the defendants in *Ford*, Berks County Defendants fail to credibly explain *why* they cannot accommodate female Trusty inmates at the Reentry Center.

### 4. Mses. Victory and Velazquez-Diaz need not show invidious motive to establish their sex discrimination claims.

Berks County Defendants argue we should grant them summary judgment on Mses. Victory's and Velazquez-Diaz's Equal Protection claims because Mses. Victory and Velazquez-

24

Diaz fail to show intentional discrimination. Mses. Victory and Velazquez-Diaz argue because Berks County's policy treating male and female Trusty inmates differently is facially discriminatory, it need not show discriminatory motive. We agree with Mses. Victory and Velazquez-Diaz.

In *Hassan v. City of New York*, a group of Muslims alleged the New York City Police Department violated the Equal Protection Clause by targeting Muslims with increased surveillance following the September 11th terrorist attacks.[195] The police department argued the plaintiffs failed to show purposeful discrimination because public safety concerns, not discrimination, drove the policy of differential treatment.[196] Our Court of Appeals rejected the police department's argument explaining the department confused "intent" and "motive."[197] The court explained the plaintiff need not show "invidious motive;" rather, the plaintiff only the defendant "*meant* to single out a plaintiff because of the *protected characteristic* itself."[198]

Berks County Defendants argue Mses. Victory and Velazquez-Diaz only show Berks County Defendants treat male and female Trusty inmates differently for reasons of safety, staffing concerns, and institutional needs. But like the defendants in *Hassan*, Berks County Defendants misunderstand the difference between "intent" and "motive." As the policy discriminates on its face, Mses. Victory and Velazquez-Diaz need not show an invidious motive for differential treatment. They only need to show Berks County Defendants meant to single them out because of the protected characteristic, here, sex. Berks County Defendants admittedly house all female Trusty inmates in the Jail and all male Trusty inmates in the Reentry Center. Inmates in each facility experience different conditions of confinement. Mses. Victory and Velazquez-Diaz adduce evidence showing Berks County Defendants intentionally treat female Trusty inmates differently than they treat male Trusty inmates. Berks County Defendants' argument fails.

25

**B. We grant Berks County Defendants' motion for summary judgment on Mses. Victory's and Velazquez-Diaz's equal protection claims under the Pennsylvania Constitution.**

Berks County Defendants argue we should grant them summary judgment on Mses. Victory's and Velazquez-Diaz's equal protection claims under the Equal Rights Amendment to the Pennsylvania Constitution because Mses. Victory and Velazquez-Diaz fail to identify a statute or common law doctrine under which Berks County Defendants base their discriminatory conduct. Mses. Victory and Velazquez-Diaz argue because they raise a genuine issue of fact on their Fourteenth Amendment Equal Protection claims, we should deny Berks County's motion on their Pennsylvania Constitution claims.

Under Article One, Section Twenty-Eight of the Pennsylvania Constitution, "[e]quality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual."[199] The Pennsylvania Supreme Court explained Section Twenty-Eight "circumscribes the conduct of state and local government entities and officials of all levels in their formulation, interpretation and enforcement of statutes, regulations, ordinances and other legislation as well as decisional law."[200] The Pennsylvania Supreme Court further explained it effectuates "the Equal Rights Amendment's prohibition of sex discrimination by striking down statutes and common law doctrines 'predicated upon traditional or stereotypic roles of men and women.'"[201] For example, the Pennsylvania Supreme Court struck down the discriminatory "tender years" common law doctrine in parental custody cases—creating a presumption the court should grant the mother custody of a child—as grounded in impermissible gender stereotypes and thus violative of the Equal Rights Amendment.[202]

To bring a claim under Pennsylvania's Equal Rights Amendment, Mses. Victory and Velazquez-Diaz must identify a discriminatory statute or common law doctrine under which Berks

County Defendants justify their conduct. "Where a case does not implicate a discriminatory statute or common law doctrine, however, the Equal Rights Amendment does not apply."[203] As the Pennsylvania Superior Court explained, in every Pennsylvania state court case applying the Equal Rights Amendment to a plaintiff's claim of discriminatory treatment, the discriminatory conduct "had its roots in the statutory or judicially created law of this Commonwealth."[204] Violation of the Equal Protection Clause of the Fourteenth Amendment does not create a claim for violation of the Equal Rights Amendment under the Pennsylvania Constitution.

In *Summy-Long*, the United States District Court for the Middle District of Pennsylvania quoted the Pennsylvania Supreme Court's holding in *Weaver v. Harpster* an employee's claim under the Equal Rights Amendment failed when the employee failed to identify a discriminatory statute or common law doctrine under which the defendant justified the alleged discriminatory conduct:

> [W]e have applied the Equal Rights Amendment to invalidate legislation embodying gender classifications. We have not invoked the Equal Rights Amendment to provide a private cause of action for tort, nor have we invoked it to invalidate a statute that makes no distinctions based on gender. Employee has not identified any law under which she is being discriminated against. She is not being denied equal rights under the law due to her gender.[205]

Mses. Victory and Velazquez-Diaz argue Berks County Defendants violate Pennsylvania's Equal Rights Amendment due to Berks County's policy of housing all male Trusty inmates in the Reentry Center and all female Trusty inmates in the Jail. But like the plaintiff in *Weaver* they do not argue Berks County Defendants implement the policy under a discriminatory statute or common law doctrine. They fail to cite a statute under which Berks County Defendants justify differing treatment of male and female Trusty inmates. Nor do they cite a discriminatory common law doctrine—like, for example, the "tender years" doctrine under Pennsylvania common law— under which Berks County Defendants justify differential treatment.

27

We grant Berks County Defendants summary judgment on Mses. Victory's and Velazquez-Diaz's claims under the Equal Rights Amendment to the Pennsylvania Constitution.[206]

**C.     We grant Sergeant Spotts and Officers Reichart, Zerr, and Brown, Warden Quigley, and Deputy Warden Smith summary judgment on Ms. Victory's First Amendment retaliation claims.**

Ms. Victory claims First Amendment retaliation against Sergeant Spotts, Officers Reichart, Zerr, and Brown, Warden Quigley, and Deputy Warden Smith for retaliating against her for filing a grievance on August 18, 2018 and complaining about correctional staff's treatment. These Defendants move for summary judgment on Ms. Victory's retaliation claims.

To prove First Amendment retaliation, Ms. Victory must prove: "(1) constitutionally protected conduct, (2) a retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action."[207] Constitutionally protected conduct includes filing a grievance,[208] informally complaining to prison staff,[209] and filing a lawsuit.[210] Ms. Victory can prove a causal link by showing: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."[211] Ms. Victory must also prove Defendants knew of her protected conduct.[212] She cannot establish knowledge with mere speculation.[213]

If Ms. Victory establishes a prima facie case for retaliation, the burden shifts to Defendants "to prove by a preponderance of the evidence that [they] would have taken the same adverse action even in the absence of the protected activity, for reasons reasonably related to a penological interest."[214]

Our Court of Appeals explained verbal threats and harassment do not constitute adverse action to establish a retaliation claim in the prison context.[215] In *Dunbar*, a prisoner sued prison

28

officials claiming First Amendment retaliation. The plaintiff alleged prison officials threatened him for his legal work to "expose the behavior of prison staff."[216] He alleged prison officials threatened him, warning the prisoner "he was a marked man and that his days were numbered."[217]

Our Court of Appeals listed types of conduct sufficient to establish "adverse action" in the prison context: "several months in disciplinary confinement; denial of parole, financial penalties, and transfer to an institution whose distance made regular family visits impossible; and placement in administrative segregation that severely limited access to the commissary, library, recreation, and rehabilitative programs."[218] The court held in contrast "verbal threats" did not constitute adverse action to establish a retaliation claim.[219] Other courts in our circuit held as a matter of law, allegations of verbal threats in the prison context did not establish adverse action to support a retaliation claim.[220]

Ms. Victory argues verbal threats can constitute "adverse action" for a retaliation claim. But she cites cases outside the prison context. In *Schleig v. Borough of Nazareth*, a police officer sued a coworker for First Amendment retaliation alleging the coworker threatened to get the police officer fired after the police officer joined a union.[221] Our Court of Appeals explained "[t]he threat of dismissal from public employment is . . . a potent means of inhibiting speech."[222] The court did not hold a threat of dismissal constitutes adverse action in the prison context.

Ms. Victory also cites *Mirabella v. Villard*.[223] But in *Mirabella*, our Court of Appeals held outside the prison context a defendant's threat to move for sanctions against the plaintiff if the plaintiff sued the defendant did not constitute "adverse action" to establish a retaliation claim.[224]

We analyze Ms. Victory's retaliation claims against Sergeant Spotts, and Officers Reichart, Zerr, and Brown, Warden Quigley, and Deputy Warden Smith.

