## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| THERESA VICTORY, *et al.* | : CIVIL ACTION |
| | : |
| v. | : NO. 18-5170 |
| | : |
| BERKS COUNTY, *et al.* | : |

## MEMORANDUM

**KEARNEY, J.**                                                                 **October 17, 2019**

Berks County admittedly houses female Trusty inmates in its Jail with different rights as to freedom of movement, access to privileges, and visitation than it offers to male Trusty inmates in a neighboring Community Reentry Center even though all inmates are carefully screened upon prison entry to ensure only the lowest risk inmates are classified as "Trusty." Two female Trusty inmates no longer in custody challenge this policy, as well as differing access rights to prison furloughs, as violating the Equal Protection Clause of the Fourteenth Amendment. They individually seek damages. They also seek permanent injunctive relief on behalf of class of similar situated female Trusty inmates to change this policy. Berks County defends its policy arguing it is not obligated to provide the same freedom of movement, access to privileges, and visitation to females as males and otherwise cannot think a plan to remedy the possible equal protection violation given its safety fear, structural barriers, and lack of female staff. Both parties move for summary judgment. Although we find Berks County's policy as to freedom of movement, access to privileges, and visitation violates the female Trusty inmates' rights to equal protection, we deny both motions as there are genuine issues of material fact as to Berks County's policy on access to furloughs for Trusty inmates, the narrowness, intrusiveness and necessity of permanent injunctive relief, and possible compensatory and punitive damages for the two former Trusty female inmates.

## I.    Undisputed Facts[1]

The Berks County Jail System consists of the Berks County Jail and the Community Reentry Center.[2]  The Reentry Center is located down the hill from the Jail.[3]  Berks County houses both male and female inmates in the Jail.[4]  The Jail consists of several male-only housing units, one female-only housing unit, and two medical units housing both male and female inmates.[5]  Berks County houses only male inmates in the Reentry Center.[6] Berks County classifies inmates as one of five custody levels: Administrative Segregation, Maximum, Medium, Minimum, and Trusty.[7] Trusty is the least restrictive custody level.[8]

As of May 14, 2019, Berks County housed 1,006 inmates in the Berks County Jail System, with 873 male inmates and 133 female inmates.[9] As of August 16, 2019, eight female inmates held Trusty status.[10]  Sixty-eight male inmates held Trusty status.[11]  From January 2016 to May 2019, female Trusty inmates accounted for fourteen percent of the total Trusty inmate population.[12]  Berks County houses ninety-two male inmates in the Reentry Center.[13]

The average length of stay in the Berks County Jail System for female Trusty inmates from 2014 to 2018 was 126 days, while the average length for male Trusty inmates was 149 days.[14]  From January 2016 to May 2019, female Trusty inmates held "Trusty" status for an average forty-nine days during their incarceration, while male Trusty inmates held the status for an average sixty-three days.[15] In 2018, the average length of incarceration was fifty-seven days for female Trusty inmates and fifty-six days for male Trusty inmates.[16]

### *Berks County uses the Ohio Risk Assessment System.*

Berks County classifies inmates with a custody level after a risk assessment and review by the Institutional Classification Committee.[17]   Berks County uses an "objective classification system" to determine an inmate's custody level and eligibility for programming.[18] Berks County

2

bases an inmate's custody level on their security risk.[19] Berks County employs the Ohio Risk Assessment System, a nationally recognized risk assessment test, to determine both male and female inmates' risk level in the Jail System.[20] It uses the Ohio Risk Assessment "Prison Screening Tool" to categorize an inmate as low, moderate, or high risk.[21] Prison officials perform the risk assessment analysis for both male and female inmates.[22] Trusty inmates generally receive "low" or "moderate" Ohio Risk Assessment scores.[23] Berks County applies this System to men and women and does not distinguish between men and women in classifying the presented risk.

An inmate's risk assessment score determines eligibility for job-related programming. Berks County hired Berks Connection, a non-profit organization, to provide programs at the Jail and the Reentry Center.[24] Deputy Warden Smith testified Berks Connection offers programming to inmates based on their Ohio Risk Assessment scores.[25] She testified Berks Connections only offered job-related programs—in the Jail and the Reentry Center—to inmates with "moderate" or "high" risk scores.[26] Berks Connection offers four job-related programs at the Reentry Center: (1) Introduction to Reentry, (2) Ready to Reenter, (3) Resume writing seminar, and (4) Ready to Succeed.[27] Berks Connection offer these four programs to inmates with "moderate" or "high" Ohio Risk Assessment scores.[28]

Berks Connection offers a single job-related program at the Jail called Working Towards Change, a cognitive behavior therapy program focused on problem solving and reducing recidivism.[29] Berks Connection offers Working Towards Change only to "moderate" or "high" risk inmates in the Jail.[30]

### *Female Trusty inmates reside only in the Jail.*

Berks County houses female Trusty inmates on the F Block of the Jail, either in locked cells or in bunk-style housing in the overflow unit.[31] During her incarceration, Ms. Victory lived

3

in both a locked cell and the overflow unit.[32] The locked cells house two inmates and contain a toilet and a sink.[33] The toilet has no lid and locks after two flushes.[34] Female Trusty inmates eat their meals in their cells.[35] Ms. Velazquez-Diaz testified she ate meals with a locked toilet containing feces.[36] Female Trusty inmates leave their cells to retrieve meals and medicine and attend programming.[37]

Female Trusty inmates in the overflow unit in the Jail live in an open housing area with bunk beds.[38] They use communal bathrooms and showers.[39] Female Trusty inmates in the overflow unit cannot wander freely around the unit except during recreation periods.[40] Female Trusty inmates can use only during telephones and microwaves in the overflow unit recreation periods.[41]

Female Trusty inmates in the Jail receive six hours of recreation each day but forfeit recreation during lockdowns.[42] Female Trusty inmates can only use the shower, microwave, and telephone during recreation periods but cannot use these amenities during lockdowns.[43] Between February 24, 2018 and April 7, 2019, the Berks County Jail System had seventy-one lockdowns, with six of those only affecting the F Block.[44] Lockdowns can last longer than a day.[45] Captain Miguel Castro admits inmates in the Jail spend more time on lockdown than inmates in the Reentry Center.[46]

Female Trusty inmates may receive visitors in the Jail. A glass partition separates female Trusty inmates in the Jail from their visitors.[47] Ms. Velazquez-Diaz testified she could not hear her family members during visits because she shared the room with other inmates and visitors and people shouted to each other.[48]

4

### *Male Trusty inmates reside only in the Community Reentry Center.*

The Community Reentry Center houses male inmates with Trusty, Minimum, and Medium custody level classifications.[49] It has four units (Q, R, S, and T) and contains 152 beds.[50] Two roll-up doors separate Units Q and R, but there are openings near the ceiling between the two units.[51] Unit T houses Minimum and Medium male inmates.[52] Glass windows separate Units T and S.[53] The Reentry Center also contains a dayroom with telephones and microwaves.[54] The Reentry Center has communal bathrooms and showers.[55]

The Reentry Center contains cells housing two or four inmates.[56] These cells do not contain toilets or sinks, and they do not lock.[57] Inmates in the Reentry Center can access the Center's dayroom and can use the microwaves and showers any time from 5:00 AM to 11:00 PM.[58] They can move freely between their cells and the dayroom during this time.[59] They may eat their meals in the dayroom.[60] Between 11:00 PM and 5:00 AM, they can only leave their cells to use the bathroom.[61] The Reentry Center contains a computer lab.[62] The Reentry Center also contains four locked cells with toilets for inmates with minor disciplinary infractions.[63]

Inmates in the Reentry Center can only receive visitors on Sundays at specific times.[64] Visitations occur in the Reentry Center's gymnasium.[65] The Inmate Handbook provides visits in the Reentry Center can last up to fifty minutes, while Lieutenant Mugar testified visits in the Reentry Center cannot exceed forty-five minutes.[66] No partition separates Reentry Center inmates from their visitors.[67]

### *Berks County's differing policies for access to furloughs for male Trusty inmates.*

Berks County officials swore inmates only receive furloughs if the sentencing judge allows for furloughs.[68] But its policy does not define this condition. The Berks County Jail System's

Inmate Handbook describes the furlough policy but does not mention a need for sentencing judge approval for eligibility:

> The furlough program provides a means for temporary release from custody for those inmates successfully participating in select treatment programs, or in some specific cases for family emergencies, e.g. to attend funerals of immediate family members. The Warden makes the final determination on whether or not a furlough will be considered. To be eligible for any furlough you must be sentenced on all charges, have no detainers, and have no un-adjudicated parole violations. Requests for any type of furlough are initiated through your counselor.[69]

The policy provides further access to furloughs for Reentry Center inmates only: "Access to other types of program furloughs may be offered and will be considered on an individual basis."[70] Deputy Warden Smith admitted men currently receive furloughs to spend time with family members, but no women do.[71] She testified she could not remember any female inmate ever receiving a furlough to spend time with family members.[72]

When sentenced male Trusty inmates move to the Reentry Center, Berks County personnel assist inmates complete furlough paperwork.[73] Mr. James Williams was incarcerated in the Berks County Jail System from July 2018 through December 3, 2018.[74] Mr. Williams swears Berks County transferred him to the Reentry Center around "September or early October 2018."[75] During his second day, he swears he attended an orientation where "a [Berks County] staff member gave [him] a form to sign to request approval for a furlough from my sentencing judge."[76] Two weeks after signing the form, Mr. Williams swears he "received a document informing him [he] had been approved for a furlough."[77]

Ms. Velazquez-Diaz swears Berks County does not assist female Trusty inmates in applying for furloughs. She swears: "No Berks County Jail System employee ever told me I could request approval for a furlough from my sentencing judge."[78] Ms. Velazquez-Diaz also swears:

