## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THERESA VICTORY, *et al.*** | **: CIVIL ACTION** |
| | : |
| **v.** | **: NO. 18-5170** |
| | : |
| **BERKS COUNTY, *et al.*** | : |

## MEMORANDUM

## with Findings of Fact and Conclusions of Law

**KEARNEY, J.**                                                                                    **January 15, 2020**

In 2010, Berks County announced its incarcerated residents classified as "Trusty" low risk inmates would be moved from its Jail to a Community Reentry Center to meet touted goals of reducing recidivism and promoting reentry to society. The Community Reentry Center provided these Trusty inmates increased mobility with unlocked cells, access to privileges, visitation rights, and, access to home furloughs aiding work release. But contrary to its 2010 goals for its residents, Berks County chose to house only male Trusty inmate residents in the Reentry Center. It decided to leave the women Trusty inmates in the Jail with substantially different conditions of incarceration. Even after we repeatedly held over the past year its policy is unconstitutional, Berks County vigorously defended its decision citing safety/security reasons and a logistical inability to provide the same rights to women as men although it classified both as "Trusty" inmates. Berks County opposed every effort by female Trusty inmates to ensure equal protection. It sought stays of our injunctions and eventually never implemented court-ordered compliance. It denied the female inmates's internal grievances and then successfully moved to dismiss cases when female inmates did not exhaust administrative remedies before their shorter-term Trusty status sentences expired. As late as October 2019, the Berks County Commissioners approved a six-figure contract

to renovate the Community Reentry Center housing the male Trusty inmates. Berks County offered no sign of relenting in its view.

But on the business day before we started the jury trial on damages claims, Berks County told us it just moved all the male Trusty inmates out of the Reentry Center and into the Jail. It then immediately argued there is no more Equal Protection violation mooting a need for further prospective injunctive relief. The female inmates are not confident in the stability of this last-minute change by elected officials about to face a jury. In addition to damages awarded by the jury, a class of female Trusty inmates seek permanent injunctive relief believing Berks County's voluntary cessation of unconstitutional practices will not last without a permanent injunction Order.

After evaluating the credibility of witnesses in several hearings including three preliminary injunction hearings, four days of trial, and dozens of briefs leading to extensive opinions on motions to dismiss and summary judgment, we agree with the female Trusty inmates as to the need for a narrowly tailored permanent injunction to ensure Berks County does not change its mind once outside of our scrutiny. Given the timing of Berks County's reversal in policy and potential change absent contrary evidence, we may enter this prospective relief although we are not aware of a presently challenged violation of the Equal Protection Clause. Most of the requested relief is narrowly tailored, comports with the needs-narrowness-intrusive requirements of the Prison Litigation Reform Act, and otherwise satisfies the long-established elements necessary for permanent injunctive relief. Given today's specific findings and Berks County's apparent change of mind, we decline to enter declaratory relief to address past violations. Our accompanying Order denies declaratory relief but enters permanent injunctive relief narrowly tailored to the specific harms challenged by the female Trusty inmates.

2

# I.  Findings of Fact

After evaluating the credibility of several witnesses in three preliminary injunction hearings, a trial on prospective permanent relief, and studying the adduced evidence, we find:

1.  In 2010, Berks County converted a juvenile detention center down the hill from its Jail into a "Community Reentry Center" managed by the same Berks County officials and correctional officers for the admitted "goal of reducing recidivism and assisting residents in reestablishing themselves as productive members of our community."[1]

2.  Berks County's goals for its Reentry Center did not distinguish between male and female residents.[2]

3.  After opening the Reentry Center, Berks County began housing its most trustworthy male and female inmates, termed "Trusty" inmates, in different facilities based on their sex: Trusty men lived in the Reentry Center and Trusty women lived in the F-Block of the Jail.[3]

4.  Male Trusty inmates living in the Reentry Center lived in unlocked cells with the freedom to access to a communal dayroom with microwaves, showers, and telephones for eighteen hours a day and received visitors in the Reentry Center's gymnasium without a glass partition.[4] Female Trusty inmates living on the Jail's F-Block lived in locked cells with six hours of recreation per day and visitation from guests from behind a glass partition.[5]

5.  On January 28, 2018, Theresa Victory entered the custody of the Berks County Jail System after being sentenced to one to five years' imprisonment. Three days later, the Jail classified her a Trusty inmate.[6] Unlike male Trusty inmates, it housed her in the Jail's F-Block.[7]

3

### *Ms. Victory sues to challenge the housing policy.*

6.     On November 30, 2018, Ms. Victory sued to challenge Berks County's Trusty inmate housing policies, claiming male Trusty inmates' more favorable living conditions in the Reentry Center violated her Equal Protection rights under the Fourteenth Amendment.[8] She sued Berks County, its Commissioners, Warden Janine Quigley, Deputy Warden Stephanie Smith, and other County employees.[9]

7.     On December 11, 2018, Ms. Victory moved to preliminarily enjoin Berks County from denying female Trusty inmates housing in the Reentry Center on the basis of sex.[10] She argued "the Berks County policy of holding women with Trusty custody-level and/or Work Release designations in the Jail, even while otherwise similarly situated men reside in the [the Reentry Center] under substantially better conditions, violates the United States Constitution."[11]

8.     On December 28, 2018, Berks County argued Ms. Victory had no reasonable likelihood of success on the merits because its housing policy served the important government interest of ensuring female Trusty inmates' safety, and the housing policy reasonably related to the safety interest because housing women inmates in the Reentry Center would raise significant safety concerns.[12]

9.     On January 10, 2019, we held a full-day hearing on Ms. Victory's motion for a preliminary injunction where Ms. Victory, Warden Quigley, Deputy Warden Smith, Captain Miguel Castro, Lieutenant Robert Mugar, and Commissioner Kevin S. Barnhardt testified.[13] Berks County argued: (1) female Trusty inmates on work release enjoy a similar amount of time outside their cells as male Trusty inmates living in unlocked cells in the Reentry Center;[14] (2) male and female Trusty inmates are similarly confined to a limited space;[15] and, (3) the safety objective of ensuring male and female prison populations be housed separately justifies the housing policy.[16]

4

*We enjoined Berks County's unconstitutional treatment of female Trusty inmates.*

10.  On January 15, 2019, we issued an Order and Memorandum with Findings of Fact granting Ms. Victory's motion for preliminary injunctive relief and ordered Berks County to implement a schedule providing Ms. Victory:

> the same liberty and freedom of movement provided to male Trusty inmates housed at the Community Reentry Center as of January 10, 2019, including (by way of example only) thirteen hours of each day (not including work release) outside of her cell, no lock on her cell in the evening hours, and direct access to rehabilitative programs she wishes to attend in the Community Reentry Center.[17]

11.  On January 17, 2019, Ms. Victory, joined by two additional plaintiffs—Amara Sanders and Samantha Huntington—filed an Amended Complaint.[18]

12.  On January 28, 2019, Warden Quigley swore to approval of a plan for compliance with our January 15, 2019 Order enjoining differential treatment.[19] Warden Quigley swore Ms. Victory "shall be housed in a single cell on F-Unit and the cell door lock shall remain in the unlocked position at all times [Ms.] Victory is in a trusty status[.]"[20] Warden Quigley further swore "from 0430 HRS through 2300 HRS, [Ms.] Victory shall have access to dayroom privileges and services that are available during open dayroom periods such as television, microwave, telephone, shower, etc."[21]

13.  Ms. Victory's one-year custodial sentence ended on January 28, 2019.[22]

14.  The same day, Berks County moved under Rule 60(b) of the Federal Rules of Civil Procedure for relief from the preliminary injunction after releasing Ms. Victory from custody.[23]

15.  We then dissolved the January 15 preliminary injunction and denied Mses. Sanders and Huntington's request for a preliminary injunction upon finding:

a.  Mses. Victory and Huntington had been released from the custody of the Berks County Jail System; and,

5

b.    Ms. Sanders had not exhausted her administrative remedies.[24]

16.    On April 5, 2019, we granted Berks County's Motion to dismiss the claims of Mses. Sanders and Huntington but denied the Motion to dismiss as to Ms. Victory, as she plead a claim for sex discrimination by alleging Berks County provided differential treatment to male Trusty inmates in the Community Reentry Center compared to female Trusty inmates in the Jail.[25]

17.    On April 22, 2019, Ms. Victory, joined by another female Trusty inmate, Alice Velazquez-Diaz, filed a Second Amended Complaint.[26] Ms. Velazquez-Diaz, serving an eleven-and-a-half to twenty-three-month sentence, resided in the Jail's F-Block beginning in October 2018. Ms. Velazquez-Diaz joined Ms. Victory's Equal Protection challenge to Defendants' housing policy of Trusty inmates.[27] Mses. Victory and Velazquez-Diaz sought a permanent injunctive and declaratory relief and compensatory damages.[28]

18.    On April 24, 2019, Ms. Velazquez-Diaz moved for preliminary injunctive relief arguing she was "in all relevant respects similarly situated to Ms. Victory when the Court heard her motion for a preliminary injunction [in January 2019]."[29]

19.    On May 7, 2019, Berks County responded arguing substantially equivalent living conditions between male Trusty inmates housed in the Reentry Center and female Trusty inmates housed in the Jail. Berks County further argued even if not substantially similar, Berks County's government interests in "providing [female Trusty inmates] adequate segregated housing, ensuring [their] safety within [Berks County Jail System], and limiting overpopulation concerns are . . . served by the policy of housing all female inmates in F-Block."[30]

20.    On May 15, 2019, we evaluated the credibility of witnesses and accepted evidence in support of Ms. Velazquez-Diaz's motion for a preliminary injunction.[31] Berks County again argued safety concerns related to creating a female housing unit in the Reentry Center. But Berks

6

County did not mention whether it considered closing the Reentry Center to address our detailed constitutional concerns.

*We again enjoined Berks County's unconstitutional treatment of female Trusty inmates.*

21.     On May 20, 2019, we granted Ms. Velazquez-Diaz's motion for preliminary injunctive relief.[32] We found Ms. Velazquez-Diaz showed a likelihood of success on the merits of her Equal Protection claim complaining of differential treatment concerning freedom of movement and visitation conditions between male Trusty inmates in the Reentry Center and female Trusty inmates in the Jail.[33]

22.     In granting the preliminary injunction, we ordered "[o]n or before May 28, 2019, Berks County, through Warden Quigley, shall file a proposed plan to ensure compliance with the accompanying Memorandum allowing Ms. Velazquez-Diaz to have the freedom of movement provided to male Trusty inmates housed at the Community Reentry Center . . . ; and, visitation without glass partition as afforded to male trusty inmates."[34] We allowed Ms. Velazquez-Diaz to promptly comment upon or object to Berks County's plan.[35]

23.     On May 23, 2019, Berks County appealed our May 20, 2019 Order and sought a stay of implementing the Order pending appeal.[36] On June 3, 2019, we denied the stay and again explained, in extensive detail, why Berks County's longstanding different housing and services provided to Ms. Velazquez-Diaz violated the Equal Protection Clause.[37]

24.     On June 3, 2019, Berks County moved for summary judgment again arguing substantially different treatment is justified by "[t]he important government interest of safety and security is served by housing female Trusty inmates on F-Unit [in the Jail]."[38] Berks County also argued security risks and concerns with building a female-only housing unit in the Reentry Center, including dangers of assaults on female inmates and overcrowding of the Reentry Center. Berks

7

County did not adduce evidence showing it considered closing the Reentry Center as a housing unit.[39]

25.     On June 4, 2019, Berks County, through Warden Quigley, responded to our May 20, 2019 Memorandum and Order swearing "[b]ased upon my experience in corrections, management of the safety and security needs and the physical facilities at [Berks County Jail System], I believe . . . we are providing equal housing and services to all inmates . . . within the operational parameters and using our best judgment to manage and operate the [Berks County Jail System]."[40] Warden Quigley swore, if we so ordered, she would move Ms. Velazquez-Diaz to the F-Block Overflow Unit, but she could not "make any other recommendations for the housing arrangements of [Ms.] Velazquez-Diaz" without sacrificing the Jail's safety and security.[41]

26.     On June 4, 2019, Berks County moved for an emergency stay of the May 20, 2019 Order in our Court of Appeals.[42]

27.     On June 6, 2019, Ms. Velazquez-Diaz timely responded to Warden Quigley's June 4, 2019 affidavit arguing Defendants failed to provide a plan and even if we considered the renewed idea of moving the female Trusty inmates into the overflow unit, this transfer would not meet the terms of our May 20, 2019 Order.[43]

28.     On June 12, 2019, Mses. Victory and Velazquez-Diaz moved to enforce our preliminary injunction order and for contempt arguing Warden Quigley's affidavit did not propose a plan to comply with the preliminary injunction.[44]

29.     On June 14, 2019, Berks County responded with Warden Quigley swearing to safety and security concerns concerning visitation conditions at the Jail and the Community Reentry Center but again failed to propose a method for providing similar visitation conditions for male and female Trusty inmates.[45]

8

30. On June 20, 2019, our Court of Appeals denied Berks County's emergency motion for a stay. We scheduled a hearing on the pending motion for contempt for July 9, 2019.[46]

31. On July 1, 2019, Warden Quigley responded "Senior Staff at [Berks County Jail System] has routinely reviewed options to develop a Plan that would comply with this Court's Orders and have been continually reviewing all options to develop a Plan that would be as safe and secure as possible."[47] She filed a plan proposal in which the Jail would repurpose the quarantine unit (in the Jail) to house female Trusty inmates with the same freedom of movement, no locked cells, a common area with tables for meals and recreation, barrier free visitation, and toilets with no lockouts.[48] But Warden Quigley expressed significant safety and security concerns with this proposal.[49] She did not mention anyone considering moving the male Trusty inmates to the Jail or closing the Reentry Center.

32. On July 8, 2019, we granted Berks County's Motion for summary judgment on all claims other than the Equal Protection claim. As to the Equal Protection claim, we found Mses. Victory and Velazquez-Diaz raised a genuine issue of material fact as to whether (1) female Trusty inmates were similarly situated to male Trusty inmates; (2) Berks Defendants provided substantially equivalent treatment to female Trusty inmates; and, (3) Berks County's differential treatment served important government objectives and the policy substantially related to the governmental objectives.[50]

33. In our June 8, 2019 Order and Memorandum, we granted Mses. Victory's and Velazquez-Diaz's Motion for class certification, certifying a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure of "[a]ll current and future female inmates committed to the Berks County Jail System who have the Trusty custody-level classification but denied assignment to the Community Reentry Center and denied access to the privileges and services available to

9

men assigned to the [Community Reentry Center]."[51] We certified Mses. Victory and Velazquez-Diaz as class representatives.[52] Mses. Victory and Velazquez-Diaz sought declaratory and permanent injunctive relief for the Class.