29

### 1. We grant Sergeant Spotts summary judgment on Ms. Victory's First Amendment retaliation claim.

Ms. Victory alleges Sergeant Spotts retaliated against her after she complained Officers Drosdak and Bauer did not release her in time for work on July 14, 2018. She alleges Sergeant Spotts responded, "You will go to work when I tell you to. If you keep it up, you will not go at all."[225]

Sergeant Spotts argues she did not work or even visit the Jail on July 14, 2018. Ms. Victory does not respond to Sergeant Spotts's argument, nor does she adduce evidence to support a retaliation claim against Sergeant Spotts.

Absent a disputed issue of fact, we grant Sergeant Spotts summary judgment on Ms. Victory's First Amendment retaliation claim for not releasing her in time for work on July 14, 2018.

### 2. We grant Officer Reichart summary judgment on Ms. Victory's First Amendment retaliation claim.

Ms. Victory alleges protected conduct when she filed a grievance on August 18, 2018. She alleges Officer Reichart retaliated against her by (1) preventing Ms. Victory from leaving for work on time on September 12, 2018 threatening "Knock on your door one more time, and you'll lose your job;"[226] and, (2) failing to release her on time for work on October 18, 2018.[227]

Officer Reichart argues she did not know of Ms. Victory's August 18, 2018 grievance. She argues a threat does not constitute adverse action.

Ms. Victory argues Officer Reichart must have known of her grievance considering "the large number of other [Berks County] staff members and other prisoners who knew about Ms. Victory's grievances and the frequency with which she spoke about her grievances and their subject matter."[228] She argues Officer Reichart worked on the same unit as correctional officers

30

and prison counselors to whom Ms. Victory told about her grievance. She also argues Officer Reichart had "many opportunities" to overhear Ms. Victory discussing her grievance. For example, when Ms. Victory discussed her grievances with her counselor, correctional officers were "within earshot" of the counselor's office.[229] But Ms. Victory does not argue she told Officer Reichart about her grievances or named Officer Reichart in any of her grievances. She merely speculates Officer Reichart knew of her grievance because she could have overheard Ms. Victory discussing her grievances or heard about the grievances from someone else. As our Court of Appeals explained in *Palfrey*, Ms. Victory cannot establish Officer Reichart's knowledge of her protected conduct with mere speculation.[230] Even assuming Officer Reichart could overhear Ms. Victory discuss her grievances with her counselor, she fails to adduce evidence showing these conversations occurred before the alleged adverse action. Officer Reichart could not retaliate against Ms. Victory unless Officer Reichart knew about the protected conduct before the alleged adverse action.[231] Without evidence Officer Reichart knew of Ms. Victory's August 18, 2018 grievance, she fails to raise a genuine issue of material fact allowing the jury to consider her First Amendment retaliation claim against Officer Reichart.

Ms. Victory argues we must draw inferences in her favor and as such, she establishes a genuine issue of fact as to Officer Reichart's knowledge of her protected conduct. But as our Court of Appeals explained "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."[232] Ms. Victory argues "it becomes difficult" to believe Officer Reichart did not know of her grievance considering the conversations Ms. Victory had with other people. But as she merely speculates as to Officer Reichart's knowledge, we cannot draw an inference in her favor. As such, she fails to establish a prima facie case of First Amendment retaliation against Officer Reichart.

31

We grant Officer Reichart summary judgment on Ms. Victory's First Amendment claim.

### 3. We grant Officer Zerr summary judgment on Ms. Victory's First Amendment retaliation claim.

Ms. Victory alleges protected conduct when she filed a grievance on August 18, 2018. She alleges Officer Zerr retaliated by refusing to allow Ms. Victory to leave for work on September 4, 2018. When Ms. Victory protested, Officer Zerr threatened to send Ms. Victory to "the hole" if she continued to ask about work.[233]

Officer Zerr argues she did not know of Ms. Victory's grievance on September 4, 2018. She further argues Ms. Victory was not scheduled for work on September 4, 2018. Ms. Victory argues Officer Zerr must have known of her grievance but only speculates as to Officer Zerr's knowledge of her protected conduct, making the same assumptions to imply Officer Zerr's knowledge of her protected conduct. She does not argue she named Officer Zerr in any grievance, nor did she tell Officer Zerr about her grievances. Ms. Victory only argues Officer Zerr must have overheard her speaking about her grievance or heard about them through another person. As explained, we cannot infer Officer Zerr's knowledge of her protected conduct based only on speculation.

Assuming Ms. Victory argues her protest on September 4, 2018 constitutes protected activity, she only alleges Officer Zerr threatened her in retaliation for her protected activity. As our Court of Appeals explained, "verbal threats" do not constitute adverse action to establish a retaliation claim.[234]

We grant Officer Zerr summary judgment on Ms. Victory's First Amendment retaliation claim.

### 4. We grant Officer Brown summary judgment on Ms. Victory's First Amendment retaliation claim.

Ms. Victory alleges protected conduct when she filed a grievance on August 18, 2018. She alleges Officer Brown retaliated against her by refusing to let Ms. Victory leave for work on September 4, 2018. After she complained about missing work, Officer Brown threatened, "If you ask me one more time, I'm going to put you in the hole today."[235] She also alleges on November 19, 2018, Officer Brown punished Ms. Victory for possessing an extra towel, extra bed sheet, and prohibited correspondence in her cell.[236]

Ms. Victory fails to adduce facts showing Officer Brown's knowledge of her grievance. She merely speculates as to Officer Brown's knowledge. Assuming her complaint on September 4, 2018 constituted protected conduct, Ms. Victory argues Officer Brown threatened her in response. As explained, Ms. Victory cannot establish adverse action with only verbal threats.[237]

We grant Officer Brown summary judgment on Ms. Victory's First Amendment retaliation claim.

### 5. Ms. Victory cannot proceed with her First Amendment retaliation claims against Warden Quigley and Deputy Warden Smith.

In her Second Amended Complaint, Ms. Victory claims First Amendment retaliation against Warden Quigley and Deputy Warden Smith alleging these Defendants were "aware of, acquiesced to, and/or directed the continued retaliation against Ms. Victory."[238] But in dismissing Ms. Victory's Amended Complaint, we dismissed Ms. Victory's First Amendment retaliation claims against Warden Quigley and Deputy Warden Smith.[239] We allowed her to proceed with First Amendment retaliation claims only against Sergeant Spotts, and Officers Reichart, Zerr, and Brown.[240] Warden Quigley and Deputy Warden Smith did not move for summary judgment on Ms. Victory's First Amendment retaliation claims in her Second Amended Complaint. But we did

33

not allow Ms. Victory to proceed with these claims, and Ms. Victory does not show why we should revive First Amendment retaliation claims against Warden Quigley and Deputy Warden Smith.

## D. We grant Defendants' motion for summary judgment on claims for punitive damages.

Defendants argue Mses. Victory and Velazquez-Diaz cannot recover punitive damages for their civil rights claims. Ms. Victory argues she can recover punitive damages for her First Amendment retaliation claims.

The Supreme Court held a plaintiff in a § 1983 action cannot recover punitive damages against a municipality.[241] We earlier dismissed Mses. Victory's and Velazquez-Diaz's damages claim under the Equal Protection Clause of the Fourteenth Amendment against the individual Berks County Defendants holding qualified immunity bars claims for damages against these individuals.[242] As we grant summary judgment against Ms. Victory on her First Amendment claims, the remaining damages claims are against Berks County on the Equal Protection claims. Mses. Victory and Velazquez-Diaz cannot recover punitive damages from Berks County.

## III. We certify a class of female Trusty inmates for injunctive relief.

As explained today, Mses. Victory and Velazquez-Diaz may proceed to trial seeking to enjoin Berks County Defendants' differential treatment of male and female Trusty inmates under the Equal Protection Clause of the Fourteenth Amendment. In addition to seeking damages for themselves,[243] Mses. Victory and Velazquez-Diaz seek class injunctive relief under Federal Rule of Civil Procedure 23(b)(2), where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."[244]

They now move to certify a class defined as:

All current and future female inmates committed to the Berks County Jail System who have the Trusty custody-level classification and/or Work Release status but have been denied assignment to the Community Reentry Center ("CRC") and denied access to the privileges, services, and programs available to men assigned to the CRC.[245]

To obtain class certification, Mses. Victory and Velazquez-Diaz must satisfy the requirements of Federal Rule of Civil Procedure 23(a) by a preponderance of the evidence.[246] Mses. Victory and Velazquez-Diaz must show "[a]ctual, not presumed[,] conformance" with the Rule 23(a) requirements.[247] To determine whether there is actual conformance, we must conduct a "rigorous analysis" of the evidence and proffered arguments.[248] We must also "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action."[249] Under Rule 23(a), Mses. Victory and Velazquez-Diaz must show: (1) numerosity: meaning the class "is so numerous that joinder of all members is impracticable"; (2) commonality: meaning there are "questions of law or fact common to the class"; (3) typicality: meaning the "claims or defenses of the representative parties" are "typical of the claims or defenses of the class"; and, (4) adequacy of representation: meaning the named plaintiff and counsel will "fairly and adequately protect the interests of the class."[250]

As they seek injunctive relief for the proposed class, Mses. Victory and Velazquez-Diaz must also satisfy the requirements of Rule 23(b)(2). The key feature of an injunctive class "is the 'indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"[251] Our Court of Appeals instructs we focus on the "cohesiveness" of the class "[b]ecause there is no right to opt out from such a class, and because significant individual issues in a (b)(2) class might present manageability issues and undermine the value of utilizing the class

35

action mechanism[.]"[252] Our Court of Appeals further explained "many courts have found Rule 23(b)(2) well suited for cases where the composition of the class is not readily ascertainable; for instance, in a case where the plaintiffs attempt to bring suit on behalf of a shifting prison population."[253]

We rigorously analyzed the record and find Mses. Victory and Velazquez-Diaz establish the propriety of certifying a class of current and future female Trusty inmates in the Berks County Jail System.