6

"No [Berks County Jail System] employee ever assisted or offered to assist me in requesting a furlough from my sentencing judge."[79]

### *Berks County's employee allocation in the Jail System.*

Correctional staff members in the Jail System belong to the Teamsters Union.[80] The Union's collective bargaining agreement sets wages for correctional staff.[81] Berks County currently employs thirty-three female correctional officers.[82] Only twenty-two female officers are active, due to medical leaves, training, or bid positions.[83] Warden Quigley testified she performed a staffing analysis in 2016 and determined Berks County required six individual correctional staff members to cover shifts for an entire week.[84] Berks County requires at least one female officer present in each facility housing female inmates.[85] Captain Castro testified Warden Quigley attempted to hire additional female correctional officers, but Berks County cannot force women to apply for these positions.[86]

### *Ms. Victory's one-year incarceration in Jail.*

The Commonwealth incarcerated Theresa Victory in the Berks County Jail from January 28, 2018 to January 28, 2019.[87] During her incarceration, Ms. Victory lived in both a locked cell and the overflow unit on F Block.[88] Berks County scored Ms. Victory as "low" risk under the Ohio Risk Assessment System.[89] On January 31, 2018, Berks County classified Ms. Victory as a Trusty inmate with Work Release status.[90] Deputy Warden Smith testified Ms. Victory could not participate in Berks Connections' job-related programs because of her risk assessment score.[91] Ms. Victory's sentencing judge did not make her eligible for furloughs.[92]

In February 2018, Berks County moved Ms. Victory to the overflow unit on F Block.[93] Ms. Victory requested a furlough on May 12, 2018.[94] Two days later, a nonparty official denied her request.[95] Ms. Victory began hearing of Berks County's treatment of male Trusty inmates in the

7

Reentry Center.[96] In late May 2018, she filed a grievance complaining about not being housed in the Reentry Center.[97] Correctional Officer Bauer transferred her to a locked cell shortly after her grievance.[98]

After exhausting her internal grievances, Ms. Victory sued the Berks County Defendants alleging, among other things, violations of the Equal Protection Clause of the Fourteenth Amendment arising from Berks County's differing treatment of male and female Trusty inmates.[99]

### *Ms. Velazquez-Diaz's incarceration in the Jail.*

The Commonwealth incarcerated Alice Velazquez-Diaz in the Berks County Jail beginning October 24, 2018.[100] Ms. Velazquez-Diaz scored "low" risk on the Ohio Risk Assessment test.[101] Her sentencing judge did not make her eligible for furloughs.[102]

Berks County initially classified Ms. Velazquez-Diaz as a Trusty inmate.[103] Ms. Velazquez-Diaz lived in both a locked cell and the overflow unit on F Block during her incarceration.[104] On February 8, 2019, Ms. Velazquez-Diaz grieved Berks County's housing male Trusty inmates in the Reentry Center and female Trusty inmates in the Jail.[105] Deputy Warden Smith responded, "[The Reentry Center] is a male housing unit."[106] In April 2019, she requested a furlough but Berks County denied her request.[107]

### *Berks County proposes new housing plan for female Trusty inmates.*

On April 22, 2019, Ms. Velazquez-Diaz joined Ms. Victory's lawsuit.[108] Two days later, she filed for preliminary injunctive relief seeking to enjoin Berks County's differing treatment.[109] After a hearing, we granted Ms. Velazquez-Diaz's motion for injunctive relief on May 20, 2019.[110] We ordered Berks County to provide a plan for providing Ms. Velazquez-Diaz with similar freedom of movement and visitation conditions provided to male Trusty inmates in the Reentry Center.[111]

8

On May 20, 2019, we ordered Berks County to file a proposed plan allowing female Trusty inmates similar conditions of confinement to male Trusty inmates.[112]  Berks County, through Warden Quigley, swore an affidavit stating "[b]ased upon my experience in corrections, management of the safety and security needs and the physical facilities at [Berks County Jail System], I believe . . . we are providing equal housing and services to all inmates . . . *within the operational parameters and using our best judgment* to manage and operate the [Berks County Jail System]."[113]  Warden Quigley further stated "[t]here are significant safety and security concerns associated with providing inmates . . . access to non-secure visits."[114]

On July 8, 2019, Warden Quigley amended her affidavit and attached a memorandum titled "Housing and Schedule Changes for Female Inmates Classified as 'Trusty.'"[115]  Berks County's amended plan would redesign the Jail's quarantine unit to house female Trusty inmates with the same freedom of movement, with no locked cells,  common area with tables for meals and recreation, barrier free visitation, and toilets with no lockouts.[116]  Mses. Victory and Velazquez-Diaz objected to the proposal.[117]

## II. Analysis[118]

Ms. Victory and co-plaintiffs seek injunctive relief and compensatory and punitive damages.[119]  Mses. Victory and Velazquez-Diaz allege Berks County Defendants violated the Equal Protection Clause of the Fourteenth Amendment by housing only male Trusty inmates in the Reentry Center and offering them more favorable conditions of confinement. The parties now cross-move for summary judgment.  Berks County Defendants argue Mses. Victory and Velazquez-Diaz fail to show they are similarly situated to male Trusty inmates; Mses. Victory and Velazquez-Diaz argue female and male Trusty inmates are similarly situated. Berks County argues Mses. Victory and Velazquez-Diaz fail to show impermissibly different treatment; Mses. Victory

and Velazquez-Diaz argue there is impermissibly different treatment. The parties also dispute whether any differing treatment serves important government objectives.

Under the Fourteenth Amendment, Berks County Defendants may not "deny to any person within [their] jurisdiction the equal protection of the law."[120] The Supreme Court held the Equal Protection Clause applies to discrimination on the basis of sex.[121] "A successful claim that a government practice or policy violates the Equal Protection Clause requires proof that the plaintiff 'has been treated differently from persons who are similarly situated.'"[122] "Official action does not violate the Equal Protection Clause solely because it results in a disproportionate impact; proof of discriminatory intent or purpose is required to show a violation."[123]

If Mses. Victory and Velazquez-Diaz show there are no disputes as to material facts concerning differential treatment of similarly-situated persons, Berks County Defendants can still defeat summary judgment by showing differing treatment "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."[124] If Mses. Victory and Velazquez-Diaz fail to adduce sufficient facts to show Berks County disparately treats similarly situated male and female Trusty inmates, then Berks County is entitled to judgment as a matter of law.

## A. There are no genuine issues of disputed material fact as to Berks County Defendants' constitutional violation of female Trust inmates' freedom of movement, access to privileges, and visitation.

Mses. Victory and Velazquez-Diaz argue Berks County disparately treats its similarly situated female and male Trusty inmates by denying female inmates similar freedom of movement, access to privileges, visitations, and furloughs. Mses. Victory and Velazquez-Diaz move for summary judgment for the first three of these alleged violations. But they do not move for summary judgment on the issue of furloughs. Berks County Defendants moves for summary

10

judgment in its favor on all four conditions. Upon intensive review of the record, there is no genuine dispute as to material fact : (1) female and male Trusty inmates are similarly situated; (2) Berks County Defendants do not similarly treat female and male Trusty inmates respecting freedom of movement, access to privileges, visitations, and furloughs; and, (3) Berks County Defendants' differential treatment does not serve an important governmental objective, and discrimination is not substantially related to those objectives. But there are disputed material facts about whether Berks County fails to provide substantially similar treatment to male and female Trusty inmates regarding furloughs.

## 1. Female Trusty inmates are similarly situated to male Trusty inmates in the Berks County Jail System.

Berks County Defendants argue female and male Trusty inmates in the Berks County Jail System are not similarly situated as a matter of law because (1) the male Trusty inmate population is larger, with a longer average length of incarceration and (2) female Trusty inmates are more likely to be abuse victims and single, sole custody parents. Mses. Victory and Velazquez-Diaz argue female and male Trusty inmates are similarly situated as a matter of law because undisputed facts show Berks County Defendants classify female and male inmates through the same risk assessment test, female and male Trusty inmates have similar lengths of incarceration, and there is no evidence female Trusty inmates are more dangerous than male Trusty inmates. We agree with Mses. Victory and Velazquez-Diaz.

The Court of Appeals for the Eighth Circuit's decision in *Klinger v. Department of Corrections* offers guidance for determining whether female prisoners are similarly situated to male prisoners under the Equal Protection Clause.[125] In *Klinger*, female inmates in Nebraska's only all-female correctional facility sued the Nebraska Department of Corrections under the Equal Protection Clause alleging male inmates in the Nebraska prison system received favorable

11

treatment with regard to prison programs and services.[126] They claimed men at an all-male facility received superior "vocational, educational and employment opportunities and programs, rehabilitation programs, exercise and recreational programs and facilities, visiting privileges, legal programs, medical, dental and psychological services, and treatment associated with security classifications."[127] The case did not resolve on summary judgment motions. After a four-week trial, Judge Kopf of the United States District Court for the District of Nebraska found the Department of Corrections liable for violating the female prisoners' right to equal protection under the law.[128]

The court of appeals reversed Judge Kopf, holding the female inmates were not similarly situated to the male inmates without reaching the issue of differing treatment.[129] The court of appeals looked at the differences between the female prison and the male prison, including the size of the two institutions.[130] The all-male prison housed six times as many inmates, the male inmates averaged two to three times greater lengths of incarceration, and the inmates at the all-male prison had a higher security level.[131] The court also explained female inmates were more likely to be single, sole custody parents, and victims of sexual or physical abuse.[132] Male inmates were also more violent and predatory than female inmates.