34. Hours after we certified the Class, Mses. Victory and Velazquez-Diaz moved for a preliminary injunction on behalf of the Class.[53]

35. Also on July 8, 2019, Warden Quigley amended her affidavit and attached a memorandum titled "Housing and Schedule Changes for Female Inmates Classified as 'Trusty.'"[54] Warden Quigley swore "[i]t was further my understanding from this Court's Order of May 20 that my obligation was to provide the Court with safe and secure alternatives."[55] Warden Quigley again outlined a proposed plan where the Jail would convert the quarantine unit to a female Trusty inmate housing unit.

### We raised the possible move of male Trusty inmates to the Jail.

36. On July 9, 2019, we held a hearing to determine whether Berks County failed to comply with our May 20, 2019 Order. At the beginning of the hearing, we questioned counsel for Berks County about whether the way to address the Class claims for injunctive relief would be to move all male Trusty inmates to the Jail. Our inquiry appeared to be the first time Berks County considered this option:

**The Court**: How about if I order all the men out of the CRC and back to jail?

**Mr. Connell**: If Your Honor orders –

**The Court**: Does that work for you guys? If the [Community Reentry Center] is that incompetent to be able to put women in there unless they put a monitor there and have them do the construction, why not order all the men back to jail? You okay with that?

**Mr. Connell**: I would have to discuss. I can't discuss –

10

**The Court**: Maybe we can shortcut all of this. The substantial[] equivalen[ce] would be to move all the trusty back to the jail.

**Mr. Connell**: And put them under all the same current conditions.

**The Court**: Same conditions as the women.

**Mr. Connell**: We could have done that, Your Honor. We would have contemplated that, but Your Honor precluded that, prohibited that, in your original order.

**The Court**: Because I said they have to be treated substantially the same. I ordered them to go to [the Community Reentry Center] or ordered them to go to the equivalent status. But the question struck me as why don't they make them equivalent status and move the men over?

**Mr. Connell**: Or they can just lock the doors at the [Community Reentry Center].

**The Court**: No, that's not the same.

**Mr. Connell**: No?

**The Court**: No. Shut down the [Community Reentry Center], move the men over. Why not?

**Mr. Connell**: I have to discuss that with my client. I don't know if they have the facilities to hold all of them. Can I – because I would need to speak to more than just the warden.

**The Court**: Are the commissioners here today?

**Mr. Connell**: I have a commissioner.

**The Court**: While you're putting on your witnesses, they can think about it. Because that would be [a] way to make the[] [living conditions] substantially equivalent. I'm not saying that Mr. Feldman agrees with me. I'm not saying he does. But I've got to find a way to get them on the same parity, at least until I have a final order.[56]

37. We then heard testimony from Captain Miguel Castro who swore:

    a.    Before submitting the June 4, 2019 Affidavit, he and other Berks County Jail System officials, along with Warden Quigley and Berks County's counsel, discussed how to comply with our May 20, 2019 Order while still maintaining safety and security in the Jail System;

    b.    He talked to officers and lieutenants in the Jail System to determine a course of action;

    c.    Berks County officials believed they already provided similar conditions for female and male Trusty inmates before June 4, 2019, despite our May 20, 2019 Order and Findings detailing unequal treatment;

    d.    Berks County officials did not consider providing similar visitation conditions to female Trusty inmates in meetings leading up to Warden Quigley's June 4, 2019 Affidavit; and,

    e.    Although Warden Quigley swore she would be "prepared to move [Ms.] Velazquez-Diaz to the F-Unit Overflow Unit should it be so ordered," he admitted Berks County would need to make further adjustments to the overflow unit to comply with our May 20, 2019 Order, including adjustments to ensure the same freedom of movement offered to male Trusty inmates in the Community Reentry Center.[57]

38. On July 11, 2019, we granted Ms. Velazquez-Diaz's Motion for contempt against Berks County and Warden Quigley imposing compensatory sanctions of $500.00 to Ms. Velazquez-Diaz and $6,571.20 to Ms. Velazquez-Diaz's counsel.[58] We also ordered: (1) Warden Quigley to "e-mail Plaintiffs' counsel with a specific implementation schedule for moving only female Trusty inmates to the former quarantine unit of the Jail;"[59] and, (2) Mses. Victory and

12

Velazquez-Diaz to "either withdraw or file a status memorandum as to remaining issues on its pending Motion for preliminary injunction."[60]

39.    On July 16, 2019, Berks County appealed the contempt and implementation order to our Court of Appeals.[61]  Berks County moved for an emergency stay of our implementation order.  Our Court of Appeals granted the emergency Motion for stay.

40.    On July 30, 2019, Mses. Victory and Velazquez-Diaz filed a status memorandum seeking the same injunctive relief for the Class as previously ordered for the individual plaintiffs, arguing "[t]he record . . . . before the Court when it heard the prior preliminary injunction motions has amply demonstrated that Defendants are violating the rights of all female Trusty prisoners, not just those of Ms. Victory and Ms. Velazquez-Diaz."[62]

41.    On August 5, 2019, Berks County responded by arguing our implementation order (directing Berks County to move all female Trusty inmates to the quarantine unit consistent with the proposed plan) mooted the Class claim for injunctive relief.  Even if ripe, Berks County argued the Class failed to meet four prerequisites of granting a preliminary injunction, incorporating arguments raised in earlier filings.[63]

42.    On August 7, 2019, we granted the Class Motion for a preliminary injunction but stayed implementation of the Order; we found "after three evidentiary hearings, the same likelihood of success and irreparable harm exist[ing] for female Trusty inmates as part of the Class as previously awarded to Plaintiff Alice Velazquez-Diaz under our May 20, 2019 Order."[64]

43.    On September 16, 2019, the parties cross-moved for summary judgment on the Equal Protection Clause claim, with both sides repeating the same arguments addressed earlier.[65]  Berks County argued its housing policy served the important governmental interest of "operating

13

a safe and secure facility" and then explained why creating a housing unit in the Reentry Center or Jail posed significant safety concerns for the Jail.[66]

44. On October 11, 2019, our Court of Appeals dismissed Berks County's challenges to the January 15 and May 20 preliminary injunctions and July 15 implementation order as moot under the Prison Litigation Reform Act.[67] In dismissing the challenges, the Court of Appeals held the Plaintiffs did not meet required needs-narrowness-intrusiveness findings for entering preliminary prospective relief under the Prison Litigation Reform Act; without such evidence and subsequent findings, the Court of Appeals held the preliminary injunctions "w[ere] without legal effect."[68] The Court of Appeals vacated our contempt order after finding we based the order on the May 20, 2019 preliminary injunction.[69] In a later order, the Court of Appeals vacated the August 7, 2019 preliminary injunction (awarded to the Class) for reasons stated in its October 11, 2019 Opinion.[70]

45. On October 17, 2019, we denied the summary judgment cross-motions finding genuine issues of material fact regarding access to furloughs, compensatory damages, and the scope of injunctive relief for the Class.[71] While denying the relief sought in the parties' cross-motions, we held as a matter of law: (a) female and male Trusty inmates in the Berks County Jail System were similarly situated; (b) Berks County failed to provide substantially equivalent treatment to female Trusty inmates regarding freedom of mobility, access to privileges, and visitation when comparing the totality of living conditions of female Trusty inmates housed in the Jail to male Trusty inmates residing in the Community Reentry Center; and, (c) Berks County's housing policy did not serve an important governmental objective and the housing policy did not substantially relate to an important governmental objective.[72] We concluded "Berks County violated Mses. Victory's and Velazquez-Diaz's rights when it discriminated against them in

14

disparate treatment as to freedom of mobility, access to privileges, and visitation on the basis of sex in violation of the Equal Protection Clause."[73]

46. We set trial on remaining liability and damages questions for November 12 through 15, 2019. We granted Berks County's Motion to bifurcate the trial and ordered the trial to proceed in three parts by first presenting the remaining liability question on the constitutionality of Berks County's furlough policy, then Ms. Victory's case for compensatory damages, and finally on the scope of requested prospective relief under 18 U.S.C. § 3626(a)(1).[74] Phases one and two involved jury questions and phase three would involve evidence presented to the Court.

### *Berks County moves the Male Trusty inmates to the Jail the day before trial.*

47. On November 8, 2019, the last business day before the first day of trial, Defendants filed a "Notice to the Court" to "advise that the Berks County Board of Commissioners decided to move the inmates that have been housed at the Berks County Community Reentry Center to the Berks County Jail."[75] "As of November 8, 2019, the [Community Reentry Center] is no longer a housing unit holding any inmates of the Berks County Jail System. All inmates, male and female, that are incarcerated at the Berks County Jail System are being housed at the Berks County Jail."[76]

### *Evidence adduced at trial resulting in jury verdicts on the damages issues.*

48. On November 12 and 13, 2019, we held the first phase of the trial relating to unequal access to furloughs between male and female Trusty inmates. The adduced evidence established:

a. The Jail's policy made male Trusty inmates (housed in the Reentry Center) and female Trusty inmates (housed in the Jail) eligible for the Partial Confinement Reentry Program upon being classified as Trusty;[77]

15

b. The Partial Confinement Reentry Program (for both male and female Trusty inmates) had two main aspects: work release and furlough;[78]

c. Work release enabled Trusty inmates to gain employment in the community while incarcerated[79] and furlough provided a "temporary release of an inmate with court approval for a predetermined amount of time";[80]

d. Berks County offered different types of furloughs to Trusty inmates; one furlough, called a "home furlough," allowed a Trusty inmate to leave the Jail for up to ten hours to spend time with family;[81]

e. Berks County required certain conditions be met before a Trusty inmate could take a home furlough: (1) an Order from the inmate's sentencing judge (a Partial Confinement Reentry Order);[82] (2) a work release job or a job in the prison;[83] and, (3) be taken within four months of the minimum sentence date.[84]

f. Mses. Victory and Velazquez-Diaz, on behalf of the Class, argued Berks County assisted male Trusty inmates obtain the Partial Confinement Reentry Order—a prerequisite for furlough—but did not similarly assist female Trusty inmates:

i. The Partial Confinement Order is a one-page document with certain information fields at the top, including: the applicant name, inmate number, charge, minimum sentence date, maximum sentence date, sentencing judge, and date initially eligible for program.[85] The Order has a signature line for the inmate, Warden Quigley, and the sentencing judge;[86]

ii. When male inmates obtained Trusty status, the Jail would host an orientation in the Reentry Center;[87]

iii. Typically, there would be ten to twenty male Trusty inmates in a given orientation;[88]

16

iv. The orientation involved information about the Reentry Center's housing unit and about work release and obtaining furlough;[89]

v. During this orientation, Berks County staff provided each male Trusty inmate a Partial Confinement Reentry Order with the information fields at the top of the Order, such as inmate name and number, already filled out by Berks County to be signed by the male inmate;[90]

vi. After the orientation, the Reentry Center sent each Order to Warden Quigley and the sentencing judge for signatures;[91]

vii. After the sentencing judge signed and returned the Order to the Reentry Center, Berks County provided the male Trusty a copy of the completed Order and he could use the Order to take a home furlough when the inmate became eligible for furlough;[92]

viii. The Jail's "Work Release Coordinator," Joanna Brown, testified the Reentry Center provided completed forms to male Trusty inmates during orientation to be submitted to sentencing judges for "efficiency" explaining "I can review them all at once. I can get them all signed [all] at once. I can provide them to [Warden Quigley] at once. The Judges individually all at once;"[93]

ix. The Jail did not host an orientation for female Trusty inmates, did not issue already filled-out Partial Confinement Reentry Orders to female Trusty inmates, nor did they advise female Trusty inmates they would need a Partial Confinement Reentry Order to take furlough unless the female Trusty inmate requested the Order.[94]

g. Mses. Victory and Velazquez Diaz, on behalf of the Class, argued Berks County assisted male Trusty inmates obtain work release jobs—another prerequisite for furlough—but did not similarly assist female Trusty inmates:

17

              i.           Coordinator Brown "coordinate[d] the work that [was] brought to the table by an inmate or an employer directly" by ensuring all necessary paperwork was completed and the employer met program requirements;[95]

              ii.          Coordinator Brown did not affirmatively seek jobs for male or female Trusty inmates;[96]

              iii.        Instead, the work release job must have been "brought to [Coordinator Brown], the work either by an inmate directly because they had that job before they came in, or the inmate spen[t] their time while incarcerated . . . job searching, or an employer would come to [Coordinator Brown] directly seeking out people";[97]

              iv.        Coordinator Brown testified certain employers, such as Morgan Truck Body, contacted the Jail seeking work release employees;[98]

              v.        When an employer called seeking work release employees, Coordinator Brown asked the employer if they were "interested in hiring male or females;"[99]

              vi.        Once the employer indicated its hiring preference, Coordinator Brown would advertise job openings either to male Trusty inmates in the Reentry Center or female Trusty inmates in the Jail;[100]

              vii.       Coordinator Brown testified no employer expressed interest in hiring female Trusty inmates until last October (right before our November trial) in which case she posted a job memorandum for female Trusty inmates in the F-Block;[101]

              viii.      Male Trusty inmates regularly observed job memorandum and postings on the bulletin board in the Reentry Center.[102]

    49.     The jury concluded Berks County violated the Equal Protection Clause by refusing to provide female Trusty inmates substantially equivalent access to furloughs as male Trusty

18

inmates.[103] The jury concluded Berks County's furlough policy served an important government interest, but the policy did not substantially relate to the important government interest.[104]

50. During the second phase of the trial, the jury evaluated the testimony of:

a. Ms. Victory who felt dehumanized and discriminated against after learning only male Trusty inmates lived in the Reentry Center;[105] attended her work release job many times without showering because she would leave the Jail before female Trusty inmates could use the showers;[106] and, became nauseous and had increased stress when Berks County Jail staff could not release her for work release because of a lockdown or crisis in the F-Unit.[107]

b. Ms. Jean Eckroth, a counselling volunteer at the Jail, who met with Ms. Victory during her incarceration and testified to Ms. Victory's "stressed out" condition and about Ms. Victory's "hopelessness and despair";[108]

c. Captain Castro, who testified to the day-to-day safety precautions and procedures as to the Jail permitting female Trusty inmates to leave the Jail for work release.[109]