## A.    The proposed class definition is not overbroad.

Berks County argues Mses. Victory's and Velazquez-Diaz's class definition is overly broad relying on *Kemblesville HHMO Ctr., LLC v. Landhope Realty Co.*.[254] In *Kemblesville*, the plaintiffs owned property near the defendant company's gas station. They alleged the gas station leaked a dangerous chemical into groundwater and the chemical spread to nearby properties. The property owners sought to certify a class of property owners within a 2,500-foot radius of the gas station whose properties lost value due to the contaminated groundwater. The company argued the property owners defined the class too broadly.

The district court explained it would not certify a class if determining membership in the class "would essentially require a mini-hearing on the merits of each case."[255] The district court held the class definition overbroad because the property owners adduced no evidence the dangerous chemical traveled or would travel 2,500 feet.[256] The only evidence adduced showed the chemical affected properties within 1,500 feet of the gas station. The court explained it would need to conduct small hearings to determine whether the chemicals affected properties within the 2,500-foot radius.

Unlike *Kemblesville* where the court could not determine whether the defendant's conduct affected the proposed class members, Berks County concedes it treats all female Trusty inmates differently than male Trusty inmates. Berks County admittedly houses all female Trusty inmates in the Jail and all male Trusty inmates in the Community Reentry Center. Berks County denies female Trusty inmates, merely because of their sex, similar freedom of movement, access to furloughs, and visitation conditions.[257] Unlike *Kemblesville*, a determination of class membership would not require a "mini-hearing" on the merits of each case because the mere classification of a female inmate as "Trusty" bars them from conditions available to male Trusty inmates. Unlike *Kemblesville*, we can readily discern membership in the class by a female inmate's classification as Trusty. Mses. Victory's and Velazquez-Diaz's class definition is not overbroad.

## B.    Mses. Victory and Velazquez-Diaz satisfy the numerosity requirement.

Mses. Victory and Velazquez-Diaz must show the putative class "is so numerous that joinder of all members is impracticable." "Impracticable does not mean impossible," but refers to "the difficulties of achieving joinder."[258] Our Court of Appeals instructs "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."[259] While the number of plaintiffs is not dispositive, courts generally find joinder of over forty claimants is impracticable and joinder of twenty or less can be efficiently managed. As Berks County currently houses four female Trusty inmates, our Court of Appeals directs we must engage in a particularly rigorous factual analysis to ensure joinder is impracticable before allowing a class to proceed.[260]

We look at five factors to determine whether Mses. Victory and Velazquez-Diaz satisfy the numerosity requirement: "(1) judicial economy, (2) geographic dispersion, (3) financial

resources of class members, (4) the claimant's ability to institute individual suits, and (5) requests for injunctive relief that could affect future class members."[261] Our Court of Appeals explained "both judicial economy and the ability to litigate as joined parties are of primary importance."[262]

### 1. Judicial economy favors class treatment.

Mses. Victory and Velazquez-Diaz argue joinder is "logistically unfeasible" as the class includes a "transient" population of current and future female Trusty inmates.[263] They argue while the number of female Trusty inmates can fluctuate from day to day, Berks County classified seventy-five individual female inmates as Trusty in 2018, and within the past five years, as few as forty-three female inmates as Trusty.[264] Berks County classified the following number of individual female inmates as Trusty over the past five years: forty-seven in 2014, forty-three in 2015, fifty-four in 2016, sixty-four in 2017, seventy-five in 2018, and twenty-nine in 2019 as of April 12, 2019.[265] Mses. Victory and Velazquez-Diaz further argue unfeasibility of joinder due to the average length an inmate holds Trusty status. For example, in 2018 the average length of incarceration was fifty-seven days for female Trusty inmates.[266]

Mses. Victory and Velazquez-Diaz further argue denial of class certification will lead to more preliminary injunction hearings. They explain since Ms. Victory filed her lawsuit, Berks County has released four of the five Plaintiffs in this case.[267] Without class certification, the individual female Trusty inmates at the Jail must join the lawsuit and move for a preliminary injunction, requiring additional hearings. Mses. Victory and Velazquez-Diaz argue class certification will allow us to preserve resources by allowing the class representatives to pursue one permanent injunction on behalf of the entire class of current and future female Trusty inmates in the Berks County Jail System.

We agree with the reasoning from other judges holding a "transient" population warrants class treatment of current and future female Trusty inmates as joinder is impracticable. In *Hawker v. Consovoy*, prisoners sued the New Jersey State Parole Board under the Due Process Clause alleging the Board failed to meet deadlines for prisoner parole hearings.[268] The district court explained "[t]he joinder of potential future class members who share a common characteristic, but whose identity cannot be determined yet is considered impracticable."[269] The court found over eighteen thousand prisoners would be eligible for parole in the upcoming twelve months and considered these future parolees part of the putative class.[270]

In *Santiago v. City of Philadelphia*, a class of seventeen juvenile detainees sued the City of Philadelphia alleging unconstitutional conditions of confinement at a youth detention center.[271] Juveniles detainees stayed at the detention center for an average of two weeks.[272] The class representatives sought injunctive relief and moved to certify a class of all current and future juvenile detainees at the center.[273] Judge Lord held the detainees satisfied numerosity explaining the "constant influx" and "rotation" of changing juvenile detainees made joinder impracticable.[274]

Like the potential class members in *Hawker*, all current and future female Trusty inmates share a common characteristic: Berks County denies them housing in the Community Reentry Center merely because of their sex and instead houses them in the Jail. Merely because of their sex, female Trusty inmates do not have the same freedom of movement, access to furloughs, and visitation conditions as male Trusty inmates. Joinder of these future female Trusty inmates is impracticable. Like the potential class of juvenile detainees in *Santiago*, Mses. Victory and Velazquez-Diaz show a constant rotation of female Trusty inmates. In 2018, Berks County classified seventy-five individual female inmates as Trusty.[275] From January 2016 to May 2019, female Trusty inmates held Trusty status for an average forty-nine days during their

39

incarceration.[276] In 2018, the average length of incarceration for a female Trusty inmate was fifty-seven days.[277] Since this lawsuit began, Berks County released four of the five female Trusty inmate Plaintiffs.

Berks County argues Mses. Victory and Velazquez-Diaz only speculate joinder is impracticable because Berks County could possibly fail to classify any female inmates as Trusty in the future. But Mses. Victory and Velazquez adduce evidence showing Berks County classified at least forty individual female inmates as Trusty over the past five years. They further show the number of female inmates classified as Trusty has steadily increased over the past four years, from forty-seven in 2014 to seventy-five in 2018.[278] Berks County instead speculates in the face of statistical evidence showing an increasing trend of female inmates in the Berks County Jail System receiving Trusty status.[279]

Berks County argues the decision in *T.R. v. School District of Philadelphia* warrants denial of class certification.[280] In *T.R.*, students and parents in the Philadelphia School District sued the school district alleging violations of the Individuals with Disabilities Education Act.[281] These students and parents argued the school district failed to provide sufficient translation and interpretation services to special education students living with parents with "limited proficiency" in speaking English.[282] To show numerosity, the parents and students presented evidence over 3,000 special education students live in homes where English is not the primary language.[283]

Judge Goldberg held the students and parents failed to satisfy the numerosity requirement. He explained while a court may use "common sense assumptions" to determine whether a plaintiff satisfies numerosity, he warned "[w]here a putative class is some subset of a larger pool, the trial court may not infer numerosity from the number in the larger pool alone."[284] Judge Goldberg explained while the parents provided the number of households with English as a secondary

language, they failed to show the number of "children [who] *also* have *parents* who have limited English proficiency."[285] The plaintiffs only showed the putative class members primarily spoke a language other than English, but failed to show these parents could not speak English proficiently.[286]

Unlike the parents and students in *T.R.*, Mses. Victory and Velazquez-Diaz do not ask us to infer a putative class number from a larger pool. We do not have to guess who is included in Mses. Victory's and Velazquez-Diaz's putative class. Any female inmate Berks County classifies as Trusty belongs to the class, since Berks County automatically treats female Trusty inmates differently than male Trusty inmates because of their sex. Mses. Victory and Velazquez-Diaz further provide an estimate of future putative class members based on statistics from the past five years. As shown, Berks County classified at least forty individual female inmates as Trusty each year over the past five years: forty-seven inmates in 2014, forty-three inmates in 2015, fifty-four inmates in 2016, sixty-four inmates in 2017, seventy-five inmates in 2018, and twenty-nine inmates in 2019 as of April 12, 2019.[287] As explained, we can consider "potential future class members who share a common characteristic, but whose identity cannot be determined."[288] Because the class definition includes future female Trusty inmates, joinder of these inmates is impracticable. Mses. Victory and Velazquez-Diaz have shown the inefficiency of female Trusty inmates joining the lawsuit and moving individually for preliminary injunctive relief. We held three preliminary injunction hearings in less than six months. A permanent injunction affecting current and future female Trusty inmates would avoid further hearings.