Scholars criticize the *Klinger* "similarly situated" analysis. The court in *Klinger* concluded the size difference between the male and female prisons showed female inmates were not similarly situated to male inmates, explaining the all-male prison housed six times as many inmates. But as Professor Jennifer Lee explains, "[t]he focus on the differences between prison facilities at the 'similarly situated' stage defeats the purpose of the constitutional claim."[133] She argues the court's analysis makes no sense since a challenged condition—*e.g.*, the smaller size of an institution, and

12

as a corollary, its dearth of programming—could prevent a court from even analyzing whether the differing condition violates the Equal Protection Clause.

Professor Baker makes a similar argument about the court of appeals' use of "special characteristics"—female prisoners were more likely to be single, sole custody parents and abuse victims—to determine female and male inmates were not similarly situated. The court of appeals concluded because female inmates are "more likely to be single parents with primary responsibility for child rearing [and] more likely to be sexual or physical abuse victims," female and male inmates in the Nebraska correctional system were not similarly situated.[134] Professor Baker argues while this might be true, courts should not allow the state actor to merely point at statistical differences between male and female inmates to avoid an analysis of unequal treatment.[135] Because the court in *Klinger* concluded female and male inmates were not similarly situated, it did not reach the issue of whether offering male inmates in the Nebraska correctional facility more programming violated the Equal Protection Clause. Focusing on these differences to determine female and male inmates are not similarly situated illogically leads to a court avoiding analysis of an issue which may exacerbate these differences.[136]

Professors Lee and Baker note the Court of Appeals for the Eighth Circuit's decision predates the Supreme Court's decision in *United States v. Virginia*.[137] In *Virginia*, the Court held the Commonwealth of Virginia failed to show an exceedingly persuasive justification for excluding women from the citizen-soldier program offered at Virginia military college in violation of the Equal Protection Clause. The Court framed the issue as whether excluding women who were "capable of all the individual activities required of VMI cadets" violated the Equal Protection Clause.[138] The Court instructed the State "may not exclude qualified individuals based on 'fixed notions concerning the roles and abilities of males and females.'"[139]

13

The *Klinger* analysis is informative but, as Professors and Lee and Baker suggest, we should not rigidly apply *Klinger*'s reasoning when faced with very different circumstances than *Klinger*. Berks County female Trusty inmates and male Trusty inmates are similarly situated as a matter of law. Female and male Trusty inmates have similar lengths of incarceration. In 2018, the average length of incarceration for female Trusty inmates was fifty-seven days, while the average length for males was fifty-six days.[140] The population of female and male Trusty inmates is similar. Trusty women and men are all in the custody of Berks County's custody and incarcerated in neighboring buildings within the same jail complex.[141] The Berks County prison complex consists only of these two buildings, and they are administered, run, and staffed by the same officials.[142] While Berks County Defendants adduce evidence showing male Trusty inmates comprise a larger percentage of the overall inmate population than female Trusty inmates, the difference is insignificant when analyzing whether female and male inmates are similarly situated.

Berks County Defendants admittedly use the same Ohio Risk Assessment System for all inmates, both female and male, to determine risk level and security classification. Berks County Defendants classify inmates—both female and male—as "Trusty" only after the inmate receives a risk assessment score and Berks County's Institutional Classification Committee reviews the inmate's score. Unlike the Nebraska Department of Corrections in *Klinger*, Berks County Defendants adduce no evidence male Trusty inmates are more violent or predatory than female Trusty inmates—or any personal characteristics of the two groups—to raise a genuine issue of material fact as to whether the two groups are similarly situated. Without such a showing, Mses. Victory and Velazquez-Diaz demonstrate female Trusty inmates are similarly situated to male Trusty inmates as a matter of law.

**2. Berks County Defendants do not provide substantially equivalent treatment to female Trusty inmates for freedom of movement, access to privileges, and visitation.**

Berks County Defendants argue we should grant them summary judgment because housing conditions in the Jail are substantially equivalent to housing conditions in the Reentry Center. Mses. Victory and Velazquez-Diaz argue they adduce sufficient undisputed evidence to demonstrate differential treatment concerning freedom of movement, access to privileges, and visitation conditions as a matter of law. We agree with Mses. Victory and Velazquez-Diaz.

Under the Equal Protection Clause, Berks County Defendants are "bound to provide women inmates with treatment and facilities that are substantially equivalent to those provided the men[.]"[143] Courts use a standard of "parity of treatment, as contrasted with identity of treatment, between male and female inmates with respect to the conditions of their confinement and access to rehabilitation opportunities."[144]

For example, in *McCoy v. Nevada Department of Prisons*, female prisoners in the Nevada Women's Correctional Center sued the Nevada Correctional Department alleging sex discrimination in Nevada prisons.[145] The female prisoners alleged superior conditions at all-male prisons, and alleged male prisoners received better programs, better visitor privileges, more free time, and more access to telephones. Concerning free time, the plaintiffs argued "male inmates are permitted greater free time, i.e., more time out of their cells, than female inmates[.]"[146] The court denied the department's motion for summary judgment on the female prisoners' claim male prisoners receive more time out of their cells.[147]

In *Bukhari v. Hutto*, a female prisoner at an all-female prison in Virginia sued the state department of corrections alleging sex discrimination in the state's prison system.[148] She alleged female prisoners experienced "more restricted freedom of movement among and interaction with the general prison population" than male prisoners in the Virginia prison system.[149] The district

court refused to dismiss the plaintiff's Equal Protection claim. While acknowledging the smaller female prison population and providing similar conditions for female prisoners could entail a greater cost, the district court warned the department of corrections may not use cost concerns to "justify official inaction or legislative unwillingness to operate a prison system in a constitutional manner."[150]

In *Mitchell v. Untreiner*, female prisoners in a Florida county jail sued the board of county commissioners alleging sex discrimination.[151] The female prisoners alleged inferior visitation conditions to male inmates, including non-contact visits separated by windows in the presence of other inmates and visitors.[152] The female prisoners alleged the county board allowed male inmates contact visits.[153] The district court entered summary judgment for the female prisoners on their Equal Protection claims and ordered injunctive relief ordering similar visitation conditions for male and female inmates.[154]

Mses. Victory and Velazquez-Diaz adduce evidence Berks County Defendants fail to provide "substantially equivalent" conditions for female and male Trusty inmates. Berks County Defendants offer male Trusty inmates more freedom of movement at the Reentry Center. Male Trusty inmates can move between their cell and a dayroom nineteen hours a day. They can access microwaves, showers, and a television during this time. They may eat their meals in the dayroom. They sleep in unlocked cells and use communal bathrooms and showers. During visitations, no partition separates visitors from male Trusty inmates.

Berks County Defendants house all female Trusty inmates in the Jail. Berks County housed Mses. Victory and Velazquez-Diaz currently resides in a locked cell for most of their incarcerations. Female Trusty inmates eat their meals in locked cells. The cells contain locking toilets. Ms. Velazquez-Diaz testified she ate meals next to a locked toilet containing feces.[155]

16

Female Trusty inmates living in locked cells can only leave their cells for six hours a day during recreation periods but forfeit recreation during lockdowns. Captain Castro testified the Jail experiences more lockdowns than the Reentry Center.[156] Female Trusty inmates can only access showers, microwaves, and telephones during recreation periods. As with *Bukhari* and *McCoy*, Mses. Victory and Velazquez-Diaz show differential treatment with evidence of differing amounts of free time and freedom of movement. Like the plaintiff in *Mitchell*, Mses. Victory and Velazquez-Diaz show Berks County Defendants treat male and female Trusty inmates differently with respect to visitation conditions. A glass window separates female Trusty inmates in the Jail from their visitors, while no partition separates male Trusty inmates in the Reentry Center from their visitors.[157]

Berks County Defendants argue they do not impermissibly treat female Trusty inmates differently because we should not conduct a "side-by-side" comparison of the Reentry Center and the Jail. They argue the Equal Protection Clause only requires "parity" and they provide substantially equivalent housing in the Jail and the Reentry Center. We agree Berks County Defendants need only provide substantially equivalent housing for female and male Trusty inmates. But as a matter of law Berks County fails to provide substantially equivalent housing for female and male Trusty inmates. Mses. Victory and Velazquez-Diaz adduce undisputed material facts demonstrating Berks County Defendants treat them differently than male Trusty inmates concerning freedom of movement, access to privileges, and visitation conditions. Courts recognize this differential treatment supports a prisoner's Equal Protection claim.

> **3.     The differential treatment does not serve an important governmental objective, and discrimination is not substantially related to those objectives.**

Mses. Victory and Velazquez-Diaz adduce sufficient undisputed material facts proving differential treatment of similarly situated persons as a matter of law. But differential treatment of

17

similarly situated persons "is permissible . . . if it bears a sufficient nexus to a qualifying governmental interest; in the case of a gender classification, the state must show that the classification 'serves important government objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'"[158] Berks County Defendants move for summary judgment arguing "the important government interest of operating a safe and secure facility is served by Berks County's policy."[159] Mses. Victory and Velazquez-Diaz move for summary judgment arguing Berks County discriminatory policy is invented *post hoc* to litigation and, even if not invented *post hoc*, is insufficient as a matter of law because they are not substantially related to the interest of operating a safe and secure facility.

We agree with Berks County Defendants: safety is a valid government interest.[160] But even when the objective is legitimate and important, the defendant must show the discriminatory means are substantially related to the legitimate and important governmental interest.[161] Berks County Defendants fail to adduce facts showing their treatment of different Trusty female inmates compared to male Trusty inmates is substantially related to the government's valid security interest.