51. The jury found Berks County's Equal Protection Clause violation caused her to experience physical or emotional pain and awarded her $2,800 in compensatory damages.[110]

### *Evidence adduced for permanent prospective relief.*

52. We proceeded to the third and prospective relief phase of the trial. Warden Quigley and Deputy Warden Smith testified about the new housing policies at the Jail after closing the Community Reentry Center as of November 15, 2019:[111]

a. There were approximately seventy-seven male Trusty inmates and thirteen female Trusty inmates;[112]

b. Berks County no longer housed male Trusty inmates in the Reentry Center and had moved all male inmates housed in the Reentry Center to the A-Unit of the Jail;[113]

19

c. Berks County still housed female Trusty inmates in the F-Unit of the Jail;[114]

d. Berks County Commissioners decided to move male Trusty inmates to the Jail and Warden Quigley counselled the Commissioners on the "pros and cons and the feasibility" of the decision;[115]

e. The Jail no longer issued pre-completed Partial Confinement Reentry Orders to male Trusty inmates but instead staff assisted Trusty inmates (male and female) to obtain orders once eligible to take furlough;[116]

f. Warden Quigley was not aware of any steps taken by the Jail to dismiss a furlough Order held by a male Trusty prisoner;[117]

g. Warden Quigley swore she has the authority to change the Inmate Handbook but typically presents proposed changes to the Berks County solicitor before a final decision.[118]

53. Following testimony, Mses. Victory and Velazquez-Diaz argued the Berks County voluntarily ceased the constitutional violation and therefore Mses. Victory and Velazquez-Diaz "should be entitled to discovery to the process by which [the changed housing policy] happened, because the Supreme Court and the [Court of Appeals for the Third Circuit] have said that is relevant to determining whether [the constitutional violation] will recur."[119] Berks County responded by arguing we should not enter an injunction because "[a]t this point, there is no irrevocable harm under the heightened standard for males and females because they are treated nearly identically now" and argued "it is not a matter of cessation" because "the change [is not] because of this litigation."[120]

### *Post-trial status of Berks County's treatment of Trusty inmates.*

54. After the evidence and arguments from counsel, we ordered: (1) Berks County to file a status report describing the change in housing and treatment of male Trusty inmates by December 2, 2019; (2) Plaintiffs to "move to withdraw the request for prospective relief or submit Memoranda . . . describing how we may continue to entertain a request for prospective relief under the Prison Litigation Reform Act given the noticed changes in the treatment of male and female Trusty inmates in the Berks County Jail System with a responsive brief . . . due no later than December 19, 2019."[121]

55. Defendants timely filed its status report December 2, 2019 and filed a supplemental status report on December 9, 2019.[122] According to the first status report:

     a. Both female and male Trusty inmates: "are living in cells (A-Unit for males and F-Unit for females) with two beds, a toilet, a sink and a desk;" "receive 6 [h]ours of [d]aily [r]ecreation;" "have access to the dayroom which includes telephones, showers, microwaves, and television" during indoor recreation periods; "have three designated visitation days per week;" "may receive two visits per week from no more than three visitors at one time;" "use visitation areas that have a glass partition between them and their visitor;" "carry their tray to their cell and eat their meal in the cell;" and, "will be eligible for furlough."[123]

     b. Concerning the Jail's furlough policy, Berks County attested:

          i. "Between November 25 and November 27, 2019 [the Berks County Jail System's] Treatment Department Staff provided information regarding general rules for Trusty inmates and information regarding furloughs and work release. The information provided included the presentation of slides 5, 10, and 11 of the former Orientation given to male Trusty inmates" before November 8, 2018;[124]

21

ii. Berks County Jail System "submitted a Partial Confinement Reentry Order to the sentencing judge" for all agreeable female Trusty inmates;[125]

iii. After November 11, 2019, "a Partial Confinement Reentry Order will be submitted to the sentencing judge on a case by case basis after a given [T]rusty inmate meets the criteria for and requests a home furlough;"[126]

iv. Once "a male or female inmate is classified as a Trusty, they are advised of that classification by being provided a Review for Trusty Status Memorandum from Treatment Staff at [Berks County Jail System]."[127]

c. Defendants also modified the Inmate Handbook "to exclude all references to the former Community Reentry Center."[128]

56. In its supplemental status report, Defendants stated they "modified its work release program to allow male and female inmates to work on the same shift with the same employer" and they "placed bulletin boards in [] the A-Unit and F-Unit [] where all job opportunities that come to the Jail from outside employers are placed."[129]

57. On December 9, 2019, Plaintiffs filed a memorandum expressing they still seek a permanent injunction despite the reported changes claiming such changes are only a "voluntary cessation" of the adjudged unconstitutional conduct. The Plaintiffs' memorandum addresses the availability of the requested prospective relief under the Prison Litigation Reform Act (18 U.S.C. § 3626(a)(1)(A)).[130] Plaintiffs seek to permanently enjoin Berks County to:

a. "Provide the same amount of time each day during which cell doors are unlocked and prisoners are permitted to access the dayroom for all Trusty women and men, unless there is a unit-wide lockdown or individual disciplinary action."[131]

22

b. "Provide equal access to phones, microwaves, and showers to all Trusty women and men, allowing both Trusty women and men to access those amenities during all time periods when their cell doors are unlocked, unless there is a unit-wide lockdown or individual disciplinary action."[132]

c. "Provide substantially equivalent visitation conditions for Trusty women and men, including the length of visits, the frequency of visits, and the presence or absence of a physical barrier between prisoners and their visitors."[133]

d. "Update the [Berks County Jail System] Inmate Handbook to reflect the current internal furlough policy, including a list of the eligibility requirements for each type of furlough."[134]

e. "Provide a completed Partial Confinement Reentry Order (i.e. furlough order) (except for the prisoner's and judge's signatures) to all male and female Trusty prisoners upon their attaining the Trusty classification, and send the proposed furlough orders to the appropriate court or sentencing judge."[135]

f. "Provide a written notice to all potential employers that contact [Berks County Jail System] to seek work release employees that [Berks County Jail System] has both male and female Trusty prisoners on work release who are available for employment."[136]

g. "Provide written notice, either individually or through public postings, to all male and female Trusty prisoners about all work release job opportunities that [Berks County Jail System] becomes aware of and meet [Berks County Jail System's] requirements."[137]

h. "File written status reports with the Court once every six months for two years, updating the Court and Class Members on the treatment of Trusty men and Trusty women in [Berks County Jail System] with respect to freedom of mobility, access to privileges, visitation

23

conditions, and access to furloughs (including the number of men and women who have been approved for furloughs)."[138]

58.   Mses. Victory and Velazquez-Diaz added evidence:

a.   An October 3, 2019 Commissioners' Board Meeting Minutes "[a]dopting a resolution authorizing the award and the Director of Contracts & Procurement to execute as a result of Invitation to Bid #19-21-GR, two (2) contracts for the [Community Reentry Center] Elevator Modernization Project as identified herein"[139]:

> **Dolan Construction, Inc.**
> 401 South 13[th] Street
> Reading, PA 19602
> **General Construction: Total Bid Not to Exceed Amount: $173,500.00**
>
> **H.B. Frazer Company – Pennsylvania**
> 3 Morgan Drive
> Reading, PA 19608
> **Electrical Contractor: Total Bid Not to Exceed Amount: $30,976.00**[140]

b.   A November 10, 2019 *Reading Eagle* article, entitled "Berks County officials close reentry center prior to federal trial," stating[141]:

i.   "County solicitor Christine M. Sadler said Saturday that the county [C]ommissioners' decision to shut down the [Community Reentry Center] had been a topic of discussion long before the lawsuit was filed. She said the facility, which was opened in 2010, was a source of concern because it is considered inefficient and oversized;"[142]

ii.   "She said the decision was made now largely due to financial factors;"[143]

iii.   "[Solicitor] Sadler said the county received notification in late summer that the state was terminating its contract to use the Berks County Prison to house state prisoners with technical parole violations – a significant loss in revenue to the county. That change

would also free up [fifty] beds and [fifty] spots in programs to help inmates reestablish themselves back into the community;"[144]

          iv.     "[Solicitor] Sadler said the county's action is based on an October court order;"[145]

          v.     "[Solicitor] Sadler said the county was precluded from making changes to the program while the lawsuit was working its way through the court system based on an order by U.S. District Judge Mark A. Kearney. But, she said, that order was overturned on [October 11, 2019];"[146] and,

          vi.     "When that happened, [Berks County's] Chief Financial Officer Robert J. Patrizio brought a proposal to the [C]ommissioners. Sadler said he found that closing the [Community Reentry Center] would save the county $1.4 million to $1.9 million in costs for maintenance, needed equipment upgrades and personnel costs over the next two years."[147]

          c.     A November 21, 2019 *Reading Eagle* article stating: The Berks County Commissioners "defended to [Berks County resident Jane Palmer] their decision to close the Community Reentry Center and move the reentry program to the Jail. Commissioner Christian Y. Leinbach said the facility needed work on its elevators, HVAC system, and cameras, and those costs would be avoided with the decision. He added the reentry program would remain the same."[148]

59.     On December 19, 2019, Defendants responded to Plaintiffs' memorandum contesting the Plaintiffs' ability to seek prospective relief under 18 U.S.C. § 3626(a)(1)(A) and traditional equitable principles given the changes to the housing policy and arguing the changes render the request moot. Even if the request is not moot, Defendants argue the terms of the

proposed permanent injunction fail to meet the requirements of a permanent injunction under 18 U.S.C. § 3626(a)(1)(A).[149]

## II. Conclusions of law

60.     Congress, through the Prison Litigation Reform Act, does not bar prospective relief after Berks County moved the male Trusty inmates to the Jail and took steps to address Plaintiffs' specific challenges to its treatment of male and female Trusty inmates in substantially equivalent manner after our multiple Orders.

61.     Berks County's last-minute changes do not moot Plaintiffs' request for permanent injunctive relief.

62.     Plaintiffs meet their burden of establishing the four elements for permanent injunctive relief.

63.     Plaintiffs' proposed prospective relief, in large part, satisfies the needs-narrowness-intrusiveness requirements of the Prison Litigation Reform Act.

64.     After carefully evaluating the substantial weight we afford to an adverse impact on public safety and the operations of the criminal justice system by the entry of proposed prospective relief, we enter permanent prospective relief under the Prison Litigation Reform Act.

65.     Plaintiffs fail to show a basis for declaratory relief.

## III. Analysis

Our remaining issue is whether Mses. Victory and Velazquez-Diaz may obtain prospective relief under the Prison Litigation Reform Act (18 U.S.C. § 3626(a)(1)(A)) and traditional principles of our equitable powers.[150] Is a permanent injunction mooted or barred by Defendants' trial eve changes, which seem to address the violations of female Trusty inmates' constitutional rights? If Plaintiffs' claim for prospective relief is not mooted or barred, we must then consider

26

whether the terms of the proposed injunction meet the needs-narrowness-intrusiveness test for entering prospective relief under the Prison Litigation Reform Act and if Plaintiffs' request meets the traditional four-part test for entering a permanent injunction. Mses. Victory and Velazquez-Diaz also move for declaratory relief.

## A.    Plaintiffs' request for prospective relief is not barred by the Prison Litigation Reform Act.

We first consider whether the Prison Litigation Reform Act bars the Class claim for prospective relief because Berks County recent decisions to cure the constitutional violation. After careful evaluation, we hold the Prison Litigation Reform Act does not bar entry of prospective relief for the Class against the Defendants under the unique last-minute political decisions at issue in this case.

The Prison Litigation Reform Act identifies the particular findings we must make before granting or approving certain remedies in actions challenging prison conditions:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.[151]

As defined by Congress, "the term 'prospective relief' means all relief other than compensatory monetary damages."[152]

The Act mandates courts to terminate prospective relief "upon the motion of any party or intervener" two years after relief is entered (or one year after a previous attempt to terminate prospective relief) unless "the court makes written findings based on the record that prospective relief remains necessary to *correct a current and ongoing violation of the Federal right*, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief

27

is narrowly drawn and the least intrusive means to correct the violation."[153] Congress provides a party or intervener seeking to terminate prospective relief may move at any time if "the relief was approved or granted in the absence of [needs-narrowness-intrusiveness] findings."[154] We refer to this aspect of the Act as the termination provision.

The question is whether we may enter an injunction under Section 3626(a)(1)(A) against Berks County and its officers after this Court and a jury adjudged them to have violated the constitutional rights of prisoners but Berks County then took steps to cure the unconstitutional conditions before entry of prospective relief. As it appears from the parties' briefing and our research, our Court of Appeals has not yet issued an opinion on this issue. But the parties direct us to a split of authority among circuit courts of appeals who considered the interplay between the mootness doctrine and entering prospective relief under the Prison Litigation Reform Act. The circuit split stems from divergent interpretations of the phrase "necessary to correct the violation of a Federal right" and whether Congress requires finding an ongoing violation of a Federal right before entry of prospective relief.

The earlier approach, taken in 2002 by the Court of Appeals for the Ninth Circuit in *Hallett v. Morgan*[155], interprets "necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs" as requiring an ongoing live constitutional violation. In *Hallett*, a class of women state prisoners moved to extend district court jurisdiction over a consent decree entered several years earlier in a case where the class alleged Eighth Amendment violations at a state prison for women. The motion to extend jurisdiction constituted prospective relief under Section 3626(a)(1)(A). After holding an evidentiary hearing, the district court concluded the prison cured the constitutional violations and, finding no "current and ongoing" violation, held it lacked authority to extend its jurisdiction over the consent decree.