Mses. Victory and Velazquez-Diaz show judicial economy favors class treatment.

### 2. Mses. Victory and Velazquez-Diaz make no argument regarding geographic dispersion.

Mses. Victory and Velazquez-Diaz make no argument concerning the geographic dispersion of class members. As all potential class members are current and female Trusty inmates in the Berks County Jail, these class members are in the same building.

Geographic dispersion of potential class members favors joinder.

### 3. We cannot determine if the financial resources of the class members favor class treatment.

Mses. Victory and Velazquez-Diaz adduce no evidence of the potential class members' financial resources. We cannot determine whether the financial resources of potential class members favor class treatment. We are aware Ms. Velazquez-Diaz remains in the Jail with little or no income.

### 4. The class members' ability and motivation to institute individual suits favors class treatment.

Mses. Victory and Velazquez-Diaz argue female Trusty inmates could not bring individual suits because the average time for exhausting administrative remedies for an Equal Protection claim before filing a lawsuit exceeds the average length of incarceration for female Trusty inmates.[289] Mses. Victory and Velazquez-Diaz further argue female Trusty inmates may not sue individually for fear of retaliation from prison officials.

Inmates must exhaust available administrative remedies in their institution before filing suit. Under the Prison Litigation Reform Act, Congress provides "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."[290] To determine whether a prisoner properly exhausts administrative

42

remedies for a claim, we look to whether the prisoner complied with the prison's grievance procedure.[291]

Under the Berks County Jail System's Inmate Handbook, an inmate must submit a grievance within thirty days of a grievable event.[292] Berks County officials will answer the grievance within fifteen days, with an option to extend an additional ten days.[293] After receiving a response from prison officials, an inmate must appeal within fifteen days.[294] The inmate must file a written appeal with the Warden.[295] The Handbook does not provide a timeframe for the Warden's response to the appeal.

Mses. Victory and Velazquez-Diaz adduce evidence showing potential class members would be unable to litigate their claims for injunctive relief individually because of the administrative exhaustion requirement and the short length of incarceration for female Trusty inmates. From January 2016 to May 2019, female Trusty inmates held Trusty status for an average forty-nine days during their incarceration.[296] In 2018, the Commonwealth incarcerated female Trusty inmates in the Berks County for an average fifty-seven days.[297] Female Trusty inmates could not file lawsuits seeking injunctive relief because they would fail to exhaust administrative remedies before their claims for injunctive relief became moot.[298] Ms. Victory exhausted her remedies and filed suit but Berks County released her shortly after we granted her motion for injunctive relief.[299] Berks County released two other plaintiffs who earlier joined in this action— Anabell Dealba and Samantha Huntington[300]—before we could rule on their motions for preliminary injunctive relief. Mses. Victory and Velazquez-Diaz show the putative class members' inability to seek injunctive relief individually.

Berks County fails to address Mses. Victory's and Velazquez-Diaz's argument concerning the inability of female Trusty inmates to exhaust administrative remedies before their injunctive

relief claims become moot. Berks County only argues Mses. Victory and Velazquez-Diaz merely speculate as to female Trusty inmates' fear of retaliation if they join this lawsuit. Berks County argues because Congress passed the Prison Litigation Reform Act to reduce the overwhelming amount of prison litigation, Mses. Victory and Velazquez-Diaz cannot credibly argue female Trusty inmates fear retaliation from joining the lawsuit. But a former female Trusty inmate testified after Ms. Victory filed grievances, Berks County officials treated Ms. Victory more harshly by subjecting her to more cell searches than any other inmate.[301] We can infer some female inmates may fear joining the lawsuit due to Berks County's harsher treatment of parties to the suit.

Mses. Victory and Velazquez-Diaz show the potential class members' ability and motivation to pursue relief individually favors class treatment.

### 5. Mses. Victory's and Velazquez-Diaz's request for injunctive relief affecting future class members favors class treatment.

Mses. Victory and Velazquez-Diaz seek injunctive relief enjoining Berks County from treating male Trusty inmates differently than female Trusty inmates. Mses. Victory and Velazquez-Diaz seek only injunctive relief for the potential class members. This factor favors class treatment.[302]

Mses. Victory and Velazquez-Diaz show judicial economy, the potential class members' ability and motivation to institute individual suits, and their request for injunctive relief favor class treatment. Balancing the factors, and finding they satisfy the two most important factors—judicial economy and the ability of the potential class members to pursue claims individually—Mses. Victory and Velazquez-Diaz satisfy the numerosity requirement.

### C. Mses. Victory and Velazquez-Diaz satisfy the commonality requirement.

"The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."[303] Commonality "does not

44

require identical claims or facts among class member[s]."[304] To satisfy commonality, "even a single common question will do."[305]

Mses. Victory and Velazquez-Diaz argue they satisfy the commonality requirement because whether Berks County's policy of prohibiting female Trusty inmates from the Community Reentry Center and denying them the same liberty as male Trusty inmates violates the Equal Protection Clause applies to all class members.[306]

Berks County argues Mses. Victory and Velazquez-Diaz fail to satisfy commonality because their claims require individualized proof. Berks County argues it provides programming to all inmates regardless of sex. It further argues it provides job-related programming based on an inmate's Ohio Risk Assessment Score. But Berks County fails to address the argument male Trusty inmates in the Reentry Center receive different freedom of movement, access to furloughs, and visitation conditions than female Trusty inmates in the Jail. These claims do not require individualized proof. We can compare the freedom of movement offered to female Trusty inmates housed on the F Block in the Jail with the freedom of movement offered to male Trusty inmates in the Reentry Center without delving into individual issues. The same is true for the claim of differential treatment regarding visitation conditions and access to furloughs in the Jail and the Reentry Center. To satisfy commonality, Mses. Victory and Velazquez-Diaz need only show they share "at least one question of fact or law" with the potential class. Mses. Victory and Velazquez-Diaz satisfy this requirement.

## D. Mses. Victory and Velazquez-Diaz satisfy the typicality requirement.

Mses. Victory and Velazquez-Diaz must show their claims and defenses are "typical of the claims or defenses of the class." We focus on "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned

with those of the class."[307] "Factual differences will not defeat typicality if the named plaintiffs' claims arise from the same event or course of conduct that gives rise to the claims of the class members and are based on the same legal theory."[308]

The claims of the class members and Mses. Victory and Velazquez-Diaz arise from the same conduct: Berks County's differential treatment of female Trusty inmates and male Trusty inmates in the Berks County Jail System. Mses. Victory and Velazquez-Diaz and potential class members all claim differential treatment violates the Equal Protection Clause of the Fourteenth Amendment.

Berks County argues Mses. Victory and Velazquez-Diaz fail to satisfy typicality because "male and female inmates who are not Trusty but who may qualify for work-release status are not treated differently."[309] Berks County misses the point. Mses. Victory and Velazquez-Diaz do not argue Berks County treats male and female non-Trusty, work release inmates differently. In fact, Mses. Victory and Velazquez-Diaz argue all Work Release inmates are classified as Trusty.[310] They argue Berks County treats male Trusty inmates more favorably than female Trusty inmates. For example, Berks County automatically houses male Trusty inmates in the Reentry Center because of their sex, and female Trusty inmates in the Jail. It is this conduct Mses. Victory and Velazquez-Diaz argue violates the Equal Protection Clause. Mses. Victory and Velazquez-Diaz satisfy the typicality requirement.