In *Davie v. Wingard*, inmate Michael Davie argued Ohio prison officials violated the Equal Protection Clause by enforcing different hair grooming policies for male and female inmates.[162] Department regulations governed male and female hair grooming rules. Male inmates' hair could not "extend over the ears or the shirt collar;" [163] female inmates' hair could not "extend below the middle back area in length." [164] Ohio Defendants moved for summary judgment, arguing the "gender classification is justified because male inmates pose different issues of safety, security, and discipline when compared to female inmates."[165] Ohio Defendants offered "several pieces of evidence to support their conclusion."[166] They adduced evidence demonstrating female offenders

18

were less likely to be violent offenders than male counterparts,[167] and female inmates were "less likely to be classified in higher safety classification."[168] Defendants also adduced evidence showing "[f]emale inmates are less likely than male inmates to be involved in the production and hiding of contraband such as drugs or weapons."[169]

Judge Smith granted Ohio Defendant's summary judgment motion as to Mr. Davie's Equal Protection claim. Judge Smith concluded Ohio Defendants demonstrated male inmates presented a higher risk than female inmates of smuggling unsafe contraband in long hair.[170] Ohio Defendants proved their hair policy substantially related to security concerns.

In contrast, prisoner William Sassman challenged the constitutionality of California's Alternative Custody Program allowing female—but not male—prisoners to apply to serve the last twenty-four months of their sentence outside of prison.[171] The California legislature enacted the Alternative Custody Program after finding:

- Female incarceration rate doubled in twenty years; [172]

- Approximately sixty-seven percent of incarcerated women were mothers, and many of them were single parents;[173]

- Most of California's incarcerated mothers were the primary caregivers of dependent children and hoped to return home to their children once released;[174]

- Children were substantially impacted when separated from their parents, resulting in an observed higher likelihood to become incarcerated;[175]

- A father's involvement in a child's life greatly improved the child's chances for success.[176]

California enacted the Alternative Custody Program to "facilitate parenting and family reunificiation." But it explicitly limited eligibility to "female prisoners."[177]

In 2013, Mr. Sassman applied to the Alternative Custody Program, requesting the California Department of Corrections and Rehabilitation allow him to finish his sentence in his home community of Sacramento.[178] Mr. Sassman claimed he met all criteria.[179] But the state

rejected his application because of his gender. [180] The state instead instructed Mr. Sassman to "transition back into society via transition hubs instead."[181] The transition hubs offered programs on "substance abuse, criminal thinking, anger management, and family relationships."[182]

The parties cross moved for summary judgment. Mr. Sassman argued California's refusal to permit male inmates to apply to the Alternative Custody Program violated the Equal Protection Clause. California argued the Alternative Custody Program survived constitutional scrutiny because it: "(1) serves the legitimate governmental objective of reducing recidivism for female offenders and ameliorating the disproportionate burdens they face in prison, particularly by treating the lasting effects of separation for their children, and trauma, abuse, and addiction; and (2) is substantially related to that objective because it provides gender-responsive programming tailored to female offenders' needs."[183] Chief Judge England dismissed California's argument, explaining: "[t]he legislative history made clear that, contrary to Defendants' current assertions, the State's interests in passing the [Alternative Custody Program] were family reunification and community reintegration, which this Court has already determined are interests not served, and indeed undermined, by excluding men from the [Alternative Custody Program]."[184] Because California failed to show the discriminatory policy furthered their important governmental objective, Judge England granted Mr. Sassman's motion for summary judgment.

As in *Sassman*, Berks County Defendants fail to adduce evidence to demonstrate treating female Trusty inmates less favorably than male Trusty inmates serves its compelling government interest in maintaining security. To meet its burden of proving differing treatment substantially relates to security, Berks County Defendants must demonstrate the sexes must be treated differently to ensure security. It could do as the Ohio defendants did in *Davie*; it could have tried to adduce evidence showing Berks County female Trusty inmates exhibit higher incidences of

violence compared to male Trusty inmates. But Berks County did not do so. Instead, the Berks County Defendants rely on security risks *if it were to provide a parity of treatment* between male and female Trusty inmates. Such evidence does not demonstrate treating female Trusty inmates differently than male Trusty inmates substantially relates to a legitimate security interest in safety.

The reason Berks County's asserted justifications for differential treatment fail becomes clearer after examining Judge Gertner's reasoning in *Ford v. City of Boston*.[185] Boston city officials housed female arrestees in the county jail and performed strip and body cavity searches on these arrestees during booking.[186] But officials did not search male arrestees, and they housed men in more comfortable cells in the police station.[187] The female arrestees sued under the Equal Protection Clause alleging impermissibly differential treatment. City officials attempted to justify differential treatment arguing (1) the police station cells "could not hold women, because they were not configured to separate women from men" and (2) the police department "did not have the personnel and resources to administer holding cells for women."[188]

Judge Gertner rejected the City's arguments. She reasoned "these conclusory statements do little more than recast the City's original decision to discriminate in less offensive terms," explaining: "To satisfy the strictures of the equal protection jurisprudence . . . , the City would have to explain *why* it could find no satisfactory space for women in the BPD station houses, and *why* it felt its personnel and resources were better used to meet the needs of male rather than female arrestees."[189] Judge Gertner explained: "[v]ague and general references to funding and space constraints cannot justify" a clearly discriminatory policy.[190]

We review Berks County Defendants' asserted security interests and find each suffer from the same flaw as the City of Boston in *Ford*. Berks County Defendants fail to adduce evidence sufficiently explaining *why* female Trusty inmates are treated differently than male Trusty inmates.

21

The explanations only vaguely address security concerns for remedying a past decision to provide more favorable treatment to male Trusty inmates.

Berks County Defendants argue the structure of the Reentry Center prohibits housing both male and female Trusty inmates. They argue they cannot safely house female Trusty inmates in the Reentry Center because the units are separated by windows through which inmates can see inmates in other units. They also argue safety concerns prevent female Trusty housing at the Reentry Center because (1) an open area exists near the ceiling between the S and R units, and (2) inmates could slide items under the roll-up doors separating units.

We rejected these arguments on an earlier summary judgment motion; Berks County Defendants adduce no new evidence to support their argument. Berks County Defendants only speculate as to safety issues due to the Reentry Center's structure. They also fail to adduce evidence they could not make minor modifications to the Reentry Center to ensure the safety of female Trusty inmates. Berks County Defendants once again adduce no evidence such modification would be cost-prohibitive.

They also argue moving female Trusty inmates to the Reentry Center requires displacement of male inmates in the Reentry Center. But the Reentry Center contains 152 beds and as of May 14, 2019, Berks County only housed ninety-two inmates in the Reentry Center.[191] As of the same date, only four female Trusty inmates reside in the Jail. Warden Quigley also testified Berks County could house four female Trusty inmates in the Reentry Center's smallest unit and still accommodate the displaced male inmates in the Reentry Center's remaining units.[192] As a matter of law, we cannot see how Berks County Defendants' failure to house female Trusty inmates in the Reentry Center serves an important governmental interest and is substantially related to the achievement of the objective.

Berks County Defendants also argue they lack sufficient female correctional staff to house female Trusty inmates in the Reentry Center. They argue they can only freely assign twenty-two of the thirty-three total female correctional staff members and they cannot assign female officers to the Reentry Center without creating security concerns. They argue they need six individual female correctional officers to fill every duty post in the Jail twenty-four hours per day.[193]

We rejected this argument in denying Berks County's earlier motion for summary judgment. Berks County Defendants adduce no new evidence supporting their argument. We explained Berks County Defendants failed to credibly explain why they need six female correctional officers for each post except they "prefer[] one female correctional officer available to the necessary strip search of female inmates new to the jail system or returning each day from Work Release."[194] But we also found Berks County Defendants admitted they often only have one female officer on a unit with female inmates.[195] Berks County Defendants fail to adduce evidence warranting a different conclusion. Like the defendants in *Ford*, Berks County Defendants fail to credibly explain *why* they cannot accommodate female Trusty inmates at the in similar living conditions to male Trusty inmates based on security concerns about their female Trusty inmates.

Berks County Defendants cite *Danberg* and *Pitts* to argue "[l]ack of available resources justifies implementation of a policy which is substantially related to an important government interest."[196] But both *Danberg* and *Pitts* dealt with overcrowding—an issue where lack of resources may substantially relate to the policies enacted by the government. In *Danberg*, our Court of Appeals considered whether the district court properly upheld a Delaware Department of Corrections policy allowing law enforcement officers to bring women arrested in Sussex County, Delaware to Sussex Correctional Institution for twenty-four hours before being transferred eighty-

23

five miles north to Baylor Women's Correctional Institution—the only all-women's facility in Delaware.[197] Judge Sleet reasoned the female inmate plaintiff failed to demonstrate "the named defendants violated the Equal Protection Clause by requiring male and female inmates to be housed separately" and failed to adduce facts to show a female inmate would be released sooner if not transferred to Baylor Women's Correctional Institution.[198] Our Court of Appeals affirmed, concluding "transferring women, and quickly, to a facility that can accommodate them directly accomplishes the goal of providing gender-segregated institutions."[199] Judge Barry, writing for a unanimous panel, reasoned defendants based the policy on "sound gender-neutral reasoning" because, without the policy, Delaware risked overcrowding in the few cells used for short-term female prisoners.[200]

We also find *Pitts* inapposite. In *Pitts*, female inmates brought an equal protection claim against the Federal Bureau of Prisons, based on the geographic locations of prison facilities for women versus those for similarly situated men. The district court found the evidence of severe overcrowding and determined the only way to house women prisoners in the closer facility would have been to build or purchase a new facility, or to convert a present facility. The court explained: "the practice of gender-based separation allows the classification according to gender at issue to achieve a modest reduction in prison overcrowding."[201] Berks County does not adduce sufficient evidence to show their differential treatment substantially relates to a legitimate and genuine concern about overcrowding. We do not find *Pitts* or *Danberg* persuasive.