The prisoners appealed, arguing the district court applied the wrong standard by requiring proof of a "current and ongoing" violation—language used by Congress in the Act's termination provision—when entry of prospective relief under Section 3626(a)(1)(A) does not require a plaintiff to show a "current and ongoing" violation. The court of appeals denied the prisoners' argument, observing "[t]he quoted standard for termination does not differ materially from the standard to be applied in deciding whether prospective relief is proper" and Section 3626(a)(1)(A)—through stating relief must be "necessary to correct"— "requires the existence of constitutional 'violation' in need of correction."[156]

We compare this 2002 interpretation to the 2019 approach adopted by the Court of Appeals for the Fourth Circuit in *Porter v. Clarke*[157] and shared by the Court of Appeals for the Eleventh Circuit in 2010.[158] These circuit courts do not read Congress (through Section 3626(a)(1)(A)) to require an active constitutional violation to enter prospective relief if the party seeking prospective relief can prove a reasonable prospect the violation will recur. In *Porter*, death row inmates sued the director of the Virginia Department of Corrections and the former warden of the state prison housing death row inmates alleging the conditions of confinement violated the Eighth Amendment. Between the time the death row inmates filed the case and entry of summary judgment in their favor, the director and warden improved the death row inmates' living conditions. The district court, finding the former conditions of confinement violated the Eighth Amendment as a matter of law, considered whether it possessed the authority to enter an injunction against the director. The district court concluded it had the authority to enter an injunction despite the changes, relying largely on traditional principles of equity and Congress's decision to insert "current and ongoing violation" in the termination section but not in the section authorizing an initial entry of prospective

relief. The district court enjoined the director from reimposing conditions adjudged to be violative of the Constitution.

The Court of Appeals for the Fourth Circuit affirmed the district court, relying on three main points in its reasoning. First, the court of appeals agreed Congress omitting "current and ongoing" from the entry of initial prospective relief is "strong evidence 'that Congress did not intend for the 'current and ongoing' standard to apply outside of termination.'"[159] Second, the court of appeals closely considered the text of the termination provision—"relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right"—and found including both "necessary to correct the violation" as requiring "a current and ongoing violation" would make "redundant the phrase current and ongoing violation in Section 3626(b)(3), as that provision also requires that the court find the prospective relief necessary to correct."[160] Third, the court invoked a separation of powers principle enunciated by the Supreme Court in *Miller v. French*: courts "should not construe a statute to displace courts' traditional equitable authority absent the clearest command or an inescapable inference to the contrary."[161]

Judge Niemeyer dissented in *Porter*, drawing on the Court of Appeals for the Ninth Circuit's decision in *Hallett* by interpreting the phrase "necessary to correct the violation of a Federal right" as requiring an ongoing violation.[162] Judge Niemeyer focused on the legislative history of the Prison Litigation Reform Act, noting "the [Prison Litigation Reform Act] attempt[ed] to eliminate unwarranted interference with the administration of prisons . . . by establish[ing] standards for the entry and termination of prospective relief in civil actions challenging prison conditions."[163]

30

Mses. Victory and Velazquez-Diaz argue we should adopt the 2019 reasoning of the Court of Appeals for the Fourth Circuit in *Porter*, and Berks County argues we should apply the 2002 reasoning of the Court of Appeals for the Ninth Circuit's *Hallett* decision. Reviewing the arguments on how to best interpret "necessary to correct the violation of a Federal right" in Section 3626(a)(1)(A), we conclude the *Porter* analysis accurately reflects Congress's purpose of not requiring an active violation of a Federal right to enter prospective relief.

We agree with the *Porter* majority's textual reading. Congress's use of "current and ongoing" in the termination provision but not in the entry of initial relief indicates Congress did not seek to mandate a party to show an ongoing violation before entry of prospective relief under Section 3626(a)(1)(A). This reading makes practical sense. A party seeking prospective relief under Section 3626(a)(1)(A) has likely only recently proven a defendant violated their Federal rights. Why should the plaintiff have to prove the violation again to be awarded prospective relief?

We are also persuaded the phrase relief "shall extend no further than necessary to correct the violation of the Federal right" cannot mean a "current and ongoing violation" when looking to the termination provision which includes both phrases. As the Court of Appeals for the Fourth Circuit reasoned, reading the "necessary to correct the violation" phrase to mean a "current and ongoing violation" would make one phrase redundant of the other. Also, the termination provision requires a court to issue "written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right [and] extends no further than necessary to correct the violation of the Federal right"[164]— if they mean the same thing, why would Congress direct written findings as to each?

We also find convincing the separation of powers principle relied upon by the Court of Appeals for the Fourth Circuit: if Congress wants to strip the court of its equitable powers, it must

31

do so expressly. There is no express language stripping our equitable powers in Section 3626(a)(1)(A).

Our reading also has a pragmatic benefit: it precludes a defendant who defends the constitutionality of a practice all the way through trial from avoiding the entry of prospective relief by changing the questioned policy (maybe even only on a temporary basis) before prospective relief can be entered. We cannot imagine the Prison Litigation Reform Act—enacted to address *frivolous* litigation filed by prisoners and to limit indefinite federal court involvement in prison litigation[165]—would diminish the ability of a prisoner or class of prisoners from obtaining prospective relief after proving a Federal right violation.

We find these reasons more persuasive than the reasoning in *Hallett*. The Court of Appeals for the Ninth Circuit in *Hallett* found "[Section 3626(a)(1)(A)], too, requires the existence of a constitutional violation in need of correction."[166] But the Court of Appeals for the Ninth Circuit does not explain a situation where a court determines entry of prospective relief is still *necessary* even if a defendant acts to respond to an adverse ruling or verdict before the District Judge can enter prospective relief.[167] We find the Court of Appeals' reasoning in *Porter* more persuasive and adopt the approach of the Fourth Circuit. A plaintiff seeking prospective relief does not need to show a current and ongoing violation of a Federal right to obtain prospective relief. Thus, Mses. Victory and Velazquez-Diaz are not barred by the Prison Litigation Reform Act in their request for prospective relief even if they currently fail to show a current and ongoing violation of the Federal rights of female Trusty inmates in the Berks County Jail System.

## B. Plaintiffs' request for a permanent injunction is not moot under traditional equitable principles.

Finding the Prison Litigation Reform Act does not bar Plaintiffs from requesting a permanent injunction, we must then consider whether Berks County's changes to its prison policies

32

moots Plaintiffs' claim under traditional principles of equity. Berks County, citing their decision to move male Trusty inmates back to the Jail on the last business day before trial and other assurances of remedying adjudged constitutional violations in two status reports, argue the request for injunctive relief is moot under traditional principles of equity. We do not agree.

Article III of the U.S. Constitution provides the "judicial Power shall extend to . . . Cases . . . [and] to Controversies."[168] Our Court of Appeals explained: "[t]his grant of authority embodies a fundamental limitation restricting the federal courts to the adjudication of 'actual, ongoing cases or controversies.'"[169] A case "is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."[170] A "court's ability to grant effective relief lies at the heart of the mootness doctrine. That is, [i]f developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot."[171]

Generally, "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot."[172] "But jurisdiction, properly acquired, may abate if the case becomes moot because (1) it can be said with assurance that there is no reasonable expectation . . . that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."[173] It is only "[w]hen both [of these] conditions are satisfied . . . that the case is moot."[174] Our Court of Appeals "articulated the burden for the party alleging mootness as 'heavy,' even 'formidable.'"[175]

Our Court of Appeals decision in *DeJohn v. Temple University* is useful for evaluating whether a defendant meets the heavy burden of proving an injunction request is moot.[176] In *DeJohn*, a graduate student alleged his university's sexual harassment policy violated the First

33

Amendment. He sought injunctive relief to enjoin the university from continuing to use the policy. Less than three weeks before the deadline for filing dispositive motions, the university changed its policy, addressing the student's First Amendment concerns with its change. The student nonetheless moved for summary judgment arguing the original policy violated the First Amendment. The district court granted the student's summary judgment motion and enjoined the university from reimplementing or enforcing the original sexual harassment policy. The university appealed the injunction arguing the district court lacked jurisdiction to issue an injunction relating to the harassment policy because "the constitutionality of the former policy was rendered moot after [the university] voluntarily revised the policy."[177]

Our Court of Appeals, looking at "the posture of this case," felt "no assurance" the university "would not reimplement its [earlier sexual harassment], absent an injunction, after th[e] litigation ha[d] concluded" and ruled the case was live.[178] Now-Chief Judge Smith, writing for the unanimous panel, felt no assurance because: (1) the university "did not change its sexual harassment policy for more than a year after the commencement of litigation and then only near the end of discovery, less than three weeks before the dispositive motions deadline in the case;" and, (2) "[m]ore importantly, [the university] defended and continues to defend not only the constitutionality of its prior sexual harassment policy, but also the need for the former policy."[179] Judge Smith concluded "these two factors [are] significant in evaluating whether there is a 'reasonable expectation' that [the university] will reimplement its previous sexual harassment policy."[180]

As Judge Smith reviewed the university's assurances in *DeJohn*, we now review the assurances from Berks County as to whether it will resort to the adjudged unconstitutional policies.

34

We look at the timing of the change and whether the Berks County defended the constitutionality and need for the former policy.

We look first to the timing of Berks County's changes. Ms. Victory sued Berks County in December 2018 alleging the County's policy of housing male Trusty inmates in the Reentry Center and female Trusty inmates in the Jail violated the Equal Protection Clause. Ms. Victory promptly moved for preliminary injunction. Berks County responded by defending its housing policy. We held a full-day hearing in January 2019. Berks County again defended its housing policy at the hearing, arguing male and female Trusty inmates are similarly confined to a limited space. We issued a preliminary injunction one year ago ordering Berks County to provide "the same liberty and freedom of movement provided to male Trusty inmates housed at the Community Reentry Center."[181] We eventually dissolved the injunction upon Ms. Victory's release from custody two weeks later.

On May 20, 2019, we granted Ms. Velazquez-Diaz's motion for a preliminary injunction ordering Berks County to submit a plan providing her the "the freedom of movement provided to male Trusty inmates at the Community Reentry Center."[182] On July 1, 2019, Warden Quigley submitted a plan after "continually reviewing all options to develop a plan that would be as safe and secure as possible."[183] We held a contempt hearing a week later. At the beginning of the hearing, we questioned counsel for Berks County about whether a way to address the Class claims would be to move the male Trusty inmates to the Jail. We directly asked Berks County's counsel: "How about if [we] order all the men out of the [Community Reentry Center] and back to jail?"[184] Berks County's counsel stated he would discuss this decision with the Commissioners. We heard nothing.

35

If Berks County's counsel discussed this policy with the Commissioners before the November Notice, it was not presented on the record. Berks County instead continued to represent it could redesign the Jail's quarantine unit into a housing unit for female Trusty inmates with substantially equivalent living conditions to male Trusty inmates despite Warden Quigley and Captain Castro repeatedly expressing security concerns with this approach. In briefing cross-motions for summary judgment, Berks County listed the significant security concerns if it created a female housing unit either in the Reentry Center or in the Jail. Berks County did not address moving male inmates out of the Reentry Center. On October 17, 2019, we ruled the totality of differences in the housing policy between male and female Trusty inmates violated the Equal Protection Clause as a matter of law with regards to freedom of movement, access to showers, telephones, microwaves and dayroom, and visitation.[185] We found issues of fact as to access to furloughs requiring a jury trial on this issue.

On November 8, 2019, the last business day before beginning the three phase trial, Berks County filed a one-page Notice to "advise that the Berks County Board of Commissioners decided to move the inmates that have been housed at the Berks Reentry Center to the Berks County Jail."[186] The Notice did not explain why the Commissioners made the decision, nor did the Notice detail if the housing policy would be permanent.

While for slightly different reasons than *DeJohn*, we find the timing of Berks County's change does not assure us the violation will not recur. In contrast to *DeJohn*, where the university changed its policy three weeks before the dispositive motion deadline, Berks County changed its housing policy after we found the housing policy violated the Constitution as a matter of law. We cannot disparage Berks County for attempting to comply with the Constitution after we found its housing policy was unconstitutional as a matter of law. But we also cannot consider these changes

36

are permanent when Berks County litigated the case for almost a year without proposing moving male inmates from the Reentry Center to the Jail and then moved male inmates out of the Reentry Center on the last business day before trial on the remaining issues. Berks County did not notify opposing counsel before filing the Notice.[187] We directly addressed this possible move during a July 2019 hearing. We find the timing of the change weighs against Berks County's mootness argument.

Our Court of Appeals next directs us whether Berks County defended and continues to defend the constitutionality of its earlier housing policy and the need for the housing policy. As addressed above, Berks County defended the constitutionality of its housing and furlough policies throughout the case—through three separate preliminary injunctions, a contempt hearing, multiple appeals to our Court of Appeals, two affirmative motions for summary judgment, defending a motion for summary judgment, and at trial. Berks County submitted affidavits defending the constitutionality of the policy *after* we issued a preliminary injunction making extensive findings the housing policy violated the Equal Protection Clause.[188] We have no reason to believe Berks County does not continue to defend the constitutionality of its earlier policy of housing male inmates in the Reentry Center.[189]

Berks County, after the change, says it no longer needs to house male inmates in the Reentry Center to ensure safety and security.[190] But Berks County only avers this in briefing. We have no assurances from Berks County personnel. We question: What happens if there is a spike in prisoner population? Will Berks County need to reopen the Reentry Center? What happens after the contracted renovations to the Reentry Center? What happens if the voters remove the Commissioners who seemingly waited approximately ten months to make this decision after we found the policy unconstitutional and approximately one month after approving a contract for

37

construction renovations to the Reentry Center? It is Berks County's "heavy" and "even formidable" burden to prove mootness.[191] Berks County offers no assurances it will not move men back to the Reentry Center if we do not enter an injunction. We cannot conclude there is no reasonable expectation the alleged violation will recur. Under *DeJohn*, Berks County fails to meet its burden.

Berks County argues this situation is unlike *DeJohn* and relies on the Court of Appeals for the Eleventh Circuit's decision in *Jews for Jesus* to argue injunctive relief is moot because it occurred only after Berks County's "substantial deliberation."[192] In *Jews for Jesus*, a missionary organization sued an airport seeking injunctive and declaratory relief against the airport's policy prohibiting the distribution of literature at the airport. About one month after the organization filed its case, the airport lifted its prohibition on distributing literature. The organization, which could now lawfully distribute its literature in the airport, argued the airport's change did not moot the case because of the possibility of a return to the earlier policy. The Court of Appeals for the Eleventh Circuit disagreed. It found no reasonable expectation that the airport would return to its restrictive policy because the change (1) resulted from substantial deliberation by airport officials; and (2) had been consistently applied for three years.