## E.    Mses. Victory and Velazquez-Diaz satisfy the adequacy requirement.

We ask whether class representatives will "fairly and adequately protect the interests of the class." To determine adequacy, we look at two issues: (1) "the interests and incentives of the class representatives" and (2) "the experience and performance of class counsel."[311] We also ask whether Mses. Victory and Velazquez-Diaz's proposed class counsel possess "adequate

46

experience, will vigorously prosecute the action, and will act at arm's length from the defendant."[312]

Concerning class counsel's experience, Mses. Victory and Velazquez-Diaz argue counsel's organization the Pennsylvania Institutional Law Project is "devoted exclusively to representing incarcerated and otherwise institutionalized individuals in Pennsylvania in civil legal matters."[313] Counsel swears they litigated several prison civil rights class actions resulting in "improved conditions in prisons and jails, including reforms to overcrowded conditions in the Philadelphia Prison System's intake areas, increased access [to] medical care at a privately-owned halfway house, and medical treatment for individuals with Chronic Hepatitis C in the Pennsylvania [Department of Corrections]."[314]

Berks County argues Mses. Victory and Velazquez-Diaz fail to satisfy adequacy because they "have significantly divergent interests than the class they propose to represent."[315] It argues because Mses. Victory and Velazquez-Diaz seek damages for their equal protection claims—and Ms. Victory for her retaliation claims—their personal interests will "certainly conflict with [their] ability to protect the interest of the proposed class."[316]

Our Court of Appeals rejected a similar argument. In *New Directions Treatment Services v. City of Reading*, methadone users and a methadone treatment center sued the City of Reading arguing the City impermissibly denied a permit for a new methadone clinic in Reading.[317] The methodone users and center sought certification of a Rule 23(b)(2) class. The City argued the methadone users failed to show adequacy because the named plaintiffs sought individual damages for themselves but only injunctive relief for the class.[318] Our Court of Appeals rejected the City's argument explaining it failed to show a conflict of interest between the named plaintiffs and the class members.[319]

47

In a similar civil rights class action, former prisoners sued the Pennsylvania Department of Corrections under the Eighth Amendment alleging the department failed to provide inmates suffering from Hepatitis C with adequate medical care.[320] The former prisoners sought injunctive relief on the Eighth Amendment claim requiring the department formulate a plan for treating Hepatitis-suffering inmates.[321] One former prisoner brought a separate medical malpractice claim against prison medical officials and sought damages for himself.[322] Judge Padova found the former prisoners satisfied the adequacy requirement. He explained although the former prisoner separately brought damages claims, no conflict between the representative plaintiff and the class members existed "since [the representative plaintiff's] claims for monetary damages arise from the same policy and practice as the class's claim for injunctive relief."[323]

In *Santiago*, juvenile detainees challenging unconstitutional conditions at a detention center sought injunctive relief for the class of current and future juvenile detainees and sought damages for themselves. The court rejected the argument the juvenile plaintiffs failed to satisfy adequacy because they sought damages. The court explained the City defendants showed no antagonism between the class representatives and the class. The court further explained "a finding in favor of the named plaintiffs for damages could only support the class claims for injunctive relief."[324]

We disagree with Berks County. Ms. Velazquez-Diaz remains incarcerated, and she remains affected by Berks County's discriminatory treatment of female Trusty inmates, even after we ordered Berks County provide her similar treatment and conditions it provides to male Trusty inmates.[325] Ms. Velazquez-Diaz shares the class members' interest in permanent injunctive relief. Like *Chimenti*, Ms. Victory's damages claims under the Equal Protection Clause arise from the same policy as the class members' claim for injunctive relief: Berks County's policy of treating

48

female Trusty inmates differently than male Treaty inmates. A finding in favor of Mses. Victory and Velazquez-Diaz on their claims for damages for Equal Protection violations would similarly support a claim for injunctive relief. Berks County fails to show Mses. Victory and Velazquez-Diaz will not adequately represent the putative class.

Mses. Victory and Velazquez-Diaz satisfy the adequacy requirement.

## F.     Mses. Victory and Velazquez-Diaz satisfy the cohesiveness for a Rule 23(b)(2) class.

Before we certify a Rule 23(b)(2) class, Mses. Victory and Velazquez-Diaz must show the cohesiveness of the class. Our Supreme Court explained "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"[326] Our Court of Appeals also explained an injunctive class is "well suited for cases where the composition of the class is not readily ascertainable; for instance, in a case where the plaintiffs attempt to bring suit on behalf of a shifting prison population."[327]

Mses. Victory and Velazquez-Diaz argue they satisfy the cohesiveness requirement because Berks County admittedly maintains a policy housing all female Trusty inmates in the Jail and all male Trusty inmates in the Reentry Center. Male Trusty inmates experience different living conditions and potential access to programming merely due to their gender.

Berks County argues against cohesiveness repeating its argument about individual factual differences among female Trusty inmates. They argue inmates' Ohio Risk Assessment scores and program eligibility present "too many individual issues to permit certification[.]"[328] In our ruling on summary judgment, we find Mses. Victory and Velazquez-Diaz fail to raise a genuine issue of fact as to differential treatment concerning access to job-related programming. We instead face

49

claims of differential treatment concerning freedom of movement, access to furloughs, and visitation conditions. We need not delve into individual issues for these claims.

Mses. Victory and Velazquez-Diaz show cohesiveness.

## III. Conclusion

In an accompanying Order, we deny the motion for summary judgment of Berks County, Commissioner Barnhardt, Leinbach, and Scott, Warden Quigley, and Deputy Warden Smith on Mses. Victory's and Velazquez-Diaz's Equal Protection claims under the Fourteenth Amendment. We grant their motion on Mses. Victory's and Velazquez-Diaz's claims under the Equal Rights Amendment under the Pennsylvania Constitution. We grant the motions of Sergeant Spotts, and Officers Reichart, Zerr, and Brown on Ms. Victory's First Amendment retaliation claims. We dismiss Ms. Victory's First Amendment retaliation claims against Warden Quigley and Deputy Warden Smith.

In another accompanying Order, we grant the Plaintiffs' motion for class certification on the claims for injunctive relief under the Equal Protection Clause for the narrowly defined class. The parties shall promptly work towards an acceptable notice and protocol.

---

[1] Our Policies and Procedures require a Statement of Undisputed Material Facts ("SUMF") and an appendix in support of summary judgment. Berks County Defendants filed their SUMF ("Berks SUMF") at ECF Doc. No. 147 and their brief in support of their motion at ECF Doc. No. 146. They filed an amended appendix in support of summary judgment at ECF Doc. No. 167. Mses. Victory and Velazquez-Diaz filed their response SUMF ("Victory Response SUMF") and supplemental appendix at ECF Doc. No. 164. They filed their brief in opposition at ECF Doc. No. 163. Berks County Defendants filed a Reply to Mses. Victory's and Velazquez-Diaz's opposition at ECF Doc. No. 171 and response to Mses. Victory's and Velazquez-Diaz's SUMF at ECF Doc. No. 172.

[2] ECF Doc. No. 164 (Victory Response SUMF) ¶ 192.

[3] *Id.* at ¶ 194.

50

[4] ECF Doc. No. 164-2 (Victory Response App.) at A1159.

[5] ECF Doc. No. 114 ¶¶ 9-11.

[6] ECF Doc. No. 164 (Victory Response SUMF) ¶ 198.

[7] *Id.* at ¶ 199.

[8] *Id.*

[9] *Id.* at ¶ 200.

[10] ECF Doc. No. 147 (Berks SUMF) ¶ 2.

[11] *Id.*

[12] ECF Doc. No. 164 (Victory Response SUMF) ¶ 203; ECF Doc. No. 167-5 (Berks App.) at A0151.

[13] ECF Doc. No. 147 (Berks SUMF) ¶ 5.

[14] ECF Doc. No. 164 (Victory Response SUMF) ¶ 333.

[15] *Id.* at ¶ 382.

[16] ECF Doc. No. 147 (Berks SUMF) ¶ 9; ECF Doc. No. 164 (Victory Response SUMF) ¶ 9.

[17] ECF Doc. No. 164 (Victory Response SUMF) ¶¶ 222-23.

[18] *Id.* at ¶ 221.

[19] ECF Doc. No. 167-17 (Berks App.) at A0569.

[20] ECF Doc. No. 147 (Berks SUMF) ¶ 13; ECF Doc. No. 164 (Victory Response SUMF) ¶ 13.

[21] ECF Doc. No. 147 (Berks SUMF) ¶ 6.

[22] *Id.* at ¶ 6.

[23] ECF Doc. No. 147 (Berks SUMF) ¶ 7; ECF Doc. No. 164 (Victory Response SUMF) ¶ 7.

[24] ECF Doc. No. 147 (Berks SUMF) ¶ 8; ECF Doc. No. 164 (Victory Response SUMF) ¶¶ 236, 292.

[25] ECF Doc. No. 147 (Berks SUMF) ¶ 11; ECF Doc. No. 164 (Victory Response SUMF) ¶ 11.

[26] ECF Doc. No. 164 (Victory Response SUMF) ¶¶ 228, 292.

[27] ECF Doc. No. 164-4 (Victory Response App.) at A1306-11.

[28] ECF Doc. No. 164 (Victory Response SUMF) ¶ 234; ECF Doc. No. 164-4 (Victory Response App.) at A1306.

[29] ECF Doc. No. 167-15 (Berks App.) at A0373-74.

[30] ECF Doc. No. 164 (Victory Response SUMF) ¶ 238.

[31] *Id.* at ¶ 404.

[32] ECF Doc. No. 147 (Berks SUMF) ¶ 15.

[33] *Id.* at ¶¶ 14, 15.

[34] ECF Doc. No. 147 (Berks SUMF) ¶¶ 16, 17; ECF Doc. No. 164 (Victory Response SUMF) ¶¶ 16, 17.

[35] ECF Doc. No. 147 (Berks SUMF) ¶ 19.

[36] *Id.* at ¶ 20.

[37] ECF Doc. No. 164 (Victory Response SUMF) ¶ 235.

[38] ECF Doc. No. 147 (Berks SUMF) ¶ 219.