At best, Defendants point to potential security concerns associated with moving female Trusty prisoners to another housing unit, but, even if valid, these concerns cannot justify the vast differences in treatment of Trusty men and Trusty women, including not only their being housed in different buildings but also differences in out-of-cell time, access to phones and microwaves,

24

and the quality of visits. Defendants' justifications for their discrimination in these three conditions against members of the Plaintiff Class fail based on the undisputed facts.[202]

### 4. Mses. Victory and Velazquez-Diaz need not show invidious motive to establish their sex discrimination claims.

Berks County Defendants argue we should grant them summary judgment on Mses. Victory's and Velazquez-Diaz's Equal Protection claims because Mses. Victory and Velazquez-Diaz fail to show intentional discrimination. Mses. Victory and Velazquez-Diaz argue because Berks County's policy treating male and female Trusty inmates differently is facially discriminatory, it need not show discriminatory motive. We agree with Mses. Victory and Velazquez-Diaz.

In *Hassan v. City of New York*, a group of Muslims alleged the New York City Police Department violated the Equal Protection Clause by targeting Muslims with increased surveillance following the September 11th terrorist attacks.[203] The police department argued the plaintiffs failed to show purposeful discrimination because public safety concerns, not discrimination, drove the policy of differential treatment.[204] Our Court of Appeals rejected the police department's argument explaining the department confused "intent" and "motive."[205] The court explained the plaintiff need not show "invidious motive;" rather, the plaintiff need only show the defendant "*meant* to single out a plaintiff because of the *protected characteristic* itself."[206]

Berks County Defendants argue Mses. Victory and Velazquez-Diaz only show Berks County Defendants treat male and female Trusty inmates differently for reasons of safety, staffing concerns, and institutional needs. But like the police department in *Hassan*, Berks County Defendants misunderstand the difference between "intent" and "motive." As the policy discriminates on its face, Mses. Victory and Velazquez-Diaz need not show an invidious motive for differential treatment. They only need to show Berks County Defendants meant to single them

out because of the protected characteristic, here, sex. Berks County Defendants admittedly house all female Trusty inmates in the Jail and all male Trusty inmates in the Reentry Center. Inmates in each facility experience different conditions of confinement. Mses. Victory and Velazquez-Diaz adduce evidence showing Berks County Defendants intentionally treat female Trusty inmates differently than they treat male Trusty inmates. Berks County Defendants' argument fails.

**B.     There are genuine issues of material facts as to whether Berks County Defendants disparately treats female and male Trusty inmates in its furlough policy.**

Mses. Victory and Velazquez-Diaz also argue Berks County Defendants provide male Trusty inmates with more furloughs—but they do not move for summary judgment on this issue. Berks County Defendants argue there are no disputes as to material fact on the issue of furloughs. Mses. Victory and Velazquez-Diaz both unsuccessfully requested furloughs while incarcerated. They argue while Berks County Defendants provide male inmates with weekly family furloughs because it has not granted a female inmate a family furlough since at least September 2014.[207]

Berks County Defendants respond they do not impermissibly discriminate since it only grants inmates—both male and female—furloughs if their sentencing judge allows furloughs.[208] But Mses. Victory and Velazquez-Diaz raise a genuine issue of fact concerning differential treatment with access to furloughs. Berks County provides its furlough policy in the Inmate Handbook. It allows furloughs for inmates "successfully participating in select treatment programs, or in some specific cases for family emergencies[.]"[209] Berks County's Inmate Handbook represents, "[t]o be eligible for any furlough you must be sentenced on all charges, have no detainers, and have no un-adjudicated parole violations."[210] Berks County's Inmate Handbook does not condition eligibility on a sentencing judge's approval. Berks County further provides in its furlough policy: only inmates in the Reentry Center have "[a]ccess to other types of program

26

furloughs may be offered and will be considered on an individual basis."[211] Based on the additional language in the furlough policy applying only to Reentry Center inmates, Mses. Victory and Velazquez-Diaz argue Berks County treats female Trusty inmates differently than male Trusty inmates concerning access to furloughs. Deputy Warden Smith admitted men currently receive family furloughs, but no women do.[212]

Even if the adduced evidence demonstrated Berks County Defendants condition furlough eligibility on a sentencing judge's approval,[213] Berks County may disparately treat female and male Trusty inmates regarding access to furloughs because there is evidence Berks County assists all eligible Reentry Center inmates in applying for furloughs. Former Reentry Center inmate Mr. James Williams swears Reentry Center personnel assisted him in completing furlough paperwork during his orientation in the facility.[214] There is no adduced evidence of similar assistance in the Jail. To the contrary, Ms. Velazquez-Diaz swears no Berks County employee ever even offered to assist her in requesting a furlough from her sentencing judge.[215]

Considering the Inmate Handbook's silence about a sentencing judge's determination for eligibility and the additional policy for Reentry Center inmates, and adduced evidence showing Berks County assists male Trusty inmates but not female Trusty inmates in obtaining furloughs, there are genuine issues of material fact whether Berks County treats female Trusty inmates differently than male Trusty inmates concerning access to furloughs. We cannot decide if a parity of treatment exists based on the genuine issues of material fact concerning access to furloughs.

## C. There are genuine issues of material facts as to the appropriate remedy.

There are no questions of material fact concerning Berks County Defendant's liability for violating the constitutional rights of Mses. Victory and Velazquez-Diaz as to freedom of movement, access to privileges, and visitation. But we cannot enter judgment as a matter of law

27

on the remedy for this violation when questions remain as to Mses. Victory and Velazquez-Diaz's monetary damages and the class claims for injunctive relief. [216]

## 1. There are questions of fact as to Mses. Victory and Velazquez-Diaz's individual claims for damages.

Mses. Victory and Velazquez-Diaz request monetary damages for their sex discrimination claim under the Equal Protection Clause. We conclude Berks County Defendants' policy of housing male inmates in the CRC and female inmates in the Jail resulted in a "clear and significant gender disparity in the treatment" of Berks County inmates as to at least three conditions.[217] Berks County failed to show a dispute as to material fact to support their reasons justified for the disparate treatment as to freedom of movement, access to privileges, and visitation.

But Mses. Victory and Velazquez-Diaz do not adduce evidence of their monetary damages. They sued seeking compensatory and punitive damages. They do not waive these damages. If they only seek nominal damages with reasonable attorney's fees, we have a different issue on their individual claim. A jury must decide the extent of compensatory and punitive damages if Mses. Victory and Velazquez-Diaz seek this recovery.[218]

## 2. There are questions of fact as to class claims for injunctive relief.

Mses. Victory and Velazquez-Diaz argue, if we were to grant their partial motion for summary judgment, we should enter a permanent injunction. To grant prospective relief, the Prison Litigation Reform Act requires the prospective relief (1) be narrowly drawn, (2) extend no further than necessary to correct the harm, and (3) be the least intrusive means necessary to correct the harm.[219] We also must give substantial weight to an adverse impact the relief may have on public safety or the operation of the criminal justice system.[220] But the injunctive relief must remedy the violation of the federal right.[221]

We afford certain deference to prison officials as they undertake their duty to protect inmates, staff, and the community.[222] Our deference includes "giving the States the first opportunity to correct the errors made in the internal administration of their prisons."[223] This deference does not preclude district court judges permitting or ordering prison officials to propose remedial plans in prison conditions litigation.[224] We need to balance these issues.

We permitted Berks County prison officials the opportunity to propose a remedial plan. We consider whether this plan—which, from our review of the record—is the only concrete remedial plan proposed by either party. There are significant disputes as to material facts and we cannot determine as a matter of law whether this proposal meets the test of the Prison Litigation Reform Act.[225] Berks County's proposed plan "correct[s] the violation of the Federal right."[226] Mses. Victory and Velazquez-Diaz contest the remedial effect of the County's proposed plan. This dispute requires fact finding to determine whether a plan may correct Berks County's violations at least as to the disparate treatment as to freedom of movement, access to privileges, and visitation.

Mses. Victory and Velazquez-Diaz objected to housing Trusty women—the lowest custody-level classification—in cells "designed and designated for Female inmates in Administrative Segregation, Quarantine Status."[227] They contend "these cells are not meant for long-term confinement" and "[u]nlike the cells in general population, these cells have metal toilets," "the sinks in these cells are substantially smaller than those in the general population cells," and "the cells themselves may be smaller."[228] They also argue if Berks County will keep the cell doors unlocked, the cells have no lockers in which female inmates could securely store personal possessions.[229]

Mses. Victory and Velazquez-Diaz question whether a proposed plan purports to provide access to the F Unit dayroom or to create a new dayroom in the current quarantine area.[230] The

29

ambiguity appears in the proposed plan, where Berks County states female inmates "shall have access to the dayroom" but also references "the open dayroom area contained within this housing area" and "the newly created dayroom area."[231] Mses. Victory and Velazquez-Diaz object if the proposed plan creates a new, smaller dayroom than the F Unit dayroom to which they currently have access.