We are not bound to follow the Court of Appeals for the Eleventh Circuit in *Jews for Jesus*. But even under the factors looked to by the Court of Appeals for the Eleventh Circuit, Berks County fails to meet its burden to show mootness. It adduced no evidence of substantial deliberation. Berks County argues "whether to make improvement[s] to the facility or shut the [Reentry Center] was a topic of discussion long before the litigation began."[193] But our record defies this averment. Berks County did not raise the prospect of moving male inmates out of the Reentry Center during the January or May preliminary injunction hearings where Commissioners

testified. In the July 2019 contempt hearing we asked Berks County's counsel if the solution would be to move the male inmates out of the Reentry Center, and counsel did not know whether this solution would work because of overcrowding concerns. It never mentioned this deliberation. It instead approved a six-figure expenditure of taxpayer funds to renovate the Reentry Center.

We are also persuaded by evidence submitted in the present briefing disproving substantial deliberation. Mses. Victory and Velazquez-Diaz attach a Commissioners' Board Meeting Minutes from October 3, 2019 where the Commissioners adopted a resolution authorizing the award of two contracts (for a combined value of $204,476) for the Community Reentry Center "Elevator Modernization Project."[194] This evidence shows a month before Berks County filed its November Notice, its Commissioners approved bids to improve the Reentry Center. We cannot see why the Commissioners would agree to expend over $200,000 of taxpayer dollars to improve a facility while they also seriously considered shutting its doors to inmates. Berks County references the November 10, 2019 *Reading Eagle* article to show substantial deliberation. The article's author recounts County Solicitor Sadler's purported statements: the "decision to shut down the [Community Reentry Center] had been a topic of discussion long before the lawsuit was filed."[195] But then the article describes the financial calculation shifted because the Commonwealth notified Berks County it would terminate a contract late this past summer.[196] The article also states the Commissioners changed the policy because of a court order.[197] We are not convinced the somewhat conflicting hearsay statements made by the Solicitor to the *Reading Eagle* prove substantial deliberation.

Berks County must prove mootness. Berks County elected not to support its briefing with affidavits of the Commissioners or the County Solicitor describing the deliberations leading to

39

closing the Reentry Center. It instead relies on bare assertions in the briefing. Its say-so is insufficient to meet a heavy burden.

Even if Berks County showed substantial deliberation, the court of appeals in *Jews for Jesus* also considered whether the policy has been consistently applied. Our record reveals Berks County has attempted to cure the adjudged constitutional violations through changes made in November and December and continues to act in accordance with the changes. But, unlike in *Jews for Jesus*, Berks County only changed its policies within the past two months and did not swiftly change the challenged policies as the airport did.

Berks County argues we must also consider the presumption of good faith afforded to government entities and officials even if we find it fails to meet its burden of proving mootness. We note although "'government officials are presumed to act in good faith,' courts have concluded that government actors must make a showing that they are entitled to such a presumption when they voluntarily cease allegedly unlawful conduct."[198] We do not see—and Berks County does not cite—a decision from our Court of Appeals specifying the showing a government entity or official must make to receive the good faith presumption. But other courts of appeals considering whether the good faith presumption applies have looked to whether: (1) the decision is based on substantial deliberation;[199] (2) the policy has been consistently applied for a period of time;[200] (3) policy change is "broad in scope and unequivocal in tone;"[201] (4) the policy "could be easily abandoned or altered in the future;"[202] (5) defendant unambiguously terminated the unlawful conduct;[203] and, (6) defendant swears to continue the new policy beyond the litigation.[204]

We are persuaded to apply this guidance from other courts of appeals to determine whether Berks County is entitled to a good faith presumption. We just considered the first two factors. For the reasons already stated, neither weighs in favor of granting a good faith presumption to Berks

County. We are not convinced Berks County substantially deliberated in closing the Community Reentry Center and the policy has only been applied since November.

We next consider whether the policy changes are broad in scope and unequivocal in tone. The policy changes are rather broad: Berks County closed the Reentry Center, moved all male inmates to the Jail, and changed various facets of its furlough policies. Berks County submitted status reports detailing male Trusty inmates are now housed in similar living conditions to female Trusty inmates in the Jail. The status reports detail changes to the furlough program, including ceasing a male only orientation where Berks County staff provided male Trusty inmates with pre-filled Partial Confinement Reentry Orders. The status reports are detailed. But we do not see an unequivocal tone the policy will continue. We are mindful Commissioners made the decision to move male Trusty inmates,[205] and we have no unequivocal message from the Commissioners they will not again change the housing policy. The parties cite to a November 21, 2019 newspaper report of Commissioner Leinbach telling a Berks County citizen during a townhall that the Reentry Center "needed work on its elevators, HVAC system, and cameras, and those costs would be avoided with the decision."[206] At least according to this article, Commissioner Leinbach did not state Berks County will not reopen the Reentry Center as a male-only housing facility because of the adjudged constitutional violations. Presumably, if the cost-calculation changes, the Commissioners could consider reopening the Reentry Center as an inmate housing unit.

We next consider whether the policy changes could be easily abandoned or altered in the future. This review is two-fold: we must consider the housing policy changes and the changes to the Jail's furlough policy. First, as demonstrated by the November 8, 2019 Notice to the Court, Berks County can rather easily move prisoners between the Jail and Reentry Center. The November decision did not seem subject to public input or extensive review by Jail personnel;

41

Warden Quigley only counselled the Commissioners on the "pros and cons" and "feasibility" of moving prisoners.[207] Absent an injunction, Berks County could rather easily move male prisoners back to the Reentry Center. Regarding furloughs, Berks County discontinued the male only orientation and changed the furlough policy to assist a Trusty inmate (male or female) to obtain a furlough on a case-by-case basis. This policy can also be undone rather easily if Berks County resumes offering male Trusty inmates with an orientation denied to female Trusty inmates.

The fifth factor—whether defendant unambiguously terminated the unlawful conduct—is contested by the parties. Berks County argues their changes address adjudged constitutional violations; Mses. Victory and Velazquez-Diaz argue the changes give rise to new constitutional concerns. Our review of the status reports and the November 15, 2019 permanent injunction transcript reveals the adjudged constitutional violations have been addressed but cannot say, based on the current record, Berks County has unambiguously terminated the unlawful conduct. Sixth, we look to sworn statements. We have no affidavit from Berks County swearing to continue the new policy beyond this litigation.

The balance of these factors compel our finding Berks County is not entitled to a good faith presumption. Berks County staunchly defended its housing policy throughout this case. In doing so, it did not propose closing the Community Reentry Center as a male housing unit, despite us raising this distinct possibility during a July 2019 hearing. Berks County appealed each injunction ruling to our Court of Appeals and did not change its housing policy until the last business day before our four-day trial. After over 300 docket entries, a four-day trial, and multiple injunction hearings, we cannot award a good faith presumption to Berks County for changing policies only after the policies were adjudged to be unconstitutional as matter of law.

42

### C. Plaintiffs meet traditional requirements for award of a permanent injunction.

Mses. Victory and Velazquez-Diaz argue a permanent injunction is warranted to ensure Berks County does not resume its unconstitutionally discriminatory treatment of members of the Class by affording better treatment to Trusty men than Trusty women housed in the Jail. Berks County argues we should not enter an injunction because it is "an extraordinary remedy, which should be granted only in limited instances."[208]

In assessing whether injunctive relief is appropriate, we must consider whether:

(1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest.[209]

We review each element to determine whether Mses. Victory and Velazquez-Diaz meet their burden to prove the requirements of a permanent injunction.

#### 1. Mses. Victory and Velazquez-Diaz show actual success on the merits.

The first element is whether Mses. Victory and Velazquez-Diaz can prove actual success on the merits. Mses. Victory and Velazquez-Diaz argue they proved constitutional violations as a matter of law on summary judgment and to a jury on the issue of access to furlough. Berks County concedes, for the purposes of this Motion only, Mses. Victory and Velazquez-Diaz succeeded on the merits. Mses. Victory and Velazquez-Diaz meet this element.

#### 2. Mses. Victory and Velazquez-Diaz show irreparable injury.

We next look to whether Mses. Victory and Velazquez-Diaz can show irreparable injury. Mses. Victory and Velazquez-Diaz, on behalf of the Class, established the pre-November 8, 2019 housing conditions and the pre-December 2, 2019 policies regarding access to furloughs violated the Equal Protection Clause and, as such, made a clear showing of irreparable harm if the conditions returned in whole or in part.

43

Discrimination on the basis of sex demonstrates irreparable injury:

> [T]he right to equal treatment guaranteed by the Constitution is not co-extensive with any substantive rights to the benefits denied the party discriminated against. Rather, as we have repeatedly emphasized, discrimination itself, by perpetuating "archaic and stereotypic notions" or by stigmatizing members of the disfavored group as "innately inferior" and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group.[210]

"Deprivation of constitutional right alone constitutes irreparable harm as a matter of law, and no further showing of irreparable harm is necessary."[211]

Berks County argues, because of the changes made since being adjudged to have violated the Equal Protection Clause, Mses. Victory and Velazquez-Diaz can no longer show the Class suffers irreparable harm. We extensively analyzed this argument above by finding Berks County fails to show no reasonable probability of recurrence. We incorporate our analysis in finding Mses. Victory and Velazquez-Diaz show a reasonable probability the constitutional violations could recur. Given the possibility of recurrence, we conclude Mses. Victory and Velazquez-Diaz show irreparable injury.

### 3. Mses. Victory and Velazquez-Diaz show the granting of injunctive relief will not result in greater harm to the Berks County.

We next consider whether Mses. Victory and Velazquez-Diaz can show the balance of the hardships weigh in favor of awarding injunctive relief. Mses. Victory and Velazquez-Diaz argue deprivations of their constitutional rights outweigh harm alleged by Berks County.[212] Berks County argues they will suffer greater harm than the Class if we order a permanent injunction "which differs from the current treatment" because it would "require[] a new safety and security evaluation and changes in policies and procedures already completed, or in the process of completion, by Berks Defendants."[213] Berks County also argues a permanent injunction would

44

cause hardship as it would require our intervention before "any changes regardless of whether those changes implicate a potential violation."[214]

The entered injunction does not compel Berks County to change the purported status quo. Berks County will not need to conduct new security evaluations. The injunction only prevents Berks County from returning to the pre-change conditions. We only order Berks County to remedy adjudged constitutional violations by providing substantially equivalent treatment. We also do not see why Berks County would have to propose any change to us; it would only have to bring to our attention any changes affecting the minimally intrusive injunction. While the injunction may impose minimal hardship to Berks County, female Trusty inmates would suffer great hardship if Berks County returned to adjudged unconstitutional living conditions. We find Mses. Victory and Velazquez-Diaz meet this element.

### 4.    Mses. Victory and Velazquez-Diaz show an injunction is in the public interest.

The fourth element is whether the public interest is disserved by an injunction. Mses. Victory and Velazquez-Diaz argue the public interest "clearly favors the protection of constitutional rights."[215] Berks County argues the public interest would be disserved because an injunction would require Berks County to "confer with the Court regarding any additional changes it seeks to make, thereby impeding the Court's other functions."[216] The terms of the injunction meeting the needs-narrowness-intrusiveness requirements of the Prison Litigation Reform Act (as discussed in the next section) would largely only serve to prevent Berks County from reimposing pre-change conditions. Berks County is ordered to continue policies already in practice. We anticipate limited court involvement. Under the Prison Litigation Reform Act, Berks County can move to dissolve the injunction in two years. When we weigh the public interest in denying an injunction against the strong public interest in vindicating constitutional rights and preventing

45

future constitutional violations, we find an injunction defined in the accompanying Order serves the public interest.

### D.    Prospective relief findings under 18 U.S.C. § 3626(a)(1)(A).

Mses. Victory and Velazquez-Diaz seek a permanent injunction governed by the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(1)(A). Our Court of Appeals instructs we "cannot 'grant or approve any prospective relief' unless [we] make the needs-narrowness-intrusiveness findings."[217] Section 3626(a)(1)(A) also requires us to "give substantial weight to any adverse impact on public safety or the operations of a criminal justice system caused by the relief."[218]

We first consider whether the terms of the injunction proposed by Mses. Victory and Velazquez-Diaz meet the needs-narrowness-intrusiveness requirements. We then give substantial weight to any adverse impact on public safety or the operations a criminal justice system caused by any considered relief.

### 1.    Prospective relief needs-narrowness-intrusiveness findings under 18 U.S.C. § 3626(a)(1)(A).

Mses. Victory and Velazquez-Diaz propose an injunction containing eight different terms.

The proposed terms address:

> 1. the adjudged constitutional violation regarding freedom of movement and access to privileges (terms (a) and (b));
>
> 2. the adjudged constitutional violation concerning visitation (term (c));
>
> 3. the adjudged constitutional violation regarding access to furloughs (terms (d) through (g)); and,
>
> 4. a reporting requirement for the Class to inspect constitutional compliance (term (h)).

We must make findings as to the needs-narrowness-intrusive for each term of the proposed injunction.

###### a. Proposed injunction terms as to freedom of movement and access to privileges.

The first two terms of the permanent injunction proposed by Mses. Victory and Velazquez-

Diaz request we order Berks County to:

> a.      Provide the same amount of time each day during which cell doors are unlocked and prisoners are permitted to access the dayroom for all Trusty women and men, unless there is a unit-wide lockdown or individual disciplinary action.[219]
>
> b.      Provide equal access to phones, microwaves, and showers to all Trusty women and men, allowing both Trusty women and men to access those amenities during all time periods when their cell doors are unlocked, unless there is a unit-wide lockdown or individual disciplinary action.[220]

Mses. Victory and Velazquez-Diaz make similar arguments for why these two proposed terms

meet the needs-narrowness-intrusiveness test, arguing the terms are: (1) necessary because our

October 17, 2019 Memorandum found unconstitutional differences in the amount of time male

Trusty inmates enjoyed out of their cell with access to privileges such as phones, microwaves, and

showers compared to female Trusty inmates; (2) narrowly drawn because they are limiting the

proposed term to the core unconstitutional findings; and, (3) the least intrusive means because the

terms do not order Berks County to do anything beyond what they already say they are doing in

its status reports. Berks County argues these terms are not the least intrusive means necessary

because they require identical treatment rather than substantially equivalent treatment.