[39] *Id.* at ¶ 23.

[40] ECF Doc. No. 147 (Berks SUMF) ¶¶ 24, 25; ECF Doc. No. 164 (Victory Response SUMF) ¶¶ 24, 25.

[41] ECF Doc. No. 164 (Victory Response SUMF) ¶ 26.

[42] *Id.*

[43] *Id.* at ¶ 220.

[44] ECF Doc. No. 147 (Berks SUMF) ¶ 26; ECF Doc. No. 164 (Victory Response SUMF) ¶ 26.

[45] ECF Doc. No. 167-5 (Berks App.) at A0143.

[46] ECF Doc. No. 147 (Berks SUMF) ¶ 21.

[47] *Id.* at ¶¶ 94, 95.

[48] ECF Doc. No. 147 (Berks SUMF) ¶ 98; ECF Doc. No. 164 (Victory Response SUMF) ¶ 98.

[49] ECF Doc. No. 147 (Berks SUMF) ¶ 96; ECF Doc. No. 164 (Victory Response SUMF) ¶ 96.

[50] ECF Doc. No. 147 (Berks SUMF) ¶ 97.

[51] *Id.* at ¶ 27.

[52] ECF Doc. No. 167-5 (Berks App.) at A0150.

[53] *Id.*

[54] ECF Doc. No. 167-21 (Berks App.) at A0754-55.

[55] ECF Doc. No. 164 (Victory Response SUMF) ¶ 29.

[56] ECF Doc. No. 167-5 (Berks App.) at A0151.

[57] *Id.*

[58] ECF Doc. No. 147 (Berks SUMF) ¶ 32.

[59] ECF Doc. No. 147 (Berks SUMF) ¶ 33; ECF Doc. No. 164 (Victory Response SUMF) ¶ 33.

[60] ECF Doc. No. 167-5 (Berks App.) at A0151.

[61] ECF Doc. No. 164-4 (Victory Response App.) at A1304.

[62] ECF Doc. No. 147 (Berks SUMF) ¶ 36.

[63] *Id.* at ¶ 38.

[64] *Id.* at ¶ 40.

[65] ECF Doc. No. 147 (Berks SUMF) ¶ 39; ECF Doc. No. 164 (Victory Response SUMF) ¶ 258.

[66] ECF Doc. No. 147 (Berks SUMF) ¶ 40.

[67] ECF Doc. No. 147 (Berks SUMF) ¶ 37; ECF Doc. No. 164 (Victory Response SUMF) ¶ 37.

[68] ECF Doc. No. 147 (Berks SUMF) ¶ 40; ECF Doc. No. 164 (Victory Response SUMF) ¶ 40.

[69] ECF Doc. No. 147 (Berks SUMF) ¶ 41.

[70] *Id.* at ¶ 42.

[71] *Id.* at ¶ 44.

[72] *Id.* at ¶ 46.

[73] ECF Doc. No. 147 (Berks SUMF) ¶ 54; ECF Doc. No. 164 (Victory Response SUMF) ¶ 54.

[74] ECF Doc. No. 147 (Berks SUMF) ¶ 47; ECF Doc. No. 164 (Victory Response SUMF) ¶ 47.

[75] ECF Doc. No. 147 (Berks SUMF) ¶¶ 55, 56; ECF Doc. No. 164 (Victory Response SUMF) ¶¶ 55, 56.

[76] ECF Doc. No. 147 (Berks SUMF) ¶ 59.

[77] *Id.* at ¶ 60.

[78] *Id.* at ¶ 62.

[79] *Id.* at ¶¶ 61, 66.

[80] ECF Doc. No. 147 (Berks SUMF) ¶ 64; ECF Doc. No. 164 (Victory Response SUMF) ¶ 64.

[81] ECF Doc. No. 147 (Berks SUMF) ¶ 65.

[82] ECF Doc. No. 164 (Victory Response SUMF) ¶ 289.

[83] *Id.* at ¶ 298.

[84] ECF Doc. No. 164-3 (Victory Response App.) at A1236.

[85] ECF Doc. No. 164 (Victory Response SUMF) ¶ 295.

[86] *Id.* at ¶¶ 296-97.

[87] *Id.* at ¶ 300.

[88] ECF Doc. No. 164-3 (Victory Response App.) at A1254.

[89] *Id.*

[90] ECF Doc. No. 147 (Berks SUMF) ¶¶ 134-35.

[91] *Id.* at ¶ 136.

[92] *Id.* at ¶ 142.

[93] *Id.* at ¶ 146.

54

[94] *Id.* at ¶ 159.

[95] ECF Doc. No. 164 (Victory Response SUMF) ¶ 340.

[96] *Id.*

[97] *Id.* at ¶ 343.

[98] ECF Doc. No. 164-3 (Victory Response App.) at A1290.

[99] ECF Doc. No. 147 (Berks SUMF) ¶ 108.

[100] *Id.* at ¶ 109.

[101] ECF Doc. No. 147 (Berks SUMF) ¶ 110; ECF Doc. No. 164 (Victory Response SUMF) ¶ 110.

[102] ECF Doc. No. 147 (Berks SUMF) ¶ 111; ECF Doc. No. 164 (Victory Response SUMF) ¶ 111.

[103] ECF Doc. No. 147 (Berks SUMF) ¶ 116.

[104] *Id.* at ¶¶ 117-20.

[105] ECF Doc. No. 1.

[106] ECF Doc. No. 9.

[107] ECF Doc. No. 39.

[108] ECF Doc. No. 64.

[109] ECF Doc. No. 94.

[110] ECF Doc. No. 149-2, at p. 5.

[111] ECF Doc. No. 147 (Berks SUMF) ¶ 72.

[112] *Id.* at ¶ 74.

[113] *Id.* at ¶ 71.

[114] *Id.* at ¶ 70.

[115] ECF Doc. No. 164 (Victory Response SUMF) ¶ 396.

[116] *Id.* at ¶ 397.

[117] ECF Doc. No. 167-19 (Berks App.) at A0664.

[118] ECF Doc. No. 114.

[119] ECF Doc. No. 115.

[120] ECF Doc. No. 135.

[121] *Id.*

[122] ECF Doc. No. 147 (Berks SUMF) ¶¶ 75-77.

[123] *Id.* at ¶¶ 79, 81.

[124] ECF Doc. No. 167-45 (Berks App.) at A1049.

[125] ECF Doc. No. 147 (Berks SUMF) ¶ 80.

[126] ECF Doc. No. 167-45 (Berks App.) at A1048.

[127] *Id.*

[128] ECF Doc. No. 147 (Berks SUMF) ¶¶ 86-87.

[129] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson*, 850 F.3d at 533-34 (3d Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-323).

[130] Anabell Dealba joined Mses. Victory and Velazquez-Diaz in the Second Amended Complaint. We dismissed Ms. Dealba upon agreement of counsel. *See* ECF Doc. No. 126.

56

[131] Jennifer Bronson & E. Ann Carson, *Prisoners in 2017*, Dep't of Justice, Bureau of Justice Statistics (2019), *available at* https://www.bjs.gov/content/pub/pdf/p17.pdf.

[132] Washington Lawyers' Comm. for Civ. Rts & Urban Affairs, *D.C. Women in Prison: Continuing Problems and Recommendations for Change* (2016), *available at* http://www.washlaw.org/pdf/dc_women_in_prison_report.pdf.

[133] The Sentencing Project, *Incarcerated Women and Girls*, (2019) *available at* https://www.sentencingproject.org/publications/incarcerated-women-and-girls/.

[134] Elizabeth Swavola, Kristine Riley, & Ram Subramanian, *Overlooked: Women and Jails in an Era of Reform*, Vera Inst. of Justice & the Safety & Justice Challenge 7 (2016), a*vailable at* http://www.safetyandjusticechallenge.org/wp-content/uploads/2016/08/overlooked-women-in-jails-report-web.pdf.

[135] *Id.* at 13.

[136] Donna L. Laddy, *Can Women Prisoners be Carpenters? A Proposed Analysis for Equal Protection Claims of Gender Discrimination in Educational and Vocational Programming at Women's Prisons.* 5 Temple Pol. & Civ. Rts. L. Rev. 1, 5 (1995).

[137] U.S. Const. amend. XIV.

[138] *Reed v. Reed*, 404 U.S. 71, 76 (1971).

[139] *Dinote v. Danberg*, 601 F. App'x 127, 130 (3d Cir. 2015) (quoting *Williams v. Morton*, 343 F.3d 212, 221 (3d Cir. 2003)).

[140] *Nifas v. Beard*, No. 08-834, 2009 WL 3241871, at *10 (W.D. Pa. Oct. 6, 2009) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)).

[141] *Dinote*, 601 F. App'x at 130 (quoting *United States v. Virginia*, 518 U.S. 515, 571 (1996)).

[142] 31 F.3d 727 (8th Cir. 1994).

[143] *Klinger*, 31 F.3d at 729.

[144] *Id.*

[145] *Id.* at 730.

[146] *Id.*

[147] *Id.* at 731-32.

[148] *Id.* at 731.