Mses. Victory and Velazquez-Diaz point to the proposed plan's statement "Trusty inmates shall be required to remain in their cells, unlocked when possible . . . during any emergency situations at the jail or F-Unit requiring a lock down or lock in."[232] They believe this policy raises serious concerns because "it is undisputed . . . the Jail is subject to far more lockdowns than the CRC and . . . these lockdowns sometimes last for hours or even days."[233]

Warden Quigley swears Trusty women will be strip searched after each visit.[234] Plaintiffs argue "[a] policy under which Trusty men in the CRC were not strip searched after visits, but Trusty women were, would violate the Equal Protection Clause and should not be approved . . . ."[235]

The proposed plan "reduce[s] both the length and frequency of visits for Trusty women."[236] Mses. Victory and Velazquez-Diaz argue the plan "fail[s] to explain why these changes are necessary when [Berks County has] merely been ordered to propose a plan to provide 'visitation without glass partition.'"[237] Under the proposed plan, Mses. Victory and Velazquez-Diaz argue, "Trusty women would have their visits curtailed from three days per week for at least 30 minutes each (and often longer) to only one day per week for a maximum of 45 minutes."[238]

Each Trusty female would receive a specific forty-five-minute visitation slot each week.[239] "If a woman's visitor is not available at that time or if the woman is on work release, she would not get any visits at all."[240] Again, Mses. Victory and Velazquez-Diaz argue Berks County

30

do[es] not explain why [it] propose[s] to reduce the length and frequency of Trusty women's visits. Even if such reductions were somehow necessary in order to comply with the Court's Order, Trusty women should, at a minimum, be given a choice between visits under the old system and visits under the new proposed plan, as some women might prefer more frequent and longer visits with a partition than shorter and less frequent visits without a partition . . . .[241]

We find these disputes material and require further evidence adduced at trial. We need further factfinding to determine whether any prospective injunctive remedy would remedy the constitutional violations. We cannot enter permanent injunctive remedy under the Prison Litigation Reform Act when there are disputes as to material facts concerning the narrowness, intrusiveness and necessity of a proposed plan. The parties must submit evidence at trial sufficient to allow us to make the necessary findings under the Prison Litigation Reform Act to determine an appropriate injunctive remedy. The record does not presently allow us to make these findings.

## III.    Conclusion

Berks County violated Mses. Victory's and Velazquez-Diaz's rights when it discriminated against them in disparate treatment as to freedom of mobility, access to privileges, and visitation on the basis of their sex in violation of the Equal Protection Clause of the United States Constitution. There are no genuine issues of fact as to Berks County Defendants violating constitutional rights of female Trusty inmates through disparate freedom of movement, access to privileges, and visitation. But there are questions of material fact as to whether Berks County provides a parity of treatment to access furloughs for female Trusty inmates.

Berks County is liable in damages for its sex discrimination against both Mses. Victory and Velazquez-Diaz. Unless Plaintiffs concede they are not seeking compensatory or punitive damages, the factfinder will need to determine individual damages at trial. The record is also insufficient for us to enter a permanent injunction under the Prison Reform Litigation Act.

31

[1] Our Policies require a Statement of Undisputed Material Facts and a Joint Appendix of exhibits in support of a Rule 56 motion. The parties filed a Joint Appendix of exhibits. *See* ECF Doc. No. 221. The parties filed supplements to the Joint Appendix. *See* ECF Doc. No. 233. We reference the exhibits and affidavits submitted in the Joint Appendix as "J.A."

[2] ECF Doc. No. 231 (Victory Response SUMF) ¶ 1.

[3] J.A. 243 at ¶ 197 (ECF Doc. No. 221-1); J.A. 273 ¶ 197 (ECF Doc. No.221-1).

[4] J.A. 243-44 at ¶ 199 (ECF Doc. No. 221-1); J.A. 273 at ¶ 199 (ECF Doc. No. 221-1).

[5] J.A. 244 at ¶ 200 (ECF Doc. No. 221-1); J.A. 273 at ¶ 200 (ECF Doc. No. 221-1).

[6] *Id.*

[7] ECF Doc. No. 223 (Berks SUMF) ¶ 2; ECF Doc. No. 231 (Victory Response SUMF) ¶ 2.

[8] *Id.*

[9] J.A. 208 ¶¶ 75-80 (ECF Doc. No. 221-1); J.A. 231 ¶¶ 75-80 (ECF Doc. No. 221-1).

[10] J.A. 1224 (ECF Doc. No. 221-4).

[11] J.A. 208 ¶¶ 75-80 (ECF Doc. No. 221-1); J.A. 231 ¶¶ 75-80 (ECF Doc. No. 221-1).

[12] ECF Doc. No. 167-45 (Berks App.) at A1049.

[13] J.A. 208 ¶ 80 (ECF Doc. No. 221-1); J.A. 231 ¶ 80 (ECF Doc. No. 221-1).

[14] ECF Doc. No. 167-45 (Berks App.) at A1048.

[15] *Id.*

[16] J.A. 209 ¶¶ 86-87 (ECF Doc. No. 221-1); J.A. 232 ¶¶ 86-87 (ECF Doc. No. 221-1).

[17] J.A. 244 at ¶ 203 (ECF Doc. No. 221-1); J.A. 274 at ¶ 203 (ECF Doc. No. 221-1).

[18] J.A. 126 (ECF Doc. No. 221-1).

[19] *Id.*

[20] J.A. 203 at ¶ 32 (ECF Doc. No. 221-1); J.A. 227 at ¶ 32 (ECF Doc. No. 221-1).

[21] ECF Doc. No. 167-30 (Berks App.) at A0960.

[22] ECF Doc. No. 167-5 (Berks App.) at A0151.

[23] ECF Doc. No. 164-4 (Victory Response App.) at A1304.

32

[24] J.A. 203 at ¶ 36 (ECF Doc. No. 221-1); J.A. 227 at ¶ 36 (ECF Doc. No. 221-1).

[25] J.A. 1048 at 154:17-156:10 (ECF Doc. No. 221-2).

[26] *Id.*

[27] J.A. 203 at ¶ 38 (ECF Doc. No. 221-1); J.A. 228 at ¶ 38 (ECF Doc. No. 221-1).

[28] J.A. 204 at ¶ 40 (ECF Doc. No. 221-1); J.A. 228 at ¶ 40 (ECF Doc. No. 221-1).

[29] J.A. 204 at ¶ 39 (ECF Doc. No. 221-1); J.A. 228 at ¶ 39 (ECF Doc. No. 221-1).

[30] J.A. 204 at ¶ 40 (ECF Doc. No. 221-1); J.A. 228 at ¶ 40 (ECF Doc. No. 221-1).

[31] ECF Doc. No. 223 (Berks SUMF) ¶ 5; ECF Doc. No. 231 (Victory Response) ¶ 5.

[32] J.A. 1352 at ¶¶ 8-23 (ECF Doc. No. 221-4).

[33] J.A. 199 at ¶ 9 (ECF Doc. No. 221-1); J.A. 224 at ¶ 9 (ECF Doc. No. 221-1).

[34] J.A. 673 at 18:19-22 (ECF Doc. No. 221-2).

[35] J.A. 437 at 120:14-19 (ECF Doc. No. 221-2); J.A. 1297-99 (ECF. Doc. No. 221-4).

[36] J.A. 673 at 19:1-6 (ECF Doc. No. 221-2).

[37] J.A. 200 at ¶ 13 (ECF Doc. No. 221-1); J.A. 225 at ¶ 13 (ECF Doc. No. 221-1).

[38] J.A. 1352 at 9:12-14 (ECF Doc. No. 221-4); J.A. 1300-05 (ECF Doc. No. 221-4).

[39] J.A. 199 at ¶ 6 (ECF Doc. No. 221-1); J.A. 223 at ¶ 6 (ECF Doc. No. 221-1).

[40] J.A. 199 at ¶ 7 (ECF Doc. No. 221-1); J.A. 224 at ¶ 7 (ECF Doc. No. 221-1).

[41] J.A. 199 at ¶ 8 (ECF Doc. No. 221-1); J.A. 224 at ¶ 8 (ECF Doc. No. 221-1).

[42] J.A. 199 at ¶ 11 (ECF Doc. No. 221-1); J.A. 224 at ¶ 11 (ECF Doc. No. 221-1).

[43] J.A. 247, 254 ¶¶ 228, 292 (ECF Doc. No. 221-1); J.A. 275, 279 ¶¶ 228, 292 (ECF Doc. No. 221-1).

[44] J.A. 1126-1131 (ECF Doc. No. 221-3).

[45] ECF Doc. No. 231 (Victory SUMF) ¶ 157; ECF Doc. No. 240 (Berks Response SUMF) ¶ 157.

[46] J.A. 477 at 280:18-22 (ECF Doc. No. 221-1).

[47] ECF Doc. No. 231 (Victory Response SUMF) ¶ 161; ECF Doc. No. 240 (Berks Response SUMF) ¶ 161.

[48] J.A. 677 at 34:20-35:8 (ECF Doc No. 221-2).

[49] J.A. 200 at ¶ 15 (ECF Doc. No. 221-1); J.A. 225 at ¶ 15 (ECF Doc. No. 221-1).

[50] J.A. 200 at ¶¶ 14, 15 (ECF Doc. No. 221-1); J.A. 225 at ¶¶ 14, 15 (ECF Doc. No. 221-1).

[51] J.A. 200-01 at ¶¶ 16, 17 (ECF Doc. No. 221-1); J.A. 225 at ¶¶ 16, 17 (ECF Doc. No. 221-1).

[52] J.A. 201 at ¶ 19 (ECF Doc. No. 221-1); J.A. 225 ¶ 19 (ECF Doc. No. 221-1).

[53] J.A. 201 at ¶ 20 (ECF Doc. No. 221-1); J.A. 225 ¶ 20 (ECF Doc. No. 221-1).

[54] J.A. 437 at 118:5-7, 478 at 282:13-20 (ECF Doc. No. 221-2).

[55] ECF Doc. No. 231 (Victory SUMF) ¶ 141; ECF Doc. No. 240 (Berks Response SUMF) ¶ 141.

[56] J.A. 201 at ¶ 23 (ECF Doc. No. 221-1); J.A. 226 at ¶ 23 (ECF Doc. No. 221-1).