As we explained throughout this litigation, Berks County does not need to treat male and

female Trusty inmates identically.[221] They must only treat similarly situated inmates substantially

equivalent (or, "in parity"), unless there is a constitutionally permissible reason for the unequal

treatment. To determine substantial equivalence, we are instructed to look to the totality of living

conditions. For example, Berks County Jail could treat male and female Trusty inmates in parity

even if men received more time out of their cells than women so long as women received a

47

corresponding benefit such as providing more time for programming which the Jail did not offer to men. It is not appropriate to conduct a side-by-side comparison of an inmates' confinement to determine compliance with the Equal Protection Clause. But we did observe if the Jail offers lopsided freedoms for one sex, there must be a strong corresponding benefit offered to other sex for us to find parity.[222] We found Berks County, which offered male Trusty inmates eighteen hours of time per day with an unlocked cell and access to a dayroom, phones, microwaves, and showers, did not offer any substantial corresponding benefits to female Trusty inmates who spent all but six hours in a locked cell in the Jail.[223] We found these differences in living conditions violated the Constitution as a matter of law.[224]

We must make needs-narrowness-intrusiveness findings based on the extensive record before us. In other words, we cannot be blind to the reality of living conditions at the Berks County Jail when making these findings. The Berks County Jail consists of—or at least formerly consisted of—two facilities: the Reentry Center and the Jail. The Reentry Center, as currently constructed, requires inmate cells to remain unlocked for eighteen hours because of communal bathrooms. The unlocked cells also enable inmates to access the dayroom, phones, microwaves, and showers. Male Trusty inmates, however, no longer reside in the Community Reentry Center. Both male and female inmates reside in the Jail. Male and female Trusty inmates living conditions in the Jail are very similar, at least according to Berks County's status report. Our parity calculation is based on a situation where male and female Trusty inmates are similarly housed.

Based on this context, we agree with Berks County the language in proposed terms (a) and (b) are overly intrusive and not necessary to correct the violation of the female Trusty inmates Federal rights. If we were to require the "same amount of time each day" or "equal access," we

48

would be ordering more than the Equal Protection Clause requires. We can only order substantial equivalence.

But we find if we replace "same amount of time each day" and "equal access" with "substantially equivalent," then the proposed terms meet the needs-narrowness-intrusiveness findings.[225] We find these terms necessary – female Trusty inmates submitted undisputed evidence they received significantly less freedom of movement and access to privileges than male Trusty inmates living in the Reentry Center. Enjoining Berks County from reimposing disparate treatment is necessary to correct the adjudged violation of female Trusty inmates' constitutional rights. The proposed terms are narrow; they are based on our findings in our October 17, 2019 Memorandum. They specifically identify conditions previously substantially unequal. The proposed terms are also minimally intrusive. The terms require the Berks County Jail to similarly schedule recreation time for male and female Trusty inmates. Berks County admits to already providing these terms to inmates, so it does not require novel safety or security studies or meetings. The proposed terms contemplate situations occurring in the Jail which would prevent the Jail from providing substantial equivalence—lockdowns or individual disciplinary action—because these circumstances (largely out of Berks County's control) could disproportionately affect recreation time of one sex.

Berks County's only specific objection to these proposed terms is language requiring identical treatment. We agree with this objection, but we find these proposed terms otherwise meet the Prison Litigation Reform Act's needs-narrowness-intrusiveness requirements. We enter prospective relief under 18 U.S.C. § 3626(a)(1)(A) on these proposed grounds, with slight modifications, in the accompanying Order.

### b. Proposed term regarding visitation.

Mses. Victory and Velazquez-Diaz's proposed third term of the permanent injunction reads

Berks County shall:

> c. Provide substantially equivalent visitation conditions for Trusty
> women and men including the length of visits, the frequency of visits, and
> the presence or absence of a physical barrier between prisoners and their
> visitors.[226]

Mses. Victory and Velazquez-Diaz argue this term meets the Prison Litigation Reform Act's
needs-narrowness-intrusiveness standard because: (1) it is necessary to correct the unconstitutional
differences in visitation conditions found as a matter of law in our October 17, 2019 Memorandum;
(2) it is narrowly drawn to address the findings we made in ruling visitation conditions violated
the rights of female Trusty inmates; and, (3) it is the least intrusive means because it does not order
Berks County to do anything beyond what they are already doing. Berks County responds arguing
this injunction addresses conditions of visitation, such as the "length of visits" and "frequency of
visits," not part of this litigation.

We again observe prospective relief must be "necessary to correct the violation of the
Federal right."[227] If the proposed term does not correct a violation, then we cannot enter
prospective relief under Section 3626(a)(1)(A). We agree with Berks County we cannot
prospectively order it to remedy a condition of visitation never deemed to be violative of a Federal
right. In our October 17, 2019 Memorandum finding visitation conditions violated the
Constitution as a matter of law, we cited male Trusty inmates received visits without glass
barrier.[228] We agree the Class did not raise, and we did not address, the "length of visits" and
"frequency of visits" in our October 17, 2019 Memorandum.

Otherwise omitting these conditions from the proposed term on visitation, we find the
proposed term meets the needs-narrowness-intrusiveness requirement required for entry of

prospective relief. The proposed term—mandating substantially equivalent visitation conditions—is necessary as a matter of law because of the adjudged violation of female Trusty inmates' constitutional rights. It is narrowly drawn. It only affects visitation conditions and specifically addresses physical barriers. It is the least intrusive means. Berks County states it is already offering substantially equivalent visitation conditions for male and female Trusty inmates. While we must omit the conditions "the length of visits" and "the frequency of visits," we find this term otherwise meets the needs-narrowness-intrusiveness findings of the Prison Litigation Reform Act and include the term in our accompanying Order.

### c. Proposed terms regarding access to furlough.

Mses. Victory and Velazquez-Diaz propose four terms addressing the unconstitutional access to furlough found by the jury during our November 2019 trial. The difficulty with determining the needs-narrowness-intrusiveness of these proposed terms is the jury decided the unconstitutionality of Berks County's access to furloughs. Of course, they did not issue specific findings as to why they reached this verdict. Nevertheless, we attempted to summarize the elicited facts during trial and determine whether the adduced evidence supports the proposed terms for the permanent injunction.

Mses. Victory and Velazquez-Diaz first propose Berks County shall:

d. Update the [Berks County Jail System] Inmate Handbook to reflect the current internal furlough policy, including a list of the eligibility requirements for each type of furlough.[229]

Mses. Victory and Velazquez-Diaz argue this term is: (1) necessary to correct a violation of federal rights regarding access to furloughs; (2) narrowly drawn because it is based on evidence presented at trial showing unequal information about furloughs; and, (3) minimally intrusive because Berks County is already revising the Inmate Handbook. Berks County argues this is not minimally intrusive because it requires Berks County to insert its furlough policy into the Inmate Handbook

51

so, if there is ever a change to furlough, it will need to change, reprint, and redistribute many copies of the Inmate Handbook. We agree with Berks County this term is overly intrusive and decline to compel Berks County to revise the Inmate Handbook in this way.

We do, however, accept Mses. Victory and Velazquez-Diaz's argument the evidence presented at trial showed male Trusty inmates received greater access to information about furlough than female Trusty inmates. We agree Berks County must be compelled to provide substantially equal information to both sexes. Berks County states in its status report:

> At the time that a male or female inmate is classified as a Trusty, they are advised of that classification by being provided a Review for Trusty Status Memorandum from Treatment Staff at [Berks County Jail System]. This memorandum includes notification of the following information:
>
> i. You are fully sentenced on all charges. If additional charges are brought against you, your classification status will be reviewed and adjusted accordingly.
>
> ii. You have been medically cleared to work and must accept any job assignment offered to you. If you are no longer medically cleared, your classification status will be reviewed and adjusted accordingly.
>
> iii. If recommended programming interferes with your job assignment, your program schedule takes priority.
>
> iv. You may also be eligible for work release and furloughs. You may sign up to speak with your unit counselor about these issues.
>
> v. Formal misconduct citations may result in the loss of Trusty Classification.[230]

We inspect whether this proposal meets the needs-narrowness-intrusiveness requirements to determine whether to compel Berks County to continue to follow this system. We find it is necessary to correct the violation of a Federal right. The evidence adduced at trial established female Trusty inmates received less information about rights once obtaining Trusty status than male Trusty inmates living in the Reentry Center. The term is narrowly drawn. It addresses the demonstrated imbalance by compelling Berks County provide each Trusty inmate with a uniform

Memorandum. It also minimally intrusive. We are mindful the adjudged constitutional violation stemmed from unequal *access* to furlough. We cannot compel Berks County to offer furlough to inmates. We can only compel Berks County, if it decides to continue to offer furlough, to provide both sexes similar information about privileges within the Jail. This system notifies Trusty inmates "they *may* also be eligible for work release and furloughs" and places the onus on the inmate to discuss those privileges with the unit counselor.[231] Even if Berks County changes or abolishes its furlough policy, the unit counselor can notify the Trusty inmate of this during the requested meeting. The uniform Memorandum requires limited resources. In the accompanying Order, we compel Berks County to continue this policy.[232]

Mses. Victory and Velazquez-Diaz next seek to compel Berks County to:

> e. Provide a completed Partial Confinement Reentry Order (i.e. furlough order) (except for the prisoner's and judge's signatures) to all male and female Trusty prisoners upon their attaining the Trusty classification and send the proposed furlough orders to the appropriate court or sentencing judge.[233]

Mses. Victory and Velazquez-Diaz argue this term is: (1) necessary because the jury found Berks County provided unequal access to furlough; (2) narrowly drawn because it is based on evidence at trial showing Berks County assisted male Trusty inmates complete the Reentry Order but did not similarly assist female Trusty inmates; (3) minimally intrusive because Berks County would only have to collect orders and submit to the correct sentencing judge for the judge's signature. Berks County argues this requirement is very intrusive. We agree with Berks County.

We find the minimally intrusive method of addressing this violation is again proposed in Berks County's status report stating: "As of November 11, 201[9], a [Partial Confinement Reentry Order] will be submitted to the sentencing judge on a case by case basis after a given [T]rusty inmate meets the criteria for and requests a home furlough."[234] This method is necessary to correct

the violation of female Trusty inmates Equal Protection rights to receive substantially equivalent treatment while in confinement. It is narrowly drawn because it only addresses trial evidence showing Berks County assisted male Trusty inmates to obtain a Partial Confinement Reentry Order and did not similarly assist female Trusty inmates. It requires Berks County to submit Reentry Orders on a "case by case basis," precluding Berks County from reimposing male-only orientations where inmates receive pre-filled Reentry Orders. It is minimally intrusive because all inmates, not the Jail, must initiate the process to obtain a home furlough. Male Trusty inmates are not favored under this new policy. In the accompanying Order, we compel Berks County to conform with this policy.

Mses. Victory and Velazquez also propose Berks County shall:

f.      Provide a written notice to all potential employers that contact [Berks County Jail System] to seek work release employees that [Berks County Jail System] has both male and female Trusty prisoners on work release who are available for employment.[235]

g.      Provide written notice, either individually or through public postings, to all male and female Trusty prisoners about all work release job opportunities that [Berks County Jail System] becomes aware of and meet [Berks County Jail System]'s requirements.[236]

Mses. Victory and Velazquez-Diaz argue these terms are: (1) necessary because the jury found Berks County provided unequal access to furlough; (2) narrowly drawn because of evidence demonstrating a work release job is a prerequisite for a furlough and Trusty men were given more information about potential job opportunities than Trusty women; and, (3) minimally intrusive because it does not require Berks County do anything more than they are already doing. Berks County responds these policies are not necessary because the evidence adduced at trial showed Berks County already did both of these things before this litigation. We agree with Berks County. The purpose of the injunction is to compel Berks County to remedy previously unconstitutional

54

conditions of confinement, not to compel Berks County to continue policies treating the sexes

substantially equivalent. We decline to enter either terms in the accompanying Order.

### d.    Proposed term regarding written notice.

The eighth proposed term in Mses. Victory and Velazquez-Diaz's request states:

> h.    File written status reports with the Court once every six months
> for two years, updating the Court and Class Members on the treatment of
> Trusty men and Trusty women in [Berks County Jail System] with respect
> to freedom of mobility, access to privileges, visitation conditions, and
> access to furloughs (including the number of men and women who have
> been approved for furloughs).[237]

Mses. Victory and Velazquez-Diaz do not support this proposed term with the needs-narrowness-

intrusiveness in their briefing. Berks County argues this term does not correct the violation of a

Federal right and is not narrowly drawn because it requires Berks County inform us of continued

compliance.

We agree with Berks County. This reporting requirement does not directly remedy any of

the adjudged constitutional violations. It is not necessary. It is also intrusive as it mandates Berks

County keep track of approval for each Trusty inmate. The ordered injunction allows the Trusty

inmate to pursue a furlough after receiving substantially equivalent information. We decline to

order Berks County to comply with this intrusive requirement.

> **2.    Giving substantial weight to adverse impacts on public safety and the
> operation of the Berks County criminal justice system caused by the
> relief, we enter a permanent injunction under 18 U.S.C. §
> 3626(a)(1)(A).**

As addressed above, we find the following injunction meets the needs-narrowness-

intrusiveness requirements to enter prospective relief under the Prison Litigation Reform Act:

> Berks County and each Defendant shall:
>
> a.    Provide a substantially equivalent amount of time each day
> during which cell doors are unlocked and prisoners are permitted to access

the dayroom for all Trusty women and men, unless there is a unit-wide lockdown or individual disciplinary action;

b. Provide substantially equivalent access to phones, microwaves, and showers to all Trusty women and men, if allowing both Trusty women and men to access those amenities during time periods when their cell doors are unlocked or during indoor recreation periods, unless there is a unit-wide lockdown or individual disciplinary action;

c. Provide substantially equivalent visitation conditions for Trusty women and men including the presence or absence of a physical barrier between prisoners and their visitors;

d. Notify a female or male Trusty inmate, at the time that a male or female inmate is classified as a Trusty, of that classification by providing a Review for Trusty Status Memorandum from Berks County Jail System Treatment Staff. This memorandum shall at least notify the inmate of the following:

i. You are fully sentenced on all charges. If additional charges are brought against you, your classification status will be reviewed and adjusted accordingly.

ii. You have been medically cleared to work and must accept any job assignment offered to you. If you are no longer medically cleared, your classification status will be reviewed and adjusted accordingly.

iii. If recommended programming interferes with your job assignment, your program schedule takes priority.

iv. You may also be eligible for work release and furloughs. You may sign up to speak with your unit counselor about these programs.

v. Formal misconduct citations may result in the loss of Trusty Classification.

e. For as long as Berks County continues to offer Trusty inmates eligibility for a home furlough, submit a Partial Confinement Reentry Order to a Trusty inmates' sentencing judge on a case by case basis after a given Trusty inmate meets the criteria for and requests a home furlough.