[149] *Id.* at 731-32.

[150] Jennifer Arnett Lee, *Women Prisoners, Penological Interests, and Gender Stereotyping: An Application of Equal Protection Norms to Female Inmates*, 32 Colum. Hum. Rts. L. Rev. 251, 285 (2000).

[151] *Klinger*, 31 F.3d at 732.

[152] Angie Baker, *Leapfrogging over Equal Protection Analysis: The Eighth Circuit Sanctions Separate and Unequal Prison Facilities for Males and Females in* Klinger v. Department of Corrections*, 31 F.3d 727 (8th Cir. 1994)*, 76 Ne. L. Rev. 371 (1997).

[153] *Id.* at 389 (arguing the court in *Klinger* improperly instructs "if a court is able to articulate any statistical difference between men and women—whether or not relevant to the challenged disparity—then the court need not bother analyzing the challenged disparity").

[154] ECF Doc. No. 147 (Berks SUMF) ¶¶ 86-87.

[155] ECF Doc. No. 167-20 (Berks App.) at A0700.

[156] *Id.*

[157] *Glover v. Johnson*, 478 F. Supp. 1075, 1079 (E.D. Mich. 1979).

[158] *Id.*

[159] *McCoy v. Nevada Dep't of Prisons*, 776 F. Supp. 521, 522 (D. Nev. 1991).

[160] *Id.* at 525-26.

[161] *Id.* at 526.

[162] *Bukhari v. Hutto*, 487 F. Supp. 1162, 1164 (E.D. Va. 1980).

[163] *Id.* at 1171.

[164] *Id.* at 1172 (quoting *Glover*, 478 F. Supp. at 1078).

[165] *Mitchell v. Untreiner*, 421 F. Supp. 886, 888 (N.D. Fla. 1976).

[166] *Id.* at 891.

[167] *Id.*

[168] *Id.* at 902.

[169] ECF Doc. No. 167-17 (Berks App.) at A0569.

[170] ECF Doc. No. 167-15 (Berks App.) at A0373-74.

[171] ECF Doc. No. 147 (Berks SUMF) ¶ 97.

[172] ECF Doc. No. 164 (Victory Response SUMF) ¶ 273.

[173] ECF Doc. No. 146, at p. 11.

[174] ECF Doc. No. 167-5 (Berks App.) at A0150.

[175] *Id.*

[176] *Id.*

[177] ECF Doc. No. 167-21 (Berks App.) at A0754-55.

[178] ECF Doc. No. 147 (Berks SUMF) ¶ 38.

[179] ECF Doc. No. 167-15 (Berks App.) at A0335.

[180] ECF Doc. No. 164-4 (Victory Response App.) at A1303-04.

[181] *Id.* (showing one female Trusty inmate scored "moderate" risk while the rest scored "low" risk).

[182] *Id.* at A1304.

[183] *Id.*

[184] *See Barnes Found. v. Twp. of Lower Merion*, 982 F. Supp. 970, 985 (E.D. Pa. 1997) ("[T]he Barnes must show more than that the Defendants' application of their regulatory authority had a racially disproportionate impact, unless that impact is so 'stark' as to be 'unexplainable on grounds other than race.'"); *El v. Se. Pa. Transp. Auth.*, 418 F. Supp. 2d 659, 672 (E.D. Pa. 2005), *aff'd sub nom. El v. Se. Pa. Transp. Auth.*, 479 F.3d 232 (3d Cir. 2007) ("[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact."); *Nifas v. Beard*, No. 08-834, 2009 WL 3241871, at *10 (W.D. Pa. Oct. 6, 2009) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)) ("Official action does not violate the Equal Protection Clause solely because it results in a disproportionate impact; proof of discriminatory intent or purpose is required to show a violation.").

[185] *Dinote*, 601 F. App'x at 130.

[186] *Ford v. City of Bos.*, 154 F. Supp. 2d 131, 133 (D. Mass. 2001).

[187] *Id.* at 150.

[188] *Id.* at 151.

[189] *Id.*

[190] ECF Doc. No. 147 (Berks SUMF) ¶ 80.

[191] ECF Doc. No. 167-15 (Berks App.) at A0352-53.

[192] ECF Doc. No. 146, at p. 17.

[193] ECF Doc. No. 38 ¶ 47.

[194] *Id.* at ¶ 49.

[195] *Hassan v. City of New York*, 804 F.3d 277 (3d Cir. 2015).

[196] *Id.* at 297.

[197] *Id.*

[198] *Id.* (citing *Snyder v. Louisiana*, 552 U.S. 472 (2008)).

[199] Pa. Const. art. I, § 28.

[200] *Hartford Acc. & Indem. Co. v. Ins. Com'r of Com.*, 482 A.2d 542, 549 (Pa. 1984).

[201] *Id.* at 548.

[202] *Id.* (citing *Com. ex rel. Spriggs v. Carson*, 368 A.2d 635, 636 (Pa. 1977)).

[203] *Summy-Long v. Pennsylvania State Univ.*, 226 F. Supp. 3d 371, 412 (M.D. Pa. 2016), *aff'd*, 715 F. App'x 179 (3d Cir. 2017); *see Weaver v. Harpster*, 975 A.2d 555, 572 (Pa. 2009) ("We have not invoked the Equal Rights Amendment to provide a private cause of action for tort[.]").

[204] *Dillon v. Homeowner's Select*, 957 A.2d 772, 774 (Pa. Super. Ct. 2008).

[205] *Summy-Long*, 226 F. Supp. 3d at 412 (quoting *Weaver*, 975 A.2d at 572).

[206] Mses. Victory and Velazquez-Diaz sue under the Equal Rights Amendment to the Pennsylvania Constitution. They do not sue under the similar provision in Article One, Section Twenty-Six of the Pennsylvania Constitution providing "[n]either the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right."

[207] *Farmer v. Decker*, 353 F. Supp. 3d 342, 352 (M.D. Pa. 2018) (quoting *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006)).

[208] *Fantone v. Latini*, 780 F.3d 184, 194 (3d Cir. 2015).

[209] *Mack v. Warden Loretto FCI*, 839 F.3d 286, 298 (3d Cir. 2016).

[210] *Clay v. Overmyer*, No. 14-103, 2015 WL 630379, at *1 (W.D. Pa. Feb. 13, 2015).

[211] *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

[212] *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.").

[213] *Palfrey v. Jefferson-Morgan Sch. Dist.*, 355 F. App'x 590, 593 (3d Cir. 2009) (holding plaintiff's assertion defendant knew of her protected conduct was "a product of her own speculation" and thus insufficient to establish retaliation).

[214] *Horan v. Collins*, No. 13-140, 2016 WL 5030468, at *5 (M.D. Pa. Aug. 8, 2016), *report and recommendation adopted*, No. 13-140, 2016 WL 5033234 (M.D. Pa. Sept. 19, 2016) (citing *Carter v. McGrady*, 292 F.3d 152, 158 (3d Cir. 2002)).

[215] *Dunbar v. Barone*, 487 F. App'x 721, 723 (3d Cir. 2012) (affirming district court's grant of summary judgment on prisoner's retaliation claim explaining "verbal threats and few gestures of racial harassment" not sufficient to establish retaliation).

[216] *Id.* at 722.

[217] *Id.* at 723.

[218] *Id.*

[219] *Id.*

[220] *Burgos v. Canino*, 358 F. App'x 302, 306 (3d Cir. 2009) ("[T]hreats alone do not constitute retaliation . . . the claim relating to the threat failed."); *Cooper v. Sherman*, No. 17-2064, 2019 WL 2408973, at *7 (M.D. Pa. June 7, 2019) ("It is well settled, however, that verbal threats or verbal harassment, even if acted upon, do not constitute adverse action for purposes of establishing a First Amendment retaliation claim."); *Bartelli v. Lewis*, No. 04-908, 2005 WL 2406048, at *2 (M.D. Pa. Sept. 29, 2005) ("[V]erbal threats do not constitute an 'adverse action' and, therefore, do not fulfill a requisite element of a retaliation claim[.]").

[221] 695 F. App'x 26, 27 (3d Cir. 2017).

[222] *Schleig*, 695 F. App'x at 30.

[223] 853 F.3d 641 (3d Cir. 2017).

[224] *Mirabella*, 853 F.3d at 651.

[225] ECF Doc. No. 114 ¶ 112.

[226] *Id.* at ¶ 118.

[227] *Id.* at ¶ 124.

[228] ECF Doc. No. 163, at p. 17.

[229] *Id.* at p. 18.

[230] *See also Weil v. White*, 629 F. App'x 262, 266 (3d Cir. 2015) (granting summary judgment for defendant on First Amendment retaliation claim when plaintiff told another actor of his protected conduct and "speculates that [defendant] must have learned of this discussion before dismissing [plaintiff]").

[231] *See Pollock v. City of Philadelphia*, No. 06-4089, 2008 WL 3457043, at *18 (E.D. Pa. Aug. 8, 2008) (granting summary judgment for defendant on First Amendment claim explaining "plaintiff must come forward with evidence that defendant Johnson knew of the protected conduct before he can prove that the protected conduct was the actual cause of his termination by defendant Johnson").