[57] J.A. 201 at ¶¶ 24, 25 (ECF Doc. No. 221-1); J.A. 226 at ¶¶ 24, 25 (ECF Doc. No. 221-1).

[58] *Id.* at ¶ 26.

[59] *Id.*

[60] J.A. 246 at ¶ 220 (ECF Doc. No. 221-1).

[61] J.A. 202 at ¶ 26 (ECF Doc. No. 221-1); J.A. 226 at ¶ 26 (ECF Doc. No. 221-1).

[62] J.A. 118 (ECF Doc. No. 221-1).

[63] J.A. 201 at ¶ 21 (ECF Doc. No. 221-1); J.A. 226 at ¶ 21 (ECF Doc. No. 221-1).

[64] J.A. 209 at ¶¶ 94, 95 (ECF Doc. No. 221-1); J.A. 233 at ¶¶ 94, 95 (ECF Doc. No. 221-1).

[65] J.A. 210 at ¶ 98 (ECF Doc. No. 221-1); J.A. 233 at ¶ 98 (ECF Doc. No. 221-1).

[66] J.A. 209 at ¶ 96 (ECF Doc. No. 221-1); J.A. 233 at ¶ 96 (ECF Doc. No. 221-1).

[67] J.A. 209 at ¶ 97 (ECF Doc. No. 221-1); J.A. 233 at ¶ 97 (ECF Doc. No. 221-1).

[68] J.A. 202 at ¶ 27 (ECF Doc. No. 221-1).

[69] J.A. 125 (ECF Doc. No. 221-1).

[70] *Id.*

[71] J.A. 1046-47 at 148:20-49:2 (ECF Doc. No. 221-2).

[72] *Id.*

[73] J.A. 1234 (ECF Doc. No. 221-4).

[74] J.A. 1490 at ¶ 1 (ECF Doc. No. 233).

[75] *Id.* at ¶ 2.

[76] *Id.* at ¶¶ 3-4.

[77] *Id.* at ¶¶ 5-6.

[78] J.A. 1488 at ¶ 5 (ECF Doc. No. 233).

[79] *Id.* at ¶ 6 (ECF Doc. No. 233).

[80] J.A. 204 at ¶ 41 (ECF Doc. No. 221-1); J.A. 228 at ¶ 41 (ECF Doc. No. 221-1).

[81] J.A. 204 at ¶ 42 (ECF Doc. No. 221-1); J.A. 228 at ¶ 42 (ECF Doc. No. 221-1).

[82] J.A. 204 at ¶ 44 (ECF Doc. No. 221-1); J.A. 228 at ¶ 44 (ECF Doc. No. 221-1).

[83] J.A. 204 at ¶ 46 (ECF Doc. No. 221-1); J.A. 228 at ¶ 46 (ECF Doc. No. 221-1).

[84] J.A. 441 at 135:5-12 (ECF Doc. No. 221-2).

[85] J.A. 442 at 137:5-11 (ECF Doc. No. 221-2).

[86] J.A. 206 ¶¶ 55, 56 (ECF Doc. No. 221-1); J.A. 230 ¶¶ 55, 56 (ECF Doc. No. 221-1)

[87] J.A. 206 at ¶ 59 (ECF Doc. No. 221-1); J.A. 230 at ¶ 59 (ECF Doc. No. 221-1).

[88] J.A. 206 at ¶ 60 (ECF Doc. No. 221-1); J.A. 230 at ¶ 60 (ECF Doc. No. 221-1).

[89] J.A. 206 at ¶ 62 (ECF Doc. No. 221-1); J.A. 230 at ¶ 62 (ECF Doc. No. 221-1).

[90] J.A. 206-07 at ¶¶ 61, 66 (ECF Doc. No. 221-1); J.A. 230-31 at ¶¶ 61, 66 (ECF Doc. No. 221-1).

[91] J.A. 207 at ¶ 64 (ECF Doc. No. 221-1); J.A. 230-31 at ¶ 64 (ECF Doc. No. 221-1).

[92] J.A. 207 at ¶ 65 (ECF Doc. No. 221-1); J.A. 231 at ¶ 65 (ECF Doc. No. 221-1).

[93] J.A. 254 at ¶ 289 (ECF Doc. No. 221-1); J.A. 280 at ¶ 289 (ECF Doc. No. 221-1).

[94] J.A. 255 at ¶ 298 (ECF Doc. No. 221-1); J.A. 279 at ¶ 298 (ECF Doc. No. 221-1).

[95] J.A. 1109 (ECF Doc. No. 221-2).

[96] J.A. 414 at 27:16-22 (ECF Doc. No. 221-2).

[97] J.A. 255 at ¶¶ 296-97 (ECF Doc. No. 221-1); J.A. 274-75 at ¶¶ 296-97 (ECF Doc. No. 221-1);

[98] J.A. 255 at ¶ 300 (ECF Doc. No. 221-1).

[99] ECF Doc. No. 1.

[100] ECF Doc. No. 149-2, at p. 5.

[101] J.A. 207 ¶ 71 (ECF Doc. No. 221-1); J.A. 231 ¶ 71 (ECF Doc. No. 221-1).

[102] J.A. 207 ¶ 74 (ECF Doc. No. 221-1); J.A. 231 ¶ 74 (ECF Doc. No. 221-1).

[103] J.A. 207 ¶ 71 (ECF Doc. No. 221-1); J.A. 231 ¶ 71 (ECF Doc. No. 221-1).

[104] J.A. 207 ¶ 70 (ECF Doc. No. 221-1); J.A. 231 ¶ 70 (ECF Doc. No. 221-1).

[105] J.A. 268 ¶ 396 (ECF Doc. No. 221-1); J.A. 288 ¶ 396 (ECF Doc. No. 221-1).

[106] J.A. 268 ¶ 397 (ECF Doc. No. 221-1); J.A. 288 ¶ 397 (ECF Doc. No. 221-1).

[107] ECF Doc. No. 167-19 (Berks App.) at A0664.

[108] ECF Doc. No. 114.

[109] ECF Doc. No. 115.

[110] ECF Doc. No. 135.

[111] *Id.*

[112] ECF Doc. No. 135.

[113] ECF Doc. No. 150 at ¶ 4 (emphasis added).

[114] *Id.* at ¶ 5.

[115] ECF Doc. No. 188.

[116] J.A. 400 (ECF Doc. 221).

[117] ECF Doc. No. 181.

[118] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson*, 850 F.3d at 533-34 (3d Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 378

(2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-323).

[119] ECF Doc. No. 114 at p. 29.

[120] U.S. Const. amend. XIV.

[121] *Reed v. Reed*, 404 U.S. 71, 76 (1971).

[122] *Dinote v. Danberg*, 601 F. App'x 127, 130 (3d Cir. 2015) (quoting *Williams v. Morton*, 343 F.3d 212, 221 (3d Cir. 2003)).

[123] *Nifas v. Beard*, No. 08-834, 2009 WL 3241871, at *10 (W.D. Pa. Oct. 6, 2009) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)).

[124] *Dinote*, 601 F. App'x at 130 (quoting *United States v. Virginia*, 518 U.S. 515, 571 (1996)).

[125] *Klinger v. Department of Corrections*, 31 F.3d 727 (8th Cir. 1994).

[126] *Id.* at 729.

[127] *Id.*

[128] *Id.* at 730.

[129] *Id.*

[130] *Id.* at 731-32.

[131] *Id.* at 731.

[132] *Id.* at 731-32.

[133] Jennifer Arnett Lee, *Women Prisoners, Penological Interests, and Gender Stereotyping: An Application of Equal Protection Norms to Female Inmates*, 32 Colum. Hum. Rts. L. Rev. 251, 285 (2000).

[134] *Klinger*, 31 F.3d at 732.

[135] Angie Baker, *Leapfrogging over Equal Protection Analysis: The Eighth Circuit Sanctions Separate and Unequal Prison Facilities for Males and Females in Klinger v. Department of Corrections, 31 F.3d 727 (8th Cir. 1994)*, 76 Ne. L. Rev. 371 (1997).

[136] *Id.* at 389 (arguing the court in *Klinger* improperly instructs "if a court is able to articulate any statistical difference between men and women—whether or not relevant to the challenged disparity—then the court need not bother analyzing the challenged disparity").

[137] *United States v. Virginia*, 518 U.S. 515, 524 (1996).

[138] *Id.* at 525.

[139] *Id.* at 541 (quoting *Mississippi Univ. of Women v. Hogan*, 458 U.S. 718, 725 (1982)).

[140] ECF Doc. No. 147 (Berks SUMF) ¶¶ 86-87.

[141] ECF Doc. No. 225-2 (Victory SUMF) ¶¶ 1, 9.

[142] *Id.*

[143] *Glover v. Johnson*, 478 F. Supp. 1075, 1079 (E.D. Mich. 1979).

[144] *Id.*

[145] *McCoy v. Nevada Dep't of Prisons*, 776 F. Supp. 521, 522 (D. Nev. 1991).

[146] *Id.* at 525-26.

[147] *Id.* at 526.

[148] *Bukhari v. Hutto*, 487 F. Supp. 1162, 1164 (E.D. Va. 1980).

[149] *Id.* at 1171.

[150] *Id.* at 1172 (quoting *Glover*, 478 F. Supp. at 1078).

[151] *Mitchell v. Untreiner*, 421 F. Supp. 886, 888 (N.D. Fla. 1976).

[152] *Id.* at 891.

[153] *Id.*

[154] *Id.* at 902.

[155] J.A. 673 at 16:8-18 (ECF Doc. No. 221-2).

[156] *E.g*, J.A. 477-78 at 280:18-22 (ECF Doc. No. 221-2).