But we cannot enter this permanent injunction until we "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."[238]

Today's Order poses no adverse impact on public safety or the operation of Berks County's criminal justice system. In this injunction, we do not order Berks County to adopt a policy which it has significant public safety concerns, such as the expressed concerns with moving female Trusty inmates into the Reentry Center or repurposing the Jail's quarantine unit into a female Trusty housing unit. Throughout the litigation, Berks County argued the Jail is the most secure facility for female Trusty inmates. It now also houses male Trusty inmates in the Jail under similar conditions and is compelled to continue to offer substantially equivalent freedoms. Berks County does not alert us to safety concerns—i.e., overcrowding—with the new policies. The ordered furlough requirements are all based on Berks County's status report. Berks County expressed no security concerns with these already enacted policies. We also do not see significant adverse impact on the operation of the Berks County Jail.

We only compel Berks County to follow policies already in place. These policies, while potentially offering less freedoms to certain inmates than before this litigation began, do not adversely impact the operation of Berks County's criminal justice system.

## E.     We deny the request of Mses. Victory and Velazquez for a declaratory judgment.

Mses. Victory and Velazquez-Diaz seek a declaratory judgment to discourage Berks County from reenacting similarly discriminatory practices relating to freedom of mobility, access to privileges and furlough, and visitation conditions. Berks County argues we should not enter a declaratory judgment because declaratory relief is prospective in nature and our declaration would be based on past prison conditions already found (by this Court or by a jury) to violate the Constitution.

Our Court of Appeals instructs because "a declaratory judgment is to declare the rights of litigants, it is 'by definition prospective in nature.'"[239] A declaratory judgment "does not serve a

57

purpose where the complained-of situation has changed."[240] We agree with Berks County. We do not see why we would issue a declaratory judgment stating past prison conditions violate the Constitution when we, and a jury, held the conditions violated the Constitution as a matter of law. Mses. Victory and Velazquez-Diaz do not explain why our October 17, 2019 Memorandum or the jury's November 14, 2019 verdict do not sufficiently declare the rights of female Trusty inmates. We deny the request for declaratory judgment.

# IV. Conclusion

Despite Berks County reporting significant changes in the manner in which it houses male Trusty inmates, Mses. Victory and Velazquez-Diaz are concerned, after over a year of contentious litigation, Berks County will resume deemed unconstitutional policies treating male Trusty inmates more favorably unless we enter a permanent injunction against the County. We consider whether the significant changes mooted Mses. Victory and Velazquez-Diaz's claim for a permanent injunction under the Prison Litigation Reform Act and traditional principles of equity. We find the Prison Litigation Reform Act does not require an active or ongoing constitutional violation to enter prospective relief, and we rule the claim is live under traditional principles of equity because of a reasonable probability of recurrence. We find Mses. Victory and Velazquez-Diaz meet the four traditional requirements of a permanent injunction. We considered whether their requested injunction meets the needs-narrowness-intrusive requirements of entering prospective relief under the Prison Litigation Reform Act and hold certain proposed terms, with slight modifications, meet the needs-narrowness-intrusive requirements while others did not. We weighed whether terms meeting the needs-narrowness-intrusive requirements place any adverse impact on Berks County's public safety or the operations of its criminal justice system and find none. We deny Mses. Victory and Velazquez-Diaz's request for a declaratory judgment as our

October 17, 2019 Memorandum and the jury's November 14, 2019 verdict already declare female Trusty inmates rights as matter of law. In the accompanying Order, we enter a permanent injunction against Berks County.

---

[1] ECF Doc. No. 134 at ¶ 43 (citing Pl.'s Prelim. Inj. Hrg. Ex. 2).

[2] Pl.'s Prelim. Inj. Hrg. Ex. 2 (explaining "The Berks County Community Reentry Center is dedicated to improving the quality of our community by delivering effective and innovative inmate services that instill pro-social behavior, healthy life choices, and personal accountability, thereby reducing recidivism and its financial burden on the county" and stating the vision is to "deliver superior services with the highest level of integrity and professionalism thereby making a measurable difference in the lives of our clients, thereby positively affecting the well-being and safety of our community.").

[3] ECF Doc. No. 38 at ¶ 35. Berks County Jail System has a classification system assigning all prisoners, regardless of sex, to one of five custody levels: Administrative Segregation, Maximum, Medium, Minimum, and Trusty. ECF Doc. No. 329 at p. 27-28:24-4.

[4] ECF Doc. No. 247 at p. 5.

[5] *Id.* at pp. 3-4.

[6] ECF Doc. No. 38 at ¶¶ 3-7; ECF Doc. No. 329 at p. 27:19-21.

[7] *Id.*

[8] We refer to the collective defendants as "Berks County" in this Memorandum.

[9] ECF Doc. No. 1 at ¶ 1.

[10] ECF Doc. No. 9.

[11] ECF Doc. No. 13 at pp. 6-8.

[12] ECF Doc. No. 21 at pp. 4-10. Berks County explained "[t]he resources needed to house Plaintiff in the [Reentry Center] include personnel resources of the jail, not just the financial ability of the jail to modify or build a new facility. [Berks County] is required by law to have at least one female correctional officer working in any facility that houses female inmates. Granting the injunction requested by [Ms. Victory] would require [Berks County] to have female correctional officers at

59

the [Reentry Center] twenty-four hours a day, seven days a week. [Berks County] is currently understaffed with female correctional officers." *Id.* at p. 10.

[13] ECF Doc. No. 40.

[14] ECF Doc. No. 221-2 (J.A. 0485) at p. 311:7-12.

[15] ECF Doc. No. 221-2 (J.A. 0486) at p. 314:10-14 (arguing "the reality is that they are both confined within a space. And they both have opportunities within a space. And they both have opportunities to be out of that space. They both take advantage of the opportunities to be out of that space.").

[16] *Id.* (J.A. 0486) at p. 315:12-14 ("The objective is to ensure the separation of the male population and the female population.").

[17] ECF Doc. No. 39 at ¶ 1.

[18] ECF Doc. No. 47.

[19] ECF Doc. No. 64.

[20] *Id.* at p. 2.

[21] *Id.* Warden Quigley further swore "[i]f [Ms.] Victory expresses an interest in attending a rehabilitative program that is offered at the Community Reentry Center, she should be directed to the F Unit counselor who shall arrange for delivery of the program to [Ms.] Victory." *Id.*

[22] *Id.*

[23] ECF Doc. No. 63.

[24] ECF Doc. No. 92.

[25] ECF Docs. No. 108, 109.

[26] ECF Doc. No. 114.

[27] *Id.*

[28] *Id.*

[29] ECF Doc. No. 115.

[30] ECF Doc. No. 123 at p. 6.

[31] ECF Doc. No. 131; ECF Doc. No. 165 (Transcript of Hearing).

[32] ECF Doc. No. 135.

[33] *Id.* at p. 1.

[34] *Id.* at ¶ 1.

[35] In a May 28, 2019 Order, we granted an extension allowing Warden Quigley and Berks County to file a plan by June 4, 2019. ECF Doc. No. 140.

[36] ECF Docs. No. 137, 142.

[37] ECF Docs. No. 144, 145.

[38] ECF Doc. No. 146 at p. 11.

[39] *Id.* at pp. 12-15.

[40] ECF Doc. No. 150 at ¶ 4.

[41] ECF Doc. No. 157 at ¶ 11.

[42] *Victory v. Berks County*, No. 19-2193 (3d Cir. Jun. 4, 2019).

[43] ECF Doc. No. 152.

[44] ECF Doc. No. 157.

[45] ECF Doc. No. 160, Ex. A.

[46] ECF Doc. No. 175.

[47] ECF Doc. No. 178 at ¶ 4.

[48] *Id.*

[49] *Id.* at ¶ 9.

[50] *Id.* at pp. 13-24.

[51] ECF Doc. No. 187.

[52] *Id.*

[53] ECF Doc. No. 189.

[54] ECF Doc. No. 188.

[55] *Id.* at ¶ 5.

[56] *See* ECF Doc. No. 204 at pp. 13-15:21-12.

[57] ECF Doc. No. 204 at pp. 41-58.

[58] ECF Doc. No. 191.

[59] ECF Doc. No. 193 at ¶ 1(a).

[60] ECF Doc. No. 196 at ¶ 3.

[61] ECF Doc. No. 199.

[62] ECF Doc. No. 207 at p. 4.

[63] ECF Doc. No. 210.

[64] ECF Doc. No. 213.

[65] ECF Docs. No. 222, 225.

[66] ECF Doc. No. 222 at p. 16.

[67]*Victory v. Berks County*, Nos. 19-1329, 19-2193, 19-2648, 19-2695, 2019 WL 5095755 (3d Cir. Oct. 11, 2019) ("Preliminary injunctive relief automatically expires '90 days after its entry, unless the court makes the findings required under subsection (a)(1) . . . and makes the order final . . . .'") (quoting 18 U.S.C. § 3626(a)(2)). Because no party ever moved for a final order under 18 U.S.C. § 3626(a)(2), the relief expired ninety days after entry.

[68] *Id.* at *4.

[69] *Id.*

[70] *Victory v. Berks County*, No. 19-3060 (3d Cir. Oct. 24, 2019).

[71] ECF Doc. No. 246.

[72] ECF Doc. No. 247.

[73] *Id.*

[74] ECF Doc. No. 297.

[75] ECF Doc. No. 307.

62

[76] *Id.*

[77] Community Reentry Center Orientation PowerPoint Presentation, Trial Ex. 82.

[78] *Id.*; ECF Doc. No. 330 at p. 12:19-22 (N.T. J. Brown) (agreeing "to be eligible for a work release job, an inmate would have to have what is known as Trusty status"); *id.* at p. 17:7-9 (N.T. J. Brown) (agreeing "furloughs . . . are allowed for inmates successfully participating in treatment programs").

[79] *Id.* at p. 12:14-18 (N.T. J. Brown) (agreeing "work release just means that the inmate is released from the Berks County Jail into the community to work that job and then comes back at the end of the shift").

[80] Community Reentry Center Orientation PowerPoint Presentation, Trial Ex. 82.

[81] ECF Doc. No. 330 at p. 42-43:22-24 (N.T. J. Heckman).

[82] *Id.* at p. 30-31:20-5 (N.T. J. Brown).

[83] ECF Doc. No. 329 at p. 34:17-21 (N.T. J. Heckman); ECF Doc. No. 330 at p. 126:8-10 (N.T. S. Smith) (observing "[s]he was not on work release, so she would not qualify for any furlough to go home.").

[84] *Id.* at p. 34:17-21 (N.T. J. Heckman).

[85] Partial Confinement Reentry Order, Trial Ex. 33. The Partial Confinement Reentry Order stated the "purpose of furlough" is "work release, self-employment, seeking employment, attending an educational institute, vo[cational] tech[nical] training, securing medical treatment, or other appropriate purposes." ECF Doc. No. 329 at p. 33:9-11 (N.T. J. Heckman).

[86] Partial Confinement Reentry Order, Trial Ex. 33.

[87] ECF Doc. No. 329 at p. 31:23-25 (N.T. J. Heckman).

[88] ECF Doc. No. 330 at p. 65:17-21 (N.T. J. Brown).

[89] ECF Doc. No. 329 at p. 31-32:23-12 (N.T. J. Heckman).

[90] ECF Doc. No. 330 at p. 110:10-13 (N.T. S. Smith); ECF Doc. No. 329 at p. 33:21-24 (N.T. J. Heckman) (testifying, during his orientation as a male Trusty inmate in the Reentry Center, he received a Partial Confinement Reentry Order with "[his] sentence on it, the judge that sentenced [his], [his] minimum date, [his] maximum date, [his] name, the docket number, and [his Berks Jail System] number" to sign and submit to his sentencing judge).

[91] ECF Doc. No. 330 at pp. 66-67:7-2 (N.T. J. Brown).

[92] *Id.* at pp. 66-67:7-2 (N.T. J. Brown). Coordinator Brown testified it was the inmates's responsibility to know his or her eligibility date for taking a furlough.

[93] *Id.* at p. 66:1-6 (N.T. J. Brown).

[94] ECF Doc. No. 329 at p. 85:2-21 (N.T. T. Victory).

[95] ECF Doc. No. 330 at p. 8:15-18 (N.T. J. Brown). For example, Coordinator Brown testified it was her "job as Work Release Coordinator [to] make sure" the sentencing judge signed an order allowing the inmate to take work release. *Id.* at pp. 15-16:22-5 (N.T. J. Brown).

[96] *Id.* at p. 10:20-25 (N.T. J. Brown).

[97] *Id.* at p. 10:20-25 (N.T. J. Brown).

[98] *Id.* at p. 53:19-21 (N.T. J. Brown).

[99] *Id.* at p. 53:21-22 (N.T. J. Brown).

[100] *Id.* at pp. 53-54:21-2 (N.T. J. Brown).

[101] *Id.* at p. 51:12-14 (N.T. J. Brown).

[102] ECF Doc. No. 329 at p. 36:18-19 (N.T. J. Heckman).

[103] ECF Doc. No. 321.

[104] *Id.*

[105] ECF Doc. No. 331 at p. 77:8-24 (N.T. T. Victory).

[106] *Id.* at p. 82:12-23 (N.T. T. Victory).

[107] *Id.* at p. 164:17-20 (N.T. T. Victory).

[108] *Id.* at pp. 185-192:7-16 (N.T. J. Eckroth).

[109] ECF Doc. No. 332 at pp. 21-22:5-7 (N.T. M. Castro).

[110] ECF Doc. No. 323.

[111] ECF Doc. No. 327.

[112] ECF Doc. No. 332 at p. 107:9-16 (N.T. J. Quigley).

[113] *Id.* at pp. 105-06:25-2 (N.T. J. Quigley).

[114] *Id.* at p. 105:21-22 (N.T. J. Quigley).

[115] *Id.* at p. 119:16-17 (N.T. J. Quigley).