[232] *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 (3d Cir. 1990) (citing *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985)).

[233] ECF Doc. No. 114 ¶¶ 113-14.

[234] *Dunbar*, 487 F. App'x at 723.

[235] ECF Doc. No. 114 ¶¶ 114-15.

[236] *Id.* at ¶ 125.

[237] *Dunbar*, 487 F. App'x at 723.

[238] ECF Doc. No. 114 ¶ 200.

[239] ECF Doc. No. 109.

[240] *Id.* at ¶ 1.c.

[241] *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

[242] ECF Doc. No. 108, at p. 18.

[243] ECF Doc. No. 114, at p. 27 (seeking damages for sex discrimination under the Fourteenth Amendment).

[244] Fed. R. Civ. P. 23(b)(2).

[245] ECF Doc. No. 149-2, at p. 2.

[246] *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 248-49 (3d Cir. 2016).

[247] *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).

[248] *Id.*

[249] *Id.*

[250] Fed. R. Civ. P. 23(a)(1)-(4).

[251] *Shelton v. Bledsoe*, 775 F.3d 554, 561 (3d Cir. 2015) (quoting *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 360 (2011) and Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

[252] *Id.*

[253] *Id.* at 562 (quoting *Shook v. El Paso Cty.*, 386 F.3d 963, 972 (10th Cir. 2004)).

[254] No. 08-2405, 2011 WL 3240779 (E.D. Pa. July 28, 2011).

[255] *Kemblesville*, 2011 WL 3240779, at *4 (citing *Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 478 (D.N.J. 2009)).

[256] *Id.* at *5.

[257] Berks County argues it provides inmates job-related programming based on risk assessment score, not sex. As described above, Mses. Victory and Velazquez-Diaz fail to raise a genuine issue of fact concerning differential treatment with respect to access to job-related programming. But Mses. Victory and Velazquez-Diaz raise a genuine issue of fact as to differential treatment with respect to freedom of movement, access to furloughs, and visitation conditions. These claims may be pursued on a classwide basis.

[258] *Modafinil*, 837 F.3d at 249 (quoting *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993)).

[259] *Martz v PNC Bank, N.A.*, No. 06-1075, 2007 WL 2343800, at *2 (W.D. Pa. Aug. 15, 2007) (citing *Stewart v. Abraham*, 275 F.3d 220, 226 (3d Cir. 2001)).

[260] *Modafinil*, 837 F.3d at 250 ("Although district courts are always under an obligation to ensure that joinder is impracticable, their inquiry into impracticability should be particularly rigorous when the putative class consists of fewer than forty members.").

[261] *Id.* at 247 (quoting *King Drug Co. of Florence v. Cephalon, Inc.*, 309 F.R.D. 195, 203 (E.D. Pa. 2015)).

[262] *Id.* at 253 ("[J]udicial economy is one of the purposes behind Rule 23(a)(1) and class actions in general.").

[263] ECF Doc. No. 149-2, at p. 9.

[264] ECF Doc. No. 149-5 (Victory Class App.) at 836.

[265] *Id.*

[266] ECF Doc. No. 167-45 (Berks App.) at A1048.

[267] Berks County released female Trusty inmates Samantha Huntington, Anabell Dealba, Amara Sanders, and Ms. Victory.

[268] *Hawker v. Consovoy*, 198 F.R.D. 619, 620 (D.N.J. 2001).

[269] *Id.* at 625 (citing *Lanning v. Se. Pennsylvania Transp. Auth.*, 176 F.R.D. 132, 148 (E.D. Pa. 1997) ("The number of women who will apply in the future and who will be denied the equal opportunity to become SEPTA police officers is 'necessarily unidentifiable' and thus their joinder is 'certainly impracticable.'")).

[270] *Id.*

[271] *Santiago v. City of Philadelphia*, 72 F.R.D. 619 (E.D. Pa. 1976).

[272] *Id.* at 623.

[273] *Id.*

[274] *Id.* at 624 ("This rotation of youths into the class makes joinder impracticable and emphasizes the desirability of class action as a tool for litigating the issues raised in this suit.").

[275] ECF Doc. No. 149-5 (Victory Class App.) at 836.

[276] ECF Doc. No. 167-45 (Berks App.) at A1048.

[277] *Id.*

[278] ECF Doc. No. 149-5 (Victory Class App.) at 836.

[279] We further trust Berks County will not manipulate the classification system to now reduce the number of female Trusty inmates as such conduct may give rise to further fee-shifting litigation.

[280] *T.R. v. Sch. Dist. of Philadelphia*, No. 15-4782, 2019 WL 1745737, at *1 (E.D. Pa. Apr. 18, 2019).

[281] *Id.*

[282] *Id.*

[283] *Id.* at *10.

[284] *Id.*

[285] *Id.* at *11.

[286] *Id.*

[287] ECF Doc. No. 149-5 (Victory Class App.) at 836.

[288] *Hawker*, 198 F.R.D. at 625 (citing *Lanning*, 176 F.R.D. at 148 ("The number of women who will apply in the future and who will be denied the equal opportunity to become SEPTA police officers is 'necessarily unidentifiable' and thus their joinder is 'certainly impracticable.'")).

[289] ECF Doc. No. 149-2, at pp. 10-11.

[290] 42 U.S.C. § 1997e(a).

[291] *Robinson v. Tennis*, No. 11-1724, 2012 WL 4442586, at *2 (M.D. Pa. Sept. 24, 2012) (quoting *Drippe v. Tobelinski*, 604 F.3d 778, 781 (3d Cir. 2010)) ("[T]he determination whether a prisoner properly exhausted a claim is made by evaluating compliance with the prison's specific grievance procedures.").

[292] ECF Doc. No. 149-5 (Victory Class App.) at 743.

[293] *Id.*

[294] *Id.*

[295] *Id.*

[296] ECF Doc. No. 167-45 (Berks App.) at A1048.

[297] ECF Doc. No. 147 (Berks SUMF) ¶¶ 86-87.

[298] If we certify a class, Mses. Victory and Velazquez-Diaz argue potential class members would not be required to exhaust administrative remedies for their Equal Protection claims under the doctrine of "vicarious exhaustion." *Chimenti v. Wetzel*, No. 15-3333, 2018 WL 2388665 (E.D. Pa. May 24, 2018). Under this doctrine, a putative prisoner class satisfies the exhaustion requirement when "one or more class members ha[s] exhausted his administrative remedies with respect to each claim raised by the class." *Id.* at \*4 (quoting *Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004)).

[299] ECF Doc. No. 94.

[300] Ms. Huntington joined the Amended Complaint but did not join the Second Amended Complaint. While Ms. Dealba joined the Second Amended Complaint, we dismissed Ms. Dealba with prejudice following agreement of counsel. *See* ECF Doc. No. 126.

[301] ECF Doc. No. 149-4 (Victory Class App.) at 435.

[302] *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 06-1797, 2017 WL 3705715, at \*11 (E.D. Pa. Aug. 28, 2017) ("This factor weighs in favor of class certification where the claims are for injunctive relief rather than damages.").

[303] *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001), *as amended* (Oct. 16, 2001) (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 310 (3d Cir. 1998)).

[304] *Chimenti*, 2018 WL 2388665, at \*5 (quoting *Marcus*, 687 F.3d at 597).

[305] *Id.* (quoting *Marcus*, 687 F.3d at 597).

[306] ECF Doc. No. 149-2, at pp. 15-16.

[307] *Gwiazdowski v. Cty. Of Chester*, 263 F.R.D. 178, 187 (E.D. Pa. 2009) (quoting *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006)).

[308] *Augustin v. City of Philadelphia*, 318 F.R.D. 292, 299 (E.D. Pa. 2016) (quoting *Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 150 (3d Cir. 2008)).

[309] ECF Doc. No. 162, at p. 15.

[310] ECF Doc. No. 173, at p. 7 n.4.

[311] *In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig.*, 795 F.3d 380, 392 (3d Cir. 2015).

[312] *Chimenti*, 2018 WL 2388665, at \*9.

[313] ECF Doc. No. 149-2, at p. 18.

[314] ECF Doc. No. 149-5 (Victory Class App.) at 841 (Declaration of Su Ming Yeh).

[315] ECF Doc. No. 162, at p. 16.

[316] *Id.* at p. 17.

[317] *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 295 (3d Cir. 2007).

[318] *Id.* at 313.

[319] *Id.* at 313 n.14.

[320] *Chimenti*, 2018 WL 2388665, at *1.

[321] *Id.*

[322] *Id.* at *3.

[323] *Id.* at *7.

[324] *Santiago*, 72 F.R.D. at 625.

[325] ECF Doc. No. 150 (Warden Quigley's Affidavit in Response to May 20, 2019 Order).

[326] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

[327] *Shelton*, 775 F.3d at 562 (quoting *Shook v. El Paso Cty.*, 386 F.3d 963, 972 (10th Cir. 2004)).

[328] ECF Doc. No. 162, at p. 18.