[157] J.A. 458 at 202:23-203:18 (ECF Doc No. 221-2).

[158] *Dinote v. Danberg*, 601 F. App'x 127, 130 (3d Cir. 2015) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996).

[159] ECF Doc. No. 222, at p. 13.

[160] *E.g.*, *Davie v. Wingard*, 958 F. Supp. 1244, 1252 (S.D. Ohio 1997).

[161] *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 723 (1982).

[162] *Davie*, 958 F. Supp. at 1246-47.

[163] *Id.* at 1247.

[164] *Id.* at 1252.

[165] *Id.*

[166] *Id.* at 1253.

[167] *Id.* (noting "approximately 8% of [Ohio Department of Rehabilitation and Correction]'s female inmates have been convicted of a violent crime, while 21% of male inmates have been convicted of a violent crime.").

[168] *Id.* ("Approximately 1% of female inmates are classified as close or maximum security, but 32% of male inmates are classified as such.").

[169] *Id.*

[170] *Id.* ("[t]he differences between male and female inmates that Defendants cite are the very characteristics which justify the policy . . . . Therefore, the Court finds that the gender classification is substantially related to an important government interest.").

[171] *Sassman v. Brown*, 99 F. Supp. 3d 1223 (E.D. Cal. 2015).

[172] *Id.* at 1228.

[173] *Id.*

[174] *Id.*

[175] *Id.* (emphasis omitted).

[176] *Id.*

[177] *Id.* To ensure Alternative Custody Program participants remedied issues observed by the legislature, the bill setup a detailed selection process. A female prisoner must apply to the California Department of Corrections and Rehabilitation; the Department would then screen applicants to evaluate eligibility by looking to predictive risk and preparing an individualized treatment and rehabilitation plan. *Id.* at 1230. This plan is presented to a committee which

considered the inmate for placement in the program. *Id.* The committee did not select all eligible applicants to participate. If selected, a parole officer supervised female inmates. *Id.* at 1231.

[178] *Id.* at 1231.

[179] *Id.*

[180] *Id.* The Department also dismissed his appeal because "[s]tate law only allows female inmates to participate in the [Alternative Custody Program]." *Id.*

[181] *Id.* at 1231.

[182] *Id.*

[183] *Id.* at 1235.

[184] *Id.* at 1235 n. 10. Chief Judge England wrote: "On a fundamental basis, the most troubling aspect of the State's arguments is that, even if the ACP is a superior method of approaching recidivism and social issues for some women, and even though the State has offered ample justifications for providing the program to female offenders, the State still has not offered any rational explanation for excluding men." *Id.* at 1243.

[185] *Ford v. City of Boston*, 154 F. Supp.2d 131, 133 (D. Mass. 2001).

[186] *Id.*

[187] *Id.* at 150.

[188] *Id.*

[189] *Id.*

[190] *Id.*

[191] J.A. 208 at ¶ 80 (ECF Doc. No. 221-1).

[192] ECF Doc. No. 167-15 (Berks App.) at A0352-53.

[193] ECF Doc. No. 146, at p. 17.

[194] ECF Doc. No. 38 at ¶ 47.

[195] *Id.* at ¶ 49.

[196] ECF Doc. No. 230-2, at p. 5 (citing *Dinote v. Danberg*, 601 Fed. App'x 127 (3d Cir. 2015); *Pitts v. Thornburgh*, 866 F.2d 1450 (D.C. Cir. 1989)).

[197] *Dinote*, 601 Fed. App'x 127.

[198] *Dinote v. Danberg*, No. 12-377, 2013 WL 2297039, at *3-5 (D. Del. May 23, 2013).

[199] *Dinote*, 601 Fed. App'x at 130 (Appeals observed a "direct relationship between th[e 24-hour transfer policy] and its objective [of providing gender-segregated institutions].").

[200] *Id.* at 130.

[201] *Id.*

[202] Mses. Victory and Velazquez-Diaz argue Berks County's asserted justifications were invented *post hoc* to litigation. But we do not find Berks County's justifications sufficient as a matter of law regardless of whether genuine or invented *post hoc*. We do not need to decide this question.

[203] *Hassan v. City of New York*, 804 F.3d 277 (3d Cir. 2015).

[204] *Id.* at 297.

[205] *Id.*

[206] *Id.* (citing *Snyder v. Louisiana*, 552 U.S. 472 (2008)).

[207] J.A. 1046-47 (ECF Doc No. 221-4).

[208] ECF Doc. No. 146, at p. 11.

[209] J.A. 125 (ECF Doc No. 221-1).

[210] *Id.*

[211] J.A. 125 (ECF Doc No. 221-1).

[212] J.A. 1046-47 145:24-149:20 (ECF Doc No. 221-4).

[213] *E.g.*, J.A. 1229 (ECF Doc No. 221-4).

[214] J.A. 1490-91 (ECF Doc. No. 233).

[215] J.A. 1488-89 (ECF Doc. No. 233).

[216] *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 419– 420 (1977) ("The power of the federal courts to restructure the operation of local and state governmental entities is not plenary. Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation.") (internal quotation marks omitted).

[217] *Ford*, 154 F. Supp. 2d at 151.

[218] *Id.; cf. Gordon v. Pete's Auto Service of Denbigh, Inc.*, 837 F. Supp. 2d 581, 585 (E.D. Va. 2011) (granting summary judgment with respect to liability with "[a] determination as to monetary

damages, if any, [] reserved for jury trial"); *Old St. Paul Missionary Baptist Church v. First Nation Insurance Group*, 707 F. Supp. 2d 811, 827 (E.D. Ark. 2010) (granting summary judgment as to liability but "[g]enuine issues of material fact remain as to the amount of compensatory damages to which Old St. Paul is entitled on those claims."); *Bradley v. Atlantic City Board of Education*, 736 F. Supp. 2d 891, 901 (D.N.J. 2010) (granting summary judgment as to liability); *Leaf Funding, Inc. v. Brogan Pharmaceuticals, Inc.*, 642 F. Supp. 2d 844, 855-56 (N.D. Ind. 2009) (granting summary judgment on damages "in an amount to be determined following further briefing by the parties on the calculation of damages."); *MacSteel International USA Corp. v. M/V IBN Abdoun*, 154 F. Supp. 2d 826, 831 (S.D.N.Y. 2001) (granting summary judgment as to liability but "the issue of damages is reserved for trial"); *Capitol Records, Inc. v. Progress Record Distributing, Inc.*, 106 F.R.D. 25, 30 (N.D. Ill. 1985) (granting motion for summary judgment on the issue of liability only and setting trial date to resolve issue of damages); *Polo Fashions, Inc. v. Gordon Group*, 627 F. Supp. 878, 886 (M.D.N.C. 1985) ("it is proper for a court to grant summary judgment on the issue of liability alone and to leave the determination of damages for later proceedings").

[219] 18 U.S.C. § 3626(a)(1)(A).

[220] *Id.*

[221] 18 U.S.C. § 3626(a)(1)(A).

[222] *Turner v. Safley*, 482 U.S. 78 (1987).

[223] *Lewis v. Casey*, 518 U.S. 343, 362 (1996); *see also Issa v. School District of Lancaster*, 847 F.3d 121, 144 n.13 (3d Cir. 2017) ("[T]he District Court should allow the [Defendant] an opportunity to propose a legally compliant solution, among other alternatives considered by the Court, before the issuance of any permanent injunction . . . .").

[224] *See e.g.*, *Hernandez v. County of Monterey*, 110 F. Supp. 3d 929, 940-41, 959-60 (N.D. Cal. 2015) (specifying elements prison officials must submit in proposed remedial plan); *Lipscomb v. Pfister*, No. 12-1041, 2014 WL 287269, at *3 (C.D. Ill. Jan. 27, 2014) ("Recognizing . . . courts must provide for flexibility and defer to the expertise of prison officials, and keeping with the requirements of [18 U.S.C.] § 3626, the [c]ourt will not order a specific policy or practice to resolve the this problem. Rather, Defendant . . . must craft a policy . . . address[ing] the constitutional violation . . . , and must submit a remedial plan to the [c]ourt . . . to verify . . . it satisfies the Eighth Amendment."); *Henderson v. Thomas*, 913 F. Supp. 2d 1267, 1317 (M.D. Ala. 2012) (affording prison defendants opportunity to propose appropriate relief); *Clark v. California*, 739 F. Supp. 2d 1168, 1234 (N.D. Cal. 2010) (allowing prison opportunity to develop amendments to order to remedy noncompliance with prior orders and disability statuses); *Couch v. Jabe*, 737 F. Supp. 2d 561, 573-74 (W.D. Va. 2010) (enjoining prison censorship policy as facially unconstitutional and allowing defendants opportunity to revise policy); *Skinner v. Uphoff*, 234 F. Supp. 2d 1217-18 (D. Wyo. 2002) (ordering parties to submit plan or joint remedial plan to address constitutional prison violations).

[225] 18 U.S.C. § 3626(a)(1)(A).

[226] *Id.*

[227] ECF Doc. No. 181 at p. 2 (citing ECF Doc. No. 178 at 6).

[228] *Id.*

[229] *Id.* at 2-3.

[230] *Id.* at 3.

[231] *Id.*

[232] *Id.* at 3-4.

[233] *Id.* at 4.

[234] *Id.* (citing ECF Doc. No. 178 at 5).

[235] *Id.*

[236] *Id.* (citing ECF Doc. No. 178 at 5, 7).

[237] *Id.* (citing ECF Doc. No. 135).

[238] *Id.* (citing ECF Doc. No. 178 at 5, 7).

[239] *Id.*

[240] *Id.*

[241] *Id.* at 4-5.