[116] *Id.* at p. 112:15-19 (N.T. J. Quigley).

[117] *Id.* at p. 121:1-4 (N.T. J. Quigley).

[118] *Id.* at pp. 115-16:25-14 (N.T. J. Quigley).

[119] *Id.* at p. 143:4-8.

[120] *Id.* at pp. 143-44:25-14.

[121] ECF Doc. No. 325.

[122] ECF Doc. No. 328 (first status report); ECF Doc. No. 333 (supplemental status report).

[123] ECF Doc. No. 328.

[124] *Id.*

[125] *Id.* One of the eleven female Trusty inmates refused to sign the Order. *Id.*

[126] *Id.*

[127] *Id.* The Trusty Status Memorandum notifies Trusty inmates they: (1) are fully sentenced on all charges; (2) have been medically cleared to work and must accept any job assignment; (3) must attend programming even if it interferes with job assignment; (4) may be eligible for work release and furlough and "may sign up to speak with [the] unit counselor about these issues;" and, (5) may lose Trusty status if they receive a misconduct citation.

[128] *Id.*

[129] ECF Doc. No. 333.

[130] ECF Doc. No. 334.

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] *Id.*

[135] *Id.*

[136] *Id.*

[137] *Id.*

[138] *Id.*

[139] ECF Doc. No. 334-2, Ex. B.

[140] *Id.*

[141] ECF Doc. No. 334-2, Ex. C.

[142] *Id.*

[143] *Id.*

[144] *Id.*

[145] *Id.*

[146] *Id.*

[147] *Id.*

[148] ECF Doc. No. 334-1, Ex. A.

[149] ECF Doc. No. 337.

[150] Mses. Victory and Velazquez-Diaz are no longer in Berks County custody but seek a permanent injunction as representatives of the Class of female Trusty inmates. We refer to the Class by naming the class representatives Mses. Victory and Velazquez-Diaz.

[151] 18 U.S.C. § 3626(a)(1)(A).

[152] *Id.* § 3626(g)(7).

[153] *Id.* § 3626(b)(1)(A), (b)(3) (emphasis added).

[154] *Id.* § 3626 (b)(2).

[155] *Hallett v. Morgan*, 296 F.3d 732 (9th Cir. 2002).

[156] *Id.* at 743.

[157] *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019).

[158] *Thomas v. Bryant*, 614 F.3d 1288, 1319-20 (11th Cir. 2010). The Court of Appeals for the Eleventh Circuit noted a "previous[] [Eleventh Circuit decision] recognized that the 'current and ongoing' requirement is distinct from the standard governing the initial entry of injunctive relief." *Id.* at 1320 (quoting *Cason v. Seckinger*, 231 F.3d 777, 784 (11th Cir. 2000)). The Eleventh Circuit explained "there is no indication in the [Prison Litigation Reform Act], its legislative history, or the case law to suggest that the 'current and ongoing' requirement was intended by Congress to amend the well-established law that injunctive relief is available in the first instance 'to prevent a substantial risk of serious injury from ripening into actual harm,' i.e., to prevent future harm." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 845 (1994)). The Court of Appeals for the Sixth Circuit also shares the view "the 'current and ongoing' language comes from § 3626(b)(3), governing the *termination* of relief, not from § 3626(a), governing requirements for initial relief." *Austin v. Wilkinson*, 372 F.3d 346, 360 (6th Cir. 2004), *aff'd in part, rev'd in part and remanded on other grounds*, 545 U.S. 209 (2005).

[159] *Porter*, 923 F.3d at 348 (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)).

[160] *Id.*

[161] *Id.* (quoting *Miller v. French* 530 U.S. 327, 340 (2000)).

[162] *Id.* at 374 (Niemeyer, J., dissenting).

[163] *Id.* (quoting *Miller*, 530 U.S. at 331).

[164] 18 U.S.C. § 3626(b)(3).

[165] *See* 141 Cong. Rec. S14408-01, 141 Cong. Rec. S14408-01, S14413, 1995 WL 568915. Then-Senate Majority Leader Bob Dole stated "this legislation is a new and improved version of S. 866, which I introduced earlier this year to address the alarming explosion in the number of frivolous lawsuits filed by State and Federal prisoners. It also builds on the stop-turning-out-prisoners legislation, championed by Senators Kay Bailey Hutchinson and Spencer Abraham, by making it much more difficult for Federal judges to issue orders directing the release of convicted criminals from prison custody." *Id.* Senator Abraham's remarks illustrate the concerns of judicial involvement in court-ordered remedies in prison conditions cases:

> Under a series of judicial decrees resulting from Justice Department suits against the Michigan Department of Corrections, the Federal courts now monitor our State prisons to determine[:]
> First, how warm the food is; second, how bright the lights are; third, whether there are electrical outlets in each cell; fourth, whether windows are inspected and up to code; fifth, whether prisoners' hair is cut only by licensed barbers; and sixth, and whether air and water temperatures are comfortable.

> This would be bad enough if a court had ever found that Michigan's prison system was at some point in violation of the Constitution, or if conditions there had been inhumane. But that is not the case.
>
> To the contrary, nearly all of Michigan's facilities are fully accredited by the American Corrections Association. We have what may be the most extensive training program in the Nation for corrections officers. Our rate of prison violence is among the lowest of any State. And we spend an average of $4,000 a year per prisoner for health care, including nearly $1,700 for mental health services.
>
> Rather, the judicial intervention is the result of a consent decree that Michigan entered into in 1982-13 years ago-that was supposed to end a lawsuit filed at the same time. Instead, the decree has been a source of continuous litigation and intervention by the court into the minutia of prison operations.

*Id.* Senator Abraham later stated: "Our bill forbids courts from entering orders for prospective relief (such as regulating food temperatures) unless the order is necessary to correct violations of individual plaintiffs' Federal rights. It also requires that the relief be narrowly drawn and be the least intrusive means of protecting the Federal rights. And it directs courts to give substantial weight to any adverse impact on public safety or the operation of the criminal justice system caused by the relief." Senator Abraham concluded: "This is a balanced bill that *allows the courts to step in where they are needed*, but puts an end to unnecessary judicial intervention and micromanagement." *Id.* (emphasis added).

[166] *Hallett v. Morgan*, 296 F.3d 732, 743 (9th Cir. 2002).

[167] *See* 141 Cong. Rec. S14408-01, 141 Cong. Rec. S14408-01, S14413, 1995 WL 568915 (Senator Abraham noting the bill "allows the courts to step in where they are needed").

[168] U.S. Const. Art. III § 2.

[169] *DeJohn v. Temple Univ.*, 537 F.3d 301, 309 (3d Cir. 2008) (quoting *United States v. Gov't of Virgin Islands*, 363 F.3d 276, 285 (3d Cir. 2004)).

[170] *Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 216 (3d Cir. 2003) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).

[171] *Id.*

[172] *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953).

[173] *DeJohn*, 537 F.3d at 309 (quoting *Los Angeles County v. Davis*, 440 U.S. 625 (1979)) (internal citations omitted).

[174] *Id.*

[175] *Id.* at 309 (quoting *United States v. Gov't of Virgin Islands*, 363 F.3d 276, 285 (3d Cir. 2004)).

[176] *Id.*

[177] *Id.* at 308.

[178] *Id.* at 309.

[179] *Id.*

[180] *Id.* Just five months after *DeJohn*, in *Burns v. Pennsylvania Department of Corrections*, our Court of Appeals again looked to "the timing and content" of a change explaining there the "[Defendant] Department of Corrections' assurances were provided exceedingly late in the game." *Burns v. Pennsylvania Dept. of Corr.*, 544 F.3d 279, 284 (3d Cir. 2008).

[181] ECF Doc. No. 39 at ¶ 1.

[182] ECF Doc. No. 135 ¶ 1.

[183] ECF Doc. No. 178 at ¶ 4.

[184] ECF Doc. No. 204 at pp. 13:21-23.

[185] ECF Doc. No. 247.

[186] ECF Doc. No. 307.

[187] ECF Doc. No. 309.

[188] ECF Doc. No. 150 at ¶ 4.

[189] ECF Doc. No. 337 at p. 6.

[190] *Id.* (arguing "[d]efendants' need for its policy, safety and security restrictions based on limited staffing, is equally served under the current housing situation.").

[191] *DeJohn v. Temple Univ.*, 537 F.3d 301, 309 (3d Cir. 2008) (quoting *United States v. Gov't of Virgin Islands*, 363 F.3d 276, 285 (3d Cir. 2004)).

[192] *Jews for Jesus, Inc. v. Hillsborough County Aviation Auth.*, 162 F.3d 627 (11th Cir. 1998).

[193] ECF Doc. No. 337 at p. 6.

[194] ECF Doc. No. 334-2, Ex. B.

[195] ECF Doc. No. 334-3, Ex. C.

[196] *See id.*

[197] *See id.*

[198] *Roman v. Fed. Bureau of Prisons*, No. 15-2247, 2016 U.S. Dist. LEXIS 135434, at *33 (E.D. Pa. Sept. 30, 2016) (quoting *Marcavage v. Nat'l Park Serv.*, 666 F.3d 856, 861 (3d Cir. 2012)).

[199] *Rich v. Florida Dep't of Corr.*, 716 F.3d 525, 531-32 (11th Cir. 2013).

[200] *Id.*

[201] *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014).

[202] *Id.* at 971-72; *see also Bell v. City of Boise*, 709 F.3d 890, 898-900 (9th Cir. 2013).

[203] *Rich*, 716 F.3d at 531-32.

[204] *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009); *Beta Upsilon Chi Chapter of the Univ. of Florida v. Machen*, 586 F.3d 908, 916-17 (11th Cir. 2009).

[205] *See* ECF Doc. No. 307.

[206] ECF Doc. No. 334-1, Ex. A.

[207] ECF Doc. No. 332 at p. 119:16-17 (N.T. J. Quigley).

[208] ECF Doc. No. 337 at p. 14 (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989)). Berks County points to our Court of Appeals decision in *Viropharma* to argue Mses. Victory and Velazquez-Diaz must show injunctive relief is necessary. *See* ECF Doc. No. 337 at p. 9 (citing *F.T.C. v. Shire Viropharma, Inc.*, 917 F.3d 147, 156-57 (3d Cir. 2019)). Chief Judge Smith observed in *Viropharma*: "Although injunctive relief can survive discontinuance of the illegal conduct, 'the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.'" *Shire Viropharma*, 917 F.3d at 156-57 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). Finding a cognizable danger of recurrence in our mootness analysis, we also assess whether Mses. Victory's and Velazquez-Diaz's proposed injunction is "necessary" to correct the violation of a Federal right, *see* 18 U.S.C. § 3626(a)(1)(A), and whether Mses. Victory and Velazquez-Diaz show irreparable harm. For reasons stated in these analyses, we find Mses. Victory and Velazquez-Diaz meet their burden of showing the prospective relief is necessary.

[209] *Coffelt v. Fawkes*, 765 F.3d 197, 201 (3d Cir. 2014) (quoting *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001)).

[210] *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982)).

²¹¹ *Beattie v. Line Mountain Sch. Dist.*, 992 F. Supp. 2d 384, 396 (M.D. Pa. 2014).

²¹² ECF Doc. No. 225-1 at p. 24 (citing *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 660 F.3d 374, 388-89 (3d Cir. 2012)) ("[T]he State does not have an interest in the enforcement of an unconstitutional law[.]").

²¹³ ECF Doc. No. 337 at p. 15.

²¹⁴ *Id.*

²¹⁵ ECF Doc. No. 225-1 at p. 24 (citing *Council of Alt. Political Parties v. Hooks*, 121 F.3d 876, 883–84 (3d Cir. 1997)) ("In the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights, . . .").

²¹⁶ ECF Doc. No. 337 at p. 16.

²¹⁷ *Victory v. Berks County*, No. 19-1329, 2019 WL 5095755, at *3 (3d Cir. Oct. 11, 2019) (quoting 18 U.S.C. § 3626(a)(1)(A). Our Court of Appeals noted: "Our sister circuits have held that, at a minimum, a district court's findings must be 'sufficient to allow a clear understanding of the ruling.'" *Id.* at *4 (quoting *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010)).

²¹⁸ 18 U.S.C. § 3626(a)(1)(A).

²¹⁹ ECF Doc. No. 334 at p. 15 ¶ (a).

²²⁰ *Id.* at p. 15 ¶ (b).

²²¹ *See, e.g.*, ECF Doc. No. 247 at p. 15.

²²² *Id.* at pp. 15-17.

²²³ *Id.* at pp. 13-24.

²²⁴ *Id.*

²²⁵ We also must modify the phrasing to proposed term (b). As written, the term requires Berks County to allow Trusty inmates to access the dayroom, telephones, showers and microwaves during any time period whenever cells are unlocked. But Berks County states Trusty inmates "have access to the dayroom which includes telephones, showers, microwaves, and television" during indoor recreation periods but not during outdoor recreation periods. ECF Doc. No. 328. We must alter the wording slightly so as to not require Berks County to provide access to the dayroom during outdoor recreation periods (out of an abundance of caution that cells are unlocked during this period).

²²⁶ ECF Doc. No. 334 at p. 16 ¶ (c).

[227] 18 U.S.C. § 3626(a)(1)(A).

[228] ECF Doc. No. 247 at p. 17.

[229] ECF Doc. No. 334 at p. 16 ¶ (d).

[230] ECF Doc. No. 328 at p. 3.

[231] *Id.* (emphasis added).

[232] We change the word "issues"—as proposed by Berks County—to the word "program" because we feel it more accurately describes what Berks County seeks to accomplish through offering Trusty inmates eligibility for work release and furlough.

[233] ECF Doc. No. 334 at p. 16 ¶ (e).

[234] ECF Doc. No. 328 at p. 3.

[235] ECF Doc. No. 334 at p. 16 ¶ (f).

[236] ECF Doc. No. 334 at p. 16 ¶ (g).

[237] ECF Doc. No. 334 at p. 16 ¶ (h).

[238] 18 U.S.C. § 3626(a)(1)(A).

[239] *Sherard v. Berks County*, 576 F. App'x 66, 69-70 (3d Cir. 2014) (quoting *CMR D.N. Corp. & Marina Towers Ltd. v. City of Phila.,* 703 F.3d 612, 628 (3d Cir. 2013)).

[240] *Id.*